SONNENSCHEIN NATH & ROSENTHAL LLP
Peter D. Wolfson
Jo Christine Reed
Michael Carney
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

*Proposed Counsel for the Debtors
and Debtors in Possessio*n

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------- x
In re                                                           :
                                                                :         Chapter 11
YOUNG BROADCASTING INC., et al.,                                :
                                                                :         Case No. 09-10645 (AJG)
                                   Debtors.¹                     :
                                                                :
-------------------------------------------------------------- x         (Joint Administration Requested)
```

**MOTION OF THE DEBTORS PURSUANT TO BANKRUPTCY CODE
SECTIONS 105(a), 363(b), 507(a), 1107 AND 1108 FOR AUTHORITY
TO PAY PRE-PETITION AND POST-PETITION EMPLOYEE
COMPENSATION, BENEFITS, REIMBURSABLE BUSINESS EXPENSES,
AND OTHER OBLIGATIONS AND RELATED ADMINISTRATIVE COSTS**

Young Broadcasting Inc. ("Young") and certain of its direct and indirect subsidiaries

(collectively with Young, the "Debtors," and each individually, a "Debtor"), hereby move for

entry of interim and final orders pursuant to Sections 105(a), 363(b), 507(a), 1107 and 1108 of

Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy

---

[1]   Young's direct and indirect subsidiaries that are debtors in these cases include Young Broadcasting of Lansing,
Inc., Young Broadcasting of Louisiana, Inc.; Young Broadcasting of Nashville, LLC; Young Broadcasting of
Albany, Inc.; Young Broadcasting of Richmond, Inc.; Young Broadcasting of Knoxville, Inc.; Young
Broadcasting of Green Bay, Inc.; Young Broadcasting of Davenport, Inc.; Young Broadcasting of Sioux Falls,
Inc.; Young Broadcasting of Rapid City, Inc.; Young Broadcasting of San Francisco, Inc.; Young Broadcasting
of Nashville, Inc.; Young Broadcasting of Los Angeles, Inc.; Young Broadcasting Shared Services, Inc.; Adam
Young Inc.; WKRN, G.P.; WATE, G.P.; KLFY, L.P.; YBT, Inc.; YBK, Inc.; LAT, Inc.; Winnebago Television
Corporation; Fidelity Television, Inc.; and Honey Bucket Films, Inc.

Code"), and Rule 6003 of Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing, but not requiring (i) the Debtors to (a) pay certain pre-petition and post-petition wages, salaries, commissions, bonuses, other compensation, reimbursable employee expenses, and payroll taxes, and (b) honor employee benefits, and (ii) authorize financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing. In support of the Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      This Court has subject matter jurisdiction to consider this motion (the "Motion") under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and may be determined by the Bankruptcy Court. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

3.      Contemporaneously with the filing of this pleading, the Debtors have filed a motion with this Court pursuant to Rule 1015 of the Bankruptcy Rules seeking joint administration of their cases.

4.      No creditors' committee has been appointed in these cases, and no request for the appointment of a trustee or examiner has been made.

5.      Young, incorporated in 1986, is one of the largest television broadcast station groups in the country. The Debtors own and operate ten television stations in geographically

diverse markets as well as the national television representation firm, Adam Young, Inc. The television stations include (i) WKRN - an ABC network affiliate located in Nashville, Tennessee; (ii) WTEN - an ABC network affiliate located in Albany, New York; (iii) WATE - an ABC network affiliate located in Knoxville, Tennessee; (iv) WRIC - an ABC network affiliate located in Richmond, Virginia; (v) WBAY - an ABC network affiliate located in Green Bay, Wisconsin; (vi) KWQC - an NBC network affiliate located in the Quad Cities; (vii) WLNS - a CBS network affiliate located in Lansing, Michigan; (viii) KELO - a CBS network affiliate located in Sioux Falls, South Dakota; (ix) KLFY - a CBS network affiliate located in Lafayette, Louisiana; and (x) KRON - a MyNetworkTV network affiliate located in San Francisco, California.

6.      In addition to the primary stations, the Company operates satellite stations that rebroadcast programming from primary stations.  Specifically, satellite stations KCLO, KPLO and KDLO rebroadcast programming transmitted from the Sioux Falls station, KELO. Similarly, the WCDC satellite station rebroadcasts programming from the WTEN station.

7.      The Debtors' television broadcasting stations reach over 6% of the total U.S. television households and are "#1" in news in a majority of their geographical markets.  In addition to focusing on local news, the Debtors' stations emphasize local sports programming and community affairs.

8.      A more detailed description of the Debtors' businesses, organizational structure, capital structure and the events leading to the filing of these Chapter 11 cases is set forth in the Declaration of James A. Morgan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the Southern District of New York (the "Morgan Declaration").

**Relief Requested**

9.        Pursuant to Sections 105(a), 363(b), 507(a), 1107, and 1108 of the Bankruptcy

Code, the Debtors seek to be authorized, but not required, to (i) pay, in their sole discretion, all

pre-petition and post-petition obligations incurred under or related to Compensation Obligations,

Independent Contractor Obligations, Vacation Obligations, Reimbursement Obligations, Union

Obligations, Pension Plan, Health Benefit Obligations, 401(k) Obligations, and Employee

Deduction Obligations (as such terms are defined below, collectively the "Employee

Obligations")[2] and all costs incident to such obligations, (ii) pay, in their sole discretion, all ADP

Payroll Service Fees, Workers' Compensation Premiums (as each is defined below), and (iii)

maintain and continue to honor the practices, programs, and policies available for employees

described below (the "Employee Benefits") as they were in effect as of the Petition Date or as

they may be modified, amended, or supplemented from time to time in the ordinary course of the

Debtors' business.

10.        The Debtors request that the Court authorize and direct all banks at which the

Debtors maintain their payroll and disbursement accounts, a list of which is attached hereto as

Exhibit A (the "Disbursement Banks"), to honor and pay all pre-petition checks issued by and

fund transfer requests from the Debtors with respect to the Employee Obligations that were not

honored or paid as of the Petition Date.  In addition, the Debtors seek authority, in their

discretion and in the exercise of their business judgment, to issue new post-petition checks, or

effect new fund transfer requests, with respect to any of the obligations and fees addressed

---

[2]    Although the Debtors have made every effort to set forth all the pre-petition or post-petition Employee
       Obligations they seek to be authorized, but not directed, to honor, continue, or pay, on account of the Debtors'
       many subsidiaries, classes and kinds of Employees, CBAs, and Employee handbooks, among other things, the
       Debtors may have inadvertently omitted obligations to their Employees they would otherwise have included in
       this Motion.  The Debtors hereby incorporate any and all other obligations to their Employees that they have
       inadvertently neglected to mention herein into the term "Employee Obligations."

herein, to replace any pre-petition checks or fund transfer requests that may be dishonored or denied.

## Basis For Relief Requested

**I.      Obligations that Are the Subject of this Motion**

      **A.      Employee/Independent Contractor Remuneration and Vacation Obligations**

            **1.      Employee Compensation and Payroll Tax Obligations**

11.      As of the Petition Date, the Debtors employed approximately 1110 employees nationwide (the "Employees"), including approximately 963 full-time Employees and approximately 131 part-time Employees.  To facilitate payment, the Debtors engage a payroll service, Automatic Data Processing, Inc. and certain of its affiliates (collectively, "ADP") to process payroll for the Debtors.  ADP processed an estimated $74.15 million in payroll in 2008. The regular payroll period for all Employees of the Debtors is semi-monthly.  The current payroll period for substantially all Employees ended on February 13, 2009.

12.      As of the Petition Date, the Debtors estimate that they will owe unpaid, pre-petition wages (the "Wages") in a negligible amount to employees generally, as all Wages due on February 13, 2009, were, in the main, paid as of the Petition Date.  But the Debtors will, however, owe five of their corporate directors a total of $27,000.00, representing unpaid, pre-petition Wages due and owing as of the Petition Date.[3]  The Debtors seek authority to satisfy any obligations for pre-petition Wages that were not tendered before the Petition Date, and to direct their banks to honor any checks issued pre-petition with respect to such amounts post-petition.

13.      As noted above, the Debtors own and operate multiple stations in the United States, each of which is a separate corporate entity.  The Debtors' revenues come primarily from selling the stations' advertising time.  To maximize the sale of their advertising time, the stations

---

3      None of these individual payments will exceed the section 507(a)(5) priority wage cap: Alfred Hickey is to receive $6000, Richard Lowe: $6000, Alex Mason: $3000, Jeffrey Ambling: $6000 and Reid Murray: $6000.

employ sales executives (the "Sales Executives") who develop and cultivate relationships with advertisers. As is typical for employees in sales, including those in the television broadcasting industry, a portion of the Sales Executives' compensation is tied to the sales they generate. Accordingly, in addition to their salary, the Sales Executives are entitled to receive commission wages (the "Commission Wages") under various sales compensation programs at the different stations (collectively, the "Commission Programs"). Pre-petition, the Sales Executives had earned approximately $289,762.87 in Commission Wages in the aggregate. Those wages are due to be paid on March 15, 2009. The Debtors seek to pay the Commission Wages earned pre-petition in the ordinary course of business post-petition as they become due.[4]

14. The Debtors pay the Sales Executives responsible for generating the vast majority of the Debtors' revenue based upon this commission structure. Thus, the Debtors also seek to be authorized, but not directed, to continue the Commission Programs in the ordinary course of business. Any failure to pay the Commission Wages would significantly jeopardize the Debtors' ability to generate revenue.

15. The Debtors are required by law to withhold from their Employees' pay all applicable federal, state, and local income taxes, state unemployment taxes, and social security and Medicare taxes (collectively, the "Trust Fund Taxes") and to remit the Trust Fund Taxes to the appropriate taxing authorities (collectively, the "Taxing Authorities"). In addition, the Debtors are required to match from their own funds the social security and Medicare taxes, and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Trust Fund Taxes, the "Payroll Taxes") and to remit the Payroll Taxes to the Taxing Authorities.

---

[4] The Debtors believe that none of the Commission Wages earned pre-petition but due to be paid post-petition exceeds the priority wage cap pursuant to Bankruptcy Code section 507(a)(5).

As of the Petition Date, Debtors estimate that they will owe a negligible amount of Payroll Taxes, as all Payroll Taxes due on February 13, 2009, will in the main have been paid as of the Petition Date. But out of an abundance of caution, the Debtors seek authority to satisfy any obligations for pre-petition Payroll Taxes that were not tendered before the Petition Date, post-petition. Again, the Debtors expect any such sum to be negligible.

16.     In addition, because the Debtors are required by law to withhold and remit the Payroll Taxes, the Debtors also seek to be authorized, but not required, to withhold and remit such Payroll Taxes to the proper Taxing Authorities post-petition in the ordinary course of business.

17.     In sum, the Debtors seek to be authorized, but not required, to honor and pay in full the accrued and unpaid pre-petition accrued and unpaid pre-petition Wages, Commission Wages, and Payroll Taxes (collectively, the "Compensation Obligations") and to continue to honor the Compensation Obligations post-petition.

## 2.     Independent Contractors

18.     To supplement their workforces, the Debtors commonly utilize the services of independent contractors from time to time who provide necessary services relating to the operation of the Debtors' businesses. Included among these independent contractors are individuals from temporary service agencies and persons acting as freelance consultants providing services with respect to general management and various professional disciplines, such as engineering and equipment repairs (such individuals and corporate entities collectively, the "Independent Contractors"). Payment to each of the Independent Contractors varies according to the terms of each Independent Contractor's contract with the Debtors.

19.     It would be difficult, time-consuming, and expensive to replace these Independent Contractors or to refrain from hiring them in the future on account of their specialized skills,

training, and/or knowledge of the Debtors' operations and facilities. Although contract employees, these individuals work closely with the Debtors' wage and salary employees while engaged and are considered an important part of the team.

20.     The Debtors estimate that, as of the Petition Date, their total accrued and unpaid pre-petition obligations owed to the Independent Contractors (the "Independent Contractor Obligations") will be negligible, as all pre-petition Independent Contractor Obligations will in the main have been paid as of the Petition Date. But on account of, for example, late processing of certain checks by Independent Contractors who do not have their paychecks directly deposited, certain amounts for the pay period ending on February 13, 2009 may remain outstanding as of the Petition Date.

21.     Out of an abundance of caution, the Debtors seek to be authorized, but not required, to honor and pay in full the accrued and unpaid Independent Contractor Obligations. The Debtors also seek to be authorized, but not required, to continue to retain Independent Contractors, in the Debtors' sole discretion as needed, in the ordinary course of business post-petition.

### 3.     Vacation and Paid Time Off

22.     The Debtors provide certain of their eligible Employees with vacation pay and/or other paid time off pursuant to a number of different policies at each of the Debtors' subsidiaries, including, but not limited to, policies under certain collective bargaining agreements ("CBAs") with the Debtors' unionized workforce. Vacation and paid time off policies vary considerably from subsidiary to subsidiary and from union to union. As of the Petition Date, the Debtors estimate that certain eligible Employees at KRON-TV were owed at least $634,862.37 in pre-petition accrued but unpaid vacation and/or other paid time off. Additional amounts of pre-petition vacation and/or paid time may have accrued to Employees at other of the Debtors'

television stations in accordance with applicable policies (the "Vacation Obligations"). Accordingly, the Debtors seek the authority to honor the Vacation Obligations and to continue honoring the Vacation Obligations post-petition in the ordinary course of business.

### 4.      Expense Reimbursement Obligations

23.      The Debtors customarily reimburse their Employees for certain expenses (the "Reimbursement Obligations").  Specifically, the Debtors reimburse Employees for a variety of business expenses (such as travel expenses) incurred in the ordinary course of performing their duties on behalf of the Debtors.  In addition, the Debtors customarily pay certain obligations directly to third parties on behalf of their Employees to the extent that such obligations were business related (including, but not limited to, paying amounts owed with respect to certain corporate credit cards issued for the benefit of the Debtors for use by certain Employees) or incurred under or in connection with the Debtors' various benefit plans, programs, and policies. Because the Employees and affected third parties do not always submit claims for reimbursement immediately, it is difficult for the Debtors to determine the amounts outstanding at any particular time.  The Debtors estimate that, as of the Petition Date, their pre-petition Reimbursement Obligations described above are approximately $25,000.00 in the aggregate. The Debtors seek to be authorized, but not required, to honor and pay in full the accrued and unpaid Reimbursement Obligations.  The Debtors also request authority to continue honoring these obligations in the ordinary course of business post-petition.

### B.      Union Obligations

24.      Certain of the Employees at two of the Debtor Station(s), KWQC-TV and KRON-TV, are members of unions.  Approximately thirty-three of the KWQC-TV Employees are members of the International Brotherhood of Electrical Workers (the "IBEW"), and approximately forty-seven KRON-TV Employees are members of the IBEW.    Further,

approximately thirty-seven KRON-TV Employees are members of the American Federation of Radio and Television Artists ("AFTRA"). Pursuant to the CBAs governing the relationships between the Debtors and their unions, the Debtors withhold union dues and other withholding obligations from the union Employees' payroll each pay period. The Debtors are also required to make multiemployer plan trust fund contributions, and may be required to make other contributions to the unions pursuant to the terms of the CBAs (the "Union Obligations").

25. For the month of February, 2009 the Debtors estimate that they will owe approximately $2,490.00 in Union Obligations withheld from Employee wages, which Union Obligations are due to be paid on February 27, 2009. In addition, for the month of February, 2009, the Debtors will owe approximately $48,812.00 in health and pension payments required under the AFTRA CBA.[5] This payment is due on March 6, 2009. Pursuant to section 1113(f), the Debtors are required to comply with the terms of collective bargaining agreements post-petition, and are therefore legally obligated to make CBA contributions and remit Union Dues as required.

26. The Debtors therefore seek to be authorized, but not required, to pay any accrued, unpaid, pre-petition Union Obligations owing. The Debtors also seek to be authorized, but not required, to continue to honor Union Obligations in the ordinary course of the Debtors' business post-petition.

C.    **Employee Benefit Obligations**

1.    **401(k) Plan**

27. The Debtors maintain a tax-qualified defined contribution plan (the "401(k) Plan") pursuant to the requirements of the Internal Revenue Code of 1986, as amended (the

---

[5]    Although the AFTRA CBA has expired, the Debtors are required to continue to negotiate in good faith and abide by the terms of the CBA during the negotiation process. *See* 29 U.S.C. § 158(a).

"Internal Revenue Code") through which Employees can accumulate retirement savings. Each Employee may contribute up to a certain percentage of his or her pre-tax earnings to the 401(k) Plan subject to the ceiling set by the Internal Revenue Code and related guidance.

28.     In addition to allowing Employees to make pre-tax contributions to the 401(k) Plan, the Debtors provide  matching contributions in accordance with the terms of the 401(k) Plan.

29.     The Debtors remit contributions to the 401(k) Plan directly to the 401(k) Plan's trust (the "401(k) Obligations").  These contributions include wage deferrals collected from Employees through automatic withholding authorized by the Employees and executed by the Debtors, as well as the Debtors' own matching contributions.  To the extent the Debtors have withheld 401(k) contributions from Employees' wages, such amounts are not property of the Debtors' estates, but rather are held in trust for the Employees making the contributions and should be timely paid to the 401(k) Plan's trust.  The Debtors estimate that approximately $175,000 in Employee wage deferrals will be due for the pay period ending February 13, 2009 to the 401(k) Plan's trust.  Pursuant to Department of Labor regulations at 29 C.F.R. Section 2510.3-102 such Employee wage deferrals must be remitted to the 401(k) Plan's trust as of the earliest date on which such contributions can reasonably be segregated from the Debtor's general assets.

30.     Additionally, the Debtors estimate that as of the Petition Date, approximately $214,881 in matching contributions accrued through the Petition Date. The matching component of the 401(k) Plan is central to Employee morale and productivity—especially in these difficult economic times.  Although the amount that the Debtors match Employee contributions is quite small when compared to their operations generally, the payoff in terms of Employee morale more than justifies continuing the 401(k) matching program and allowing the Debtors to remit

amounts matched through the Petition Date to the Administrator in the ordinary course of business. The Debtors therefore seek to be authorized, but not required, to maintain the 401(k) Plan, including remitting to the 401(k) trust any amounts due on account of matching contributions, regardless of when such amounts accrued or will accrue.

### 2. Health and Welfare Benefit Obligations

31. The Debtors collectively sponsor several health and welfare benefit plans to provide benefits to the Employees, including medical and health, prescription drug, life, AD&D, travel accident, dental, vision care, short- and long-term disability, flexible spending account, employee assistance program, and supplemental unemployment, among others (the "Health Benefit Plans").

32. Benefits provided under the Health Benefit Plans are paid monthly, in advance, by the Debtors out of general corporate assets. For the month of February, 2009, the Debtors have paid for such benefits prior to the Petition Date, and the Debtors estimate that there are no outstanding pre-petition premiums with respect to the Health Benefit Plans as of the Petition Date. But certain of the Debtors' health and dental plans are partially self funded, and, in addition to the payment of monthly premiums, the Debtors are required to fund a "special premium" reserve account held by the insurer equal to the amount of reserves required for open and/or unreported claims and expenses (the "Health and Dental Accounts"). The insurers have the ability to draw on the Health and Dental Accounts monthly depending on Employee claims under the health and dental policies. Post-petition, the Debtors estimate that approximately $72,000 will be drawn down from the Health and Dental Accounts to cover pre-petition Employee health and dental insurance claims based upon historical numbers.[6]

---

[6] This number is based on the 2008 year-end balance in the Health and Dental Accounts. The Debtors used the 2008 ending balance as a proxy for expected drawdowns for 2009. The prorated amount for January 1, 2009
(continued)

33.     Because of the manner in which expenses are incurred and claims are processed under the Health Benefit Plans, it is difficult for the Debtors to either determine or estimate the accrued obligations under the Health Benefit Plans and the Health and Dental Accounts outstanding at any particular time (the "Health Benefit Plan Obligations"). Specifically, because the Health Benefit Obligations are largely dependent on Employee claims for benefits and are beyond the Debtors' control, it is impossible for the Debtors to project future Health Benefit Plan Obligations accurately. Indeed, the Debtors will not know the amount of accrued but unpaid pre-petition Health Benefit Plan Obligations until they receive invoices from the applicable insurers. The Debtors have therefore used an historical average to estimate these amounts.

34.     The Health Benefit Plan Obligations have been historically incurred in the ordinary course of business and are a normal part of employee health and dental insurance policies for employers such as the Debtors. The Debtors therefore seek to be authorized, but not required, to continue their Health Benefit Plans post-petition in the ordinary course of business, including the authority to fund and allow drawdowns on the Health and Dental Accounts for any applicable, pre-petition Health Benefit Plan Obligations.

### D.     Employee Deduction Obligations

35.     As requested or required by law, Debtors make certain deductions from Employee wages for charitable donations and wage garnishments (the "Employee Deduction Obligations"). On average, Employee Deduction Obligations total approximately $11,292.00 per pay period. As of the Petition Date, Debtors estimate that they will owe a negligible amount of pre-petition Employee Deduction Obligations. Out of an abundance of caution, the Debtors seek to be authorized, but not required, to honor any pre-petition Employee Deduction Obligations. The

---

through the Petition Date is $72,000, which the Debtors have estimated to be the drawdown for pre-petition health and dental insurance claims.

Debtors also seek to be authorized, but not required, to continue to honor post-petition Employee Deduction Obligations in the ordinary course of business.

### E.    Workers' Compensation Obligations

36.    The laws of the various states in which the Debtors operate require Debtors to maintain workers' compensation policies and programs to provide the Employees with coverage for claims arising from or related to their employment (the "Workers' Compensation Programs").    Debtors maintains the Workers' Compensation Programs with The Chubb Corporation in all of the states in which the Debtors operate.  The Debtors' insurance broker for the Workers' Compensation Programs is Lyman & Sheets, and the Debtors' current annual policy costs $467,916 for coverage from June 30, 2008, through June 30, 2009.  The Debtors paid approximately $392,346 towards the annual premium in 2008 and approximately $37,785 pre-petition in 2009.  The final premium payment of approximately $37,785 will come due on March 25, 2009.

37.    Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors seek to be authorized, but not required, to (i) to continue the Workers' Compensation Programs on an uninterrupted basis, consistent with the Debtors' practices prior to the Petition Date and (ii) to make all premium, administrative fee, and other payments for obligations related to the Workers' Compensation Programs (the "Workers' Compensation Premiums").  As the Debtor is required by law to provide workers' compensation coverage, the Debtors seek to be authorized, but not required, to pay all premiums and other amounts due under their Workers' Compensation Programs.

## II.    Bank Accounts

38.    The Debtors request that, to the extent practicable, the Disbursement Banks be authorized and directed to honor checks or fund transfers with respect to Employee Obligations

regardless of whether they were issued pre-petition or post-petition. In addition, the Debtors seek to be authorized, but not required, to issue new post-petition checks or fund transfer requests on account of the Employee Obligations to replace any pre-petition checks or fund transfer requests that may have been dishonored or denied.

### III. Applicable Authority

39.     As a result of these Chapter 11 filings, the Debtors are prohibited from paying claims that arose before the Petition Date unless the Debtors receive specific authorization from the Court. Pursuant to section 507(a)(4)(A) of the Bankruptcy Code, claims of employees for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $10,950 per employee. Similarly, section 507(a)(5) of the Bankruptcy Code provides that employees' claims for contributions to certain employee benefit plans are also afforded priority unsecured status to the extent of $10,950 per employee covered by such plan, less any amount paid pursuant to section 507(a)(4).

40.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. 363(b)(1). Furthermore, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. 105(a). Accordingly, because most (if not all) such priority claims may be paid in full under a plan of reorganization, unless the holders otherwise agree, accelerated payment of such claims at this time is appropriate and this Court is authorized to grant the relief requested.

41.     The Debtors believe that no Employees are owed in excess of $10,950 on account of Compensation Obligations and Benefit Obligations as of the Petition Date. Accordingly,

15

substantially all of the Debtors' Compensation Obligations and Benefit Obligations constitute priority claims.

42.     It is essential to the continued operation of the Debtors' businesses and the maximization of value to creditors that the services of the Employees be retained and that the morale of the Employees be maintained.  If the checks issued or fund transfers requested in respect of the Employee Obligations are neither honored nor replaced, morale will deteriorate and the Employees will suffer extreme personal hardship.  Consequently, it is critical that the Debtors have the authority, in their discretion and the exercise of their business judgment, to continue their ordinary course of business personnel policies, programs, and procedures that were in effect prior to the commencement of these chapter 11 cases.

43.     The Debtors submit that the payment of the Employee Obligations in accordance with the Debtors' pre-petition business practices is in the best interest of the Debtors, their estates and creditors, and will enable the Debtors to continue to operate their businesses in an economic manner without disruption.  Indeed, the Employees are central to their operations.

44.     The Debtors do not seek to alter Employee compensation, vacation, or other benefit policies at this time.  This Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtors, in their discretion, to continue to honor their practices, programs, and policies with respect to their Employees, as such practices, programs, and policies were in effect as of the Petition Date as described in this Motion.

45.     Payment of all Employee Obligations in accordance with the Debtors' pre-petition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in

interest and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption. A significant deterioration in employee morale at this critical time undoubtedly would have a devastating impact on the Debtors, their customers and vendors, the value of the Debtors' assets and businesses, and the Debtors' ability to continue operations. The total amount sought to be paid in this Motion is relatively modest compared with the value of the Debtors' businesses and the importance of the Employees to the Debtors' chapter 11 cases.

46.     With respect to Trust Fund Taxes, in particular, the Supreme Court has held that taxes such as excise taxes, taxes under the Federal Insurance Contributions Act ("FICA"), and withholding taxes are property held by a debtor in trust for another and, as such, do not constitute property of its estate. *See Begier v. Internal Revenue Serv.*, 496 U.S. 53, 55-56, 59-61, 66-67 (1990). Accordingly, the Bankruptcy Code does not prohibit a debtor from paying such taxes.

47.     In the normal course of business, the Debtors maintain accurate and complete records of intercompany charges and payments between the Debtors with respect to Employee Obligations. Moreover, the Debtors intend to continue to maintain such records of any amounts paid with respect to the Employee Obligations and any and all other amounts sought to be paid pursuant hereto. Further, the Debtors will continue to maintain such records on an ongoing basis.

48.     The Debtors have on deposit sufficient funds in the payroll account to enable the Disbursement Banks to pay in full the Employee Obligations drawn on such account. Accordingly, the Disbursement Banks will not be prejudiced by the entry of an order directing them to honor checks or fund transfer requests paying such amounts.

49.     The authorization sought in this Motion does not constitute post-petition assumption or adoption of any practice, policy, plan, program, or agreement pursuant to section

365 of the Bankruptcy Code.  The Debtors are in the process of reviewing these matters and reserve all of their rights under the Bankruptcy Code with respect thereto.

50.    In other chapter 11 cases, courts in this district have approved payment of pre-petition claims for compensation, benefits, and expense reimbursements similar to those described in this motion.  *See, e.g., In re Lyondell Chem. Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. 2009); *In re Tricom, S.A.*, Case No. 08-10720 (Bankr. S.D.N.Y. 2008); *In re Silicon Graphics, Inc.*, Case No. 06-10977 (Bankr. S.D.N.Y. 2006); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. 2006); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. 2005); *In re Delta Air Lines*, *Inc.*, Case No. 05-17923 (Bankr. S.D.N.Y. 2005); *In re Atkins Nutritionals, Inc.*, Case No. 05-15953 (Bankr. S.D.N.Y. 2005); *In re Footstar, Inc.*, Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. 2004); *In re Parmalat USA Corp.*, Case No. 04-11139 (Bankr. S.D.N.Y. 2004); *In re Twinlab Corp.*, Case No. 03-15564 (Bankr. S.D.N.Y. 2003).

51.    Accordingly, by this Motion, the Debtors seek authority pursuant to sections 507(a), 363(b), and 105(a) of the Bankruptcy Code to pay, subject to the Debtors' sole discretion, the Employee Obligations as they become due and owing during the pendency of these cases and to continue, uninterrupted, their practices, programs, and policies with respect to their Employees, as such practices, programs, and policies were in effect as of the Petition Date as described in this Motion.

**Immediate Relief Is Necessary to Avoid Irreparable Harm**

52.    Bankruptcy Rule 6003 provides that ""[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding … a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition ….." Fed. R. Bankr. P. 6003.

53.     If the Debtors are not permitted to continue their ordinary business operations by honoring, paying and providing benefits to their Employees on a current basis, they will suffer immediate and irreparable harm. Accordingly, granting the relief requested herein within the first 20 days of these cases is consistent with Bankruptcy Rule 6003.

## Request for Waiver of Stay

54.     Any delay in paying the obligations and fees addressed herein would be detrimental to the Debtors, their creditors, and their estates.  Accordingly and to successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

55.     The Debtors served notice of this Motion on (i) the Office of the United States Trustee for the Southern District of New York, (ii) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d), (iii) counsel to the agent for the Debtors' pre-petition secured lenders, (iv) the informal committee of senior subordinated noteholders, (v) the Internal Revenue Service, and (vi) the Pension Benefit Guaranty Corporation.  In light of the nature of the relief requested, the Debtors respectfully submit that no other or further notice need be provided.

## No Prior Request

56.     The Debtors have not previously requested the relief sought in this Motion from this Court or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter interim and final orders granting the relief requested herein and such other and further relief as the Court may deem proper.

Dated: February 13, 2009
       New York, New York                    Respectfully Submitted,


                                             SONNENSCHEIN NATH & ROSENTHAL LLP

                                             By:  _____*/s/ Peter D. Wolfson*_____
                                                  Peter D. Wolfson
                                                  Jo Christine Reed
                                                  Michael Carney
                                                  1221 Avenue of the Americas
                                                  New York, New York 10020
                                                  Telephone: (212) 768-6700
                                                  Facsimile:  (212) 768-6800

                                                  *Proposed Counsel for the Debtors*
                                                  *and Debtors in Possession*