**THIS IS NOT A SOLICITATION OF ACCEPTANCE
OR REJECTION OF THE PLAN.  ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A
DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING
SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THIS COURT.**

```
------------------------------------------------------------- x
                                             :
In re:                                       :        Chapter 11
                                             :
YOUNG BROADCASTING INC., et al.,             :        Case No. 09-10645 (AJG)
                                             :
                        Debtors.1            :
                                             :        (Jointly Administered)
------------------------------------------------------------- x
```

**DISCLOSURE STATEMENT FOR JOINT PLAN OF
YOUNG BROADCASTING INC. AND ITS DEBTOR AFFILIATES
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

| | |
|---|---|
| Voting Record Date: | November 2, 2009 |
| Plan Objection Deadline: | December 15, 2009 |
| Voting Deadline: | December 11, 2009 |
| Confirmation Hearing: | December 21, 2009 |

Peter D. Wolfson
Jo Christine Reed
**SONNENSCHEIN NATH & ROSENTHAL LLP**
Attorneys for Debtors and
Debtors in Possession
1221 Avenue of the Americas
New York, New York 10020

~~October 8,~~ November 4, 2009

---

[1]  The Debtors in these cases are Young Broadcasting Inc.; Young Broadcasting of Lansing, Inc.; Young Broadcasting of Louisiana, Inc.; Young Broadcasting of Nashville, LLC; Young Broadcasting of Albany, Inc.; Young Broadcasting of Richmond, Inc.; Young Broadcasting of Knoxville, Inc.; Young Broadcasting of Green Bay, Inc.; Young Broadcasting of Davenport, Inc.; Young Broadcasting of Sioux Falls, Inc.; Young Broadcasting of Rapid City, Inc.; Young Broadcasting of San Francisco, Inc.; Young Broadcasting of Nashville, Inc.; Young Broadcasting of Los Angeles, Inc.; Young Broadcasting Shared Services, Inc.; Adam Young Inc.; WKRN, G.P.; WATE, G.P.; KLFY, L.P.; YBT, Inc.; YBK, Inc.; LAT, Inc.; Winnebago Television Corporation; Fidelity Television, Inc.; Honey Bucket Films, Inc.; Young Broadcasting Capital Corp.; and Young Communications Inc.

THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON DECEMBER 21, 2009, AT 10:00 A.M. EASTERN TIME BEFORE THE HONORABLE ARTHUR J. GONZALEZ, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK LOCATED AT ONE BOWLING GREEN, NEW YORK, NEW YORK 10004. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR BY NOTICE OF ANY ADJOURNMENT OF THE CONFIRMATION HEARING FILED BY THE DEBTORS.

TO BE COUNTED, THE BALLOTS, UPON WHICH HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE SHALL CAST THEIR VOTE TO ACCEPT OR REJECT THE PLAN (EACH A "BALLOT") INDICATING ACCEPTANCE OR REJECTION OF THE PLAN, MUST BE RECEIVED IN ACCORDANCE WITH THE INSTRUCTIONS ON SUCH BALLOT. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE IX OF THIS DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE DEBTORS.

OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE DECEMBER 15, 2009 AT 4:00 P.M. EASTERN TIME IN ACCORDANCE WITH THE SOLICITATION NOTICE AND SOLICITATION PROCEDURES ORDER, WHICH ARE DESCRIBED IN FURTHER DETAIL IN ARTICLE IX OF THIS DISCLOSURE STATEMENT. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES AND SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

THE DEBTORS PROVIDE NO ASSURANCE THAT THIS DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS TO THE DISCLOSURE STATEMENT, THAT IS ULTIMATELY APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES (1) WILL CONTAIN ANY OF THE TERMS IN THE CURRENT DOCUMENT OR (2) WILL NOT CONTAIN DIFFERENT, ADDITIONAL, MATERIAL TERMS THAT DO NOT APPEAR IN THE CURRENT DOCUMENT. THEREFORE, MAKING INVESTMENT DECISIONS BASED UPON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS IS HIGHLY SPECULATIVE, AND THE DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING SUCH INVESTMENT DECISIONS WITH RESPECT TO (1) THE DEBTORS OR (2) ANY OTHER PARTIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.

<u>T</u>ABLE OF <u>C</u>ONTENTS

I.    <u>S</u>UMMARY ...................................................................................................................... 1

     A.     Rules of Interpretation, Computation of Time, and References to Monetary Figures ..................................................................................................... 2

     B.     Overview of Chapter 11 ........................................................................... 3

     C.     The Purpose and Effect of the Plan ......................................................... 3

     D.     Treatment of Claims and Interests .......................................................... 3

     E.     Claims Estimates ...................................................................................... 5

     F.     parties entitled to vote on the plan .......................................................... 6

     G.     confirmation ............................................................................................. 7

     H.     Consummation .......................................................................................... 8

     I.     Liquidation and Valuation Analyses ....................................................... 8

     ~~J.    REORGANIZATION VALUE ............................................................... 8~~

     <u>J.    Reorganization Value</u> ............................................................... 8

     K.     Certain Factors to be Considered Prior to Voting ................................... 9

II.    <u>B</u>ACKGROUND TO THE <u>C</u>HAPTER 11 <u>C</u>ASES ...................................................... 9

     A.     The Debtors' Businesses ......................................................................... 9

     B.     Debtors' Principal Assets ...................................................................... 13

     C.     Summary of Prepetition Indebtedness and Prepetition Financing ......... 13

     D.     Pending Litigation and Other Proceedings ........................................... 14

III.    <u>T</u>HE <u>R</u>EORGANIZATION <u>C</u>ASES .................................................................... ~~17~~<u>18</u>

     A.     Events Leading to the Reorganization Cases .................................... ~~17~~<u>18</u>

     B.     Commencement of the Reorganization Cases ................................... ~~18~~<u>19</u>

     C.     the Creditors Committee .................................................................. ~~20~~<u>22</u>

     D.     Claims Process and Bar Date ........................................................... ~~21~~<u>22</u>

     E.     Significant Executory Contracts and Other Significant Motions ....... ~~21~~<u>23</u>

     F.     Exclusivity ....................................................................................... ~~22~~<u>23</u>

G.      Sale Process ................................................................................................ ~~22~~24

IV.    SUMMARY OF THE JOINT PLAN ................................................................................ ~~24~~25

    A.      Administrative Expense Claims and Priority Tax Claims ............................ ~~24~~25

    B.      Classification of Claims and Equity Interests ............................................ ~~24~~26

    C.      Transactions Contemplated by the Plan ...................................................... ~~27~~29

    D.      Provisions for Implementation of the Plan ................................................. ~~28~~30

    E.      Treatment of Executory Contracts and Unexpired Leases .......................... ~~33~~35

    F.      Procedures Governing Distributions ........................................................... ~~34~~36

    G.      Procedures for Resolving Disputed Claims ................................................ ~~38~~40

    H.      Conditions Precedent to Confirmation and Consummation of the Plan ...................... ~~39~~41

    I.      Effect of Confirmation ................................................................................ 42

    J.      Settlement, Release, Injunction and Related Provisions ............................. ~~40~~44

    K.      Limitation Of Governmental Releases ........................................................ 49

    ~~J~~L.    Modification, Revocation or Withdrawal of the Plan ................................. ~~46~~49

    ~~K~~M.    Retention of Jurisdiction ............................................................................ ~~46~~50

    ~~L~~N.    Miscellaneous Provisions .......................................................................... ~~48~~52

V.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ................................ ~~49~~53

    A.      The Confirmation Hearing ......................................................................... ~~49~~53

    B.      Confirmation Standards .............................................................................. ~~51~~54

    C.      Best Interests Tests .................................................................................... ~~52~~55

    D.      Financial Feasibility .................................................................................. ~~54~~57

    E.      Acceptance by Impaired Classes ............................................................... ~~55~~59

    F.      Confirmation Without Acceptance by all Impaired Classes ....................... ~~56~~60

VI.    CERTAIN FACTORS TO BE CONSIDERED ................................................................. ~~57~~61

    A.      Certain Bankruptcy Considerations ........................................................... ~~58~~61

    B.      Risks Relating to the Securities Issued in Connection with the Sale .......... ~~59~~63

    C.      Governmental Regulations ......................................................................... ~~60~~64

**VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**............................~~60~~64

    A.    Liquidation Under Chapter 7 .........................................................~~60~~64

    B.    Alternative Plan .............................................................................~~61~~65

**VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .......................~~61~~65

    A.    Circular 230 Disclosure ...............................................................~~61~~65

    B.    General...........................................................................................~~61~~65

    C.    U.S. Federal Income Tax Considerations of the Debtors ..............~~62~~66

    D.    U.S. Federal Income Tax Considerations of Plan Distributions to U.S. Holders .........~~65~~69

    E.    U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of the Holdco Notes .........................................................~~68~~72

    F.    U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of the Holdco Common Stock and Holdco Warrants ...............~~69~~73

    G.    U.S. Federal Income Tax Consequences to U.S. Holders of Claims and Equity Interests.......................................................................................~~70~~74

    H.    Information Reporting and Backup Withholding ........................~~71~~75

**IX.    VOTING PROCEDURES** ...........................................................................~~71~~**75**

    A.    The Solicitation Package .............................................................~~71~~75

    B.    Voting Instructions ......................................................................~~72~~77

    C.    Voting Tabulation .......................................................................~~74~~81

**X.    CONCLUSION AND RECOMMENDATION** ...........................................................~~76~~**84**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR SIMILAR LAWS.  THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE JOINT PLAN OF YOUNG BROADCASTING INC. AND OF ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN.  THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED TO, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.  EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY ENTITIES DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT.  ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO, OR REFERRED TO IN, THIS DISCLOSURE STATEMENT OR THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE, AS MORE FULLY SET FORTH HEREIN.  REORGANIZED YOUNG WILL NOT BE A REPORTING CORPORATION AS OF THE EFFECTIVE DATE UNDER THE SECURITIES EXCHANGE ACT AND ITS SHARES WILL NOT BE LISTED ON ANY NATIONAL SECURITIES EXCHANGE.  THE DEBTORS DO NOT ANTICIPATE THAT THERE WILL BE A PUBLIC MARKET FOR THE SECURITIES.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN SHOULD CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE OWNERSHIP AND TRANSFERABILITY OF ANY SUCH SECURITIES.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN COMPLIES WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, THE DEBTORS CANNOT ASSURE SUCH COMPLIANCE OR THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN.

ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.

CONSOLIDATED PROJECTED OPERATING AND FINANCIAL RESULTS (THE "FINANCIAL PROJECTIONS") PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTORS.  THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE LIKELIHOOD THAT THE DEBTORS WILL ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

PLEASE REFER TO ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN FACTORS TO BE CONSIDERED," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

UNLESS OTHERWISE SPECIFICALLY INDICATED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND IS BASED ON AN ANALYSIS OF DATA AVAILABLE AT THE TIME OF THE PREPARATION OF THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS (INCLUDING THE FINANCIAL PROJECTIONS) WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT. SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS REGARDING FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN, PARTICULARLY IN LIGHT OF THE CURRENT WORLDWIDE FINANCIAL AND CREDIT CRISIS, AND ACTUAL RESULTS MAY DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR EXPECTED FUTURE RESULTS AND OPERATIONS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR MANAGEMENT'S ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS OF OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

AMONG THE FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM CURRENT ESTIMATES OF FUTURE PERFORMANCE ARE THE FOLLOWING: (1) THE DEBTORS' ABILITY TO DEVELOP, PROSECUTE, CONFIRM, AND CONSUMMATE THE PLAN WITH RESPECT TO THESE CHAPTER 11 CASES; (2) THE POTENTIAL ADVERSE IMPACT OF THESE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; (3) THE OUTCOME AND TIMING OF THE DEBTORS' EFFORTS TO RESTRUCTURE; (4) THE EFFECTS OF THE CURRENT RECESSION AND THE TURMOIL IN THE CREDIT AND FINANCIAL MARKETS; (5) THE EFFECTS OF THE INTENSE COMPETITION THAT EXISTS IN THE BROADCASTING INDUSTRY; (6) THE RISK THAT THE DEBTORS MAY LOSE OR FAIL TO RENEW THEIR LICENSES REQUIRED FOR THE OPERATION OF THE STATIONS; (7) THE EFFECTS OF EVENTS ADVERSELY IMPACTING THE ECONOMY; AND (8) FINANCIAL COMMUNITY AND RATING AGENCY PERCEPTIONS OF THE DEBTORS' BUSINESSES, AND THE EFFECT OF ECONOMIC, CREDIT, AND CAPITAL MARKET CONDITIONS ON THE ECONOMY AND THE BROADCASTING INDUSTRY, PARTICULARLY IN LIGHT OF THE FILING OF THESE CHAPTER 11 CASES.

**TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL INCOME TAX ISSUES CONTAINED OR REFLECTED IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THE HOLDER UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING**

OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE FILING DATE OF THIS DISCLOSURE STATEMENT AND THE DEBTORS ARE UNDER NO OBLIGATION, AND EXPRESSLY DISCLAIM ANY OBLIGATION, TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

# I. SUMMARY

The following summary of this Disclosure Statement is qualified in its entirety by the more detailed information contained in the Joint Plan of Young Broadcasting Inc. and its Debtor Subsidiaries under Chapter 11 of the Bankruptcy Code, dated September 24, 2009, as the same may be amended from time to time (the "Plan"), which was filed by the Debtors with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on September 24, 2009, and elsewhere in this Disclosure Statement. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in Article I of the Plan. Some terms that are only used in a specific section may be defined in that section.

The Debtors submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims and Interests in the Debtors in connection with (i) the solicitation of votes to accept or reject the Plan and (ii) the Plan Confirmation Hearing, which is scheduled for December 21, 2009 at 10:00 a.m. Eastern Time. A copy of the Plan is attached hereto as Exhibit A and is incorporated herein by reference.

The purpose of this Disclosure Statement is to provide information of a kind and in sufficient detail to enable Holders of Claims and Interests in the Debtors who are entitled to vote on the Plan to make an informed decision on whether to accept or reject the Plan.

Please note that if there is any inconsistency between the Plan (including the attached exhibits and any supplements to the Plan) and the descriptions in the Disclosure Statement, the terms of the Plan (and the attached exhibits and any supplements to the Plan) will govern. The summaries of the Plan and other documents related to the restructuring of the Debtors are qualified in their entirety by the Plan, its exhibits, and the documents and exhibits contained in the Plan Supplement. The Plan Supplement will be filed with the Bankruptcy Court prior to the Confirmation Hearing, but no later than 5 days before the Voting Deadline. Documents to be included in the Plan Supplement will also be posted at http://chapter11.epiqsystems.com/ybc as they become available, but no later than 5 days before the Voting Deadline. The financial and other information included in this Disclosure Statement are for purposes of soliciting acceptances of the Plan and are being communicated for settlement purposes only.

The Bankruptcy Code provides that only creditors who vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained. Failure to timely deliver a properly completed ballot by the Voting Deadline will constitute an abstention (i.e. will not be counted as either an acceptance or a rejection). Any improperly completed or late ballot may not be counted.

**THIS DISCLOSURE STATEMENT, THE PLAN AND THE PLAN SUPPLEMENT ARE THE ONLY MATERIALS CREDITORS SHOULD USE TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**THE DEBTORS BELIEVE THAT ACCEPTING THE PLAN IS IN THE BEST INTEREST OF CREDITORS. THEREFORE, THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.[2]**

---

[2] The Debtors understand that the Creditors Committee intends to file a plan that would, among other things, reinstate the Credit Agreement. If the Creditors Committee files such a plan, the Debtors reserve the right to modify this Disclosure Statement prior to the hearing to approve the Disclosure Statement to address the competing plan and recommendations with respect thereto.

### A. RULES OF INTERPRETATION, COMPUTATION OF TIME, AND REFERENCES TO MONETARY FIGURES

1. *Rules of Interpretation.*

For purposes of this Disclosure Statement: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement; (f) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in the Plan Supplement; (g) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (j) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents Filed in the Reorganization Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Debtors or Holdco, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Additionally, except as otherwise specifically provided in the Plan to the contrary, references in this Disclosure Statement to the Debtors, Holdco, or Reorganized Young, shall mean the Debtors, Holdco or Reorganized Young, as applicable, to the extent the context requires.

2. *Computation of Time.*

In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply. If the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

3. *Reference to Monetary Figures.*

All references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## B.     OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor, and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

## C.     THE PURPOSE AND EFFECT OF THE PLAN

After careful review of their current business operations and various liquidation and recovery scenarios, the Debtors have concluded that the recovery for Holders of Allowed Claims and Interests will be maximized by the Debtors' continued operation as a going concern pursuant to the restructuring described in the Plan.  The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation scenario, either in whole or in substantial part.

The Debtors recommend that, Holders entitled to vote, vote to accept the Plan.  As discussed in further detail in this Disclosure Statement, the Debtors believe that any alternative to Confirmation of a viable plan, such as liquidation, could result in significant delays, litigation, and additional costs.

Several documents that will be included in the Plan Supplement are described in this Disclosure Statement, but these summaries are not a substitute for a complete understanding of such documents.  Please review the full text of all such documents in the Plan Supplement.

## D.     TREATMENT OF CLAIMS AND INTERESTS

1.     *Summary of Classification, Treatment and Projected Recoveries of Classified Claims and Interests*

The Plan divides all Claims, except Administrative Claims and Priority Tax Claims, and all Interests into various Classes applicable to each Debtor individually.  The classification, treatment and the projected recoveries of classified Claims and Interests under the Plan are described in summary form

below for illustrative purposes only and are subject to the more detailed and complete description contained in Article IV of this Disclosure Statement and the provisions of the Plan.

As described in Article III below, the broadcasting industry is in a state of great flux. These uncertainties and other risks related to the Debtors make it difficult to determine a precise value for the Debtors and the equity interests that may be distributed in connection with the implementation of the Plan. The recoveries described in the following table represent the Debtors' best estimates of the value of the Distributions to be made to Holders of Allowed Claims, given the information available at this time. These estimates do not predict the value for the Reorganized Debtors or the Holdco Securities to be issued in connection with the Plan. Unless otherwise specified, the information in the following table and in the sections below are based on calculations as of the date of this Disclosure Statement. The estimation of recoveries makes the following assumptions:

- The Effective Date is assumed to occur soon after the occurrence of both: (a) entry of the Confirmation Order, and (b) issuance of the FCC Consent.

- The estimated aggregate amount of Allowed General Unsecured Claims against the Debtors is $19.3 million. Holders of Allowed Claims shall receive a distribution based upon and consistent with the terms of the Plan.

- On the Effective Date, Holders of the Prepetition Lender Claims will receive a distribution of $75 million face amount of senior secured Holdco Notes. The Holdco Notes will have a 5 year maturity, pay quarterly interest at a rate of LIBOR plus 500 basis points (with a LIBOR floor of 300 bps) and pay interest in kind during the first 12 months (subject to certain conditions set forth in greater detail in the Disclosure Statement). For the purposes of this analysis, the value of the Holdco Notes is assumed to be equal to the $75 million face amount.

- The Equity Value is assumed to be equal to the difference between Total Enterprise Value and the $75 million face amount of secured term loan notes to be issued by Holdco. The actual value of the Holdco Common Stock (and/or Holdco Lender Warrants) to be distributed pursuant to the Plan will be reduced by the value of the Noteholder Warrants to be distributed to Holders of Noteholder Claims. The estimated Equity Value is not reduced for dilution due to options or other distributions of equity interests in Holdco that may occur pursuant to future management ~~incentives~~incentive plans or other equity issuances.

- The value of ~~Assets~~assets available for Distribution to Holders of Allowed Claims is based upon the results of the auction, as set forth in greater detail in this Disclosure Statement, that produced a $200 million ~~Credit Bid~~credit bid, submitted by the Prepetition Lenders, which was subsequently declared the "Prevailing Bid". Accordingly, for the purpose of this recovery analysis the Total Enterprise Value setting forth the valuation of the Debtors' ~~Assets~~assets is assumed to be $200 million.

- Pursuant to the Plan, Priority Claims are to be paid in full in cash on or about the Effective Date or after such Claim becomes Allowed. The Debtors' estimate of Priority Claims assumes a substantial reduction or disallowance of a significant Priority Tax Claim that has been asserted against the Estates.

- For the purposes of this analysis, the Debtors assume that leases or agreements giving rise to Allowed Other Secured Claims ~~filed~~ against the Debtors are assumed pursuant to the Plan and that Holders of Other Secured Claims will be Reinstated. However, if such leases or agreements are rejected, then such Holders of Other Secured Claims will receive their Collateral or other treatment, as set forth in the Plan. Holders of Other Secured Claims are Unimpaired and if a Holder of an Allowed Other Secured Claim is Reinstated, then ~~recoveries will be distributed in~~future payments will be made pursuant to the loan or lease agreement.

- Pursuant to the Plan, Holders of Allowed Noteholder Claims will receive Noteholder Warrants to purchase up to 2.5% of the fully diluted equity interests of the Reorganized Debtors. For the purposes of this recovery analysis, the value of the Noteholder Warrants was estimated using a Black Scholes model for valuing options with the following assumptions: 2-1/2 year time to maturity, $125 million spot price, $225 million strike price, 2.25% risk free rate and 138% volatility, based upon the mean 60 day volatility for a group of comparable broadcasting companies.

- As set forth in the Plan, Holders of Allowed General Unsecured Claims will receive $1 million cash to be distributed on a *pro rata* basis on or about the Effective Date.

| Class | Description | Treatment | Estimated Amount of Claims / Interests | Projected Recovery |
|---|---|---|---|---|
| A | Priority Non-Tax Claim | Paid in full in cash | $113,358 | 100% |
| B | Prepetition Lender Claims | Ratable Proportion of Holdco Notes, Holdco Common Stock and/or Holdco Lender Warrants, as provided for under the Holdco Corporate Documents and in accordance with the Plan | $342,964,955.10 | 59.7% |
| C | Other Secured Claims | Reinstated; paid in full in Cash; or satisfied in full by return of the Collateral | $171,255.00 | 100% |
| D | Noteholder Claims | Ratable Proportion of Noteholder Warrants | $~~484,300,000.00~~484,299,000.00 | 0.4% |
| E | General Unsecured Claims | Ratable Proportion of $1 million | $19,321,505.00 | ~~5.1~~5 - 10% |
| F | Equity Interests | Deemed canceled | $0 | N/A |
| G | Intercompany Interests | No distributions; remain unaltered. | $0 | N/A |

## E.    CLAIMS ESTIMATES

As of August 13, 2009, Epiq Bankruptcy Solutions (the "Claims and Solicitation Agent") had received approximately 750 Proofs of Claim against the Debtors.  The total ~~amounts~~amount of Claims remaining on the ~~Claims Register~~claims register against one or more of the Debtors were as follows:  fifty one Secured Claims in the total amount of $8,576,347,645; five Administrative Claims in the total amount of $6,754,633; sixty Priority Tax Claims in the total amount of $820,914; thirty one Other Priority Claims in the total amount of $1,267,604; five hundred and fifty three General Unsecured Claims in the total amount of $34,706,260 and fifty Noteholder Claims in the total amount of $12,107,475,000.  The Debtors believe that many of the Filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, therefore, the Debtors are in the process of objecting to such Claims.

As set forth in further detail in the chart above, the Debtors estimate that at the conclusion of the Claims objection, reconciliation, and resolution process, Allowed Other Secured Claims will be approximately $171,225, Allowed Priority Tax Claims will be approximately $1,536,804, Allowed Other Priority Claims will be approximately $113,358, Allowed General Unsecured Claims will be approximately $19,321,505 and Allowed Noteholder Claims will be approximately $484,299,000. These estimates are based upon a number of assumptions, including applicable interest rates, and there is no guarantee that the ultimate total amount of Allowed Claims in each category will conform to the Debtors' estimates.

The Debtors estimate that at the conclusion of the Claims objection, reconciliation, and resolution process, estimated Allowed Administrative Claims will be approximately $2,960,000.  The estimate of Allowed Administrative Claims includes obligations to pay Cure Claims and certain Administrative Claim requests reflected on the Claims Register and docket for which the Debtors reasonably expect there to be a recovery.  The estimate of Allowed Administrative Claims does not include ordinary course obligations incurred postpetition such as trade payables, the Debtors' employees' compensation, or Compensation and Reimbursement Claims.

## F.    PARTIES ENTITLED TO VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a chapter 11 plan.  Holders of Claims not impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.  Holders of Claims or Equity Interests impaired by the Plan and receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes A and C are Unimpaired and deemed to accept the Plan.  Holders of Interests in Classes F and G are wholly Impaired and, therefore, deemed to reject the Plan.  Accordingly, Holders of Claims or Interests in Classes A, C, F and G are not entitled to vote on the Plan, and the vote of such Holders of Claims and Interests shall not be solicited.  Only Holders of Claims in Classes B, D and E are entitled to vote to either accept or reject the Plan.

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan.

| *Class* | *Designation* | *Impairment* | *Entitled to Vote* |
|---------|---------------|--------------|--------------------|
| Class A | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class B | Prepetition Lender Claims | Impaired | Yes |
| Class C | Other Secured Claims | Unimpaired | No (deemed to accept) |

| Class D | Noteholder Claims | Impaired | Yes |
| Class E | General Unsecured Claims | Impaired | Yes |
| Class F | Equity Interests | Impaired | No (deemed to reject) |
| Class G | Intercompany Interests | Impaired | No (deemed to reject) |

Pursuant to section 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code: (1) an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan; and (2) an Impaired Class of Interests has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the Plan. The Debtors will tabulate all votes on the Plan on a consolidated basis for the purpose of determining whether the Plan satisfies section 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code. All votes on account of Allowed Claims shall be counted as if filed against a single consolidated Estate.

## G.    CONFIRMATION

Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation at the Confirmation Hearing scheduled to commence on December 21, 2009, at 10:00 a.m., Eastern Time, before the Bankruptcy Court. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors also reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.

The Bankruptcy Court has established November 2, 2009, as the Voting Record Date for determining which Holders of Claims are eligible to vote to accept or reject the Plan. Ballots, along with this Disclosure Statement, the Plan, and the Solicitation Procedures Order, will be mailed to all registered Holders of Claims as of the Voting Record Date that are entitled to vote to accept or reject the Plan. An appropriate return envelope, postage prepaid, will be included with each Ballot, if appropriate.

The Debtors have engaged the Claims and Solicitation Agent to assist in the voting process. The Claims and Solicitation Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

To obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement, or other Solicitation Package materials (except Ballots), please refer to the Debtors' restructuring website at http://chapter11.epiqsystems.com/ybc.

**BALLOTS CAST BY HOLDERS MUST BE RECEIVED BY THE CLAIMS AND SOLICITATION AGENT, AS APPLICABLE, BY THE VOTING DEADLINE AT THE ADDRESS LISTED ON THE APPLICABLE BALLOT, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY. THE BALLOTS AND THE PRE-ADDRESSED, POSTAGE PRE-PAID ENVELOPES ACCOMPANYING THE BALLOTS WILL INDICATE THAT THE ADDRESS OF THE CLAIMS AND SOLICITATION AGENT IS: EPIQ BANKRUPTCY SOLUTIONS, LLC, ATTN: YOUNG BROADCASTING INC. BALLOT PROCESSING.**

**FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL THE CLAIMS AND SOLICITATION AGENT AT 646-282-2400.**

**TO BE COUNTED, THE BALLOTS CAST BY HOLDERS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN THE VOTING DEADLINE. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE IX OF THIS DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE DEBTORS.**

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL HOLDERS OF CLAIMS AND RECOMMEND THAT ALL SUCH HOLDERS WHOSE VOTES ARE BEING SOLICITED VOTE TO ACCEPT THE PLAN.**

**H.      CONSUMMATION**

Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is a Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect, and all conditions to Consummation have been satisfied or waived. Unless otherwise provided in the Plan, distributions to Holders of Claims Allowed as of the Effective Date will be made on the Distribution Date or as soon as practical thereafter in accordance with the Plan. All other distributions under the Plan will be made in accordance with the distribution provisions contained in the Plan.

**I.      LIQUIDATION AND VALUATION ANALYSES**

The Debtors believe that the Plan will produce a greater recovery for Holders of Allowed Claims against and Interests in the Estates than would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code because of, among other things, (1) the additional Administrative Claims generated by conversion to chapter 7 cases, (2) the administrative costs of liquidation and associated delays in connection with chapter 7 liquidations, (3) the priority of distributions under a chapter 7 liquidation as compared to the distributions set forth in the Plan, and (4) regulatory concerns and impairment of value in connection with chapter 7 liquidations, each of which likely would diminish the overall value of the Debtors' assets available for distributions.

**J.      REORGANIZATION VALUE**

During the course of these bankruptcy cases, the Debtors underwent an extensive marketing process seeking buyers for substantially all of the Debtors' assets or equity investors, as set forth in greater detail in Article III.G of this Disclosure Statement. As part of this marketing process, extensive information respecting the Debtors' operations and financial performance, including budgets and financial projections, management presentations and other due diligence material was shared with prospective bidders and investors in an effort to maximize bids at the auction. The highest qualified offer produced in connection with the sale process was a $200 million Credit Bid (defined below in Article III.G), submitted by the Prepetition Lenders (as described more fully in Article III.G of this Disclosure Statement), which was subsequently declared the Prevailing Bid. Accordingly, the total value available for distribution to Holders of Allowed Claims is the $200 million of consideration provided as part of the Credit Bid.

The Debtors anticipate that the payment of Administrative Expenses and certain Priority Claims on or about the Effective Date will reduce cash on hand balances significantly. In order to maintain sufficient liquidity to support the operation of the Debtors' assets as a going concern, the Reorganized Debtors will obtain a $10 million Exit Facility on the Effective Date. As set forth in the Plan, the Exit Facility will be secured by a first lien on all the assets of Reorganized Young and its

subsidiaries and will be available to meet any short term liquidity funding required in the operations of Reorganized Young. The funds available to Reorganized Debtors pursuant to this Exit Facility, as well as any cash on hand remaining on the Effective Date, are excluded from the valuation of assets available for distribution to Holders of Allowed Claims because such funds generally will be used in the Debtors' operations and not for making Distributions.

## K.      CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

Prior to voting to accept or reject the Plan, each Holder in a voting Class should carefully consider all of the information in this Disclosure Statement, especially the risk factors described in Article VI.

## II.      BACKGROUND TO THE CHAPTER 11 CASES

## A.      THE DEBTORS' BUSINESSES

Young is a Delaware corporation that was founded in 1986 by Vincent Young and his father, Adam Young. Vincent Young, Young's chairman, has over 35 years of experience in the television broadcast industry. Young is headquartered in New York and is the direct or indirect parent of each of the other Debtors.

The Debtors own and operate ten television stations in geographically diverse markets and a national television sales representation firm, Adam Young, Inc. The television stations include (i) WKRN - an ABC network affiliate located in Nashville, Tennessee; (ii) WTEN - an ABC network affiliate located in Albany, New York; (iii) WATE - an ABC network affiliate located in Knoxville, Tennessee; (iv) WRIC - an ABC network affiliate located in Richmond, Virginia; (v) WBAY - an ABC network affiliate located in Green Bay, Wisconsin; (vi) KWQC - a NBC network affiliate located in Davenport, Iowa; (vii) WLNS- a CBS network affiliate located in Lansing, Michigan; (viii) KELO - a CBS network affiliate located in Sioux Falls, South Dakota; (ix) KLFY - a CBS network affiliate located in Lafayette, Louisiana; and (x) KRON - a MyNetworkTV network affiliate located in San Francisco, California. In addition to the primary stations, the Debtors operate satellite stations that rebroadcast programming from primary stations. Specifically, satellite stations KCLO, KPLO and KDLO rebroadcast programming transmitted from the Sioux Falls station, KELO. Similarly, the WCDC satellite station rebroadcasts programming from the WTEN station.

The markets served by the Debtors' stations are located in Lansing, Michigan, Green Bay, Wisconsin, Lafayette, Louisiana, Nashville and Knoxville, Tennessee, Albany, New York, Richmond, Virginia, Davenport, Iowa, Sioux Falls and Rapid City, South Dakota and San Francisco, California. Each of the Debtors' stations are owned and operated by a direct or indirect subsidiary of Young. The Debtors' television broadcasting stations reach over 6% of the total U.S. television households and are "#1" in news in a majority of their geographical markets. In addition to focusing on local news, the Debtors' stations emphasize local sports programming and community affairs.

The Debtors employ approximately 1107 employees nationwide, including approximately 953 full-time employees and 154 part-time employees. Approximately 102 employees are members of either the International Brotherhood of Electrical Workers or the American Federation of Television and Radio Artists.

1.      *Product.*

The Debtors' primary product is advertising sold in time increments, which are priced primarily on the basis of a program's popularity among the specific audience an advertiser desires to

reach. Advertising rates are also affected by the number of advertisers competing for the available time, the size and demographic makeup of the market served by the station, as well as the availability of alternative advertising media in the market area—such as cable television, print media, and the internet.

2.    *Programming.*

Program rights represent the right to air various forms of existing programming. Program rights and the corresponding contractual obligations are recorded when the license period begins and the program is available for use. The Debtors continually review their existing programming inventory and seek to purchase the most profitable and cost-effective syndicated programs available for each time period. In developing the Debtors' selection of syndicated programming, management balances the cost of available syndicated programs, their potential to increase advertising revenue and the risk of reduced popularity during the term of the program contract. The Debtors seek to purchase programs with contractual periods that permit programming flexibility and which complement a station's overall programming strategy and counter competitive programming. Programs that can perform successfully in more than one time period are more attractive due to the long lead time and multi-year commitments inherent in program purchasing.

Many of the Debtors' program commitments are for syndicated shows which are produced by syndicators to be aired on a first run basis. Such shows do not generally stay in production if they do not attract a significant audience. If the syndicator cancels a show, the Debtors' liability for future payments is extinguished. Program rights are analyzed by management on a quarterly basis to determine if revenues support the recorded basis of the asset. If the revenues are insufficient, additional analysis is done to determine if there is an impairment of the asset. If an impairment exists, the Debtors reduce the recorded basis of the program license rights as additional amortization of program license rights in the period in which such impairment is identified. For the years ended December 31, 2006, 2007 and 2008, the Debtors recorded a write-down of program licenses rights of approximately $4.5 million, $4.6 million and $10.9 million, respectively.

The Debtors are dependent on networks for their programming. Five of the Debtors' ten stations are affiliated with the ABC television network, three are affiliated with the CBS television network, one is affiliated with the NBC television network and one is affiliated with the MyNetworkTV network. Each of the Debtors' stations other than KRON-TV is a party to an affiliation agreement with one of the major networks, which gives a station the right to rebroadcast programs transmitted by the network. MyNetworkTV provides KRON-TV with 2 hours per day of network programming. The television viewership levels for stations other than KRON-TV are materially dependent upon programming provided by the major networks. The four major networks have historically paid their affiliated stations a fee for each hour of network programming broadcast by the stations in exchange for the networks' right to sell the majority of the commercial time during such programming. Beginning in 2010, there will be no contractually obligated network compensation payments. Additionally, it is likely that the Debtors will need to begin paying some amount of compensation to the networks in connection with negotiating affiliation agreement renewals.

The ABC affiliations expire on December 31, 2009, the CBS affiliations for WLNS-TV and KLFY-TV expire on September 30, 2012, the CBS affiliation for KELO-TV and its satellite stations expires on April 2, 2015, and the NBC affiliation expires on January 1, 2015. Under the ABC, CBS and NBC affiliations, the Debtors will be receiving significantly less network compensation than the Debtors received from ABC, CBS and NBC under previous agreements.

3.      *Customers.*

The Debtors' primary customers are local, regional, and national advertisers. The Debtors work closely with advertisers to develop campaigns that match specifically targeted audience segments with the advertisers' overall marketing strategies. With this information, the Debtors regularly refine their programming mix among network, syndicated and locally produced programs in a focused effort to attract audiences with demographic characteristics desirable to advertisers. The Debtors sell advertising to a large number of diverse customers in different industries, thus spreading credit risk.

4.      *Competition.*

Competition in the television industry takes place on several levels: competition for audience, competition for programming (including news) and competition for advertisers. Additional factors that are material to a television station's competitive position include signal coverage and assigned frequency.

(a)      Audience

Stations compete for audience on the basis of program popularity, which has a direct effect on advertising rates. A majority of the daily programming on the Debtors' stations, other than KRON-TV, is supplied by the network with which each station is affiliated. In those periods, the stations are totally dependent upon the performance of the network programs in attracting viewers. There can be no assurance that such programming will achieve or maintain satisfactory viewership levels in the future. Non-network time periods are programmed by the station with a combination of self-produced news, public affairs and other entertainment programming, including news and syndicated programs purchased for cash, cash and barter, or barter only.

Although the commercial television broadcast industry historically has been dominated by the four major broadcast networks (ABC, NBC, CBS, and FOX), stations affiliated with the other national networks (The CW, MyNetworkTV, and ION Television), independent stations, and other video programming delivery methods, such as cable and satellite systems, have become significant competitors for the broadcast television audience. In addition, in recent years, certain cable operators have elected to compete for a share of the local news audience with local cable news channels.

Other sources of competition include home entertainment systems (including video cassette and video disc recorders and playback systems, videodisks, DVDs, DVRs, and video game devices), video-on-demand and pay-per-view, portable digital devices, and the Internet. In particular, networks have started distributing programming directly to consumers via the Internet and portable digital devices such as video iPods and mobile phones.

Further advances in technology may increase competition for household audiences and advertisers. Video compression techniques, applicable to all video delivery systems, reduce the bandwidth required for television signal transmission and have the potential to provide vastly expanded programming to highly targeted audiences. This ability to reach very narrowly defined audiences is expected to alter the competitive dynamics for advertising expenditures. The same compression technology, however, enables local television broadcast stations to broadcast multiple digital channels of local television programming either free or on an encrypted, subscription fee basis. This technology expands the capacity of local television broadcast stations to provide more programming and could develop new sources of revenue. The Debtors, however, are unable to predict the effect that any of these or other technological changes in which video programming may be delivered will have on the broadcast television industry or the future results of the Debtors' operations.

(b)     Programming

Competition for programming involves negotiating with national program distributors or syndicators, which sell first-run and rerun packages of programming. The stations compete against in-market broadcast station competitors for exclusive local access to off-network reruns (such as *Friends*) and first-run product (such as *Entertainment Tonight*) in their respective markets. Cable and satellite systems compete with local stations for programming to a lesser extent, and various national cable and satellite networks from time to time have acquired programs that would have otherwise been offered to local television stations. Competition for exclusive news stories and features is also endemic in the television industry.

(c)     Advertising

Advertising rates are based upon the size of the market in which the station operates, a program's popularity among the viewers that an advertiser wishes to attract, the number of advertisers competing for the available time, the demographic makeup of the market served by the station, the availability of alternative advertising media in the market area, aggressive and knowledgeable sales forces, and development of projects, features and programs that tie advertiser messages to programming. Advertising revenue comprises the primary source of revenue for commercial television stations. The Debtors' stations compete for such advertising revenue with other television stations in their respective markets, as well as with other advertising media, such as newspapers, radio stations, magazines, outdoor advertising, transit advertising, yellow page directories, direct mail, the Internet, and cable and satellite systems serving the same market. Competition for advertising dollars in the broadcasting industry occurs primarily within individual markets. Generally, a television broadcasting station in the market does not compete with stations in other market areas. The Debtors' television stations are located in highly competitive markets.

5.     *Seasonality; Cyclicality.*

Expenditures by advertisers tend to be cyclical, reflecting overall economic conditions, as well as budgeting and buying patterns. A decline in the economic prospects of advertisers or the economy in general could alter current or prospective advertisers' spending priorities. This could cause the Debtors' revenues or operating results to decline significantly in any given period.

The advertising revenue of the Debtors' stations are generally highest in the second and fourth quarters of each year, due in part to increases in consumer advertising in the spring and retail advertising in the period leading up to, and including, the holiday season. In addition, advertising revenue is generally higher during even numbered election years due to spending by political candidates and supporters of ballot initiatives where spending typically is heaviest during the fourth quarter.

6.     *Other Operations.*

In addition to advertising revenue, a small percentage of the Debtors' revenue is derived from retransmission consent revenues from certain cable and satellite providers, and other miscellaneous sources, including commercial production, trade shows, internet sales and tower space rental income.

In respect of the Debtors' retransmission consent revenues, in 2006, cable penetration measured as a percentage of total households fell for the first time in 16 years. At the same time, other delivery systems such as satellite and telephone company based ("telco") systems increased their penetration. In the future, these direct competitors to cable operators, especially the telco systems, are expected to increase cable's competition in delivering television programming into the home. Each of these delivery platforms (cable, satellite and telco) has made the inclusion of local television stations on

their systems a key element of their marketing to consumers. Satellite and telco operators generally pay for the right to retransmit local television station signals. Cable system operators had generally resisted paying for retransmission rights. However, during the second half of 2008, several new retransmission consent agreements were reached with cable operators, leading to an increase in retransmission revenues. Additional retransmission consent agreements were signed in 2009, and the Debtors continue to negotiate retransmission rights with counterparties possessing various video delivery platforms.

## B.     DEBTORS' PRINCIPAL ASSETS

The Debtors' principal assets are comprised of: (1) cash and cash equivalents; (2) trade accounts receivable; (3) deferred charges; (4) intangible assets, including programming license rights, broadcast licenses, and network affiliation agreements; and (5) property and equipment.

The Debtors' property and equipment consists primarily of offices, studios, transmitter sites, and antenna sites maintained under capital leases. The studios are generally housed with the respective Debtor's office in downtown or business districts. The transmitter sites and antenna sites are generally located in elevated areas so as to provide maximum market coverage. Additionally, in 2006, Sprint Nextel Corporate ("Nextel") was granted the right from the FCC to reclaim from broadcasters in each market across the country the 1.9 GHz spectrum for an emergency communications system. In order to reclaim this signal, Nextel is required to replace all analog equipment currently using this spectrum with digital equipment. All broadcasters have agreed to use the digital substitute that Nextel will provide. The transition is being completed on a market-by-market basis. During 2007, two of the Debtors' stations replaced their existing equipment and put the new equipment into service. During 2008, one of the Debtors' stations replaced its existing equipment and put the new equipment into service. The remaining stations expect this replacement to occur by the end of 2009.

## C.     SUMMARY OF PREPETITION INDEBTEDNESS AND PREPETITION FINANCING

The original face amount of the Debtors' prepetition indebtedness consists of: (a) $370 million in senior secured credit, comprised of a revolver and term loans and (b) $640 million in aggregate principal amount of senior subordinated unsecured notes. The following chart summarizes the Debtors' prepetition indebtedness as of the Commencement Date:

| Financing | Original Amount | Outstanding Amount | Maturity Date | Security |
|---|---|---|---|---|
| Revolver | $20 million | $0 | May 30, 2012 | Secured |
| Term Loan | $300 million | $289.5 million | Nov. 3, 2012 | Secured |
| Incremental Term Loan | $50 million | $48.6 million | Nov. 3, 2012 | Secured |
| 10% Senior Subordinated Notes | $500 million | $344.3 million | March 1, 2011 | Unsecured |
| 8¾% Senior Subordinated Notes | $140 million | $140.0 million | January 15, 2014 | Unsecured |

1.     *Secured Credit Facility.*

On May 3, 2005, Young, as borrower, and each of the other Debtors as guarantors, entered into the Fourth Amended and Restated Credit Agreement (as subsequently amended and supplemented, and together with related loan and security documents, the "Credit Agreement") with the financial institutions, signatory thereto from time to time (the "Prepetition Lenders"), Wachovia Bank,

National Association as administrative agent, collateral agent and issuing bank (the "Prepetition Agent"), Lehman Commercial Paper, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agents, BNP Paribas as documentation agent, and Wachovia Capital Markets, LLC, Lehman Brothers Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated as joint lead arrangers and joint lead book runners. The Credit Agreement consists of a $300.0 million term loan that matures in 2012 and a revolving credit facility in the amount of $20.0 million that matures in 2010. The Secured Obligations under the Credit Agreement bear a floating interest rate, based upon LIBOR which ranged from 4.00% to 5.25% as of December 31, 2008. On May 3, 2005, the full $300.0 million of the term loan was borrowed. The proceeds of the term loan were used to finance the purchase by Young of all of its $246.9 million outstanding principal amount of 8½% Senior Notes due 2008 and for working capital. Young pays an annual commitment fee at the rate of 0.5% per annum of the unused available borrowings under the revolving credit portion of the Credit Agreement. Young capitalized approximately $6.0 million of fees associated with the new term loan and revolving credit facility.

On May 30, 2006, Young entered into (i) the First Amendment to the Credit Agreement and (ii) the Increase Joinder to the Credit Agreement. The Increase Joinder to the Credit Agreement provided for a $50.0 million incremental term loan under the Credit Agreement which Young borrowed in full on May 30, 2006. The First Amendment effected certain amendments to the Credit Agreement including, without limitation, (i) the reduction of the minimum amount of cash Young must maintain from $35.0 million to $10.0 million and (ii) an increase of 0.25% to each of the Base Rate Margin and the LIBOR Margin (used in the calculation of interest rates payable by Young under the Credit Agreement). The incremental term loan has the same terms and conditions as the term loans outstanding under the Credit Agreement (as amended by the First Amendment) immediately prior to the incremental term loan borrowing. The term loan portion of the Credit Agreement matures in 2012. Young capitalized approximately $1.4 million of fees associated with the incremental term loan and First Amendment.

On May 3, 2005, the Debtors entered into an interest rate swap agreement for a notional amount of $71.0 million with a commercial bank who is also a Prepetition Lender under the Credit Agreement. The Debtors accounted for this agreement as a cash flow hedge under FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*, and as such, the change in the fair value of the interest rate swap was reported as a component of other comprehensive income (loss). For the year ended December 31, 2008 income of approximately $87,000, respectively, was recorded in other comprehensive income (loss). The swap expired on May 8, 2008. Accordingly, the fair value of the swap was reduced to zero during the second quarter of 2008.

The Secured Obligations under the Credit Agreement are secured by interests in and liens upon substantially all of the Debtors' assets as more fully described, and subject to the limitations set forth in the Credit Agreement. As of February 13, 2009, the Allowed amount of the Secured Obligations owing to the Prepetition Lenders was $338,451,923.85 (comprising outstanding principal of $338,125,000.00, plus unpaid prepetition fees, costs and expenses as of the Commencement Date).

2.    *Unsecured Notes.*

On March 1, 2001, Young completed a private offering of $500.0 million of 10% Senior Subordinated Notes due 2011. On December 23, 2003, Young completed a private offering of $140.0 million of 8¾% Senior Subordinated Notes due 2014. These two series of notes are collectively referred to as the "Senior Subordinated Notes" and have an aggregate face amount of $640.0 million. The Senior Subordinated Notes are general unsecured obligations of Young, subordinated in right of payment to all senior debt, including all of Young's indebtedness under the Credit Agreement. The Senior Subordinated Notes are guaranteed by each of the Debtors.

As of December 31, 2008, the principal amount outstanding under the Senior Subordinated Notes was approximately $484.3 million.

## D.    PENDING LITIGATION AND OTHER PROCEEDINGS

The Debtors are involved in legal proceedings and litigation arising in the ordinary course of business.  In the Debtors' opinion, the outcome of litigation currently pending will not materially affect the Debtors' financial condition or results of operations.

In addition to litigation arising in the ordinary course of business, the Debtors are occasionally party to other proceedings related to its employee benefit programs and certain union activity.  Only two of Young's stations have any employees represented by a union.  The American Federation of Television and Radio Artists ("AFTRA") represents KRON's directors, writers and newspersons in three separate bargaining units.  The International Brotherhood of Electrical Workers (the "IBEW") represents KRON's technicians, operators and some of its Video Journalists in a single bargaining unit and the technicians, directors and operators at KWQC.

1.    *KRON/IBEW Local 45 Pension Plan.*

Young maintains the KRON/IBEW Local 45 Pension Plan ("IBEW Pension Plan"), a jointly administered single employer plan, in which benefit accruals were frozen effective as of October 14, 2005.  Young is responsible to make contributions to the IBEW Pension Plan in compliance with the minimum funding requirements under the Internal Revenue Code ("Code").  However, on April 15, 2009, July 15, 2009, ~~and~~ September 15, 2009 and October 15, 2009, Young failed to make its required contribution due in each of those months.  As required under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), Young filed a reportable event notice on May 7, 2009, July 24, ~~2009 and~~2009, September 15, 2009 and October 20, 2009 to inform the Pension Benefit Guaranty Corporation (the "PBGC") of the failure to make the applicable contributions.  Through ~~September~~October 15, 2009, the total amount of Young's delinquent contributions equal $~~275,781.00.  On October 15, 2009, Young will be required to contribute $106,202 to the IBEW Pension Plan.  Additionally, after~~381,909.00.  After December 31, 2009, Young may become subject to excise taxes on the aggregate amount of contributions that remain unpaid at that time.

Young will file an application ~~requesting~~with the PBGC ~~to make a determination~~and a motion with the Bankruptcy Court seeking determinations that the Pension Plan qualifies to be terminated under the PGBC's distress termination procedures because the Plan has unfunded vested benefits (i.e. insufficient assets to pay all benefits owed to participants).  There can be no assurance at this time that the PBGC will consent to or that the Bankruptcy Court will approve, the Debtors' request for a ~~distressed~~distress termination.

2.    *Paul Dinovitz, Dispute Regarding Split Dollar Agreement and Policy.*

Mr. Paul Dinovitz was the general manager of KRON-TV until the end of 2004.  Young and Dinovitz had previously entered into a split dollar agreement and a separate collateral assignment agreement with respect to a Security Life of Denver (an ING company) policy of insurance.  The policy was used, in relevant part, to provide certain pension replacement benefits (in the nature of a supplemental executive retirement plan or "SERP" benefits) provided for in Mr. Dinovitz's original employment agreement and an Agreement to Modify Employment Agreement and Non-ISO Option Agreement; Voluntary Retirement and Release Agreement ("Release Agreement").  When Mr. Dinovitz attained age 60 in 2007, he began taking distributions from the policy in the amount of $40,000 per year as his SERP benefits.

Young notified Mr. Dinovitz and Security Life of Denver of Young's desire to terminate the split dollar agreement and obtain a refund of the premiums it had paid on the policy (totaling $992,500.00). Young has commenced a legal action to recover the premiums by surrendering the policy, obtaining the entire amount of available cash value from the policy and requiring Mr. Dinovitz to pay the difference.

3. *AFTRA Multiemployer Pension and Welfare Plans.*

KRON-TV contributes to the AFTRA multi-employer pension and welfare plan ("AFTRA Plan") under its current union contracts. Young has taken no actions that would trigger withdrawal liability.

4. *Collective Bargaining Agreements at KRON-TV.*

The status of the four (4) separate collective bargaining agreements and the negotiations with respect to union-represented employees at Young Broadcasting of San Francisco, Inc. (d/b/a KRON-TV), is as follows:

(a) <u>Directors</u>. The AFTRA-KRON-TV Basic Minimum Agreement Covering Announcers and Directors (Agreement between American Federation of Television and Radio Artists and Young Broadcasting of San Francisco, Inc., owner and operator of television station KRON-TV) expired December 12, 2008. The negotiations with AFTRA were suspended after Young and its Affiliates filed for bankruptcy and will resume in October 2009.

(b) <u>Newspersons</u>. The AFTRA-KRON-TV Basic Minimum Agreement Covering Newspersons (Agreement between American Federation of Television and Radio Artists and Young Broadcasting of San Francisco, Inc., owner and operator of television station KRON-TV) expired June 30, 2008. The negotiations with AFTRA were suspended after Young and its Affiliates filed for bankruptcy and will resume in October 2009.

(c) <u>Writers</u>. The AFTRA KRON-TV Basic Minimum Agreement Covering Writers (Agreement between American Federation of Television and Radio Artists and Young Broadcasting of San Francisco, Inc., owner and operator of television station KRON-TV) expired December 12, 2008. The negotiations with AFTRA were suspended after Young and its Affiliates filed for bankruptcy and will resume in October 2009.

(d) <u>IBEW Members</u>. The Supplemental Agreement to Amend and Extend by and between Young Broadcasting of San Francisco, Inc. and The International Brotherhood of Electrical Workers, Local Union 45, AFL-CIO-CLC expires on December 15, 2009. Negotiations for a new contract will begin in October 2009.

5. *Collective Bargaining Agreement at Young Broadcasting of Davenport, Inc.*

The Agreement between Young Broadcasting of Davenport, Inc. and International Brotherhood of Electrical Workers, Local 825 expired on May 26, 2009. Negotiations for a new contract commenced on April 14, 2009, and have been ongoing since that date. Negotiations will continue in October 2009.

On August 26, 2009, a decertification petition was filed (NLRB Case #33-RD-902) to decertify IBEW Local 825 as the bargaining representative of employees at the station. The Petition was blocked by the filing of an unfair labor practice charge by the union on September 2, 2009 (NLRB Case #33-CA-15876). The charge filed by the union alleges the employer assisted an employee in filing the decertification petition and that the employee is a manager of the company. The NLRB is presently investigating the charge and will solicit the employer's response if necessary.

During the pendency of the decertification petition and NLRB charge, the employer, under the law, must continue to bargain for a new contract. As provided above, the Station will continue to meet and negotiate in good faith with the union.

**E.     PBGC DISCLOSURE**

The PBGC has requested that the following disclosure be added to this Disclosure Statement regarding the IBEW Pension Plan. The PBGC asserts and discloses the following:

Debtor Young Broadcasting of San Francisco, Inc. sponsors the KRON/IBEW Local 45 IBEW Pension Plan (the "IBEW Pension Plan"), which is asserted to be a defined benefit IBEW Pension Plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") 29 U.S.C. §§ 1301-1461.

All of the Debtors, as either the sponsor or member of the sponsor's controlled group (within the meaning of 29 U.S.C. § 1301(a)(13), (14)), are jointly and severally liable to contribute to the IBEW Pension Plan for the amounts necessary to satisfy ERISA's and the Internal Revenue Code's minimum funding standards ("Minimum Funding Contributions"). *See* 29 U.S.C. §§ 1082, 1083 (as to § 1083, effective for pension plans years beginning after December 31, 2007); 26 U.S.C. §§ 412, 430 (as to § 430, effective for pension plan years beginning after December 31, 2007). The Debtors are also jointly and severally liable for insurance premiums owed to the Pension Benefit Guaranty Corporation ("PBGC"). See 29 U.S.C. §§ 1306, 1307.

PBGC is the federal agency that administers the nation's defined benefit pension plan termination insurance program under Title IV of ERISA. When an underfunded pension plan terminates with insufficient assets to pay benefits, PBGC generally becomes statutory trustee of the plan and pays benefits to the plan's participants up to statutory limits.

Should the Debtors decide to terminate the IBEW Pension Plan, ERISA provides the exclusive means to terminate a pension plan. See 29 U.S.C. § 1341(a)(1). The Debtors may terminate the IBEW Pension Plan in a standard termination in accordance with 29

U.S.C. § 1341(b) and corresponding regulations. *See* 29 C.F.R. §§ 4041.21-4043.31. A standard termination requires sufficient assets to pay all of the IBEW Pension Plan's promised benefits. *See* 29 U.S.C. § 1341(b)(2)(A)(i) (III).

If a standard termination of the IBEW Pension Plan is not feasible, the Debtors may seek to terminate the IBEW Pension Plan in a distress termination. *See* 29 U.S.C. § 1341(c). If the Debtors fail to meet the statutory requirements for a distress termination, the IBEW Pension Plan will remain ongoing, and the Debtors and any other controlled group members remain liable for amounts owed in continuing the IBEW Pension Plan. However, the IBEW Pension Plan may also be terminated by a PBGC-initiated termination. *See* 29 U.S.C. § 1342(a).

PBGC has filed timely proofs of claims against the Debtors for (1) the IBEW Pension Plan's underfunding on a termination basis ("Unfunded Benefit Liabilities"), (2) unpaid Minimum Funding Contributions – a portion of which PBGC asserts is entitled to priority under 11 U.S.C. §§ 507(a)(2), (5), and (3) unpaid premiums. As of May 31, 2009, PBGC estimated that the IBEW Pension Plan's unfunded benefit liability was approximately $6,552,122; this claim is contingent on the IBEW Pension Plan terminating, other than through a standard termination, during the bankruptcy and would be withdrawn if no such termination occurs.

If the IBEW Pension Plan terminates in a distress termination pursuant to 29 U.S.C. § 1341(c)(2)(B)(ii) or a PBGC-initiated termination under 29 U.S.C. § 1342 while the Debtor is attempting to reorganize in Chapter 11, and the Debtors ultimately are the subject of a confirmed Chapter 11 plan of reorganization, the Debtors will become liable to PBGC – in addition to the flat- and variable-rate premiums – for termination premiums in the amount of $1,250 for each IBEW Pension Plan participant for three years. The termination premium liability does not exist until after the Chapter 11 plan is confirmed and the Debtors exit from bankruptcy. *See* 29 U.S.C. § 1306(a)(7)(B). Thus, under those circumstances, termination premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5) and 1141. However, if the Debtors' Chapter 11 proceeding in essence becomes a liquidation, and the IBEW Pension Plan terminates in a PBGC-initiated termination, the termination premium may become immediately due, and PBGC typically asserts the termination premium as a administrative priority claim in the Debtors' liquidating bankruptcy.

Any termination of the IBEW Pension Plan shall be in conformity with statutory and regulatory requirements as well as the rules and requirements of the PBGC and the U.S. Internal Revenue Service.

# III. THE REORGANIZATION CASES

## A. EVENTS LEADING TO THE REORGANIZATION CASES

The Debtors derive their operating revenues primarily from local, regional and national advertising on their television stations. Advertising expenditures track the larger economy, thus, a decline in the economic prospects of advertisers and consumers—and a decline of the economy in general—usually negatively alters current or prospective advertiser spending priorities. Due to broadcast television stations' reliance on advertising revenue as a source of profit, declines in advertising budgets, particularly in recessionary periods, adversely affect the broadcast industry as a whole. Indeed, in these difficult economic times, domestic media companies across the board have witnessed an unprecedented decline in advertising revenue and, as a result, industry-wide revenue and operational performance has suffered. While this decline has been occurring for several years, the decline has been accelerated and exacerbated by the recession and the dislocation of the credit markets.

Advertising rates—and, by extension, advertising revenue—is in a large part determined by a television station's overall ratings and share in its market, as well as the station's ratings and share among particular demographic groups that an advertiser may be targeting. Competition for the remaining advertising dollars is steep, especially when economic conditions are tough. The Debtors are located in highly competitive markets and must compete for advertising revenue with other television stations in their respective areas as well as other advertising vehicles (e.g., newspapers, radio stations, magazines, cable networks, and Internet portals).

In addition to steep competition in the broadcast industry, advertising expenditures tend to be seasonal, with advertising revenue generally highest in the second and fourth quarters of each year. This is due in part to increases in consumer advertising in the spring and retail advertising in the period leading up to, and including, the holiday season. Advertising revenue also tends to be higher during election years due to spending by political candidates and political-action groups.

In response to declining revenues, the Debtors announced a cost savings initiative designed to save the Debtors more than $25 million by the end of fiscal year 2010. The savings initiative contemplated a 15% reduction in the Debtors' workforce, introduction of new technology, creation of a consolidated accounting system and the termination of outside professional services. In January 2008, the Debtors announced the commencement of a process intended to lead to the sale of the Company's largest station, KRON-TV ("KRON"), located in San Francisco. In 2007, KRON suffered cash flow losses, causing a cash drain on the Debtors. A sale of the station would have eliminated the cash drain on the Debtors and any consideration from the sale would have been used to repay Secured Debt. The reduction in borrowings would have reduced interest costs. The Debtors retained financial advisors to facilitate the sale of KRON. The Debtors and their financial advisors met with a number of prospective purchasers; but in November 2008, the Debtors decided to suspend the sale process.

In addition, the Debtors explored out-of-court restructuring alternatives to alleviate their heavy debt burden. Prior to the decline in market conditions in the fall of 2008, the Debtors, with the assistance of their financial advisors, engaged in discussions with several major Holders of the Senior Subordinated Notes regarding a potential restructuring transaction. The Debtors also explored other strategic transactions to infuse their operations with needed cash, but could not reach any agreements.

Despite the Debtors' efforts to reduce costs and infuse additional capital, their cash flow continued to decline to such an extent that the Debtors opted not to pay quarterly interest due on their outstanding prepetition indebtedness to preserve the cash necessary to operate their business and pursue a restructuring. In particular, on January 15, 2009, the Debtors determined to forego making the $6.125

million interest payment due on the 8¾% Senior Subordinated Notes. Additionally, on February 6, 2009, the Debtors opted to forego making a $4.51 million interest payment due on the Secured Debt.

In January 2009, the Debtors engaged a new financial advisor, UBS Securities LLC ("UBS"), to commence a dual-track process of searching for an equity investor and leading discussions with the Debtors' prepetition secured creditors regarding restructuring alternatives. In February 2009, the Debtors' Board of Directors created the position of Chief Restructuring Officer ("CRO") and appointed David Pauker of Goldin Associates, LLC as the CRO. The CRO is responsible for the implementation of the Debtors' efforts to effect a recapitalization and deleveraging through a Chapter 11 plan and/or a Section 363 sale.

## B.    COMMENCEMENT OF THE REORGANIZATION CASES

The Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code on February 13, 2009 (the "Commencement Date"). During the initial stages of these chapter 11 cases, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with the vendors, customers, employees, and utility providers that had been impacted by the commencement of these chapter 11 cases. As a result of these initial efforts, the Debtors believe that they were able to minimize the negative impacts resulting from the commencement of these chapter 11 cases.

On or about the Commencement Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of first-day motions and applications (collectively, the "First Day Motions") with the Bankruptcy Court. Within a few days, the Bankruptcy Court entered several orders to, among other things (a) prevent interruptions to the Debtors' businesses; (b) ease the strain on the Debtors' relationships with certain essential constituents; and (c) provide access to much needed cash collateral, among other things (collectively, the "First Day Orders"). First Day Orders are intended to facilitate the transition between a debtor's pre-petition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. Many of the First Day Orders obtained in this case are typical for large chapter 11 cases such as the Debtors'.

1.    *Procedural Motions.*

To facilitate a smooth and efficient administration of the Debtors' estates during the Reorganization Cases, and to reduce the administrative burden associated therewith, the Bankruptcy Court entered procedural orders: (i) authorizing the joint administration of the Debtors' chapter 11 cases (Docket No. 20); (ii) granting the Debtors an extension of time to file their Schedules (Docket No. 25); and (iii) establishing case management and administrative procedures (Docket No. 21).

2.    *Use of Cash Collateral.*

On the Commencement Date, the Debtors sought authority to use cash collateral of the Prepetition Lenders to permit, among other things, the orderly continuation of the operation of the Debtors' businesses, to maintain business relationships with vendors, suppliers, and customers, to fund payroll, to make capital expenditures and to satisfy other working capital and operational needs.

On February 17, 2009, the Bankruptcy Court entered an interim order authorizing the Debtors to use cash collateral (Docket No. 28). On March 4, 2009, the Bankruptcy Court entered a final order authorizing the use of cash collateral (Docket No. 65).

3. *Employment and Compensation of Advisors.*

The Debtors employed, with authorization from the Bankruptcy Court, several professionals to assist them in navigating the chapter 11 process, fulfilling their duties as debtors in possession and preparing all mailings to creditors and other parties in interest. While not all technically part of the first-day pleadings, the Court issued the following orders regarding the Debtors' retention of advisors: (i) Interim and Final Orders Granting Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Epiq Bankruptcy Solutions as Notice, Claims and Balloting Agent for the Debtors (Docket Nos. 27 and 67, respectively); (ii) Order Granting Application of the Debtors for an Order Authorizing the Employment and Retention of Sonnenschein Nath & Rosenthal LLP as Attorneys for the Debtors and Debtors in Possession effective *Nunc Pro Tunc* to the Commencement Date (Docket No. 102); (iii) Order Granting Application for Entry of an Order Authorizing the Employment and Retention of (I) Goldin Associates, LLC to Perform Restructuring Services for the Debtors and (II) David Pauker as the Debtors' Restructuring Officer *Nunc Pro Tunc* to the Commencement Date (Docket No. 103); (iv) Order Granting Application to Employ UBS Securities LLC as Financial and Capital Markets Advisor (Docket No. 253); (v) Order Granting Application to Employ PricewaterhouseCoopers LLP as Tax Advisors (Docket No. 268); and (vi) Order Authorizing the Debtors to Employ and Retain Ernst & Young, LLP as Auditors *Nunc Pro Tunc* to the Commencement Date (Docket No. 189).

In addition to the foregoing, the Court issued an Order Granting the Debtors' Motion for Order Authorizing the Debtors to Retain and Compensate Professionals in the Ordinary Course of the Debtors' Business to enable the Debtors to employ other professionals to perform various services on the Debtors' behalf as they had done pre-petition (Docket No. 100).

Compensation of non-ordinary course professionals is governed by the Bankruptcy Court's Order Granting Debtors' Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Committee Members (Docket No. 101).

4. *Employee Compensation.*

The Debtors rely on their employees for their day to day business operations. The Debtors believed that without the ability to honor prepetition wages, salaries, benefits, commission, and the like, their employees might have sought alternative employment opportunities, perhaps with the Debtors' competitors, thereby depleting the Debtors' workforce, hindering the Debtors' ability to meet their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to reorganize successfully. The loss of valuable employees would have been distracting at a critical time when the Debtors were focused on stabilizing their operations. Accordingly, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay, among other amounts, prepetition Claims and obligations for (a) wages, salaries, bonuses, commissions and other compensation, (b) deductions and payroll taxes, (c) reimbursable employee expenses, and (d) employee medical and similar benefits (Docket Nos. 24 and 64).

5. *Utilities.*

Section 366 of the Bankruptcy Code protects debtors from utility service interruptions upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services. The Debtors felt that the order authorizing the Debtors' use of cash collateral, along with a two week deposit and the Debtors' clear incentive to maintain their utility services, provided the adequate assurance required by the Bankruptcy Code. Consequently, the Bankruptcy Court entered an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order from the Bankruptcy Court (Docket No. 104).

6. *Cash Management Systems.*

As part of a smooth transition into these Reorganization Cases, and in an effort to avoid administrative inefficiencies, maintaining the Debtors' cash management system was of critical importance. Thus, the Debtors sought and the Bankruptcy Court entered a First Day Order authorizing the Debtors to continue using the existing cash management system, bank accounts and business forms. Further, the Bankruptcy Court deemed the Debtors' bank accounts debtor in possession accounts and authorized the Debtors to maintain and continue using these accounts in the same manner and with the same account numbers and document forms as those employed before the Commencement Date.

7. *Fees and Taxes.*

The Debtors believed that, in some cases, certain authorities had the ability to exercise rights that would be detrimental to the Debtors' restructuring if the Debtors failed to meet the obligations imposed upon them to remit certain taxes and fees. Therefore, the Debtors felt that it was in their best interests to eliminate the possibility of any unnecessary distractions. Accordingly, the Debtors sought, and the Bankruptcy Court entered, an order authorizing the Debtors to pay fees and taxes, including sales and use, franchise, real property and annual report taxes as necessary or appropriate, to avoid harm to the Debtors' business operations (Docket No. 550).

## C.    THE CREDITORS COMMITTEE

1. *Appointment of the Creditors Committee.*

Pursuant to section 1102(a) of the Bankruptcy Code, on February 26, 2009 the United States Trustee appointed the Creditors' Committee. The original members of the Creditors' Committee are (i) U.S. Bank, National Association, (ii) Capital Research and Management Company, (iii) Gannaway Web Holdings, LLC, (iv) Global Leveraged Credit Opportunity Fund I, (v) Kingworld Productions, Inc., (vi) Swiss Re, and (vii) Harris Corporation.

The Creditors Committee, with approval from the Bankruptcy Court, retained (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP as bankruptcy counsel (Docket No. 237), (ii) Young Conaway Stargatt & Taylor LLP as special conflicts counsel (Docket No. 323), and (iii) Allen & Company, LLC as financial advisor (Docket No. 416).

Since its formation, the Creditors Committee and its advisors have played an active and important role in the Reorganization Cases.

2. *Meeting of Creditors.*

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on April 3, 2009 at the Office of the United States Trustee at 80 Broad Street, Fourth Floor, New York, New York 10004. In accordance with Bankruptcy Rule 9001(5), which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined under oath by a representative of the United States Trustee and by any attending parties in interest, James A. Morgan, the Debtors' Chief Financial Officer, David Pauker, the Debtors' Chief Restructuring Officer, and counsel to the Debtors, attended the meeting and answered questions posed by the United States Trustee.

D. **CLAIMS PROCESS AND BAR DATE**

     1.    *Schedules and Statements.*

     The Debtor filed its Schedule of Assets and Liabilities and Statement of Financial Affairs (collectively, the "Schedules and Statements") with the Bankruptcy Court on March 23 and 24, 2009. Among other things, the Schedules and Statements set forth the Claims of known creditors against the Debtor as of the Commencement Date, based upon the Debtors' books and records. On April 28, 2009 the Debtors filed their first amended Schedules and Statements (the "First Amended Schedules and Statements"). The First Amended Schedules and Statements further set forth the Claims of known creditors as of the Commencement Date based upon the Debtors' books and records.

     2.    *Bar Date.*

     On April 30, 2009 the Bankruptcy Court entered an order setting a bar date of June 5, 2009, for general unsecured claims and of August 12, 2009, for governmental units (as defined by section 101(27) of the Bankruptcy Code) (the "Bar Dates"). Subsequently, the Claims Agent mailed notices of the Bar Dates to all known creditors and equity holders of the Debtor. Notice of the Bar Dates was also published in The Wall Street Journal (national edition) on May 12, 2009. To date, the Debtors have received 750 proofs of claim forms asserting approximately $20,727,119,033, in claims. The Debtor has begun the process of reviewing the asserted Claims and objecting to those Claims it believes should be Disallowed in whole or in part. The Debtors believe that many duplicate Claims have been filed and upon removing these duplicates from the ongoing Claims analysis, the remaining 645 proofs of claim asserting approximately $870,214,988 would be categorized as follows: nineteen Secured Claims in the total amount of $344,034,307; four Administrative Claims in the total amount of $6,711,351; fifty-seven Priority Tax Claims in the total amount of $745,284; twenty-nine Other Priority Claims in the total amount of $1,172,336; 534 General Unsecured Claims in the total amount of $33,252,710; and two Noteholder Claims in the total amount of $484,299,000.

     The Debtors' estimates of Allowed Claims are identified herein in Article I.

     *Notwithstanding the Debtors' substantial efforts in developing its estimate of Allowed Claims, the preparation of such estimates is inherently uncertain, and accordingly there is no assurance that such estimates will accurately predict the actual amount of Allowed Claims in these cases. As a result, the actual amount of Allowed Claims may differ significantly from the Debtors' estimates.*

E. **SIGNIFICANT EXECUTORY CONTRACTS AND OTHER SIGNIFICANT MOTIONS**

     The Debtors are party to hundreds of executory contracts, which include intellectual property licenses, licenses or leases to utilize television broadcast towers, programming agreements, network affiliation agreements, insurance policies, and real property leases, among others. The Debtors have utilized their chapter 11 cases to reject burdensome executory contracts and assume beneficial executory contracts to maximize the value of their estates in their sound business judgment. The treatment of executory contracts not already assumed or rejected is discussed more fully in Article IV.

     The Debtors have made much progress during the course of their chapter 11 cases in renegotiating key executory contracts to be assumed on more favorable terms. For example, the Debtors were able to renegotiate numerous programming and syndication agreements, including popular programs such as "Everybody Loves Raymond," "Inside Edition," "Entertainment Tonight," "The Insider," and "The Dr. Phil Show." The Debtors were also able to renegotiate more favorable terms of their licenses to air programming related to the Tennessee Titans' professional American football games and

programming related thereto. In all, the Debtors were – through renegotiating many of their programming licenses – able to save millions of dollars annually, while enabling the Debtors' to broadcast popular television shows, enhancing the Debtors' ability to ensure current advertisers maintain their business with the Debtors, and attracting new advertisers.

The Debtors were also able to renegotiate the lease for their corporate headquarters in New York City. The renegotiation of the lease for their main corporate offices enabled the Debtors to vacate unused portions of the premises, while at the same time preserving their tenancy in those portions of the premises the Debtors use in their daily operations. The Debtors intend to relocate their New York City offices to less expensive space.

## F.    EXCLUSIVITY

The Debtors requested that the Bankruptcy Court extend their exclusive periods to propose a plan of reorganization and to seek solicitation of acceptances of that plan (the "Exclusivity Motion"). On June 2, 2009 the Bankruptcy Court entered an order approving the Exclusivity Motion and extending the exclusive period for the Debtor to propose a plan through and including August 3, 2009, and to solicit acceptances of such plan until September 7, 2009 (Docket No. 377). The Debtors subsequently moved to further extend their exclusive periods to propose a plan of reorganization and to seek solicitation of acceptances of that plan (the "Second Exclusivity Motion"). On August 3, 2009, the Bankruptcy Court entered a bridge order extending the Debtors' exclusive periods through such time until the Bankruptcy Court has issued an order determining the relief requested in the Second Exclusivity Motion.

On August 12, 2009 the Court granted the Debtors' Second Exclusivity Motion and extended the debtors exclusive periods to September 17, 2009 and October 22, 2009 to file a chapter 11 plan and solicit acceptances thereof, respectively. Pursuant to the August 12th order granting the Second Exclusivity Motion (Docket No. 549), and with consent of the Debtors, the Bankruptcy Court lifted exclusivity for the limited purpose of allowing the Creditors' Committee to file and solicit acceptances for a plan of reorganization providing for the reinstatement of the obligations under the Credit Agreement substantially on the terms set forth in their objection to the Second Exclusivity Motion filed on August 3, 2009.

## G.    SALE PROCESS

1.    *Solicitation and Marketing Process.*

On March 20, 2009, the Debtors filed their Motion to Approve (i) Bidding Procedures in Connection with an Investment or Sale Transaction; (ii) Authorizing the Debtors to Enter Into a Stalking Horse Agreement in Connection with an Investment or Sale Transaction, (iii) Approving the Debtors' Payment of Breakup Fee in Connection Therewith, and (iv) Scheduling Auction and Sale Hearing Dates Pursuant to Bankruptcy Code Sections 105 and 363 (the "Bid Procedures Motion"). On April 2, 2009, the Bankruptcy Court granted the Bid Procedures Motion (Docket No. 207).

The Debtors and their advisors engaged in an extensive marketing process. Sixty-nine potential bidders were contacted, twenty-nine of which negotiated confidentiality agreements entitling them access to due diligence information. From January through June 2009, twenty-five potential bidders received access to the Debtors' electronic data room and seventeen of those parties requested and were given individual lengthy management presentations. Potential bidders were given the opportunity to visit the Debtor's stations.

The Debtors' initial marketing efforts resulted in the submission of seven indications of interest in early February 2009. Three of these parties ultimately submitted bids in an effort to be selected as the stalking horse bidder pursuant to the bidding procedures approved by this Court.

Dissatisfied with the level of the initial stalking horse bids, the Debtors extended the deadline to submit stalking horse bids from April 8, 2009 to May 15, 2009. Following further negotiations with the Debtors and their advisors, and after performing additional due diligence, the three prospective stalking horse bids were subsequently modified and resubmitted. But even as modified, the bids did not warrant an award of stalking horse status. Although the Debtors opted not to grant any entity stalking horse status, they extended the auction date and adjourned the sale approval hearing to accommodate due diligence requests of additional parties that expressed both a keen interest in the Debtors assets and the wherewithal to consummate a transaction.

The ultimate deadline to submit bids was July 10, 2009. On that date, the Debtors received three qualified bids all seeking to purchase substantially all of the Debtors' assets. Two of the bids offered to purchase the assets for $120 million; however, following adjustments for various conditions and the fact that neither bidder would assume certain administrative liabilities, the bids were valued between $115 and $117 million. In addition to the three qualified bids, the Debtors received an expression of interest from a potential investor who had not participated in the sale process or conducted due diligence. The expression of interest set forth a purchase price of $215 million, but did not qualify to participate in an auction because it was not accompanied by a deposit and the bid was subject to additional due diligence that the bidder estimated would take two to three weeks to complete. The final bid was submitted by the Prepetition Lenders. The Prepetition Lenders offered to credit $200 million of their secured debt towards the purchase of the Debtors' assets and to cause the purchasing entity to assume all allowed administrative costs and cure claims, resulting in a bid value of approximately $219.9 million (the "Credit Bid").

2.    *Auction and Selection of the Prevailing Bid.*

After reviewing the bids, the Debtors approached each of the bidders (other than the Prepetition Lenders) to determine whether they were willing to improve their offers to compete with the Credit Bid submitted on behalf of the Prepetition Lenders. Each bidder was told the amount of the Credit Bid, was asked if they intended to bid at least $200 million to overbid the Credit Bid, and was asked if they intended to attend the auction. Each indicated that they would not raise their bid to that level, did not intend to attend the auction, and requested the prompt return of their deposits. The Debtors also asked the Prepetition Lenders and the Creditors Committee whether they wanted to give the non-qualified bidder more time to conduct due diligence, and they each declined. After consultation with the Creditors Committee and the Prepetition Lenders, the Debtors deemed the Credit Bid, as defined by the bidding procedures, the Prevailing Bid and cancelled the auction.

The sale process conducted by the Debtors and their advisors, was broad in scope and diligently executed. Further, the Debtors' financial advisor believes that the other bidders' failure to top the Credit Bid accurately reflects the market perception that the current value of the Debtors' assets is less than the Credit Bid.

The Debtors executed the Asset Purchase Agreement (the "APA") with the Prepetition Lenders and obtained Bankruptcy Court approval at the APA Approval Hearing.

3.    *Reconstituted Board and Gray Television, Inc. Management Agreement.*

Pursuant to the APA, the Debtors agreed to immediately reconstitute their board of directors, reducing the number of directors from eight to five and electing two new independent directors.

Additionally, the Debtors agreed to enter into a management agreement with Gray Television, Inc. ("Gray") whereby Gray would be responsible for providing advisory and management services to certain of the Debtors' stations beginning in August 2009.

## IV.    SUMMARY OF THE JOINT PLAN

### A.    ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

1.    *Administrative Expense Claims.*

~~Each~~On the Effective Date or as soon thereafter as is practicable, except to the extent that a Holder of an Allowed Administrative Expense Claim ~~shall have its~~against any of the Debtors agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim ~~assumed, performed and paid when due~~shall receive Cash in an amount equal to the Allowed amount of such Claim; *provided however,* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors in possession, shall be paid by the Reorganized Debtors in the ordinary course of business, consistent with past practice in accordance with the terms and subject to the conditions of ~~the APA and~~ any agreements governing, instruments evidencing, or other documents relating to such transactions.

Administrative Expense Claims incurred by the Debtors after the Effective Date including (without limitation) Claims for professionals' fees and expenses incurred after such date, may be paid by the Reorganized Debtors in the ordinary course of business and without application for or Court approval, subject to any agreements with any Claim holders.

The Holders of Allowed Administrative Expense Claims shall have recourse only to the Reorganized Debtors and neither the Debtors, their Estates nor their respective properties shall be subject to any such Claims.

2.    *Compensation and Reimbursement Claims.*

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under section 503(b)(2), 503(b)(3) (except under section 503(b)(3)(D), see below), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, and (ii) except as provided below, shall be paid in full in Cash in such amounts as are allowed by the Bankruptcy Court (A) five ~~(5)~~ Business Days after the date upon which the order relating to any such Administrative Expense Claim is entered, or (B) upon such other terms as may be mutually agreed upon between the Holder of such an Administrative Expense Claim and the Debtors.  The Debtors or ~~the Disbursing Agent~~Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

All Entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred during the Reorganization Cases under section 503(b)(3)(D) of the Bankruptcy Code shall file their respective applications prior to or on the deadline for filing objections to confirmation of ~~the~~this Plan.

3. *Priority Tax Claims.*

~~Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive payment in full in Cash of the unpaid portion of an Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later to occur of (i) the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date that such Claim becomes payable under any agreement between the applicable Debtor and the Holder of such Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.~~ On the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the Holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Company), such holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be Impaired, including periodic payments on a quarterly basis over a period ending not later than five (5) years after the Petition Date, in accordance with the provisions of sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Reorganized Debtor and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

## B. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class A | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class B | Prepetition Lender Claims | Impaired | Yes |
| Class C | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class D | Noteholder Claims | Impaired | Yes |
| Class E | General Unsecured Claims | Impaired | Yes |
| Class F | Equity Interests | Impaired | No (deemed to reject) |
| Class G | Intercompany Interests | Impaired | No (deemed to reject) |

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Equity Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to the Plan, as set forth herein. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

1. *Class A - Priority Non-Tax Claims.*

   (a) <u>Classification</u>. Class A consists of the Priority Non-Tax Claims against the Debtors.

(b)     <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against any of the Debtors has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the parties.

(c)     <u>Voting</u>.  Class A is an Unimpaired Class, and the Holders of Class A Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class A Claims will not be entitled to vote to accept or reject the Plan.

2.     *Class B - Prepetition Lender Claims.*

(a)     <u>Classification</u>.  Class B consists of Prepetition Lender Claims against the Debtors arising under the Credit Agreement.

(b)     <u>Treatment</u>.  The Prepetition Lender Claims are Allowed in full and shall not be subject to any avoidance, reductions, set off, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or Entity.  The Prepetition Lender Claims are Allowed in the aggregate amount of $338,451,923.85 (comprising outstanding principal of $338,125,000.00, as of the Commencement Date, plus unpaid prepetition fees, costs and expenses).

Each Holder of a Prepetition Lender Claim, in full and complete satisfaction of the obligations owed to the Prepetition Lenders under the Credit Agreement, shall receive on the Effective Date its Ratable Proportion of the Holdco Notes, Holdco Common Stock and/or Holdco Lender Warrants, as provided for under the Holdco Corporate Documents and in accordance with the terms of the Plan.

(c)     <u>Voting</u>.  Class B is Impaired, and Holders of Class B Claims will be entitled to vote to accept or reject the Plan.

3.     *Class C - Other Secured Claims.*

(a)     <u>Classification</u>.  Class C consists of Claims against any Debtor which are claims that are secured by liens on Debtor property or that are subject to setoff under section 553 of the Bankruptcy Code to the extent of the value of the property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

(b)     <u>Treatment</u>.  Each Holder of Allowed Class C Claims shall receive, at the applicable Debtor's election, in full and final satisfaction of such Allowed Class C Claims, either (i) return of its collateral, (ii) payment in full in Cash, (iii) receive such other treatment as the Debtors and the Holder of such Other Secured Claim may otherwise agree or (iv) be Reinstated.

(c)     <u>Voting</u>.  Class C is Unimpaired, and Holders of Class C Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

4.     *Class D - Noteholder Claims.*

(a)     <u>Classification</u>.  Class D consists of 10% Senior Subordinated Note Claims and 8¾% Senior Subordinated Note Claims against the Debtors.

(b)     <u>Treatment</u>.  If Class D votes to accept the Plan, then on the Plan Effective Date, Holders of Allowed Class D Claims shall receive, in full and final satisfaction of such Allowed Class D Claims, their Ratable Proportion of Noteholder Warrants. If Class D fails to accept the Plan, the Holders of Class D Claims shall not receive a distribution under the Plan.

(c)     <u>Voting</u>.  Class D is Impaired, and Holders of Class D Claims will be entitled to vote to accept or reject the Plan.

5.     *Class E - General Unsecured Claims.*

(a)     <u>Classification</u>.  Class E consists of General Unsecured Claims against the Debtors.

(b)     <u>Treatment</u>.  Holders of Allowed Class E Claims shall receive, in full and final satisfaction of such Allowed Class E Claims, a one-time Cash distribution of their Ratable Proportion of $1,000,000 on the later of (i) the Plan Effective Date or (ii) thirty (30) days after the date on which the Claim becomes Allowed.

(c)     <u>Voting</u>.  Class E is Impaired, and Holders of Class E Claims will be entitled to vote to accept or reject the Plan.

6.     *Class F – Equity Interests.*

(a)     <u>Classification</u>.  Class F consists of all Equity Interests in Young.

(b)     <u>Treatment</u>.  All existing Equity Interests of Young shall be impaired, with no distribution to be made under the Plan to Holders thereof, and all such existing Equity Interests of Young and all warrants, conversion rights, rights of first refusal and other rights, contractual or otherwise, to acquire or receive any Equity Interests in Young, if any, shall be deemed cancelled as of the Effective Date.

(c)     <u>Voting</u>.  Class F is Impaired, and Holders of Class F Equity Interests are conclusively deemed to reject the Plan.  Holders of Class F Equity Interests are therefore not entitled to vote to accept or reject the Plan.

7.     *Class G – Intercompany Interests.*

(a)     <u>Classification</u>.  Class G consists of all Intercompany Interests in the Debtors.

(b)     <u>Treatment</u>.  There shall be no distributions to Holders of Intercompany Interests. Nonetheless, except as otherwise set forth in the Plan, Intercompany Interests

will not be canceled and, to implement the Plan, will be addressed as set forth in Article VI.G of the Plan.

(c)     Voting.  Class G is Impaired, and the Holders of Class G Intercompany Interests are conclusively deemed to reject the Plan.  Holders of Class G Intercompany Interests are therefore not entitled to vote to accept or reject the Plan.

## C.     TRANSACTIONS CONTEMPLATED BY THE PLAN

On the Effective Date (a) Reorganized Young shall issue the Reorganized Young Common Stock and shall distribute and deliver such Reorganized Young Common Stock to Holdco; (b) Holdco shall acquire and own all of the Reorganized Young Common Stock in exchange for the issuance of the Holdco Securities; (c) Holdco shall issue the Holdco Securities for distribution and delivery to the Holders of the Prepetition Lender Claims and the Holders of the Allowed Noteholder Claims pursuant to the terms of the Plan; and (d) the Prepetition Lender Claims shall be satisfied and the Secured Obligations shall be cancelled.  On the third Business Day after the Effective Date, Reorganized Young shall convert to a Delaware limited liability company.  The Plan Supplement will contain a description of all relevant Restructuring Transactions that will occur pursuant to the Plan, including the terms of the Exit Facility into which Reorganized Young will enter as of the Effective Date.  Furthermore, on the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation (or other formation documents), merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Reorganized Debtors determine are necessary or appropriate.

## D.     PROVISIONS FOR IMPLEMENTATION OF THE PLAN

1.     *Deemed Consolidation of Debtors for Plan Purposes Only.*

Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated for the following purposes under the Plan:  (i) no distributions shall be made under the Plan on account of the Intercompany Claims; (ii) all guaranties by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors; and (iii) each and every Claim filed or to be filed in the Reorganization Case of any of the Debtors shall be deemed filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

Such deemed consolidation, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this Article) affect:  (i) the legal and organizational structure of the Debtors; (ii) Intercompany Claims by and among the Debtors; (iii) pre- and post-Commencement Date guaranties, liens, and security interests that are required to be maintained (A) in connection with executory contracts or unexpired leases that were entered into during the Reorganization Cases or that have been or will be assumed by the applicable Reorganized Debtor, and (B) pursuant to the Plan; and (iv) distributions out of any insurance policies or proceeds of such policies.

2.     *Sources of Plan Distributions.*

Distributions under the Plan shall be made from the Debtors' existing assets, including Cash the Debtors have on hand and Cash generated by the operations of the Reorganized Debtors, from availability under the Exit Facility, and from Holdco as provided under the Plan.

(a)     <u>Holdco Notes</u>.  On the Effective Date, Holdco shall issue the Holdco Notes for distribution to Holders of Prepetition Lender Claims in partial satisfaction of such Prepetition Lender Claims.

(b)     <u>Holdco Common Stock</u>.  On the Effective Date, Holdco shall issue the Holdco Common Stock for distribution to certain Holders of Prepetition Lender Claims in partial satisfaction of such Prepetition Lender Claims.

(c)     <u>Holdco Lender Warrants.</u>  On the Effective Date, Holdco shall issue the Holdco Lender Warrants for distribution to certain Holders of Prepetition Lender Claims in partial satisfaction of such Prepetition Lender Claims.

(d)     <u>Noteholder Warrants.</u>  On the Effective Date, except as otherwise set forth in the Plan, Holdco shall issue the Noteholder Warrants for distribution to Holders of Allowed Noteholder Claims in full and final satisfaction of the Allowed Noteholder Claims.

3.     *Authorization of Holdco Securities.*

On or prior to the Effective Date, Holdco shall be formed and shall issue or reserve for issuance all Holdco ~~Securities~~<u>Common Stock, Holdco Lender Warrants and Holdco Noteholder Warrants (collectively, the "Holdco Equity Securities")</u> required to be issued pursuant to the Plan.  The Holdco Securities to be issued pursuant to the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.  On and after the Effective Date, Holdco will not be a reporting corporation under the Securities Exchange Act, and its shares will not be listed on any national securities exchange.  All of the Holdco <u>Equity</u> Securities issued pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid and non-assessable.  Each distribution and issuance referred to in Article VII of the Plan shall be governed by the terms and conditions set forth therein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

(a)     Limitations on Issuance of Holdco Class A Common Stock

The Disbursing Agent shall not distribute Holdco Class A Common Stock to any Entity in violation of the Communications Act of 1934 (as amended, the "Act").  Consequently, all alien (as such term has been construed under the Act) Holders of Class B Claims whose ownership or voting interests in the Holdco Class A Common Stock in the aggregate would otherwise exceed the limitation set forth in section 310(b) of the Act shall receive, on a pro rata basis, Holdco Lender Warrants in lieu of that number of shares of Holdco Class A Common Stock which, if issued to such Holders, would have caused Holdco to be in violation of section 310(b) of the Act.

In implementing the above, any Prepetition Lender that failed to provide timely and complete information as to its ownership and management structures as requested by the Prepetition Agent in connection with the preparation of the applications to the FCC for consent to assignment of the FCC broadcast authorizations held by the subsidiaries of Young will be deemed to be entirely owned and

voted by aliens for the purposes of the Act, and all or a portion of the equity in Holdco that such Prepetition Lender would otherwise have received as Holdco Common Stock at the Effective Date will be issued instead in the form of Holdco Lender Warrants.  Any Holder of Holdco Lender Warrants who is not otherwise a Holder of Holdco Common Stock shall not be a shareholder of Holdco and shall have no voting rights or other rights of a stockholder of Holdco.

In addition, to the extent that the issuance of Holdco Class A Common Stock would cause any Holder of Class B Claims to be deemed to hold an impermissible "attributable interest" under the Act in violation of the multiple or cross ownership restrictions of the Act, such Holder shall receive Holdco Class B Common Stock in lieu of that number of shares of Holdco Class A Common Stock which, if issued to such Holder, would cause such Holder to be deemed to hold such an impermissible "attributable interest" in Holdco and its licensee subsidiaries.  To the extent that any Prepetition Lender failed to provide timely and complete information as to its ownership and management structures, and its other media ownership, as requested by the Prepetition Agent in connection with the preparation of the applications to the FCC for consent to assignment of the FCC broadcast authorizations held by the subsidiaries of Young, and such Holder would otherwise be deemed to hold an "attributable interest" in Holdco if issued Holdco Class A Common Stock,  such Holder shall receive Holdco Class B Common Stock in lieu of that number of shares of Holdco Class A Common Stock which, if issued to such Holder, would cause such Holder to be deemed to hold an "attributable interest" in Holdco and its licensee subsidiaries.  Any Holder of Holdco Class B Common Stock who is not otherwise a Holder of Holdco Class A Common Stock shall have no voting rights.

Holders of Class B Claims entitled to receive Holdco Class A Common Stock should consult with their respective counsel to determine whether they are required to be disclosed to or found suitable by the FCC or whether such Holder may obtain a waiver or is otherwise exempt from such disclosure or suitability requirements under the Act.

(b)      Securities Registration Exemption

The issuance of the Holdco Equity Securities (including the Holdco Common Stock issued in connection with the exercise of the Holdco Lender Warrants and Noteholder Warrants) and any other securities pursuant to the Plan and (unless the Holder is an "underwriter" as described below) any subsequent sales, resales, transfers, or other distributions of such securities shall be exempt from any federal or state securities laws registration requirements pursuant to section 1145 of the Bankruptcy Code.

(i)      Section 1145 of the Bankruptcy Code

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering.  Therefore, the securities issued pursuant to a section 1145 exemption may generally be resold by any Holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the Holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code.  In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant

state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim against a debtor with a view to distribution of any security to be received in exchange for such claim, or (b) offers to sell securities offered or sold under the plan for the holders of such securities, or (c) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive securities under the Plan, resales of such securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of such securities may be able, at a future time and under certain conditions described below, to sell such securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act.

(ii)     Rule 144

Under certain circumstances, affiliated holders of securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., that the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act.

Certificates evidencing Holdco Equity Securities will bear appropriate legends, as set forth in the Holdco Equityholders Agreement, the Holdco Lender Warrant Agreement and the Holdco Noteholder Warrant Agreement, or as otherwise determined by the Holdco Board of Directors.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF HOLDCO EQUITY SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF HOLDCO, THE DEBTORS AND HOLDCO MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE THE HOLDCO EQUITY SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT

THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

4.      *Corporate Existence.*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by or in accordance with the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.  On the third Business Day after the Effective Date, Reorganized Young shall convert to a Delaware limited liability company.

5.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Debtor Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Codes or the Bankruptcy Rules.

6.      *Intercompany Interests.*

Except as otherwise provided in the Plan, Intercompany Interests shall be retained, and the legal, equitable and contractual rights to which the Holders of such Intercompany Interests are entitled shall remain unaltered in order to implement the Plan.

7.      *Cancellation of Existing Notes, Interests and Agreements.*

On the Effective Date, except as otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the Claims or rights of any Holder of a Claim against the Debtors, including all indentures and notes evidencing such Claims and any options or warrants to purchase Equity Interests, obligating the Debtors to issue, transfer, or sell Equity Interests or any other capital stock of the Debtors, shall be canceled, the Holders thereof shall have no further rights or entitlements in respect thereof against the Debtors, all Liens shall be automatically released, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released and discharged.  On the Effective Date, except to the extent otherwise provided in the Plan, any indenture relating to any of the foregoing, including, without limitation, the Senior Subordinated Notes, shall be deemed to be canceled, as permitted by Section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released and discharged without the need for any further order of the Bankruptcy Court.  ~~Notwithstanding the foregoing, the Indentures shall continue in effect solely for the purposes of (i) allowing the Indenture Trustee to make any distributions on account of Holders of Claims in those classes pursuant to the Plan and to perform such other necessary administrative functions with respect thereto, and (ii) permitting the Indenture Trustee to maintain any rights or Liens they may have for fees, costs, and expenses under the Indenture.~~

8.      *Board of Directors.*

The members of the initial Board of Directors of Holdco and each of the Reorganized Debtors shall be designated by the Prepetition Lenders and disclosed in the Plan Supplement, provided that Reorganized Young's Chairman and Chief Executive Officer shall be Vincent Young.

9.      *Officers.*

The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of Holdco and the Reorganized Debtors. Such officers shall serve in accordance with applicable non-bankruptcy law and their New Employment Agreements. After the Effective Date, the officers of Holdco and each of the Reorganized Debtors shall be determined by the board of directors, or managing member as applicable, of each such respective entity.

10.     *Corporate Action.*

Upon the Effective Date, the Debtors shall perform each of the actions and effect each of the transfers required by the terms of the Plan, in the time period allocated therefore, and all matters provided for under the Plan that would otherwise require approval of the stockholders, partners, members, directors, or comparable governing bodies of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law (or other applicable law) of the states in which the Debtors are incorporated or organized, without any requirement of further action by the stockholders, members, or directors (or other governing body) of the Debtors.

11.     *Release of Liens.*

Except as otherwise provided in Article IV.C of the Plan with respect to Class C or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of any estate will be fully released and discharged. The Reorganized Debtors may file a release of any lien of record to effectuate the Plan and any recording authority shall accept such release.

12.     *Effectuating Documents and Further Transactions.*

Each of the officers of each of the Debtors or Reorganized Debtors is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

13.     *Claims Administration, Prosecution and Plan Distributions.*

The Debtors shall continue to have the power and authority to prosecute and resolve objections to Disputed Claims and may settle the same without further motion to this Court. The Debtors shall also continue to have the power and authority to hold, manage and distribute Plan distributions to the Holders of Allowed Claims.

## E.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1.      *General Treatment.*

On the Effective Date , all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed as of the Effective Date, except for an executory contract or

unexpired lease that (i) has already been rejected pursuant to Final Order of the Bankruptcy Court, (ii) is specifically designated on the Schedule of Rejected Contracts and Leases included in the Plan Supplement as a contract or lease to be rejected, or (iii) is the subject of a separate motion filed under section 365 of the Bankruptcy Code by the Debtors prior to the Effective Date.

For purposes hereof, each executory contract and unexpired lease that relates to the use or occupancy of real property shall include all (x) modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired Lease, and (y) all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* relating to such premises to the extent any of the foregoing agreements are specifically rejected.

2. *Cure of Defaults.*

Except as otherwise may be agreed to by the parties, on the Effective Date, or as promptly thereafter as reasonably practicable, the Reorganized Debtors shall cure those defaults that need to be cured in accordance with section 365(b) of the Bankruptcy Code.

3. *Rejection Claims.*

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Reorganized Debtors, and the Debtors' and Reorganized Debtors' respective properties or interests in property as agents, successors, or assigns unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before the ~~date that is~~later of (a) thirty (30) days after the Effective Date or ~~such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults~~(b) thirty (30) days after the date the Bankruptcy Court enters an order rejecting such executory contract or unexpired lease.

4. *Insurance Policies.*

Except as otherwise provided in the Plan, all insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect.

The Debtors' discharge and release from Claims as provided herein, except as necessary to be consistent with this Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including without limitation, its officers and current and former directors) or any other person or entity.

## F. PROCEDURES GOVERNING DISTRIBUTIONS

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the bankruptcy court determines, that the claim or interest, and the amount thereof, is in fact a valid obligation of the debtor.

Any Claim that is not a Disputed Claim and for which a proof of claim has been filed is an Allowed Claim. Any Claim that has been listed by any Debtor in such Debtor's schedules of assets and liabilities, as may be amended from time to time, as liquidated in amount and not disputed or contingent is an Allowed Claim in the amount listed in the schedules unless an objection to such Claim has been filed. If the Holder of such Claim files a proof of claim in an amount different than the amount set forth on the Debtors' schedules of assets and liabilities, the Claim is an Allowed Claim for the lower of the amount set forth on the Debtors' schedules of assets and liabilities and on the proof of claim and a Disputed Claim for the difference. Any Claim that has been listed in the Debtors' schedules of assets and liabilities as disputed, contingent, or not liquidated and for which a proof of claim has been timely filed is a Disputed Claim. Any Claim for which an objection has been timely interposed is a Disputed Claim. For an explanation of how Disputed Claims will be determined, see Article IV.G.

An objection to any Claim may be interposed by the Debtors within one hundred eighty (180) days after the Effective Date or such later date as may be fixed by the Bankruptcy Court. Any Claim for which an objection has been interposed will be an Allowed Claim to the extent the objection is determined in favor of the Holder of the Claim.

1. *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, the Prepetition Agent and/or the Indenture Trustee, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests. The Debtors shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

2. *Date of Distributions.*

Except as otherwise provided in the Plan, any distributions and deliveries to be made pursuant to the Plan shall be made on the Effective Date or as soon thereafter as is reasonably practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

3. *Post-Petition Interest and Costs on Claims.*

Unless expressly provided in the Plan, the Confirmation Order or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or required by applicable bankruptcy law, post-petition interest, costs, fees or expenses shall not accrue on or after the Commencement Date on account of any Claim.

4. *Disbursing Agent.*

All Cash distributions under the Plan shall be made by Reorganized Young as Disbursing Agent on behalf of all of the Debtors, or such other entity designated by the applicable Reorganized Debtor as a Disbursing Agent on or after the Effective Date. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the applicable Debtor. Holdco shall be

the Disbursing Agent for the Holdco Securities. Holdco may rely on the books and records of the Prepetition Agent for the purpose of making distributions of Holdco Securities to the Prepetition Lenders. Holdco may rely on the books and records of the Indenture Trustee for the purpose of making distributions of Noteholder Warrants to Holders of Class D Claims if Class D votes to accept the Plan.

5.      *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

6.      *Compensation of Expenses Incurred on or After the Effective Date.*

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorneys' fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

7.      *Surrender of Instruments.*

As a condition to receiving any distribution under the Plan, each Holder of a certificated instrument or note must either (a) surrender such instrument or note held by it to the Disbursing Agent or its designee, or (b) submit evidence satisfactory to the Disbursing Agent with respect to the loss, theft, mutilation or destruction of such certificated instrument or note before the first anniversary of the Effective Date, unless such certificated instrument or note is being reinstated or being left unimpaired under the Plan. Any Holder of such certificated instrument or note that fails to do either (a) or (b) above shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Plan. Any distribution so forfeited shall become property of the Debtors. The Debtors reserve the right to waive this requirement. After the first anniversary of the Effective Date, all property or interest in property not distributed pursuant to Article VII of the Plan shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code. Such property or interest in property shall be returned by the Disbursing Agent to the Reorganized Debtors and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred.

8.      *Delivery of Distributions; Execution of Equityholders Agreement.*

Subject to Bankruptcy Rule 9010, all distributions to any Holder of an Allowed Claim, except the Holders of Prepetition Lender Claims and Noteholder Claims, shall be made at the address of such Holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents or in a letter of transmittal, unless the Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim by such Holder that contains an address for such Holder different from the address reflected on such Schedules for such Holder. All distributions to Holders of Prepetition Lender Claims shall be made to the addresses kept by the Prepetition Agent. Any distribution to Holders of Class D Claims shall be made to the addresses maintained by the Indenture Trustee. In the event that any distribution to any Holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such

Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to and vest in the Reorganized Debtors and any claim in respect of such undeliverable distribution shall be discharged and forever barred from assertion against the Debtors and their Estates.

As a condition to receiving any distribution of Holdco Securities under the Plan, each Holder entitled to such distribution must execute and deliver to Holdco the Equityholders Agreement. Any Holder that fails to comply with the immediately preceding sentence shall be deemed to have forfeited all rights to Holdco Securities. Any distribution so forfeited shall become the property of Holdco.

9. *Distributions of Cash.*

Any payment of Cash made by the Disbursing Agent pursuant to the Plan shall, at the Disbursing Agent's option, be made by check drawn on a domestic bank or by wire transfer.

10. *Fractional Distributions.*

No fractional dollars shall be distributed. For purposes of distribution, any fractional dollars shall be rounded up or down to the nearest whole dollar.

11. *Setoffs and Recoupment.*

The Debtors may, but shall not be required to, set off or recoup against any Claim (for purposes of determining the Allowed amount of such Claim on which such distribution shall be made), any claims of any nature whatsoever that the Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors of any such claim the Debtors may have against the Holder of such Claim. Any creditor with a valid right of setoff shall retain the ability to effectuate such setoff prior to the Effective Date.

12. *Minimum Distributions.*

No distribution of less than $25.00 shall be made by the Disbursing Agent to any Holder of a Claim unless a request therefor is made in writing to the Disbursing Agent (at the address provided in the Plan). Six (6) months after the Effective Date, any property or interest in property not distributed pursuant to Article VII of the Plan shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code. Such property or interest in property shall be returned by the Disbursing Agent to the Reorganized Debtors and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred.

13. *Distributions After the Effective Date.*

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

14. *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to

the principal amount (as determined for federal income tax purposes) of the Claim first, and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising prepetition interest, costs, expenses and fees; but solely to the extent that such interest, costs, expenses or fees are an allowable portion of such Allowed Claim.

15.     *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

16.     *Subsequent Distributions.*

Unless otherwise provided in the Plan, to the extent Cash or Holdco Securities are available subsequent to the Effective Date from undeliverable, time-barred or unclaimed distributions to Holders of Allowed Claims pursuant to the Plan, such Cash or Holdco Securities shall be transferred to Holdco to be used for general corporate purposes.

17.     *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Any party that is entitled to receive a check under the Plan but fails to cash such check within 120 days of its issuance shall be entitled to receive a reissued check from the Reorganized Debtors for the amount of the original check if the party requests that the Disbursing Agent reissue the check and provides the Disbursing Agent with such documentation as the Disbursing Agent requests to verify that such party is entitled to such check, prior to the later of (a) six (6) months after the Effective Date or (b) six (6) months after any such Claim becomes an Allowed Claim. If a party fails to cash a check within 120 days of issuance and fails to request reissuance of such check prior to the later to occur of (a) six (6) months after the Effective Date or (b) six (6) months following the date such party's Claim becomes an Allowed Claim, such party shall not be entitled to receive any Distribution under the Plan with respect to the amount of such check, and the amounts represented in any such check shall be deemed unclaimed property under Section 347(b) and such amounts revert to and vest in the Reorganized Debtors.

**G.     PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

1.     *Objections to Claims.*

Unless otherwise ordered by the Bankruptcy Code after notice and a hearing, the Debtors or Reorganized Debtors on and after the Effective Date, shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to make and file objections to Claims and shall serve a copy of each objection upon the Holder of the Claim to which the objection is made as soon as practicable, but in no event later than the latest of: (a) one hundred eighty (180) days after the Effective Date; (b) one hundred eighty (180) days after a proof of Claim with respect to the Claim objected to has been filed with the

claims agent appointed in the Reorganization Cases; or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above (the "Claims Objection Bar Date"). From and after the Effective Date, all objections shall be litigated to a Final Order except to the extent the Debtors elect to withdraw any such objection or the Debtors and the claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim without the necessity of Bankruptcy Court approval.

2. *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided in the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. Moreover, notwithstanding any other provision of the Plan, no interest shall accrue or be Allowed on any Claim after the Commencement Date, except as provided for under section 506(b) of the Bankruptcy Code.

3. *Estimation of Claims.*

The Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. On and after the Confirmation Date, claims that have been estimated may be compromised, settled, withdrawn, or otherwise resolved, without further order of the Bankruptcy Court, but in a manner consistent with the treatment of such Claims under the Plan.

4. *Distributions Relating to Disputed Claims.*

At such time as a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the Holder of such Claim, such Holder's Ratable Proportion of the property distributable with respect to the Class in which such Claim belongs. To the extent that all or a portion of a Disputed Claim is disallowed, the Holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated pro rata to the Holders of Allowed Claims in the same class.

5. *Distributions after Allowance.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim, the distribution to which such Holder is entitled to receive under the Plan.

6. *Preservation of Rights to Settle Claims.*

The Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of Article XII.B of the Plan, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan.

7. *Disallowed Claims.*

All claims held by persons or entities against whom any Debtor has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code, shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to Article VIII.G of the Plan shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors from such party have been paid.

## H. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

1. *Conditions Precedent to Confirmation.*

The Plan may not be confirmed unless each of the conditions set forth below is satisfied. Except as provided in Article X.C of the Plan, any one or more of the following conditions may be waived at any time by the Debtors.

    (a)    An Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been issued by the Bankruptcy Court and entered on the docket maintained by the Clerk of the Bankruptcy Court.

    (b)    The Confirmation Order (i) shall be in form and substance satisfactory to the Debtors and Holdco and (ii) shall include a finding by the Bankruptcy Court that the Holdco Securities to be issued on the Effective Date will be exempt from registration under applicable securities laws pursuant to Section 1145 of the Bankruptcy Code.

2. *Conditions Precedent to the Effective Date.*

The Effective Date for the Plan may not occur unless and until each of the conditions set forth below is satisfied. Except as provided in Article X.C of the Plan, any one or more of the following conditions may be waived at any time by the Debtors with the consent of the Prepetition Agent.

    (a)    A Confirmation Order, in form and substance satisfactory to the Debtors and the Prepetition Agent, shall have been entered by the Bankruptcy Court; provided, however, that the ten (10) day stay provided by Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a) shall not apply to the Confirmation Order.

    (b)    All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan are effected or executed and

delivered, as applicable, in form and substance satisfactory to the Debtors and the Prepetition Agent.

(c)     All authorizations, consents, and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked, including, without limitation, FCC Consent.

3.      *Waiver of Conditions.*

The Debtors may, with the consent of the Prepetition Agent, waive any of the conditions set forth in Articles X.A and X.B of the Plan, provided, however, that the Debtors may not waive entry of the Order approving the Disclosure Statement or entry of the Confirmation Order.  Any such waivers shall be evidenced by a writing, signed by the waiving parties, served upon the United States Trustee, are filed with the Bankruptcy Court.  The waiver may be a conditional one, such as to extend the time under which a condition may be satisfied.

4.      *Effect of Failure of Conditions.*

If the conditions specified in Article X.B of the Plan have not been satisfied or waived in the manner provided in Article X.C of the Plan by the later of (i) one hundred and eighty (180) days of Confirmation, or (ii) sixty (60) business days after receipt of FCC Consent, then:  (a) the Confirmation Order shall be of no further force and effect; (b) no distributions under the Plan shall be made; (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) all the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.  Upon such occurrence, the Debtors shall file a written notification with the Bankruptcy Court and serve it upon counsel for Holdco and the United States Trustee.  The Debtors may extend the time periods set forth in Article X.D of the Plan with consent of the Prepetition Agent.

## I.     EFFECT OF CONFIRMATION

1.      *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a claim against, or Interest in the Debtors' and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan, and whether or not such Holder is entitled to a distribution under the Plan.

2.      *Discharge of Claims and Termination of Equity Interests.*

Except as otherwise provided herein or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder, shall discharge all existing debts and Claims, and terminate all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors, shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Debtors, Reorganized Debtors or Holdco any other or further Claim or Equity Interest based

upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a proof of claim or proof of equity interest.

     3.    *Discharge of Debtors.*

     Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each Holder (as well as any trustees and agents on behalf of each Holder) of a Claim or Equity Interest and any affiliate of such Holder shall be deemed to have forever waived, released, and discharged the Debtors, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date the Confirmation Order shall act as a discharge of all debts of, Claims against and Liens on the Debtors, their respective assets and properties, _____ at any time before the Effective Date, regardless of whether a Proof of Claim with respect thereto was filed, whether the Claim is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution hereunder.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

     4.    *Term of Injunctions or Stays.*

     (a)    Unless otherwise provided, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such order.

     (b)    Injunction Regarding Worthless Stock Deduction.  Unless otherwise ordered by the Bankruptcy Court, on and after the Confirmation Date, any "fifty percent shareholder" within the meaning of section 382(g)(4)(D) of the Tax Code shall be enjoined from claiming a worthless stock deduction with respect to any Equity Interest held by such shareholder for any taxable year of such shareholder ending prior to the Effective Date.

     5.    *Retention of Causes of Action/Reservation of Rights.*

     (a)    Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors may have or which the Debtors may choose to assert on behalf of the Debtors' respective Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, and (ii) the turnover of any property of the Debtors' Estates.  Except as otherwise provided in the Plan, on and after the Effective Date, the Debtors and/or the Reorganized Debtors will have the right to enforce any and all Causes of Action against any person.  The Debtors and/or the Reorganized Debtors may pursue, abandon, settle or release any or all Causes of Action, as they deem appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court.  The Debtors and/or the Reorganized Debtors may, in their discretion, offset any claim held against a person, against any payment due such person under the Plan, *provided, however,* that any claims of the Debtors arising before the Commencement Date shall first be offset against Claims against the Debtors arising before the Commencement Date.

     (b)    Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.  The Debtors and/or the Reorganized Debtors shall have, retain,

reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Reorganization Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted by the Debtors and/or the Reorganized Debtors after the Confirmation Date to the same extent as if the Reorganization Cases had not been commenced.

6. *Indemnification Obligations.*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date with respect to all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, articles of limited partnership, board resolutions or employment contracts) for the directors who were in place as of the Commencement Date and current officers, employees, attorneys, other professionals and agents of the Debtors shall be assumed by the Reorganized Debtors and shall survive effectiveness of the Plan. All indemnification provisions in place on and prior to the Effective Date for current directors and officers of the Debtors and their subsidiaries and such current and former directors and officers' respective Affiliates shall survive the Effective Date for Claims related to or in connection with any actions, omissions or transactions occurring prior to the Effective Date. The foregoing provisions of this Section XI.F shall not apply to any claims arising from the rejection of any employment contracts, which contract rejection claims shall be treated as Class E Claims.

7. *D&O Coverage Policies.*

The Reorganized Debtors will obtain a directors and officers' liability insurance policy with tail coverage for a period of six years with the same coverage limit as is in existence immediately prior to the Effective Date for the current and former directors and officers of the Debtors.

**J.** ~~I.~~ **SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

1. *Compromise and Settlement.*

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments as set forth in the Plan take into account for and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, substantive consolidation or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant to the Plan. The Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtors and their Estates, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. In addition, the allowance, classification and treatment of Allowed Claims take into account any causes of action, claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist: (1) between the Debtors and the Releasing Parties; and (2) as between the Releasing Parties (to the extent set forth in the Third Party Release). As of the Effective Date, any and all such causes of action, claims and counterclaims are settled, compromised and released pursuant to the Plan. The Confirmation Order will approve all such releases of contractual, legal and equitable subordination rights, causes of action, claims and counterclaims against each such Releasing Party that are satisfied, compromised and settled pursuant to the Plan. Nothing in the Plan will compromise or settle in any way whatsoever, any Claims or Causes of Action that the Debtors or the Trusts may have against the Non-Released Parties.

- 45 -

2. *Releases by the Debtors.*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR CONFIRMATION ORDER, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES, INCLUDING, BUT NOT LIMITED TO: (A) THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT TO THE PLAN OR OTHERWISE; AND (B) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS AND DIRECTORS IN FACILITATING THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, EACH OF THE DEBTORS AND REORGANIZED DEBTORS SHALL PROVIDE A FULL DISCHARGE AND RELEASE TO THE DEBTOR RELEASEES (AND EACH SUCH DEBTOR RELEASEE SO RELEASED SHALL BE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS AND REORGANIZED DEBTORS) AND EACH SUCH DEBTOR RELEASEE'S RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER PERSON OR ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN; *PROVIDED, HOWEVER,* THAT THE FOREGOING DEBTOR RELEASE SHALL NOT APPLY TO ANY NON-RELEASED PARTIES AND SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CAUSES OF ACTION EXPRESSLY PRESERVED BY THE PLAN OR PLAN SUPPLEMENT.

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, THE DEBTORS AND REORGANIZED DEBTORS SHALL NOT HAVE RELEASED NOR BE DEEMED TO HAVE RELEASED BY OPERATION OF ARTICLE XII.B OF THE PLAN OR OTHERWISE ANY CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, INTERESTS, REMEDIES, LIABILITIES OR CAUSES OF ACTION THAT THEY MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE;

**(D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO THE DEBTORS AND REORGANIZED DEBTORS ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR RESPECTIVE PROPERTY**.

        3.     *Third Party Release.*

        **EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR CONFIRMATION ORDER, ON THE EFFECTIVE DATE, EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL PROVIDE A FULL DISCHARGE AND RELEASE (AND EACH PERSON OR ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO THE DEBTOR RELEASEES, AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN; _PROVIDED_, _HOWEVER_, THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY OF THE DEBTOR RELEASEES FROM ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR PLAN SUPPLEMENT, OR RELEASE HOLDCO FROM ITS OBLIGATIONS UNDER THE PLAN.**

        **THE THIRD PARTY RELEASE SHALL HAVE NO EFFECT ON THE CLAIMS OF RELEASEES TREATED UNDER THE PLAN, TO THE EXTENT OF ALLOWANCE OF CLAIMS AND SATISFACTION OF CLAIMS PURSUANT TO THE PLAN.**

        **NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, THE RELEASING PARTIES SHALL NOT HAVE RELEASED NOR DEEMED TO HAVE RELEASED BY OPERATION OF ARTICLE XII.C OF THE PLAN OR OTHERWISE ANY CLAIMS OR CAUSES OF ACTION THAT THEY, THE DEBTORS MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES.**

        **ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, _AND FURTHER_, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS:  (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE THIRD PARTY RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO ANY**

**OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED BY THE THIRD PARTY RELEASE AGAINST ANY OF THE THIRD PARTY RELEASEES OR THEIR PROPERTY.**

**NOTHING IN THE CONFIRMATION ORDER OR THE PLAN SHALL EFFECT A RELEASE BY THE UNITED STATES GOVERNMENT OR ANY OF ITS AGENCIES OR ANY STATE AND LOCAL AUTHORITY WHATSOEVER, INCLUDING WITHOUT LIMITATION ANY CLAIM ARISING UNDER THE INTERNAL REVENUE CODE, FEDERAL SECURITIES LAWS, THE ENVIRONMENTAL LAW OR ANY CRIMINAL LAWS OF THE UNITED STATES OR ANY STATE AND LOCAL AUTHORITY AGAINST THE RELEASEES, NOR SHALL ANYTHING IN THE CONFIRMATION ORDER OR THE PLAN ENJOIN THE UNITED STATES OR ANY STATE OR LOCAL AUTHORITY FROM BRINGING ANY CLAIM, SUIT, ACTION OR OTHER PROCEEDINGS AGAINST THE RELEASEES FOR ANY LIABILITY WHATEVER, INCLUDING WITHOUT LIMITATION ANY CLAIM, SUIT OR ACTION ARISING UNDER THE INTERNAL REVENUE CODE, FEDERAL SECURITIES LAWS, THE ENVIRONMENTAL LAWS OR ANY CRIMINAL LAWS OF THE UNITED STATES OR ANY STATE OR LOCAL AUTHORITY, NOR SHALL ANYTHING IN THE CONFIRMATION ORDER OR THE PLAN EXCULPATE ANY PARTY FROM ANY LIABILITY TO THE UNITED STATES GOVERNMENT OR ANY OF ITS AGENCIES OR ANY STATE AND LOCAL AUTHORITY WHATSOEVER, INCLUDING ANY LIABILITIES ARISING UNDER THE INTERNAL REVENUE CODE, FEDERAL SECURITIES LAWS, THE ENVIRONMENTAL LAWS OR ANY CRIMINAL LAWS OF THE UNITED STATES OR ANY STATE AND LOCAL AUTHORITY AGAINST THE RELEASEES; _PROVIDED_, _HOWEVER_, THAT THE FOREGOING SHALL IN NO WAY AFFECT OR LIMIT THE DISCHARGE OR INJUNCTION GRANTED TO THE DEBTORS UNDER SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE**.

4.      *Exculpation.*

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any prepetition or postpetition act taken or omitted to be taken in connection with or related to formulating, negotiating, preparing, disseminating, implementing, administering the Plan or otherwise, the Plan Supplement, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or confirming or consummating the Plan; _provided_, _however_, that the Plan's exculpation provisions shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; _provided further_, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; _provided still further_, that the foregoing Exculpation shall not apply to any acts or omissions preserved from exculpation by the Plan or Plan Supplement.

This exculpation shall be in addition to, and not in limitation of all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall not include the Non-Released Parties, and the Plan shall not exculpate nor be deemed to have exculpated any of the Non-Released Parties for any acts they have taken, whether in contemplation of the restructuring of the Debtors, in confirming or consummating the Plan, or otherwise.

5.     *Injunction.*

(A)     FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE ~~DEBTORS, REORGANIZED DEBTORS, HOLDCO, THE CREDITORS COMMITTEE, THE COMMITTEE MEMBERS, INDENTURE TRUSTEES, PREPETITION AGENT OR PREPETITION LENDERS, THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING SOLELY IN ITS CAPACITY AS SUCH AND IN NO OTHER UNRELATED CAPACITIES),~~<u>EXCULPATED PARTIES</u> AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

(B)     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST ~~HOLDCO, THE DEBTORS, THE DEBTORS IN POSSESSION, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, THE CREDITORS COMMITTEE, THE COMMITTEE MEMBERS, INDENTURE TRUSTEES, ANY OF THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING SOLELY IN ITS CAPACITY AS SUCH AND IN NO OTHER UNRELATED CAPACITIES),~~<u>THE EXCULPATED PARTIES</u> AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE.

(C)     THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS IN THE PLAN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE COMMENCEMENT DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS OR PROPERTIES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS SHALL BE SATISFIED AND RELEASED IN FULL.

(D)     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PARTIES AND ENTITIES ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, ON ACCOUNT OF ANY CLAIM OR EQUITY INTEREST SATISFIED AND RELEASED HEREBY, FROM**:**

1.     COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY ~~DEBTOR, REORGANIZED DEBTOR, HOLDCO, THE CREDITORS COMMITTEE, THE COMMITTEE MEMBERS, THE INDENTURE TRUSTEES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS~~

INDIVIDUAL CAPACITY AS SUCH AND IN NO OTHER UNRELATED CAPACITIES), OR ANY OF THEIR SUCCESSORS AND ASSIGNS~~ EXCULPATED PARTY, OR ANY OF THEIR ASSETS AND PROPERTIES;

2.      ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY ~~DEBTOR, REORGANIZED DEBTOR, HOLDCO, THE CREDITORS COMMITTEE, THE COMMITTEE MEMBERS, INDENTURE TRUSTEES AND ANY OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH AND IN NO OTHER UNRELATED CAPACITIES),~~ EXCULPATED PARTY AND THEIR RESPECTIVE ASSETS AND PROPERTIES;

3.      CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST ANY ~~DEBTOR, REORGANIZED DEBTOR, HOLDCO, THE INDENTURE TRUSTEES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH AND IN NO OTHER UNRELATED CAPACITIES), OR ANY OF THEIR SUCCESSORS AND ASSIGNS, OR ANY OF~~ EXCULPATED PARTY, OR THE PROPERTY OR ESTATE OF ANY OF THE FOREGOING; OR

4.      ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM ANY ~~DEBTOR, REORGANIZED DEBTOR, HOLDCO OR AGAINST THE PROPERTY OR ESTATE OF ANY DEBTOR, HOLDCO, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH AND IN NO OTHER UNRELATED CAPACITIES),~~ EXCULPATED PARTY EXCEPT TO THE EXTENT A RIGHT TO SETOFF, RECOUPMENT OR SUBROGATION IS ASSERTED WITH RESPECT TO A TIMELY FILED PROOF OF CLAIM; OR

5.      TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

(E)      BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM RECEIVING DISTRIBUTIONS PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE INJUNCTIONS SET FORTH IN ARTICLE XII.E OF THE PLAN.

**K.      LIMITATION OF GOVERNMENTAL RELEASES**

Nothing in the confirmation order or the plan shall effect a release by the United States government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, Federal Securities laws, the environmental law or any criminal laws of the United States or any state and local authority against

the releasees, nor shall anything in the confirmation order or the plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the releasees for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, Federal Securities laws, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the confirmation order or the plan exculpate any party from any liability to the United States government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, Federal Securities laws, the environmental laws or any criminal laws of the united States or any state and local authority against the releasees; *provided, however*, that the foregoing shall in no way affect or limit the discharge or injunction granted to the debtors under sections 524 and 1141 of the Bankruptcy Code.

**L.** ~~J.~~ **MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

The Plan may be amended, modified, or supplemented by the Debtors with the consent of the Prepetition Agent in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of Holders of Claims or Equity Interests under the Plan, the Debtors with the consent of the Prepetition Agent may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

Prior to the Effective Date, the Debtors with the consent of the Prepetition Agent may make appropriate technical adjustments and modifications to the Plan, including the filing of additional exhibits, and may make amendments to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications and amendments do not adversely affect in a material way the treatment of Holders of Claims or Equity Interests.

1.   *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors take such action, the Plan shall be deemed null and void.

2.   *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**M.** ~~K.~~ **RETENTION OF JURISDICTION**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Reorganization Cases and the Plan pursuant to and for purposes of Section 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a) To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Reorganization Cases.

(b) To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced on the Confirmation Date.

(c) To ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan.

(d) To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Administrative Claim, or Equity Interest.

(e) To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated.

(f) To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court.

(g) To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order in such a manner as may be necessary to carry out the purposes and effects thereof.

(h) To hear and determine all actions pursuant to sections 105, 502, 510, 505, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, any collection matters related thereto, and settlements thereof.

(i) To hear and determine any disputes or issues arising under the settlement agreements referred to in the Plan or any other settlements of Claims approved by the Bankruptcy Court.

(j) To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date.

(k) To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing.

(l) To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation.

(m)    To hear any disputes arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation, and similar claims pursuant to section 105(a) of the Bankruptcy Code.

(n)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

(o)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods of the Debtors ending after the Commencement Date).

(p)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

(q)    To enter a final decree closing the Reorganization Cases.

(r)    To recover all assets of the Debtors and property of the Debtors' Estates, wherever located.

## N.    L. MISCELLANEOUS PROVISIONS

1.    *Payment of Statutory Fees.*

On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.    *Dissolution of Statutory Committee of Unsecured Creditors.*

The Creditors Committee appointed pursuant to section 1102 of the Bankruptcy Code in the Reorganization Cases shall dissolve on the Effective Date, except that the Creditors Committee shall have the right to review and object to any applications for compensation and reimbursement of expenses filed in accordance with Article II.B of the Plan.

3.    *No Deemed Waiver of Causes of Action.*

Notwithstanding any payment on account of an Allowed Claim to a creditor or a settlement with a creditor with respect to a Disputed Claim, unless expressly provided in the Plan, there shall be no deemed waiver of any rights of any Debtor or any other party in interest to bring a cause of action; provided, however, that, pursuant to the Plan, avoidance actions under sections 544, 547, or 548 of the Bankruptcy Code are hereby waived by the Debtors and the estates, and may not be instituted by the Debtors or any party in interest other than by the Debtors and only as an offset against a Claim of such part asserted against the Debtors.

4.    *Indenture Trustee as Claim Holder.*

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize proofs of Claim timely filed by the Indenture Trustee in respect of any Claims under the Indentures. Accordingly, if the Indenture Trustee files proofs of Claim for the Note Claims, any other proofs of Claim for the Note Claims, filed by the registered or beneficial Holders of Note Claims, are disallowed as duplicative of the Claims of the Indenture Trustee, without any further action of the Bankruptcy Court.

5. *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

6. *Request for Expedited Determination of Taxes.*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the date on which the Debtors are dissolved.

7. *Exemption from Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by the APA or the Plan shall not be subject to any stamp, real estate transfer, mortgage, recording, sales, use or other similar tax.

8. *Pension Plan*

To the extent not otherwise terminated or compromised by order of the Bankruptcy Court, the Debtors' and the applicable Reorganized Debtor's continuing obligation under the Pension Plan shall be unaffected by the Applicable Reorganization Cases and the Plan.

9. 8. *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

10. 9. *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

## V. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

## A. THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a Plan. The Confirmation Hearing is scheduled for 10:00 a.m. Eastern Time, on December 21, 2009, before the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a Plan. Any objection to confirmation of the Plan must be in writing, must conform to

the Federal Rules of Bankruptcy Procedure, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon and received no later than 4:00 p.m. Eastern Time on December 15, 2009:

**SONNENSCHEIN NATH & ROSENTHAL LLP**
Peter D. Wolfson
Jo Christine Reed
1221 Avenue of the Americas
New York, New York 10020
Telephone: 212.768.6700
Facsimile: 212.768.6800

*Attorneys for the Debtors and Debtors in Possession*

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Gregory Bray
Fred Neufeld
One Chase Manhattan Plaza
New York, New York 10005
Telephone: 212.530.5000
Facsimile: 212.530.5219

*Attorneys for the Prepetition Lenders*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg
Samantha G. Amdursky
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212.373.3000
Facsimile: 212.757.3990

*Attorneys for the Creditors Committee*

**CLERK OF THE BANKRUPTCY COURT**
Judge Arthur J. Gonzalez Chambers
Room 523
One Bowling Green
New York, New York 10004

**OFFICE OF THE UNITED STATES TRUSTEE**
For the Southern District of New York
Richard Morrissey
33 Whitehall Street
21st Floor
New York, New York 10017

**EPIQ BANKRUPTCY SOLUTIONS, LLC**
757 Third Avenue

Third Floor
New York, New York 10017

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY
NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.      CONFIRMATION STANDARDS**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied.

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of Holdco and the Reorganized Debtors.

6.      Each Holder of an Impaired Claim or Impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

7.      Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.  Classes F and G are deemed to have rejected the Plan and thus the Plan can be confirmed only if the requirements of section 1129(b) of the Bankruptcy Code are met.

8.      Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim or, as described herein, has not objected to the non-payment in full of such Claim, the Plan provides that Allowed Administrative Expense Claims and Allowed Priority Non-Tax Claims will be paid in full on the Effective Date and that Allowed Priority Tax Claims will receive on account of such Claims deferred Cash payments, over a period not exceeding six (6) years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

9.      At least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider of the Debtors holding a Claim in such class.

10. Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Financial Feasibility" below.

## C.    BEST INTERESTS TESTS

As described above, the Bankruptcy Code requires that each Holder of an impaired Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of Cash that would be available for satisfaction of Claims and Equity Interests would be the sum of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by any unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of the liquidation itself and by such additional administrative and priority Claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net Cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during the chapter 11 cases Allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals for the Debtors and the Creditors Committee, and costs and expenses of members of the Creditors Committee, as well as other compensation Claims. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the chapter 11 cases.

The foregoing types of Claims, costs, expenses, fees, and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured Claims. The Debtors believe that in a chapter 7 liquidation, no prepetition Claims or Equity Interests would receive any distribution of property.

### 1.    *Liquidation Analysis*

As noted above, the Debtors believe that under the Plan all Holders of Impaired Claims will receive property with a value not less than the value such Holder would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) the results of the sale and marketing process that the Debtors implemented during the Reorganization Cases and (ii) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Impaired Claims and Equity Interests, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee and professional advisors to the trustee, (b) the erosion in value of assets in a chapter 7 case in the context of the rapid

liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (c) the adverse effects on the Debtors' businesses as a result of the likely departure of key employees and the probable loss of customers, (d) the substantial increases in Claims, such as estimated contingent Claims, which would be satisfied on a priority basis or on parity with the Holders of Impaired Claims and Equity Interests of the chapter 11 cases, (e) the reduction of value associated with a chapter 7 trustee's operation of the Debtors' businesses, and (f) the substantial delay in distributions to the Holders of Impaired Claims and Equity Interests that would likely ensue in a chapter 7 liquidation.

Assets liquidated in a chapter 7 case are, generally speaking, liquidated at "forced sale" prices, meaning the amounts recovered will not exceed, and in most instances will be significantly less than the Credit Bid for the Debtors' assets obtained in the auction. Under a chapter 7 liquidation, the Debtors assume that the stations would be liquidated by selling them as going concerns in order to maximize the value of their combined operations, instead of ceasing operations and selling the FCC licenses and other Assets separately. Additionally, the Debtors assume that the value of the Debtors' assets would be maximized by selling them together as an operating station group instead of individually as television broadcast assets. If the value recoverable from the stations were greater as individual television broadcast assets, then the sale process undertaken in connection with the auction would likely have produced higher bids from parties who could have purchased the station group as a whole and subsequently undertaken liquidations of the Debtors' individual television broadcast assets. By marketing the station group as a whole, the Debtors sought to recover the combined value of the stations together as going concerns. The sale process produced only two other qualified bids, both of which were at levels reflecting recoveries far lower than the Credit Bid. Therefore, it is likely that a chapter 7 "forced sale" liquidation would yield proceeds available for Distribution that would be lower than the Credit Bid and resulting Reorganization Valuation set forth in the Plan.

Additionally, the value of distributions in a liquidation under chapter 7 of the Bankruptcy Code would be substantially less than the value of the distributions required under the Plan. For example, there would be significant additional administrative expenses which would need to be paid in advance of any distributions in respect of unsecured claims, including the additional expenses involved in the appointment of a chapter 7 trustee and attorneys, accountants and other professionals to assist such trustee. The chapter 7 trustee and its counsel and other professionals would need to become familiar with the Debtors' businesses, the prior conduct of their operations and the chapter 11 Cases, the terms of numerous underlying transactions related to the Debtors' assets and the terms of the Claims against the Debtors. Such a process would involve substantial time and expense. The chapter 7 trustee's professionals would be entitled to compensation at their normal hourly rates and to reimbursement of costs incurred in this process. The chapter 7 trustee would typically be entitled to receive fees based on monies disbursed to creditors in the chapter 7 case of 25% on the first $5,000 or less, 10% of any amount in excess of $5,000 but not in excess of $50,000, 5% of any amount in excess of $50,000 but not in excess of $1,000,000 and reasonable compensation not to exceed 3% of such monies in excess of $1,000,000. These fees and expenses would be in addition to the allowed fees and expenses of the Debtor's and Committee's professionals incurred during the chapter 11 Cases. The additional fees and expenses attributable to the chapter 7 case would be deducted from assets of the Debtor otherwise available for distribution to Holders of Allowed Claims or Equity Interests under the Plan.

Therefore, the Debtors submit their belief that, under a chapter 7 liquidation, the proceeds available for distribution to all Classes would be lower than the proceeds to be distributed under the Plan.

Moreover, under chapter 7, the proceeds of any liquidation would be distributed to Classes according to absolute priority rules set forth in Sections 506 and 507 of the Bankruptcy Code. Because the proceeds to distribute under the Plan (and the Debtors believe, under a chapter 7 liquidation) are far less than the amount of the Secured Claim filed by the Prepetition Lenders, all of the net proceeds of a chapter 7 liquidation would likely be distributed to the Prepetition Lenders first, leaving no

recoveries for other Claims or Equity Interests (except possible recoveries that may be derived from preference claims, which the Debtors believe will be negligible). Under the Plan, Class D - Noteholder Claims will receive the Holdco Warrants and Class E - General Unsecured Claims will receive a distribution of $1,000,000. Both of these distributions exceed the likely distributions these Classes would receive under chapter 7. Therefore, the Distributions set forth in the Plan provide better recoveries for Holders of Impaired Claims than chapter 7, which would likely result in the Prepetition Lenders receiving all recoveries.

### D.      FINANCIAL FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses based on the Financial Projections, attached hereto as Exhibit B.

The Financial Projections consist of a statement of operations (i.e., an income statement), a statement of financial position (i.e., a balance sheet), and a cash flow statement for the time period from an assumed Effective Date of December 31, 2009 through December 31, 2013. The Financial Projections are based on the Debtors' business plan, as updated, and the forecasted consolidated financial results of the Debtors. As termination of the IBEW Pension Plan, discussed in II.D.1 above, has not been determined, the Financial Projections assume that the Debtors will continue to make contributions to the IBEW Pension Plan.

In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly deleveraged capital structure, the Debtors' business can operate to meet its financial obligations and return to viability. As such, the Debtors believe that Confirmation and Consummation is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE DEBTORS' MANAGEMENT PREPARED THE FINANCIAL PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH FINANCIAL PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE FINANCIAL PROJECTIONS THAT ACCOMPANY THIS DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF

WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE CONSUMMATION AND IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OR GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO REORGANIZED COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THIS DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in Young's Annual Report on Form 10-K for the fiscal year ending December 31, 2008 and any other recent Young report to the United States Securities and Exchange Commission. These filings are available by visiting the United States Securities and Exchange Commission's website at http://www.sec.gov or the Debtors' website at www.youngbroadcasting.com.

## E.      ACCEPTANCE BY IMPAIRED CLASSES

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interest that is impaired under a plan, accept the

plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitle the holder of such claim or equity interest; (2) cures any default and reinstates the original terms of such obligation; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only in two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

The Claims in Classes A and C are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

The Voting Classes are Impaired under the Plan, and the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least (1) two-thirds in amount and (2) a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

## F.    CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all other impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

1.    *No Unfair Discrimination*

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.    *Fair and Equitable Test*

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the

allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan equal to the greater of: (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the deemed rejection by Classes F and G. To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIV.H of the Plan.

The votes of Holders of Equity Interests and Intercompany Interests in Classes F and G, are not being solicited because, as set forth in Article IV of the Plan, there will be no distribution to either of these Classes.

Notwithstanding the deemed rejection by Classes F and G or any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## VI.     CERTAIN FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN, THE FINANCIAL PROJECTIONS, AND OTHER RISKS THAT COULD IMPACT REORGANIZED DEBTORS FUTURE BUSINESS OPERATIONS AND PERFORMANCE. THESE FACTORS SHOULD NOT,

HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.     CERTAIN BANKRUPTCY CONSIDERATIONS

1.     *Parties-in-Interest May Object To Debtors' Classification of Claims and Equity Interests.*

Section 1122 of the Bankruptcy Code provides that a plan may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created seven classes of Claims and Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Interests in each such class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.     *Failure to Satisfy Vote Requirement*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative Chapter 11 plan.  There can be no assurance that the terms of any such alternative Chapter 11 plan would be similar to or as favorable to the Creditors as those proposed in the Plan.

3.     *The Debtors May Not be Able to Secure Confirmation of the Plan*

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor or equity holder of Debtors might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and the value of distributions to non-accepting Holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such Holders would receive if Debtors were liquidated under chapter 7 of the Bankruptcy Code.  In addition, the Debtors believe that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case.  Debtors believe that Holders of Equity Interests in Debtors would receive no distribution under either a liquidation pursuant to chapter 7 or chapter 11.

If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims or Equity Interests.  The cases likely would be converted to cases under chapter 7.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms of the Plan as necessary for Confirmation.  Any such modification could result in a less favorable treatment of any non accepting Class or Classes, as well as of any Classes junior to such non

accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.      *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest deemed Allowed under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

5.      *Nonconsensual Confirmation*

In the event any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and pursuant to the Plan, will request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code in the event Class B, D or E accepts the Plan.

6.      *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur very quickly after the Confirmation Date, there can be no assurance as to such timing.

B.      **RISKS RELATING TO THE SECURITIES ISSUED IN CONNECTION WITH THE SALE**

1.      *Listing of Holdco Common Stock.*

On the Effective Date, any shares of new stock issued pursuant to the Plan will not be listed on a national securities exchange or Nasdaq Stock Market, and Holdco will not be a reporting company under the Securities Exchange Act of 1934. Accordingly, no assurance can be given that a Holder of Holdco Securities will be able to sell such securities in the future or as to the price at which any sale may occur.

2.      *Variances from Projections.*

The projections included in Article VI herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, with respect to Reorganized Debtors' business, financial condition and results of operations. Statements that use the terms "believe," "anticipate," "expect," "plan," "intend," "estimate," "project" and similar expressions in the affirmative and the negative are intended to identify forward-looking statements. These statements reflect the Debtors' current views with respect to future events and are based on current assumptions, expectations, estimates and projections about the Reorganized Debtors' business and the markets in which it operates and are subject to risks and uncertainties. Actual events (including the Reorganized Debtors' results) could differ materially from those anticipated in these forward-looking statements as a result of various factors which include, but are not limited to, the following: uncertainties exist related to the Debtors having filed chapter 11 petitions and the reorganization proceedings resulting therefrom; additional

reserves may be required for bad debts, returns, allowances, governmental compliance costs, or litigation; there may be changes in the performance of financial markets; there may be changes in the general economic conditions which affect customer payment practices or consumer spending. In addition, consideration should be given to any other risks and uncertainties discussed herein and in documents filed by the Debtors with the Securities and Exchange Commission. Except as required by applicable law, the Debtors assume no obligation to update or revise publicly any forward-looking statements, whether as the result of new information, future events or otherwise.

3.    *Significant Holders.*

Under the Plan, certain Holders of Allowed Claims may receive distributions of shares in Holdco representing in excess of five percent of the outstanding shares of the common stock. If Holders of a significant number of shares of Holdco were to act as a group, such holders may be in a position to control the outcome of actions requiring shareholder approval, including the election of directors.

Further, the possibility that one or more of the Holders of a number of shares of Holdco may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the stock of Holdco.

4.    *Lack of Trading Market*

Any stock issued in connection with the sale and confirmation of the Plan may not be listed on any exchange. There can be no assurance that an active trading market for such stock will develop. Accordingly, no assurance can be given that a holder of the stock will be able to sell such securities in the future or as to the price at which any such sale may occur. If such markets were to exist, such securities could trade at prices higher or lower than the value ascribed to such securities herein depending upon many factors, including the prevailing interest rates, markets for similar securities, general economic and industry conditions, and the performance of, and investor expectations for, Holdco.

## C.    GOVERNMENTAL REGULATIONS

The Debtors' television operations are subject to significant federal regulation by the Act. A television station may not operate without the authorization of the FCC. Approval of the FCC is required for the issuance, renewal and transfer of station operating licenses. In particular, the Debtors' business will be dependent upon their ability to continue to hold television broadcasting licenses from the FCC. Currently, the Debtors have ten stations whose applications for renewal remain pending at the FCC following their expirations in 2005, 2006 and 2007.

FCC licenses to operate broadcast television stations generally have a term of eight years. While in the vast majority of cases such licenses are renewed by the FCC, there can be no assurance that the Debtors' licenses will be renewed at their expiration dates or, if renewed, that the renewal terms will be for the maximum permitted period. The non-renewal or revocation of one or more of the Debtors' primary FCC licenses could have a material adverse effect on their operations. Congress and the FCC currently have under consideration, and may in the future adopt, new laws, regulations, and policies regarding a wide variety of matters that could, directly or indirectly, affect the operation and ownership of the Debtors' broadcast properties. The Debtors are unable to predict the impact that any such laws or regulations may have on their operations.

# VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## A.    LIQUIDATION UNDER CHAPTER 7

If no chapter 11 plan can be confirmed, the chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effect that a chapter 7 liquidation would have on the recoveries of Holders of Claims is set forth in Article V.C of this Disclosure Statement.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan due to (a) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) the additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (c) the additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

## B.    ALTERNATIVE PLAN

If the Plan is not confirmed, the Debtors could attempt to formulate a different plan of reorganization.  The Debtors and their advisors have explored various alternative scenarios and believe that the Plan benefits the Estates and creditors.  Alternatively, the Creditors Committee could attempt to seek confirmation of a plan.  The Debtors believe any attempt to formulate an alternative chapter 11 plan would unnecessarily delay creditors' receipt of distributions yet to be made and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to Holders of Claims than are currently provided for in the Plan.  Accordingly, the Debtors believe that the Plan will enable all parties in interest to realize a recovery on their respective Claims with the least delay.

# VIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.    CIRCULAR 230 DISCLOSURE

**In order to ensure compliance with requirements imposed by the Internal Revenue Service ("IRS") under Circular 230 Standards of Practice, Holders of Claims and Equity Interests are notified that (A) any discussion of U.S. federal tax issues contained herein is not intended or written to be used, and cannot be used by such Holders, for the purpose of avoiding any penalties asserted under the Internal Revenue Code of 1986, as amended (the "Tax Code"); (B) any discussion contained herein was written to support the promotion or marketing of the transactions described in this Disclosure Statement and the Plan; and (C) such Holders should seek advice from, and rely solely upon, their own independent tax advisor with respect to the U.S. federal, state, local and any foreign tax consequences of the transactions described in the Disclosure Statement and Plan in light of their particular circumstances.**

## B.    GENERAL

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtors and to U.S. Holders (as defined below) of Claims and Equity Interests.  This discussion is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder (the "Treasury Regulations"), judicial decisions, published administrative rules and pronouncements of the IRS and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).  None of the Debtors has requested or will request an opinion from counsel or a ruling from the IRS as to the U.S. federal tax consequences of the Plan.  As a

result, there can be no assurance that the IRS or any court will agree with any of the conclusions described herein.

This discussion provides only a general summary and does not consider the effect of any non-U.S., state, local, gift, estate or other tax laws that may apply to a particular U.S. Holder. This discussion does not address the U.S. federal income tax considerations of persons that are not U.S. Holders. It also does not address all the U.S. federal income tax considerations that may be relevant to U.S. Holders in light of their particular circumstances (such as holders subject to the alternative minimum tax) or to U.S. Holders that are subject to special rules under the U.S. federal income tax laws, such as banks, mutual funds, small business investment companies, regulated investment companies, retirement plans, dealers in securities or foreign currencies, traders in securities electing a mark-to-market accounting method, tax-exempt entities, insurance companies, entities that are classified as partnerships (*i.e.*, pass-through entities) for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, or persons that hold their Claims or Equity Interests as part of a hedge, straddle or conversion transaction. This discussion deals only with U.S. Holders that hold the Prepetition Lender Claims, Noteholder Claims, Equity Interests, Holdco Common Stock, Holdco Notes, and Holdco Warrants (as defined herein) as capital assets within the meaning of Section 1221 of the Tax Code (generally, property held for investment). Finally, this discussion includes certain financial data and estimates that are based on preliminary information that is subject to further review. No assurance can be given that actual results will not differ materially.

As used in this section, the term "U.S. Holder" means a beneficial owner of an equity interest or a note (as determined for U.S. federal income tax purposes) that is (a) a citizen or an individual resident of the United States; (b) a corporation (or an entity taxable as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States or any political subdivision of the United States; (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust which (i) is subject to the primary supervision of a court within the United States and the control of a U.S. fiduciary as described in Section 7701(a)(30)(E) of the Tax Code or (ii) has properly elected under applicable Treasury Regulations to be treated as a U.S. person.

## C. U.S. FEDERAL INCOME TAX CONSIDERATIONS OF THE DEBTORS

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations, of which Young is the common parent, and file a single consolidated U.S. federal income tax return (the "YB Group"). The Debtors estimate that the YB Group has approximately $629,867,134 of consolidated net operating loss ("NOL") carryforwards as of December 31, 2008. The Debtors expect that the YB Group will incur additional NOLs during its taxable year ending December 31, 2009. The amount of any such losses remains subject to audit and adjustment by the IRS (before reduction by any COD Income (as defined below) as a result of the Plan).

As discussed below, in connection with the implementation of the Plan, the amount of the YB Group's NOL carryforwards, current year NOLs, and other tax attributes may be significantly reduced. In addition, the subsequent utilization of NOLs and certain other tax attributes remaining following the Effective Date may be restricted.

### 1. *Cancellation of Indebtedness Income and Reduction of Tax Attributes*

A U.S. taxpayer generally must include in gross income the amount by which the adjusted issue price of indebtedness discharged (including the amount of any unpaid accrued interest on indebtedness to the extent previously deducted by the debtor) exceeds any consideration (*i.e.*, the amount of cash or the fair market value of property including stock of a debtor) given in exchange for the cancellation of such

debt ("COD Income"). Under Section 108(e)(4) of the Tax Code, the acquisition of indebtedness by a person which becomes related to the debtor is treated as an acquisition by the debtor for purposes of determining the amount of the debtors' COD Income. COD Income of a debtor is excluded from gross income (except with respect to certain discharged intercompany debt) if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case, and the discharge occurs by court order or pursuant to a plan approved by the court (the "Bankruptcy Exception").

A debtor that excludes COD Income from gross income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD Income. Attributes subject to reduction generally include any NOL for the taxable year of the discharge and any NOL carryforward to such taxable year, certain tax credits, capital loss carryforwards, and the tax basis of assets (including stock of subsidiaries). If advantageous, a debtor can elect to reduce the basis of depreciable property before reducing its NOL carryforwards or other tax attributes. If the debtor is a member of a consolidated group and reduces its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member.

Recent legislation allows taxpayers to elect under certain circumstances to defer the inclusion in gross income of COD Income resulting from a discharge of indebtedness occurring between January 1, 2009 and December 31, 2010. If Young makes this election with respect to COD Income arising from the distribution of Holdco Common Stock and Holdco Notes to the Senior Noteholders (as defined below) in exchange for the Senior Notes (as defined below), Reorganized Young must include such COD Income in gross income ratably over a five-year period from 2014 through 2018, cannot use the Bankruptcy Exception at the time the deferred COD Income is includible in gross income, and would not reduce tax attributes with respect to such deferred COD Income. In addition, the YB Group would not be permitted to deduct any OID (as defined herein) on the Holdco Notes to the extent that such OID (i) accrues before 2014; and (ii) does not exceed the COD Income arising from Young's satisfaction of the Senior Notes with the Holdco Notes. Instead, Reorganized Young is allowed to take such disallowed OID deductions ratably over the five-year period from 2014 through 2018. In addition, upon the occurrence of certain acceleration events (such as the liquidation or sale of substantially all of the debtor's assets or the cessation of the debtor's business), the deferred COD Income is accelerated and includible in gross income in the taxable year in which the acceleration event occurs. Young currently does not expect to make this deferral election with respect to any part of its COD Income.

The YB Group will incur substantial COD Income as a result of the implementation of the Plan. The amount of COD Income incurred depends, in significant part, on the fair market value of the Holdco Common Stock, Holdco Notes, and Holdco Warrants (as defined below) that are issued on the Effective Date. Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, the YB Group will not be required to include in gross income any COD Income arising as a result of the implementation of the Plan. Instead, the YB Group will be required to reduce its tax attributes (including NOLs, tax basis in assets, and the attributes and tax basis of subsidiaries) by the amount of COD Income that would otherwise have been required to be included in gross income. The Debtors anticipate that, pursuant to the rules described above, their consolidated NOL will be significantly reduced and the other tax attributes of the YB Group (such as tax basis) will also be reduced. As described below under the heading "—*Section 382 Limitation*," Section 382 of the Tax Code may further limit utilization of the Debtors' attributes even after they are reduced by the amount of their excluded COD Income.

2. *Section 382 Limitation*

Generally, under Section 382 of the Tax Code, if a corporation (or a consolidated group) undergoes an "ownership change" (within the meaning of the Tax Code) and the corporation does not

qualify (or elects out of) the special exception discussed below under the heading "—*Special Section 382(l)(5) Exception*," the ability of the corporation to offset future taxable income by its NOL carryforwards and certain other tax attributes (including current year NOLs to the extent allocable to the period on or before the Effective Date) (collectively, "Pre-change Losses") will be subject to an annual limitation ("Section 382 Limitation"). The Section 382 Limitation is generally equal to the product of (i) the "long-term tax-exempt rate" (for example, 4.48% for ownership changes occurring in October 2009) and (ii) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change occurs. In computing the Section 382 Limitation for a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change after giving effect to the surrender of creditors' claims but subject to certain adjustments (which can result in a reduced stock value). Any unused Section 382 Limitation in a particular taxable year may be carried forward, thereby increasing the annual Section 382 Limitation in the subsequent taxable year. Additionally, if the assets of a corporation experiencing an ownership change have a fair market value greater than their tax basis (a net unrealized built-in gain), the corporation is permitted to increase its annual Section 382 Limitation during the five years immediately after the ownership change by an amount determined with reference to the depreciation deductions that a hypothetical purchaser of the corporation's assets would have been permitted to claim if it had acquired the corporation's assets in a taxable transaction. On the other hand, if the assets of a corporation have a fair market value that is less than their tax basis (a net unrealized built-in loss) at the time of an ownership change, any built-in losses (including depreciation or amortization deductions) recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-change Losses that are subject to the annual Section 382 Limitation.

The issuance of the Holdco Common Stock pursuant to the Plan will constitute an "ownership change" of the YB Group within the meaning of Section 382 of the Tax Code. The Debtors have yet to determine whether they will be in a net unrealized built-in loss or net unrealized built-in gain position on the Effective Date.

3.      *Special Section 382(l)(5) Exception*

Section 382(l)(5) of the Tax Code provides an exception to the foregoing rules described above under the heading "—*Section 382 Limitation*". This exception applies if, immediately after an ownership change occurring upon implementation of a confirmed chapter 11 plan, at least 50% of the vote and value of a debtor's stock is held by its historic shareholders and "qualified creditors". In general, a "qualified creditor" includes creditors who have held their debt for at least 18 months prior to the date of filing the bankruptcy case or who have held "ordinary course indebtedness" at all times that it has been outstanding. A creditor that does not become a direct or indirect 5% shareholder of the reorganized company immediately after the ownership change may be treated as a qualified creditor even though the creditor has not owned the indebtedness for the requisite period immediately before the ownership change. If the exception under Section 382(l)(5) of the Tax Code applies and a debtor does not elect out of it, the debtor's ability to utilize its NOLs arising prior to the Effective Date and built-in losses and deductions (if any) recognized after the Effective Date will not be subject to the Section 382 Limitation. Instead, the amount of the debtor's Pre-change Losses that may be carried over to a post-change year would be reduced by any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of indebtedness exchanged for the debtor's stock pursuant to the plan. In addition, Section 382(l)(5) of the Tax Code provides that any further ownership change of the debtor within a two-year period immediately following consummation of the plan will result in a complete elimination of the ability to use any of the debtor's NOLs incurred prior to the date of the second ownership change. The Debtors have not yet determined whether they will be eligible for the special rule under Section 382(l)(5) of the Tax Code.

4.        *Alternative Minimum Tax*

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income each year at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for such year. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though for regular federal income tax purposes a corporation may offset all or part of its taxable income by NOL carryovers from prior years, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as recomputed for AMT purposes). This rule could cause the Reorganized Debtors to owe AMT for periods after the Effective Date even though it generates a NOL or has sufficient NOL carryforwards to offset its regular federal taxable income. Additionally, if a corporation undergoes an ownership change within the meaning of Section 382 of the Tax Code and the corporation is in a net unrealized built-in loss position on the date of the ownership change, the corporation's aggregate tax basis in its assets would be reduced for AMT purposes to reflect the fair market value of such assets as of the change date. AMT that a corporation pays is generally allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years to the extent that the corporation is no longer subject to AMT.

5.        *Cancellation of Intercompany Claims*

As noted above, the Debtors are members of an affiliated group of corporations that join in the filing of a consolidated U.S. federal income tax return. The Debtor members of the YB Group will cancel the Intercompany Claims as part of the Plan. The characterization of an instrument as indebtedness or equity involves a facts and circumstances determination that cannot be predicted with certainty. Thus, there can be no assurance that the Debtors' treatment of the Intercompany Claims as indebtedness will be respected for federal or state and local tax purposes.

Under Section 1.1502-13(g) of the Treasury Regulations, COD Income arising out of the cancellation of a debt of a member of an affiliated group by another member of the affiliated group is not eligible for exclusion from income under the Bankruptcy Exception. A Debtor of an Intercompany Claim will therefore recognize COD Income on the cancellation of the Intercompany Claim but such income is expected to be fully offset by a corresponding loss or bad debt deduction by the member of the YB Group with an interest in such Intercompany Claim. Thus, on a consolidated basis, the YB Group should not recognize net income or loss from the cancellation of the Intercompany Claims under the Plan.

**D.        U.S. FEDERAL INCOME TAX CONSIDERATIONS OF PLAN DISTRIBUTIONS TO U.S. HOLDERS**

1.        *Tax-Free Reorganization*

Pursuant to the Plan, (1) Reorganized Young will issue the Reorganized Young Common Stock to a newly formed Holdco on the Effective Date; (2) in exchange for the Reorganized Young Common Stock, Holdco will issue Holdco Common Stock and Holdco Notes to Young on the Effective Date for distribution to the Holders of the Prepetition Lender Claims (the "Senior Notes" or "Senior Noteholders") in satisfaction of the Senior Notes; (3) in exchange for the Reorganized Young Common Stock, Holdco will issue Noteholder Warrants to acquire Holdco Common Stock ("Holdco Warrants") to Young on the Effective Date for distribution to the Holders of the Noteholder Claims (the "Subordinated Notes" or "Subordinated Noteholders") in satisfaction of the Subordinated Notes; and (4) on the third business day after the Effective Date, Reorganized Young will convert to a Delaware limited liability company so as to be treated as a disregarded entity for U.S. federal income tax purposes. Taken together, the steps described in (1) through (4) above pursuant to the Plan should qualify as a tax-free reorganization within the meaning of Section 368(a) of the Tax Code.

The U.S. federal income tax consequences to the Senior Noteholders and the Subordinated Noteholders arising from the distributions under the Plan in satisfaction of the Senior Notes and the Subordinated Notes, respectively, may vary, depending upon, among other things, whether the Senior Notes, the Subordinated Notes, and the Holdco Notes constitute "securities" for U.S. federal income tax purposes. The determination of whether a debt instrument constitutes a "security" for U.S. federal income tax purposes depends upon an evaluation of the nature of the debt instrument with an important factor being the original term of the debt instrument. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities while corporate debt instruments with maturities when issued of ten years or more are considered securities. Moreover, the IRS has ruled that a new debt instrument with a term of two years may be treated as a security where an acquiring corporation issued it in a transaction that otherwise constitutes a tax-free reorganization in exchange for a target debt instrument which had an original term of more than ten years and had the same maturity date and terms (except for the interest rate) as the acquirer debt instrument. According to the IRS ruling, the acquired debt instrument represented a continuation of the holder's interest in the corporation in substantially the same form.

The Senior Notes were issued in May 3, 2005 pursuant to an amended and restated Credit Agreement and mature on May 3, 2012. The Subordinated Notes consist of (i) the 8¾% Senior Subordinated Notes that were issued on December 23, 2003 and mature on January 15, 2014; and (ii) the 10% Senior Subordinated Notes that were issued on March 1, 2001 and mature on March 1, 2011. The Holdco Notes will be issued on the Effective Date and have a five-year term. The Senior Notes with an original term of seven years may constitute securities while the Subordinated Notes with maturities of 10 and 11 years should likely be treated as securities for U.S. federal income tax purposes. The Holdco Notes, which have a term to maturity of only five years, may not constitute securities. It is also uncertain whether the Holdco Notes will be treated as having substantially the same terms as the Senior Notes and thereby represent a continuation of the Senior Notes. Due to the inherently factual nature of the determination, each U.S. Holder is urged to consult its own tax advisor regarding the treatment of the Senior Notes, the Subordinated Notes, and the Holdco Notes as securities for U.S. federal income tax purposes.

If the Senior Notes and the Holdco Notes both constitute securities for U.S. federal income tax purposes, the exchange of Senior Notes for Holdco Common Stock and Holdco Notes should be treated as a tax-free exchange for U.S. federal income tax purposes. As a result, except as discussed below with respect to consideration received for accrued interest and accrued market discount not previously includible in income, a U.S. Holder of the Senior Notes should not recognize gain or loss on the exchange provided the principal amount of the Holdco Notes does not exceed the principal amount of the Senior Notes exchanged therefor. A U.S. Holder's adjusted tax basis in the Senior Notes surrendered should be apportioned between the Holdco Common Stock and the Holdco Notes based on their respective fair market values on the Effective Date, and the U.S. Holder's holding period in the Holdco Common Stock and Holdco Notes would include its holding period in the Senior Notes that are surrendered therefor.

If the Senior Notes constitute securities but the Holdco Notes do not constitute securities, the exchange of Senior Notes for Holdco Common Stock and Holdco Notes should qualify as a partially tax-free exchange. Accordingly, subject to the discussion below with respect to consideration received for accrued interest and accrued market discount, a U.S. Holder of the Senior Notes generally should recognize gain, if any, (but not loss) in an amount equal to the lesser of (i) the difference between the aggregate issue price of the Holdco Notes and the fair market value of the Holdco Common Stock received and the U.S. Holder's adjusted tax basis in the Senior Notes exchanged therefor; and (ii) the fair market value on the Effective Date of the Holdco Notes received. A U.S. Holder's tax basis in the Holdco Notes should equal their fair market value on the Effective Date and the holding period of the Holdco Notes would commence on the day following the Effective Date. A U.S. Holder's tax basis in the Holdco Common Stock received in the exchange (other than amounts attributable to accrued but unpaid

interest not previously includible in income) should equal such holder's adjusted tax basis in the Senior Notes surrendered, decreased by the fair market value of the Holdco Notes (other than amounts attributable to accrued but unpaid interest not previously includible in income), and increased by the amount of any gain recognized in the exchange. The holding period of the Holdco Common Stock will include the U.S. Holder's holding period in the Senior Notes exchanged therefor.

Assuming the Subordinated Notes constitute securities for U.S. federal income tax purposes, the exchange of the Subordinated Notes for Holdco Warrants should constitute a tax-free exchange for U.S. federal income tax purposes. As a result, except as discussed below with respect to Claims for accrued interest and accrued market discount not previously includible in income, a U.S. Holder of the Subordinated Notes should not recognize gain or loss on the exchange. A U.S. Holder's initial tax basis in the Holdco Warrants received should equal its adjusted tax basis in the Subordinated Notes and its holding period in the Holdco Warrants will include the period during which it held the Subordinated Notes exchanged therefor.

### 2. *Taxable Exchange*

An exchange pursuant to the Plan of any Claims that are not securities for cash or other property, whether or not the property received constitutes a security, will constitute a taxable exchange. As a result, a U.S. Holder of such Claims would generally recognize gain or loss in an amount equal to the difference, if any, between (a) the "amount realized" (*i.e.*, the cash and/or aggregate fair market value or "issue price" of all property received by the U.S. Holder in exchange for its Claim (other than amounts treated as received in exchange for accrued and unpaid interest not previously includible in income); and (b) the U.S. Holder's adjusted tax basis in the Claim. See the discussion below under "U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of the Holdco Notes—*Original Issue Discount*" regarding the "issue price" of the Holdco Notes.

A U.S. Holder's initial tax basis in any property received will be the fair market value of such property on the Effective Date, and its holding period in the property received will begin on the day after the Effective Date. The character of any gain or loss recognized as long-term or short-term capital gain or loss (or as ordinary income or loss) will depend upon a number of factors, including whether the Claim has been held for more than one year, whether the Claim was purchased at a discount (in which case the market discount rules described below may apply to recharacterize a portion of any gain as ordinary income), and whether and to what extent the U.S. Holder has previously claimed, or is entitled to claim in the exchange, a bad debt or worthless securities deduction in respect of such Claim. The rules governing the character, timing, and amount of bad debt or worthless securities deductions are based on the facts and circumstances of a particular U.S. Holder, the obligor, and the instrument with respect to which a deduction is claimed. U.S. Holders of Claims are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

### 3. *Accrued and Unpaid Interest*

Pursuant to the Plan, distributions to a U.S. Holder of a Claim will be allocated first to the principal portion of such Claim as determined for U.S. federal income tax purposes and thereafter, to the extent the distribution exceeds such amount, to the portion of such Claim representing accrued but unpaid interest. There is no assurance, however, that the IRS would respect such allocation for U.S. federal income tax purposes. To the extent a U.S. Holder of a Claim (whether or not treated as a security for U.S. federal income tax purposes) receives a distribution (including Holdco Common Stock, Holdco Notes, or Holdco Warrants) in satisfaction of interest accrued during its holding period, the U.S. Holder generally would recognize ordinary interest income in such amount (if not previously included in such U.S. Holder's gross income). The tax basis of any property received in exchange for that part of the Claim constituting accrued but unpaid interest will be the fair market value of such property and the holding

period of such property will begin on the day after the Effective Date. Conversely, a U.S. Holder generally would recognize a deductible loss to the extent that any accrued and unpaid interest on any Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Each U.S. Holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of previously included but unpaid interest and original issue discount for U.S. federal income tax purposes.

        4.     *Market Discount*

A U.S. Holder of a Claim acquired after its original issuance at a market discount (generally defined as the amount, if any, by which a U.S. Holder's tax basis in the debt obligation immediately after its acquisition is less than the adjusted issue price of the debt obligation at such time, subject to a *de minimis* exception) generally will be required to treat any gain recognized in a taxable exchange as ordinary income to the extent of the market discount accrued during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. To the extent any surrendered Claims that had been acquired with market discount are exchanged for Holdco Common Stock, Holdco Notes, or Holdco Warrants in a tax-free exchange, any market discount that accrued on such Claims but was not recognized by the U.S. Holder in the exchange may result in any gain recognized on a subsequent disposition of the Holdco Common Stock, Holdco Notes, or Holdco Warrants to be treated as ordinary income.

**E.     U.S. FEDERAL INCOME TAX CONSEQUENCES TO U.S. HOLDERS OF OWNING AND DISPOSING OF THE HOLDCO NOTES**

        1.     *Original Issue Discount*

It is expected that the Holdco Notes will be issued with original issue discount ("OID") for U.S. federal income tax purposes. In general, a note with a term that exceeds one year will be treated as issued with OID if its "stated redemption price at maturity" (the sum of all payments to be made on the note other than "qualified stated interest") exceeds its "issue price" by more than a *de minimis* amount. The term "qualified stated interest" means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate. The Holdco Notes provide that interest will be payable in kind (except in certain limited circumstances) during the first 12 months after the Effective Date. Because of the payable in kind feature of the Holdco Notes, a portion of their interest payments would not meet the definition of qualified stated interest and therefore would be included in their stated redemption price at maturity. As a result, the Holdco Notes should be treated as having OID.

Under the rules governing OID, (1) U.S. Holders of the Holdco Notes will be required, without regard to their regular method of accounting, to include OID in ordinary income each year over the period that they hold the Holdco Notes in accordance with a constant yield to maturity method, whether or not they receive a cash payment of interest on the Holdco Notes on the scheduled interest payment dates; (2) the actual cash payments of interest on the Holdco Notes would not be reported separately as taxable income; (3) any amount of OID included in the U.S. Holder's gross income with respect to the Holdco Notes would increase such holder's tax basis in the Holdco Notes; and (4) the amount of distributions the U.S. Holder receives in respect of such accrued OID would reduce such holder's tax basis in the Holdco Notes. If a U.S. Holder's initial tax basis in the Holdco Notes is greater than their issue price but less than their stated redemption price at maturity, such U.S. Holder generally will be considered to have "acquisition premium" with respect to the Holdco Notes, which may reduce the amount of OID that the U.S. Holder would otherwise be required to include in taxable income.

The "issue price" of the Holdco Notes generally will equal their fair market value if the Holdco Notes are considered to be publicly traded for U.S. federal income tax purposes, and if the Senior Notes are considered to be publicly traded but the Holdco Notes are not, the issue price of the Holdco Notes will be the fair market value of the Senior Notes exchanged therefor. If neither the Senior Notes nor the Holdco Notes are considered to be publicly traded, the issue price of the Holdco Notes will be their principal amount. In general, a debt instrument will be treated as publicly traded if (i) it is listed on a national securities exchange or certain interdealer quotation systems; (ii) it appears on a system of general circulation that provides a reasonable basis to determine its fair market value by disseminating either recent price quotations of one or more identified brokers, dealers or traders or actual prices of recent sales transactions; or (iii) under certain circumstances, price quotations for the debt instrument are readily available from dealers, brokers or traders.

2.      *Sale, Exchange, or Other Taxable Disposition*

A U.S. Holder generally will recognize capital gain or loss upon the sale, exchange, or other taxable disposition of the Holdco Notes in an amount equal to the difference between (i) the amount realized by such U.S. Holder (less any amount attributable to accrued and unpaid interest not previously included in income which is taxable as ordinary income) and (ii) such U.S. Holder's adjusted tax basis in the Holdco Notes. Except to the extent a U.S. Holder acquired the Holdco Notes in exchange for Claims to which the market discount rules applied (see the discussion above under "U.S. Federal Income Tax Considerations of Plan Distributions to U.S. Holders—*Market Discount*"), any such gain or loss will be capital gain or loss and will be long-term capital gain if the U.S. Holder held the Holdco Notes for more than one year. Long-term capital gains of certain non-corporate U.S. Holders (including individuals) may qualify for a maximum 15% tax rate (which is currently effective for tax years through 2010). The deduction of capital losses is subject to certain limitations under the Tax Code.

## F.      U.S. FEDERAL INCOME TAX CONSEQUENCES TO U.S. HOLDERS OF OWNING AND DISPOSING OF THE HOLDCO COMMON STOCK AND HOLDCO WARRANTS

1.      *Distributions*

The gross amount of any distribution of cash or other property made to a U.S. Holder with respect to the Holdco Common Stock generally will be includible in the U.S. Holder's gross income as dividend income to the extent such distributions are paid out of Holdco's current or accumulated earnings and profits as determined under U.S. federal income tax principles. Cash distributions in excess of Holdco's earnings and profits will be treated as a tax-free return of capital to the extent of the U.S. Holder's adjusted tax basis in the Holdco Common Stock, and thereafter as gain from the sale or exchange of a capital asset. An individual U.S. Holder should generally qualify for a reduced rate of tax (currently, a 15% tax rate which is effective for tax years through 2010), for qualified dividends if the requisite holding period and certain other requirements are satisfied. Corporate U.S. Holders generally should qualify for the dividends received deduction if the requisite holding period is satisfied.

2.      *Sale, Exchange, or Other Taxable Disposition*

For the U.S. federal income tax consequences to a U.S. Holder upon a sale, exchange, or other taxable disposition of the Holdco Common Stock or Holdco Warrants, see the discussion above under "U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of the Holdco Notes—*Sale, Exchange, or Other Taxable Disposition*".

3. *Exercise or Lapse of Holdco Warrants*

Upon the exercise of the Holdco Warrants, a U.S. Holder will not recognize gain or loss and will have a tax basis in the Holdco Common Stock received equal to the U.S. Holder's tax basis in the Holdco Warrant plus the exercise price of such warrant. The holding period for the Holdco Common Stock purchased pursuant to the exercise of the Holdco Warrant will begin on the date of exercise and will not include the period during which the U.S. Holder held the Holdco Warrant. In the event that a Holdco Warrant lapses unexercised, a U.S. Holder generally may recognize a capital loss in an amount equal to its tax basis in the Holdco Warrant. Such loss will be long-term if the Holdco Warrant has been held for more than one year. The deduction of capital losses is subject to certain limitations under the Tax Code.

## G. U.S. FEDERAL INCOME TAX CONSEQUENCES TO U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS

1. *Class B—Prepetition Lender Claims*

A U.S. Holder of a Prepetition Lender Claim (*i.e.*, a Secured Noteholder) will receive on the Effective Date its pro rata share of the Holdco Notes and the Holdco Common Stock in satisfaction of the Senior Notes. See the discussion above under "U.S. Federal Income Tax Considerations of Plan Distributions to U.S. Holders—*Tax-Free Reorganization*" for the U.S. federal income tax consequences to the Secured Noteholders of exchanging the Senior Notes for Holdco Common Stock and Holdco Notes based on the assumption that the Senior Notes constitute securities for U.S. federal income tax purposes. If the Senior Notes do not qualify as securities for U.S. federal income tax purposes, see the discussion above under "U.S. Federal Income Tax Considerations of Plan Distributions to U.S. Holders—*Taxable Exchange*" for the U.S. federal income tax consequences to such U.S. Holder of surrendering the Senior Notes in exchange for the Holdco Common Stock and Holdco Notes.

2. *Class C—Other Secured Claims*

At the option of the Debtors, each U.S. Holder of an Other Secured Claim, will either be paid in cash or have all collateral securing its Other Secured Claim returned. If such U.S. Holder receives cash or has the collateral securing such Other Secured Claim returned, the satisfaction of its Claim should be treated as a taxable exchange. See the discussion above under "U.S. Federal Income Tax Considerations of Plan Distributions to U.S. Holders—*Taxable Exchange*" for the U.S. federal income tax consequences to such U.S. Holder of surrendering its Other Secured Claim.

3. *Class D—Noteholder Claims*

A U.S. Holder of a Noteholder Claim (*i.e.*, a Subordinated Noteholder) will receive its pro rata share of the Holdco Warrants in satisfaction of the Subordinated Notes if the Subordinated Noteholders as a class vote to accept the Plan. See the discussion above under "U.S. Federal Income Tax Considerations of Plan Distributions to U.S. Holders—*Tax-Free Reorganization*" for the U.S. federal income tax consequences to the Subordinated Noteholders of exchanging the Subordinated Notes for the Holdco Warrants.

If the Subordinated Noteholders as a class do not vote to accept the Plan, they will not receive the Holdco Warrants and the Subordinated Notes will be extinguished. In such case, each Subordinated Noteholder should recognize a loss equal to its adjusted tax basis in the Subordinated Notes unless the U.S. Holder previously claimed a bad debt or worthless securities deduction in respect of such Claim. The character of the loss will depend upon a number of factors as described above under the

heading "U.S. Federal Income Tax Considerations of Plan Distributions to U.S. Holders—*Taxable Exchange*".

    4.    *Class E—General Unsecured Claims*

A U.S. Holder of a General Unsecured Claim will receive cash in satisfaction of such General Unsecured Claim. See the discussion above under "U.S. Federal Income Tax Considerations of Plan Distributions to U.S. Holders—*Taxable Exchange*" for the U.S. federal income tax consequences to such U.S. Holder of surrendering its General Unsecured Claim. A U.S. Holder's tax basis in its General Unsecured Claim generally should equal the amount advanced to the Debtor or the amount included in income as a result of the provision of goods or services to the Debtor, except to the extent that a bad debt loss had been previously taken. Any gain or loss generally should be ordinary to the extent that the General Unsecured Claim arose in the ordinary course of a trade or business of such U.S. Holder.

    5.    *Class F—Equity Interests*

All of the Equity Interests will be cancelled as of the Effective Date in exchange for no consideration. A U.S. Holder of an Equity Interest should recognize a capital loss in an amount equal to its tax basis in such Equity Interest unless the U.S. Holder previously claimed a loss with respect to such Equity Interest under its regular method of accounting. Such loss will be treated as a long-term capital loss if the Equity Interest was held by the U.S. Holder for more than one year and otherwise will be short-term. In general, corporate U.S. Holders may use capital losses only to offset capital gains, but unused capital losses may be carried back three years (subject to certain limitations) and carried forward five years. An individual U.S. Holder generally may use capital losses only to the extent of capital gains plus $3,000 of other income, but unused capital losses may be carried forward indefinitely.

## H.    INFORMATION REPORTING AND BACKUP WITHHOLDING

U.S. Holders of the Senior Notes and the Subordinated Notes generally should not be subject to information reporting or backup withholding with respect to the receipt of the Holdco Common Stock, Holdco Notes, or Holdco Warrants pursuant to the Plan in satisfaction of the Senior Notes and the Subordinated Notes, respectively.

U.S. Holders may be subject to both information reporting and backup withholding at the current rate of 28% with respect to certain payments, including payments in respect of accrued interest (including OID), dividends paid on the Holdco Common Stock, and the gross proceeds from the sale, exchange, or other disposition of the Holdco Common Stock, Holdco Notes, or Holdco Warrants, unless the U.S. Holder (i) is exempt (such as corporations and financial institutions) and, when required, demonstrates this fact or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the U.S. Holder is a United States person, that its taxpayer identification number is correct, and that the U.S. Holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## IX.    VOTING PROCEDURES

The following briefly summarizes procedures to accept and confirm the Plan and the competing plan of reorganization (the "Committee's Plan", together with the Plan, the "Chapter 11

Plans") filed by the Official Committee of Unsecured Creditors (the Creditors' Committee).  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.  The Confirmation Hearing Notice sets forth additional information regarding voting procedures.

**A.      THE SOLICITATION PACKAGE**

The following materials constitute the Solicitation Package:

- the Confirmation Hearing Notice;

- the appropriate Ballot(s) and/or Master Ballot(s) and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope;

- the Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents which may be filed with the Bankruptcy Court;

- a letter to the Holders in each of the Voting Classes urging them to vote to accept the Plan;

- the Disclosure Statement Order any order approving the disclosure statement of the Debtors or the Creditors' Committee in these reorganization cases, which, among other things (a) approves this Disclosure Statement such disclosure statement as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code, (b) fixes a voting record date, (c) approves solicitation and voting procedures with respect to the Plan Chapter 11 Plans, (d) approves the form of the Solicitation Package and the notices to be distributed with respect thereto, and (e) schedules certain dates in connection therewith;

- any disclosure statements approved by the Court (and any Chapter 11 Plans or other materials attached to such approved disclosure statements);

- the Solicitation Procedures;

- the appropriate Ballot(s) and/or Master Ballot(s) and applicable Voting Instructions;

- a form for Allowed Holders of Class 6 claim (as defined in the Committee's Plan) for such Creditors to participate in the rights offering described in the Committee's Plan (the "Rights Exercise Form" and instructions thereto);

- the Confirmation Hearing Notice, setting forth the date fixed for submitting acceptances and rejections to the Chapter 11 Plans, the date fixed for filing objections to Confirmation of the Chapter 11 Plans, and the date, time and place of the Confirmation Hearing;

- a pre-addressed, postage pre-paid return envelope;

- a letter to the Holders in each of the Voting Classes; and

- such other materials as the Court may direct.

The Debtors anticipate commencing the solicitation period, through their Voting Agent, as soon as possible after approval of the Debtors' disclosure statement and intend to mail all Solicitation Packages on or before a date that is no more than seven (7) days after the Bankruptcy Court enters an order approving the disclosure statement.

The Core Group[3], all parties in interest ~~that have requested service of pleadings~~on the 2002 List as of the Voting Record Date and all parties entitled to vote to accept or reject the ~~Plan~~Chapter 11 Plans shall be served either paper copies of, or a CD-ROM containing the ~~Disclosure Statement Order, the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan~~materials in the Solicitation Package.  Any party who is served a CD-ROM but desires a paper copy of these documents may request a copy from the Debtors' Voting Agent by writing to Young Broadcasting Inc. c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, Third Floor, New York, New York 10017.  The Solicitation Package (except the Ballots) can also be obtained by any party by accessing the Voting Agent's website at http://chapter11.epiqsystems.com/ybc.  Moreover, all parties entitled to vote to accept or reject the ~~Plan~~Chapter 11 Plans shall receive a Solicitation Package containing paper copies of the Confirmation Hearing Notice, an appropriate Ballot and/or Master Ballot, and the Solicitation Procedures.

~~The Plan Supplement~~Any supplement to the Chapter 11 Plans will be filed by the Debtors or the Creditors' Committee, as applicable, at least five (5) days prior to the Voting Deadline.  When filed, the ~~Plan Supplement~~plan supplement shall be made available on the Voting Agent's website at http://chapter11.epiqsystems.com/ybc.  The Debtors will not serve paper or CD-ROM copies of ~~the Plan Supplement~~any plan supplement.  However, parties may request a copy of the ~~Plan Supplement~~plan supplement from the Debtors' Voting Agent.

## B.   VOTING INSTRUCTIONS

Only the Holders of Allowed Claims in Classes B, D and E ~~Claims~~of the Plan and Classes 2, 6 and 7 of the Committee's Plan as of the Voting Record Date, are entitled to vote to accept or reject the ~~Plan~~Chapter 11 Plans, and they may do so by completing the Ballot and returning it in the envelope provided to the Voting Agent by the Voting Deadline.  Such Holders must vote all of their Claims within a particular Class twice; one vote either to accept or reject the Plan and another vote either to accept or reject the Committee's Plan.  If a Holder votes to accept both of the Chapter 11 Plans, each Ballot will also allow the Holder to rank its preference between the two Chapter 11 Plans.  Voting Instructions are attached to each Ballot.

The Debtors, with the approval of the Bankruptcy Court, have engaged the Epiq Bankruptcy Solutions, LLC, as the claims and noticing agent and as the Voting Agent to assist in the solicitation process.  The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.  The Voting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the ~~Plan~~Chapter 11 Plans and will ~~file~~[[produce the Voting Report, which the Debtors will file with the Bankruptcy Court as soon as practicable before the Confirmation Hearing.]]

The deadline to vote on the ~~Plan~~Chapter 11 Plans is 4:00 p.m., Eastern Time, December 11, 2009.

---

[3]  "Core Group" means (i) United States Bankruptcy Judge Arthur J. Gonzalez's Chambers, (ii) Office of the United States Trustee for the Southern District of New York, (iii) counsel to the Creditors Committee, and (iv) counsel for the Prepetition Lenders.

<table>
<tr><td align="center">**BALLOTS**</td></tr>
</table>

| |
|---|
| Ballots and Master Ballots must be actually received by the Voting Agent by the Voting Deadline by using the envelope provided to: |

Epiq Bankruptcy Solutions
P.O. Box 5014, FDR Station
New York, New York 10150-5014
ATTN: Young Broadcasting Inc. Ballot Processing

or by First Class Mail, Overnight Courier or
Personal Delivery to:

Epiq Bankruptcy Solutions
757 Third Avenue, Third Floor
New York, New York 10017
ATTN: Young Broadcasting Inc. Ballot Processing

If you have any questions on the procedures for voting on the ~~Plan,~~ Chapter 11 Plans, please call the Voting Agent at the following telephone number:

646-282-2400

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT (I) WHICH DOES NOT CLEARLY INDICATE (A) AN ACCEPTANCE OR REJECTION OF THE PLAN ~~OR~~AND/OR (B) AN ACCEPTANCE OR REJECTION OF THE COMMITTEE'S PLAN; OR (II) WHICH INDICATES (A) BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN AND/OR (B) BOTH AN ACCEPTANCE AND A REJECTION OF THE COMMITTEE'S PLAN, SHALL NOT BE COUNTED. [[preference election?]]**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF THEIR CLAIMS WITHIN A PARTICULAR PLAN CLASS EITHER TO ACCEPT OR REJECT THE ~~PLAN~~CHAPTER 11 PLANS AND MAY NOT SPLIT THEIR VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASSES B, D AND E OF THE PLAN AND CLASSES 2, 6 AND 7 OF THE COMMITTEE'S PLAN WILL CERTIFY TO THE BANKRUPTCY COURT ~~AND THE~~, DEBTORS AND CREDITORS' COMMITTEE THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE ~~PLAN~~CHAPTER 11 PLANS.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

1. *~~Special Note For Beneficial Holders:~~*Notice of Non-Voting Status:

~~If you received a return envelope addressed to your nominee, please allow sufficient time for your nominee to process your vote on a Mater Ballot and return the Master Ballot to the Voting Agent before the Voting Deadline.~~

As reflected in the Chapter 11 Plans, certain Classes of Claims and Equity Interests under the Chapter 11 Plans are not entitled to vote to accept or reject the Chapter 11 Plans because such Classes (a)

are Unimpaired within the meaning of section 1124 of the Bankruptcy Code and therefore are deemed to accept the Chapter 11 Plans pursuant to section 1126(f) of the Bankruptcy Code, or (b) are receiving no distribution under the Chapter 11 Plans and therefore deemed to reject the Chapter 11 Plans pursuant to section 1126(g).  Instead, Holders of Claims and Equity Interests, along with Classes of Claims that are unclassified pursuant to section 1123(a)(1) of the Bankruptcy Code, will receive a Notice of Non-Voting Status, together with the Confirmation Hearing Notice.

> 2.      *Temporary Allowance of Claims:*

If an objection to a Claim or Interest is pending on the Voting Record Date, such Claim or Interest Holder shall receive a copy of the Confirmation Hearing Notice and a *Notice of Non-Voting Status With Respect To Disputed Claims* ("Disputed Claim Notice").  The Disputed Claim Notice will inform such person or entity (i) that its Claim ("Disputed Claim") or Interest ("Disputed Interest") has been objected to; and (ii) that the Holder of such Disputed Claim or Disputed Interest cannot vote unless one or more of the following has taken place at least five (5) Business Days before the Voting Deadline: (a) an order is entered by the Bankruptcy Court allowing such Disputed Claim or Disputed Interest pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order is entered by the Bankruptcy Court temporarily allowing such Disputed Claim or Disputed Interest for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the Holder of the Disputed Claim or Disputed Interest and the Debtors resolving the objection and allowing the Disputed Claim or Disputed Interest in an agreed upon amount; (d) a stipulation or other agreement is executed between the Holder of the Disputed Claim or Disputed Interest and the Debtors temporarily allowing the Holder of the Disputed Claim or Disputed Interest to vote its Claim or Interest in an agreed upon amount; or (e) the pending objection to the Disputed Claim or Disputed Interest is voluntarily withdrawn by the Debtors (each, a "Resolution Event").  No later than two (2) Business Days after a Resolution Event, the Voting Agent will distribute a Ballot and a pre-addressed, postage pre-paid envelope to the relevant Holder of the Disputed Claim or Disputed Interest, which must be returned to the Voting Agent by no later than the Voting Deadline.

If an objection to a Disputed Claim or Disputed Interest is filed by the Debtors after the Voting Record Date but before fifteen (15) days prior to the Confirmation Hearing, the Ballot of the Holder of such Disputed Claim or Disputed Interest will not be counted absent a Resolution Event.

> 3.      ~~2. *For All*~~ Holders *Entitled to Vote to Accept or Reject the Chapter 11 Plans*:

By signing and returning a Ballot, each Holder of a Claim in Classes B, D and E of the Plan and each Holder of a Claim in Classes 2, 6 and 7 of the Committee's Plan will also be certifying to the Bankruptcy Court ~~and the,~~ Debtors and Creditors' Committee that, among other things,

- the Holder has received and reviewed a copy of the ~~Disclosure Statement~~disclosure statements and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has cast the same vote with respect to all Claims in a single Class; and

- no other Ballots with respect to the amount of the Claims have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are thereby revoked.

**C.** ~~**VOTING TABULATION**~~

~~To ensure that a vote is counted, the Holder of a Claim or Interest should: (a) complete a Ballot; (b) indicate the Holder's decision either to accept or reject the Plan in the boxes provided in the Ballot; and (c) sign and timely return the Ballot to the address set forth on the enclosed prepaid envelope by the Voting Deadline. A Holder with Claims in more than one Class may receive more than one Ballot and each such Ballot will be coded for the particular Class. The Ballot may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at the time the Ballot is transmitted, Creditors should not surrender certificates, instruments, or other documents representing or evidencing their Claims.~~

The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim. Only the following Holders of Claims in Voting Classes ~~shall~~will be entitled to vote with regard to such Claims:

1. the Holders of Claims for which Proofs of Claims have been timely filed, as reflected on the official claims register, as of the close of business on the Voting Record Date, with the exception of those Claims subject to a pending objection filed before the Voting Deadline, unless such claims are allowed for voting purposes pursuant to a "Resolution Event" as outlined in the Solicitation Procedures; provided, however, to the extent that the Debtors have reached a settlement on a Claim for which a Proof of Claim has been timely filed, the terms of such settlement shall govern for purposes of determining the Holder of the Claim and the amount of the Claim;

2. the Holders of scheduled Claims that are listed in the Debtors' Schedules, with the exception of those scheduled Claims that are listed as contingent, unliquidated or disputed Claims (excluding such scheduled Claims that have been superseded by a timely-filed Proof of Claim); and

3. the Holders of Claims arising pursuant to an agreement or settlement with the Debtors executed prior to the close of business on the Voting Record Date, as reflected in a court pleading, stipulation, term sheet, agreement, or other document filed with the Bankruptcy Court, in an Order entered by the Bankruptcy Court, or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court regardless of whether a Proof of Claim has been filed.

The assignee of a transferred and assigned claim (whether a timely-filed or scheduled claim) ~~shall~~will be permitted to vote such Claim only if the appropriate Transfer/Assignment Form has been noted on the Bankruptcy Court's docket as of the close of business on the Voting Record Date.

*5.*　　*Special Note For Beneficial Holders.*[4]

---

[4]　A Beneficial Holder means those beneficial owners of Class B and Class 2 Prepetition Lender Claims and Class D and Class 6 Noteholder Claims (together, the "Debt Instruments") whose Claims have not been satisfied prior to the Voting Record Date, pursuant to the Bankruptcy Court's order or otherwise, as reflected in the records maintained by Nominees holding through The Depository Trust Company and/or the applicable Indenture Trustee, as of the close of business on the Voting Record Date.

If you received a return envelope addressed to your Nominee,[5] please allow sufficient time for your Nominee to process your vote on a Mater Ballot and return the Master Ballot to the Voting Agent before the Voting Deadline.

The following additional procedures, as well as the aforementioned procedures, shall apply to Beneficial Holders.  The Voting Record Date for determining the identity of the Holders of all Beneficial Holder Claims is November 2, 2009.

The Voting Agent will distribute or cause to be distributed the appropriate number of copies of Ballots to each Beneficial Holder holding a Claim as of the Voting Record Date, including Nominees identified by the Voting Agent as entities through which Beneficial Holders hold their Claims relating to Securities.

Any Nominee which is a Holder of record with respect to Noteholder Claims, will vote on behalf of Beneficial Holders of such Noteholder Claims by (i) immediately distributing the Solicitation Package, including Ballots, it receives from the Debtors' Voting Agent to all such Beneficial Holders, (ii) promptly collecting Ballots from such Beneficial Holders that cast votes on the Chapter 11 Plans, (iii) compiling and validating the votes and other relevant information of all such Beneficial Holders on the Master Ballot, and (iv) transmitting the Master Ballot to the Voting Agent by the Voting Deadline.

Any Beneficial Holder holding Noteholder Claims as a record holder in its own name should vote on the Chapter 11 Plans by completing and signing a Ballot and returning it directly to the Voting Agent on or before the Voting Deadline.

Any Indenture Trustee (unless otherwise empowered to do so) will not be entitled to vote on behalf of the Holders of Beneficial Holder Claims; rather, each such Holder of a Beneficial Holder Claim must submit his or her own Ballot in accordance with the Beneficial Holder Voting Procedures.

Any Beneficial Holder holding Noteholder Claims in "street name" through a Nominee must vote on the Chapter 11 Plans through such Nominee by completing and signing the Ballot and returning such Ballot to the appropriate Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return the Master Ballot to the Voting Agent prior to the Voting Deadline.  Any Beneficial Holder holding Noteholder Claims in "street name" who submits a Ballot to the Debtors, Debtors' counsel or the Voting Agent, will not be counted for purposes of accepting or rejecting the Chapter 11 Plans.

Any Ballot returned to a Nominee by a Beneficial Holder will not be counted for purposes of accepting or rejecting the Chapter 11 Plans until such Nominee properly completes and delivers to the Voting Agent a Master Ballot that reflects the vote of such Beneficial Holders by the Voting Deadline, or otherwise validates the Ballot in a manner acceptable to the Voting Agent.  Nominees will retain all Ballots returned by Beneficial Holders for a period of one (1) year after the Effective Date of the confirmed Chapter 11 Plan.

If a Beneficial Holder holds Noteholder Claims through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Ballot, and each such Beneficial Holder should execute a separate Ballot for each block of Noteholder Claims that it holds through any Nominee and must return each such Ballot to the appropriate Nominee.

---

[5]   A Nominee means any broker, dealer, commercial bank, trust company or other agent or nominee through which certain Beneficial Holders hold the relevant Debt Instruments, or their agents, rather than the Beneficial Holders themselves.

If a Beneficial Holder holds a portion of its Noteholder Claims through a Nominee or Nominees and another portion in its own name as the record holder, [[such Beneficial Holder should follow the procedures described above under Holders Entitled to Vote to Accept or Reject the Chapter 11 Plans and General Ballot Tabulation to vote the portion held in its own name and the procedures described herein and Master Ballot Tabulation, below, to vote the portion held by the Nominee(s).]]

**C.      VOTING TABULATION**

*1.      General Ballot Tabulation:*

To ensure that a vote is counted, the Holder of a Claim or Interest should: (a) complete a Ballot; (b) indicate the Holder's decision either to accept or reject the Plan in the boxes provided in the Ballot; (c) indicate the Holder's decision either to accept or reject the Committee's Plan in the boxes provided in the Ballot; (d) if the Holder votes to accept both of the Chapter 11 Plans, indicate the Holder's preference between the Plan and the Committee's Plan; and (e) sign and timely return the Ballot to the address set forth on the enclosed prepaid envelope by the Voting Deadline.  A Holder with Claims in more than one Class may receive more than one Ballot and each such Ballot will be coded for the particular Class.  The Ballot may not be used for any purpose other than to vote to accept or reject the Chapter 11 Plans.  Accordingly, at the time the Ballot is transmitted, Creditors should not surrender certificates, instruments, or other documents representing or evidencing their Claims.

In tabulating votes, the following hierarchy ~~shall~~will be used to determine the Claim amount associated with each Creditor's vote:

1.      ~~The~~the Claim amount settled and/or agreed upon by the Debtors prior to the Voting Record Date, as reflected in a court pleading, stipulation, term sheet, agreement or other document filed with the Bankruptcy Court, in an Order entered by the Bankruptcy Court, or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court;

2.      ~~The~~the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event as outlined in the Solicitation Procedures;

3.      ~~The~~the Claim amount contained on a Proof of Claim that has been timely filed by the relevant Claims Objection Bar Date (or deemed timely filed by the Bankruptcy Court under applicable law), *provided, however* that Ballots cast by Creditors whose Claims are not listed on the Debtors' Schedules, but who timely file Proofs of Claim ~~in~~that are contingent and/or are for wholly unliquidated or unknown amounts that are not the subject of an objection filed before the Voting Deadline, will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, and will count as Ballots for Claims in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; *provided further, however* that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a court pleading, stipulation, term sheet, agreement, or other document filed with the Bankruptcy Court as referenced in the Solicitation Procedures, the Claim amount in the court pleading, stipulation, term sheet, agreement, or other document filed with the Bankruptcy Court shall supersede the Claim amount set forth on the respective Proof of Claim;

4.      ~~The~~the Claim amount listed in the Debtors' Schedules, provided that such Claim is not scheduled as contingent, disputed or unliquidated and has not been paid;~~ and~~

5.      ~~In~~in the absence of any of the foregoing, zero; and

6.      claims filed or deemed filed in the amount of $0.00 are not entitled to vote.

The Claim amount established pursuant to the hierarchy described above ~~shall~~will control for voting purposes only, and ~~shall~~will not constitute the Allowed amount of any Claim.  The General Tabulation Procedures are set forth in the Solicitation Procedures.

Ballots received after the Voting Deadline in connection with the Debtors' and Creditors' Committee's request for Confirmation of the ~~Plan~~Chapter 11 Plans may not be counted.  The method of delivery of the Ballots to be sent to the Voting Agent is at the election and risk of each Holder of a Claim.  Except as otherwise provided in the Solicitation Procedures, a Ballot will be deemed delivered only when the Voting Agent actually receives the original executed Ballot.  Delivery of a Ballot to the Voting Agent by facsimile, e-mail or any other electronic means will not be accepted.  No Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Voting Agent), any Indenture Trustee (unless specifically instructed to do so)~~,~~ or the Debtors' financial or legal advisors.  The Voting Agent will retain the original Ballots and Master Ballots and electronic copy of the same for a period of one (1) year after the Effective Date of the confirmed Chapter 11 Plan, unless otherwise directed by the Bankruptcy Court.

The Debtors and the Creditors' Committee expressly reserve the right to amend from time to time the terms of ~~the~~their respective Chapter 11 Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the ~~Plan~~Chapter 11 Plans regarding modifications).  If ~~the Debtors make~~there is a material ~~changes~~change(s) to the terms of ~~the Plan or if the Debtors waive a material condition to Plan confirmation, the Debtors~~either Chapter 11 Plans, the plan proponent will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court.

If multiple Ballots are received from the same Creditor with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  Creditors must vote all of their Claims within a particular Class either to accept or reject the ~~Plan~~Chapter 11 Plans and may not split their vote.  Accordingly, a Ballot that partially rejects and partially accepts the ~~Plan~~Chapter 11 Plans will not be counted.  Further, to the extent there are multiple claims within the same class, the Debtors may, in their discretion, aggregate the claims of any particular Holder within a class for the purpose of counting votes.

A Person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of corporations, or otherwise acting in a fiduciary or representative capacity should indicate such capacity when signing and, if required or requested by the applicable Nominee or its agent, the Voting Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to so act on behalf of such claimant or Beneficial Holder.

~~In the event a designation of lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.~~

The Debtors, subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Ballot or Master Ballot at any time, either before or after the closing of voting provided however, that any such waivers will be documented in the Voting Report.

Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots and Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification~~.~~,

Unless waived or as ordered by the Bankruptcy Court, any defects or irregularities in connection with the deliveries of Ballots and Master Ballots must be cured prior to the Voting Deadline or such Ballots and Master Ballots will not be counted.

In the event a designation of lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Chapter 11 Plans cast with respect to that Claim will be counted for purposes of determining whether the Chapter 11 Plans have been accepted and/or rejected.

Subject to any contrary order of the Bankruptcy Court, the Debtors reserve the right to reject any and all Ballots and Master Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; provided however, that any such rejections will be documented in the Voting Report.

If a Claim has been estimated or otherwise Allowed for voting purposes only by final order of the Bankruptcy Court, such Claim will be temporarily Allowed in the amount so estimated or Allowed by the Bankruptcy Court for voting purposes only, and not for purposes of allowance or distribution.

The following Ballots and Master Ballots will not be counted in determining the acceptance or rejection of the Chapter 11 Plans: (i) any Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the Creditor; (ii) any Ballot or Master Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote on the Chapter 11 Plans; (iii) any Ballot or Master Ballot cast for a Claim scheduled as unliquidated, contingent or disputed for which no Proof of Claim was timely filed; (iv) any unsigned Ballot or Master Ballot; (v) any Ballot not marked to accept or reject the Chapter 11 Plans, or marked both to accept and reject the Chapter 11 Plans; and (vi) any Ballot submitted by any party not entitled to vote pursuant to the procedures described herein.

The Debtors will file with the Bankruptcy Court, as soon as practicable prior to the Confirmation Hearing, the Voting Report. The Voting Report ~~shall~~will, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or damaged. The Voting Report also ~~shall~~will indicate the Debtors' intentions with regard to such Irregular Ballots. The Voting Report will be shared with the Creditors Committee and counsel for the Prepetition Secured Lenders prior to filing with the Bankruptcy Court.

2.    *Master Ballot Tabulation*:

The following rules will apply with respect to the tabulation of Master Ballots and Ballots cast by Nominees and Beneficial Owners:

1.    votes cast by Beneficial Holders through Nominees will be applied against the positions held by such Nominees of the Notes in Class D of the Plan and Class 7 of the Committee's Plan (the "Class D/Class 7 Notes") as of the Record Date, as evidenced by the record and depository listings. Votes submitted by a Nominee, whether pursuant to a Master Ballot or prevalidated Ballot, will not be counted in excess of the amount of such securities held by such Nominee as of the Voting Record Date;

2.    if conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or prevalidated Ballot, the Debtors will attempt to reconcile discrepancies with the Nominees;

3. if over-votes on a Master Ballot or prevalidated Ballot are not reconciled prior to the preparation of the vote certification, the Debtors will apply the votes to accept and to reject the Chapter 11 Plans in the same proportion as the votes to accept and reject the Chapter 11 Plans submitted on the Master Ballot or prevalidated Ballots that contained the overvote, but only to the extent of the Nominee's position in the Class D/Class 7 Notes;

4. for purposes of tabulating votes, each Nominee or Beneficial Holder will be deemed to have voted the principal amount of its Class D/Class 7 Notes; and

5. a single Nominee may complete and deliver to the Voting Agent multiple Master Ballots. Votes reflected on multiple Master Ballots will be counted, except to the extent they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the latest dated Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supercede and revoke any prior Master Ballot.

## X.  CONCLUSION AND RECOMMENDATION

The Plan Supplement will be filed with the Bankruptcy Court no later than five (5) Business Days prior to the Voting Deadline. The Debtors reserve the right to modify and supplement the Plan Supplement through and including the Confirmation Date. The Debtors recommend that all Creditors vote to accept the Plan.

Dated:  October 8, November 4, 2009

Respectfully submitted,

By:  _/s/ James A. Morgan_____
       Title:  Chief Financial Officer

Document comparison done by DeltaView on Wednesday, November 04, 2009 5:31:27 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://nyclib1/17651345/5 |
| Document 2 | pcdocs://nyclib1/17651345/6 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 288 |
| Deletions | 160 |
| Moved from | 14 |
| Moved to | 14 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 476 |