UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YOUNG BROADCASTING INC., *et al.,* | ) | Case No. 09-10645 (AJG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DISCLOSURE STATEMENT SUPPLEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING ITS AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Andrew N. Rosenberg
Jeffrey D. Saferstein
Jonathan T. Koevary
Samantha G. Amdursky
1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000
Attorneys for the Official Committee of Unsecured Creditors
of Young Broadcasting Inc., *et al.*

THIS SUPPLEMENT TO THE DEBTORS' DISCLOSURE STATEMENT DESCRIBES THE CREDITORS' COMMITTEE'S JOINT PLAN OF REPORGANIZATION.  IT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CREDITORS' COMMITTEE'S PLAN.  ALL RIGHTS ARE RESERVED TO AMEND, SUPPLEMENT OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT SUPPLEMENT.

# TABLE OF CONTENTS

I. Introduction .................................................................................................... 1
    A.      Purpose of Disclosure Statement Supplement and Plan ............................ 1
    B.      Holders of Claims and Equity Interests Entitled to Vote .......................... 7
    C.      Summary of Classification and Treatment under the Plan. ....................... 8

II. the Plan of reorganization ............................................................................ 12
    A.      General. ................................................................................................. 12
    B.      Summary of the Plan and the Structure of the Reorganized
             Company On and After the Effective Date ............................................. 12
    C.      Treatment of Claims and Equity Interests under the Plan. ...................... 13
    D.      Unclassified Claims ............................................................................... 14
    E.      Classified Claims and Interests. ....................................................... [17]16

III. MEANS OF IMPLEMENTING THE PLAN. .......................................... [21]20
    A.      Limited Consolidation for Voting, Confirmation and
             Distribution Purposes. ..................................................................... [21]20
    B.      Indebtedness Upon Emergence ............................................................. 22
    C.      Funding of Distributions and Payment of Cure Costs. ........................... 23
    D.      Corporate Governance and Management of the
             Reorganized Company. .......................................................................... 23
    E.      Officers of Reorganized Debtors ........................................................... 25
    F.      Powers of Officers ................................................................................. 25
    G.      New Employment Agreements ............................................................... 26
    H.      Authorization of Plan Securities ........................................................... 26
    I.       Securities To Be Issued Under The Plan ................................................ 26
    J.      Securities Law Matters. ................................................................... [29]30
    K.      Rights Offering. ............................................................................... [29]30

IV. Provisions Regarding Voting, Distributions, and Treatment
    of Disputed, Contingent and Unliquidated Administrative
    Expense Claims, Claims and Equity Interests ........................................... [33]35
    A.      Voting on Plan. ............................................................................... [33]35
    B.      Objections to and Resolution of Claims. .......................................... [34]35
    C.      Administrative Claims of Indenture Trustees. ................................... [36]37
    D.      Cancellation and Surrender of Existing Securities and
             Agreements. .................................................................................... [36]38
    E.      Nonconsensual Confirmation. .......................................................... [37]38

V. Effect of Confirmation of the Plan. .............................................................. [37]38
    A.      Continued Corporate Existence ........................................................ [37]38
    B.      Dissolution of Creditors' Committee ............................................... [37]39
    C.      Vesting of Property .......................................................................... [38]40
    D.      Provisions Governing Distributions. ................................................. [38]40

E.     Discharge, Releases, Exculpation, Injunctions and Insurance ...................................................................[40]42

F.     Administrative Claims Incurred After the Confirmation Date ......................................................................[48]50

G.     Treatment of Executory Contracts and Unexpired Leases................[48]50

H.     Affiliation Agreements.........................................................[49]51

I.     Termination of Lease ..........................................................[50]52

VI. Retention of Jurisdiction. ...............................................................[50]52

VII. Miscellaneous Provisions...............................................................[51]53

A.     Payment of Statutory Fees....................................................[51]53

B.     Modification of the Plan........................................................[52]54

C.     Governing Law. ...................................................................[52]54

D.     Filing or Execution of Additional Documents. .........................[53]55

E.     Withholding and Reporting Requirements.......................[53]55

F.     Exemption From Transfer Taxes. ....................................[53]55

G.     Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure  62(a). ......................................................[53]55

H.     Exhibits/Schedules. ............................................................[54]56

I.     Pension Plan. ......................................................................[54]56

J.     Notices. ..............................................................................[54]56

K.     Plan Supplement .................................................................[55]57

L.     Conflict................................................................................[56]58

M.     Setoff by the United States.....................................................[56]58

VIII. Conditions Precedent to Confirmation and Effectiveness. ...........................[56]58

A.     Conditions Precedent to Confirmation...................................[56]58

B.     Conditions Precedent to Effectiveness...................................[57]59

C.     Waiver of Conditions. .........................................................[58]60

D.     Effect of Failure of Conditions. ...........................................[58]60

E.     Vacatur of Confirmation Order. ...........................................[58]61

F.     Revocation, Withdrawal, or Non-Consummation. ...........................[59]61

IX. Confirmation of the Plan ...............................................................[59]62

A.     Confirmation.......................................................................[60]62

B.     Alternatives to Confirmation and Consummation of the Plan.....................................................................................[63]65

X. Valuation Analysis ........................................................................[67]69

A.     Projected Financial Statements...........................................[67]69

B.     Valuation ............................................................................[69]72

XI. Risk Factors ................................................................................[79]81

A.     Business Related Risks. .......................................................[79]81

B.     Certain Bankruptcy Related Considerations. ....................[80]82

C.     Government Regulation .......................................................[82]84

D.     Reliance on Key Personnel.................................................[82]**85**

E.     Liquidity and Capital Resources.......................................[83]**85**

F.     Preferred Stock Dividends................................................[83]**85**

XII. Certain United States Federal Income Tax Consequences of
the Plan .....................................................................................[83]**86**

A.     Scope of This Summary ...................................................[84]**86**

B.     Consequences to the Debtors............................................[85]**88**

C.     Consequences to Noteholders...........................................[89]**92**

D.     Consequences to Unsecured Claimholders .....................[92]**95**

E.     Market Discount ...............................................................[93]**95**

F.     Ownership of Class A New Common Stock and New
Preferred Stock ...............................................................[94]**96**

G.     Information Reporting; Backup Withholding Tax ...........[96]**99**

XIII. Conclusion .................................................................................[98]**100**

**I.**

**<u>INTRODUCTION</u>**

A.      <u>Purpose of Disclosure Statement Supplement and Plan</u>.

This supplemental disclosure statement (the "<u>Disclosure Statement</u> <u>Supplement</u>") of the Official Committee of Unsecured Creditors (the "<u>Creditors'</u> <u>Committee</u>") of Young Broadcasting Inc. ("<u>Young Broadcasting</u>") and its affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), when read with the accompanying disclosure statement prepared by the Debtors (the "<u>Debtors' Disclosure</u> <u>Statement</u>" and together with the Disclosure Statement Supplement, the "<u>Disclosure</u> <u>Statements</u>") has been prepared pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") and annexes the **<u>amended</u>** joint plan of reorganization of the Debtors under section 1121(a) of the Bankruptcy Code as proposed by the Creditors' Committee (as may be amended, supplemented or otherwise modified from time to time, the "<u>Plan</u>"). Unless expressly provided otherwise, capitalized terms that are used but not defined in this Disclosure Statement Supplement shall have the meaning ascribed to them in the Plan.

The Plan and Disclosure Statement Supplement supplements the Debtors' Disclosure Statement. The Debtors' Disclosure Statement proposes an alternate plan of reorganization for the Debtors (the "<u>Debtors' Plan</u>" and together with the Plan, the "<u>Plans</u>"). [~~Unlike the Plan proposed by the Creditors' Committee, the Debtors' Plan would provide for the sale of substantially all of the Debtors' assets prematurely and would leave unsecured claimants without the opportunity to maximize their recovery.~~ ]In short, the Debtors' Disclosure Statement and the Disclosure Statement Supplement each propose "competing" plans of reorganization that contain key provisions rendering the

plans incompatible with each other. Both Plans will be subject to meeting Bankruptcy Code confirmation requirements and Bankruptcy Court approval. If the Bankruptcy Court rules that both Plans meet the confirmation requirements of the Bankruptcy Code, then the Bankruptcy Court will likely confirm the Plan which it deems to be in the best interests of all parties in interest, in accordance with section 1129(c) of the Bankruptcy Code.

The Debtors and the Creditors' Committee have agreed to proceed on the same timeline for seeking approval of the Disclosure Statements, for solicitation of votes in favor of or against the Plans, and for seeking [confirmation]**Confirmation** of the Plans. In an effort to avoid duplication and to promote efficiency between the Debtors and the Creditors' Committee, the parties have agreed to streamline the disclosure statement and solicitation process in certain ways. As such, the Disclosure Statement Supplement will set forth only those provisions necessary to describe the Plan and the Rights Offering. Other typical non-plan specific provisions, such as a case status discussion and the balloting timeline, will appear in the Debtors' Disclosure Statement only. Moreover, the Debtors, subject to Bankruptcy Court approval, will solicit both Plans concurrently on terms set forth and will seek votes **and commitments with respect to the Rights Offering** on a single ballot.[1]

To avoid redundancy, to the extent (i) not inconsistent with the Plan and/or this Disclosure Statement Supplement and (ii) not particular to the Debtors' Plan or the Debtors' Disclosure Statement, this Disclosure Statement Supplement incorporates the following sections and subsections of the Debtors' Disclosure Statement by reference

---

[1] Voting instructions will be set forth in Exhibit 1 to the order approving, among other things, the [Disclosure]**Disclosure** Statement [Docket No. __].

as if set forth herein, <u>provided</u> <u>however</u>, that notwithstanding any incorporated language to the contrary, in no event shall the incorporation of any section or subsection of the Debtors' Disclosure Statement be deemed as an endorsement of the Debtors' Plan or the portion of the Debtors' Disclosure Statement describing the Debtors' Plan or as a waiver of any of the Creditors' Committee's rights to assert any objection to approval of the Debtors' Disclosure Statement as it relates specifically to the Debtors' Plan or [confirmation]**Confirmation** of the Debtors' Plan:

- Overview of Chapter 11 (Section I.B)

- Voting (Sections I.K and IX)

- Background to the Chapter 11 Cases (Section II)

- The Reorganization Cases (Section III)

- The Confirmation Hearing (Section V.A)

- Best Interests Tests/Liquidation Under Chapter 11 (Sections V.C and VII.A)

- Acceptance by Impaired Classes (Sections V.E)

- Confirmation Without Acceptance by all Impaired Classes (Section V.F)

- Governmental Regulations (Section VI.C)

The purpose of this Disclosure Statement Supplement is to set forth information concerning the Plan and alternatives to the Plan and to advise the Holders of Claims and Interests of their rights under the Plan.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit 1);

- [~~The Equity Commitment Agreement (Exhibit 2)~~]**A letter to the Holders of Class 6 and Class 7 Claims urging them to vote to accept the Plan (Exhibit 2);**

- The Plan Support Agreement (Exhibit 3);

- Projections (Exhibit 4);

- Valuation (Exhibit 5)[~~; and~~]**.**

The purpose of the Disclosure Statement is to provide sufficient information to enable the creditors of the Debtors who are entitled to vote on the Plan to make an informed decision on whether to accept or reject the Plan. This Disclosure Statement describes, among other things:

- the Plan, including, among other things, the classification and treatment of Claims and Interests under the Plan, means of implementing the Plan, the terms of the securities to be issued under the Plan, how distributions under the Plan will be made and the manner in which Disputed Claims are resolved, and securities law issues (Sections III & IV);

- certain voting procedures and requirements (Section IV);

- the procedure for confirming the Plan and effect of [~~confirmation~~]**Confirmation** (Sections VIII and V);

- projections and valuation analysis (Section X)

- certain risk factors (Section XI); and

- certain tax law issues (Section XII).

Certain other information, such as a description of the Debtors' business, the reasons the Debtors commenced their [~~Reorganization~~]**Chapter 11** Cases, significant events during the [~~Reorganization~~]**Chapter 11** Cases, and the solicitation and voting process is set forth fully in the Debtors' Disclosure Statement.

**The key elements of the Creditors' Committee's Plan are**:

- Reinstatement of the Prepetition Lender Claims.

- A commitment by certain parties (under the Equity Commitment Agreement) to provide an investment of $[38]**45.6** million of new equity capital in the form of New Preferred Stock and New Common Stock

- Distribution of 10% of the New Common Stock to Noteholders.

- The opportunity for Noteholders to participate in a Rights Offering to purchase their pro rata share of the New Preferred Stock and New Common Stock**, subject to a cap of 4.9% of the New Common Stock.  Management may also participate in the Rights Offering on a limited basis**.

- Distributions to Holders of Allowed General Unsecured Claims, except Noteholders, equal to the lesser of their *pro rata* share of $1,000,000 or a one-time Cash distribution equal to 10% of the amount of their Allowed Claims.

- Cancellation of existing Equity Interests.

- Retention of key Management and creation of a new Management and Director Equity Incentive Plan.

- Distributions of Class B New Common Stock equal to 40% **(by number of votes)** of the Voting Stock but only 10% of the beneficial ownership to Vincent Young.

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DEBTORS' DISCLOSURE STATEMENT DATED OCTOBER 8, 2009, AS SUPPLEMENTED BY THIS DISCLOSURE STATEMENT SUPPLEMENT AND THE EXHIBITS HERETO, THE PLAN AND THE EXHIBITS THERETO, IN THEIR ENTIRETY, AND THE DEBTORS' DISCLOSURE STATEMENT.

THE CREDITORS' COMMITTEE BELIEVES THAT THE PLAN PROVIDES THE BEST AVAILABLE RECOVERY FOR THE DEBTORS' STAKEHOLDERS.  THIS DISCLOSURE STATEMENT SUPPLEMENT, WHEN READ TOGETHER WITH THE DEBTORS' DISCLOSURE STATEMENT, HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.  THIS DISCLOSURE STATEMENT SUPPLEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SEC, NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING

SECURITIES OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT SUPPLEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT SUPPLEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT SUPPLEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED HEREIN, THE PLAN SHALL GOVERN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

THE CREDITORS' COMMITTEE URGES AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE CREDITORS' COMMITTEE'S PLAN AND TO REJECT THE DEBTORS' PLAN.

IF YOU REMAIN UNSURE WHETHER TO VOTE TO ACCEPT THE CREDITORS' COMMITTEE'S PLAN OR THE DEBTORS' PLAN, THE CREDITORS' COMMITTEE URGES YOU TO VOTE TO ACCEPT BOTH PLANS AND TO EXPRESS A PREFERENCE FOR THE CREDITORS' COMMITTEE'S PLAN SO THAT THE BANKRUPTCY COURT MAY DETERMINE WHICH PLAN TO APPROVE.

IT IS EXPECTED THAT THERE WILL BE FEWER THAN 300 RECORD HOLDERS OF EACH OF THE PREFERRED STOCK AND THE NEW COMMON STOCK AFTER THE ISSUANCE OF THE PREFERRED STOCK AND THE NEW COMMON STOCK UNDER THE PLAN. THE CREDITORS' COMMITTEE CANNOT ENSURE THAT A LIQUID MARKET WILL DEVELOP FOR THE PREFERRED STOCK OR THE NEW COMMON STOCK OR THAT HOLDERS OF PREFERRED STOCK OR NEW COMMON STOCK WILL BE ABLE TO SELL AT ANY PARTICULAR TIME AND RECEIVE A FAVORABLE PRICE PURSUANT TO SUCH SALE. THERE WILL BE NO PUBLIC MARKET FOR THE PREFERRED STOCK OR THE NEW COMMON STOCK AND THERE IS NO ASSURANCE AS TO WHEN OR IF THE [REORGANIZED COMPANY]DEBTORS WILL COMPLETE AN INITIAL PUBLIC OFFERING FOR THE NEW COMMON STOCK.

THE DEBTORS WILL FILED A FORM 15 UNDER THE SECURITIES AND EXCHANGE ACT OF 1934 (THE "*EXCHANGE ACT*") TO DEREGISTER THE SHARES OF YOUNG BROADCASTING'S COMMON STOCK, WHICH ARE REGISTERED UNDER THE EXCHANGE ACT. UPON THE EFFECTIVENESS OF THE FORM 15, WHICH IS EXPECTED TO OCCUR AFTER THE EFFECTIVE DATE, YOUNG BROADCASTING WILL NO

LONGER BE REQUIRED TO FILE REPORTS AND OTHER INFORMATION
WITH THE SEC UNDER THE EXCHANGE ACT AND WILL CEASE TO BE A
PUBLIC REPORTING COMPANY.  FOLLOWING THE EFFECTIVE DATE OF
THE PLAN, THE REORGANIZED COMPANY WILL NOT BE A PUBLIC
REPORTING COMPANY AND THE ORGANIZATIONAL DOCUMENTS OF
THE REORGANIZED COMPANY WILL PROHIBIT TRANSFERS OF
SECURITIES IF THE TRANSFERS COULD REQUIRE THE REORGANIZED
COMPANY TO BECOME A PUBLIC REPORTING COMPANY.  AS A RESULT,
FOLLOWING THE EFFECTIVE DATE OF THE PLAN, THERE WILL NOT BE
PUBLICLY AVAILABLE CURRENT INFORMATION REGARDING THE
REORGANIZED COMPANY AND ITS FINANCIAL RESULTS.

NEITHER THE SHARES OF PREFERRED STOCK NOR THE
SHARES OF NEW COMMON STOCK WILL BE LISTED OR QUOTED ON
ANY SECURITIES EXCHANGE.  AS A RESULT OF THESE FACTORS AND
THE TRANSFER RESTRICTIONS DESCRIBED HEREIN, THERE WILL NOT
BE ANY LIQUID MARKET FOR THE PREFERRED STOCK OR NEW
COMMON STOCK AND THERE CAN BE NO ASSURANCE THAT ANY
MARKET WILL EVER DEVELOP.  THE REORGANIZED COMPANY WILL
NOT BE OBLIGATED TO COMPLETE ANY PUBLIC OFFERING
FOLLOWING THE EFFECTIVE DATE OF THE PLAN OTHER THAN AS
REQUIRED UNDER THE REGISTRATION RIGHTS AGREEMENT BETWEEN
THE REORGANIZED COMPANY AND THE BACKSTOP PARTIES.

THE SHARES OF PREFERRED STOCK AND NEW COMMON
STOCK ISSUED PURSUANT TO THE PLAN WILL BE SUBJECT TO CERTAIN
TRANSFER AND OTHER RESTRICTIONS SET FORTH IN THE NEW
CERTIFICATE OF INCORPORATION.  SUCH TRANSFER RESTRICTIONS IN
THE NEW CERTIFICATE OF INCORPORATION WILL PROHIBIT A
HOLDER OF PREFERRED STOCK AND NEW COMMON STOCK, AS
APPLICABLE, FROM TRANSFERRING ANY SHARES TO ANY PERSON NOT
ALREADY HOLDING SHARES OF THE SAME CLASS AS THOSE PROPOSED
TO BE TRANSFERRED AFTER SUCH CLASS HAS RECORD HOLDERS OF
300 OR MORE PERSONS AS DETERMINED BY THE REORGANIZED
COMPANY.

B.      Holders of Claims and Equity Interests Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of

"allowed" claims or interests in classes of claims or equity interests that are "impaired"

are entitled to vote to accept or reject a proposed chapter 11 plan.  Holders of

[classes]**Classes** of claims and interests in which the holders of claims are unimpaired

under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote

to accept or reject the plan, while holders of [classes]**Classes** of claims or interests in which the holders of claims or interests are fully impaired under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote or reject the plan.

Classes 1, 2, 3, 4 and 5 of the Plan are unimpaired, and holders of Claims and Interests in those Classes are conclusively deemed to have accepted the Plan. Classes 6 and 7 of the Plan are impaired. To the extent Claims in Classes 6 and 7 are Allowed Claims, the holders of such Claims are entitled to vote to accept or reject the Plan. Holders of Interests in Class 8 will receive no distributions under the Plan and are therefore deemed to have rejected the Plan and are not entitled to vote. Accordingly, the Creditors' Committee, via the Debtors, is soliciting acceptances of the Plan only from holders of Allowed Claims in Classes 6 and 7.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that [class]**Class** that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired [classes]**Classes** of claims or interests. Under that section, a plan may be confirmed by a court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. The Creditors' Committee intends to seek [confirmation]**Confirmation** pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class that votes to reject the Plan.

C.     Summary of Classification and Treatment under the Plan.

The Plan contemplates, among other things, the payment in full in Cash of all Administrative Expense Claims and Priority Tax Claims (or such other treatment as the Holders of such Claims agree or would leave such Claims unimpaired). Furthermore, the Plan provides for the classification and treatment of eight Classes, as summarized below. This summary is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as Exhibit 1.[2]

| Class | Type of Claim/Interest | Treatment | Estimated Recovery | Status |
|-------|------------------------|-----------|--------------------|--------|
| 1 | Other Priority Claims | *Unimpaired.* Unless otherwise agreed to by the Holders of the Allowed Class 1 Claims and the Debtors, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on the later of (i) the Plan Effective Date and (ii) 30 days after the date on which the Claim becomes Allowed. | 100% | Unimpaired, not entitled to vote (deemed to have accepted the Plan under the Bankruptcy Code) |
| 2 | Prepetition Lender Claims | *Unimpaired.* On the Plan Effective Date, the Reorganized Company shall cure any monetary default that occurred before or after the Petition Date; the maturity of the Prepetition Lender Claims shall be reinstated as such maturity existed prior to any such default and the legal, equitable and contractual rights of Holders of | 100% | Unimpaired, not entitled to vote (deemed to have accepted the Plan under the Bankruptcy Code) |

[2]  This summary contains only a brief and simplified description of the classification and treatment of Claims and Interests under the Plan. It does not describe every provision of the Plan. Accordingly, reference should be made to the entire Disclosure Statement Supplement (including exhibits) and the Plan for a complete description of the classification and treatment of Claims and Interests.

| Class | Type of Claim/Interest | Treatment | Estimated Recovery | Status |
|-------|------------------------|-----------|--------------------|--------|
| | | Class 2 Claims will not otherwise be altered. | | |
| 3 | Other Secured Claims | *Unimpaired.* Each Holder of an Allowed Class 3 Claim shall receive, at the applicable Reorganized Debtor's election, in full and final satisfaction of such Allowed Class 3 Claims, one of the following: (i) return of its collateral, (ii) a Cash payment equal to the agreed or court determined value of its collateral, (iii) payments over time pursuant to an agreed stipulation or as may be determined by the Court, or (iv) reinstatement of its Allowed Claim. | 100% | Unimpaired, not entitled to vote (deemed to have accepted the Plan under the Bankruptcy Code) |
| 4 | Intercompany Claims | *Unimpaired.* On the Plan Effective Date, the Class 4 Claims shall be reinstated as existed prior to any such default and the legal, equitable and contractual rights of the Holders of Class 4 Claims shall not be altered. | 100% | Unimpaired, not entitled to vote (deemed to have accepted the Plan under the Bankruptcy Code) |
| 5 | Intercompany Interests | *Unimpaired.* Class 5 Intercompany Interests will be (in the sole discretion of the applicable Holder of such Intercompany Interest) (1) released, waived and discharged as of the Plan Effective Date, (2) contributed to the capital of the obligor corporation, (3) dividended, or (4) remain unimpaired. | 100% | Unimpaired, not entitled to vote (deemed to have accepted the Plan under the Bankruptcy Code) |
| 6 | Noteholder Claims | *Impaired.* Prior to Confirmation, Holders of Class 6 claims who | [—]2%[3] | Impaired, entitled to |

---

[3] The estimated recovery on account of Noteholder Claims does not include the Rights or any value attributable to the Rights.

| Class | Type of Claim/Interest | Treatment | Estimated Recovery | Status |
|-------|------------------------|-----------|--------------------|--------|
| | | are Qualified Institutional Buyers shall have the right to participate in the Rights Offering described in Article VI of the Plan. The 10% Senior Subordinated Note Claims shall be deemed Allowed in the amount of $344,299,000. The 8¾% Senior Subordinated Note Claims shall be deemed Allowed in the amount of $140,000,000. On the Plan Effective Date, the Reorganized Company shall issue and deliver to the indenture trustee for each of the Notes, for the ultimate distribution to or for the account of each Holder of an Allowed Class 6 Claim in accordance with such Holder's rights and interests under the applicable notes and their respective Indentures, in full and final satisfaction of such Allowed Class 6 Claims, a pro rata portion of the Class A New Common Stock, which stock will represent 10% of the outstanding New Common Stock on the Plan Effective Date, and will be subject to dilution by the Management and Director Equity Incentive Plan. | | vote for or against the Plan. |

| Class | Type of Claim/Interest | Treatment | Estimated Recovery | Status |
|-------|------------------------|-----------|--------------------|--------|
| 7 | General Unsecured Claims | *Impaired*. Holders of Allowed Class 7 Claims shall receive, in full and final satisfaction of such Allowed Class 7 Claims, **shall receive, in full and final satisfaction of such Allowed Class 7 Claims,** a one-time Cash distribution equal to the lesser of **(i)** their pro rata share of $1,000,000 or **(ii)** a one-time Cash distribution equal to 10% of the amount of their Allowed Class 7 Claims. | [10]5%-12.5%[4] | Impaired, entitled to vote for or against the Plan. |
| 8 | Equity Interests | *Impaired*. All existing Equity Interests of Young and certain other Equity Interests at subsidiary levels shall be impaired, with no distribution to be made under the Plan to Holders thereof, and all such existing Equity Interests of Young and all warrants, conversion rights, rights of first refusal and other rights, contractual or otherwise, to acquire or receive any Equity Interests in Young or any other Debtor, if any, shall be deemed cancelled as of the Plan Effective Date. | 0% | Impaired, not entitled to vote (deemed to have rejected the Plan under the Bankruptcy Code) |

## II.
## THE PLAN OF REORGANIZATION

A.  <u>General</u>.

The following is a summary intended as a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan, a copy of which is attached hereto as <u>Exhibit 1</u>.  Each Holder of a Claim or Interest is urged to review

---

[4]    **Assumes, for information purposes only, allowed Class 7 claims of $14 -19.3 million.**

carefully the terms of the Plan and its Exhibits. In the event of any inconsistency between the provisions of the Plan and the summary contained herein, the terms of the Plan shall govern.

B. Summary of the Plan and the Structure of the Reorganized Company On and After the Effective Date

The Backstop Parties have committed to fund $[38]**45.6** million of new capital in the form of equity through a Rights Offering to capitalize the Reorganized Company. The proceeds of the Rights Offering will be used to pay all monetary defaults under the Credit Agreement (which will be reinstated), fund payments under the Plan, and for working capital and general corporate needs of the Debtors. Other than the obligations under the Credit Agreement, the Reorganized Company will have no debt **for borrowed money** upon emergence. Holders of Noteholder Claims will receive 10% of the Common Stock of the Reorganized Debtors, and those that are Qualified Institutional Buyers will be offered the right to purchase their Pro Rata Share of [[—]]**up to 22,800** shares of Preferred Stock and [[—]]**1,750,000** shares of Common Stock for a purchase price of [[—]]**$1,000** per Unit (defined below) pursuant to the Rights Offering. Holders of Allowed General Unsecured Claims will receive distributions equal to the lesser of their *pro rata* share of $1,000,000 or a one time [cash]**Cash** distribution of 10% of their Allowed Claims. Existing management will be retained and New Class B Common Stock will be distributed to Vincent Young representing 40% **(by number of votes)** of the [voting stock]**Voting Stock** of the Reorganized Company and 10% of the beneficial ownership of the Reorganized Company. The New Common Stock issued under the Plan will be subject to dilution by the Management and Director Equity Incentive Plan. On the Effective Date, the Reorganized Company will be a Delaware corporation and shall

own all of the Subsidiary Interests, which will remain unaffected by the Plan.  The Reorganized Company will be a private, non-SEC reporting Company and shall issue Preferred Stock and New Common Stock, none of which shall be traded on any exchange.

    C.    <u>Treatment of Claims and Equity Interests under the Plan</u>.

The Plan segregates the various Claims against, and Interests in, the Debtor into three categories (1) unclassified Claims; (2) unimpaired Classes of Claims and Interests; and (3) impaired classes of claims and interests.  Unimpaired Classes of Claims and Interests are divided into the following Classes: (i) Other Priority Claims (Class 1); (ii) Prepetition Lender Claims (Class 2); (iii) Other Secured Claims (Class 3); (iv) Intercompany Claims (Class 4); and Intercompany Interests (Class 5).  Impaired Classes of Claims and Interests are divided into the following Classes: (i) Noteholder Claims (Class 6); General Unsecured Claims (Class 7); and Equity Interests (Class 8).

The Plan provides that Allowed Prepetition Lender Claims will be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

    D.    <u>Unclassified Claims</u>.

    1.    <u>Administrative Claims</u>.  Each Holder of an Allowed Administrative Claim shall receive payment in full in Cash of the unpaid portion of an Allowed Administrative Claim on the latest to occur of (i) the Plan Effective Date, (ii) the date that such Claim becomes an Allowed Claim and (iii) the date that such Claim becomes payable under any agreement between the applicable Debtor and the Holder of such Claim.

2.    Fee Claims.  All requests for compensation or reimbursement of

Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code

for services rendered prior to the Confirmation Date shall be filed and served on the

Reorganized Company and its counsel, the United States Trustee, counsel to the

Creditors' Committee, counsel to the Prepetition Lenders and such other entities who are

designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the

Court, no later than forty-five (45) days after the Confirmation Date.  Unless such

deadline is extended by agreement of the Reorganized Company, holders of Fee Claims

that are required to file and serve applications for final allowance of their Fee Claims and

that do not file and serve such applications by the required deadline shall be forever

barred from asserting such Fee Claims against the Debtors, the Reorganized Company or

their respective properties, and such Fee Claims shall be deemed discharged as of the

Plan Effective Date.  Objections to any Fee Claims must be filed and served on the

Reorganized Company and their counsel and the requesting party no later than thirty (30)

days (or such longer period as may be allowed by order of the Court) after the date on

which an application for final allowance of such Fee Claim was filed and served.

[~~Upon Confirmation of the Plan or any amended plan, the financial~~

~~advisor to~~]**The agreement between** the Creditors' Committee **and its financial advisor**,

Allen & Company LLC ("Allen[~~& Co."), shall have earned the restructuring fee, which~~

~~fee shall be calculated on the amount~~]**"), provides for Allen to receive a fee of $1**

**million for every $10 million** of new capital raised by Allen [~~& Co., and shall include~~

~~any amounts funded by any unsecured creditor, funded by any third party introduced by~~

~~any unsecured creditor, or funded by any third parties otherwise participating in the Plan,~~

as]**in connection with a plan of reorganization** supported by the Creditors' Committee[and funded by unsecured creditors and other third parties, who have agreed to invest in concert with members of the group of unsecured creditors; provided, however, that the $5 million in capital to be contributed by Sopris Capital (or its designee or assigns) shall be excluded from the foregoing calculation and that, so long as the total amount to be invested does not exceed $38 million, the difference between $35 million and $38 million will be excluded, such that the fee to the financial advisor will be set at $3 million under these circumstances.  The fee shall be payable to Allen & Co. immediately upon the Confirmation Order becoming a Final Order without the need for a further fee application.]**.  Allen, the Creditors' Committee and the Backstop Parties have agreed to a fee of $3.6 million which shall be payable upon the Effective Date.**

3.      Priority Tax Claims.  On the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the Holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Company), such holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be Impaired, including periodic payments on a quarterly basis over a period ending not later than five (5) years after the Petition Date, in accordance with the provisions of sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Reorganized Debtor and

such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.[Substantial Contribution Claims][.][ All requests for compensation or reimbursement of Substantial Contribution Claims shall be filed and served on the Reorganized Company and its counsel, the United States Trustee, counsel to the Creditors' Committee, counsel to the Prepetition Lenders and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, no later than forty-five (45) days after the Confirmation Date. Unless such deadline is extended by agreement of the Reorganized Company, holders of Substantial Contribution Claims that are required to file and serve applications for final allowance of their Substantial Contribution Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Substantial Contribution Claims against the Debtors, the Reorganized Company or their respective properties, and such Substantial Contribution Claims shall be deemed discharged as of the Plan Effective Date. Objections to any Substantial Contribution Claims must be filed and served on the Reorganized Company and its counsel and the requesting party no later than thirty (30) days (or such longer period as may be allowed by the Reorganized Company or by order of the Court) after the date on which an application for final allowance of such Substantial Contribution Claims was filed and served.]**Substantial Contribution Claims. All Entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred during the Chapter 11 Cases under section 503(b)(3)(D) of the Bankruptcy Code shall file their respective**

**applications prior to or on the deadline for filing objections to confirmation of the Plan.**

    E.    <u>Classified Claims and Interests</u>

        1.    <u>Class 1 — Other Priority Claims</u>.

            (a)    Distributions.

The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims will be unaltered by the Plan. Unless otherwise agreed to by the Holders of the Allowed Class 1 Claims and the Debtors, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on the later of (i) the Plan Effective Date and (ii) 30 days after the date on which the Claim becomes Allowed.

            (b)    Impairment and Voting.

Class 1 is unimpaired under the Plan. Holders of Allowed Other Priority Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

        2.    <u>Class 2 — Prepetition Lender Claims</u>.

            (a)    Distributions.

Claims arising under the Credit Agreement**, in accordance with section 1124 of the Bankruptcy Code,** shall be deemed fully Secured and Allowed in the amount of $[~~338,451,923.85.~~]**338,451,923.85 plus postpetition interest and fees accruing thereon in accordance with the terms of the Credit Agreement.** On the Plan Effective Date, the Reorganized Company shall cure any monetary default that occurred before or after the Petition Date; the maturity of the Prepetition Lender Claims shall be

reinstated as such maturity existed prior to any such default and the legal, equitable and contractual rights of Holders of Class 2 Claims will not otherwise be altered.

(b)     Impairment and Voting.

Class 2 is unimpaired under the Plan.  Holders of Allowed Prepetition Lender Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

3.     Class 3 — Other Secured Claims.

(a)     Distributions.

Each Holder of Allowed Class 3 Claim shall receive, at the applicable Reorganized Debtor's election, in full and final satisfaction of such Allowed Class 3 Claims, one of the following:  (i) return of its collateral, (ii) a Cash payment equal to the agreed or court determined value of its collateral, (iii) payments over time pursuant to an agreed stipulation or as may be determined by the Court, or (iv) reinstatement of its Allowed Claim.

(b)     Impairment and Voting.

Class 3 is unimpaired under the Plan.  The holders of Allowed Other Secured Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

4.     Class 4 — Intercompany Claims.

(a)     Distributions.

On the Plan Effective Date, the Class 4 Claims shall be reinstated as existed prior to any such default and the legal, equitable and contractual rights of the Holders of Class 4 Claims shall not be altered.

(b)     Impairment and Voting.

Class 4 is unimpaired under the Plan.  The holders of Intercompany Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

5.      Class 5 — Intercompany Interests.

(a)     Distributions.

On the Plan Effective Date, Class 5 Intercompany Interests will be (in the sole discretion of the applicable Holder of such Intercompany Interest) (1) released, waived and discharged as of the Plan Effective Date, (2) contributed to the capital of the obligor corporation, (3) dividended, or (4) remain unimpaired.

(b)     Impairment and Voting.

Class 5 is unimpaired under the Plan.  The holders of Intercompany Interests are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

6.      Class 6 — Noteholder Claims.

(a)     Distributions.

Prior to Confirmation, Holders of Class 6 claims who are Qualified Institutional Buyers shall have the right to participate in the Rights Offering described in Article VI of the Plan.  The 10% Senior Subordinated Note Claims shall be deemed Allowed in the amount of $344,299,000.  The 8¾% Senior Subordinated Note Claims shall be deemed Allowed in the amount of $140,000,000.  On the Plan Effective Date, the Reorganized Company shall issue and deliver to the [indenture trustee for each of the notes]**Indenture Trustees**, for the ultimate distribution to or for the account of each

Holder of an Allowed Class 6 Claim in accordance with such Holder's rights and interests under the applicable notes and their respective indentures, in full and final satisfaction of such Allowed Class 6 Claims, a pro rata portion of the Class A New Common Stock, which stock will represent 10% of the outstanding New Common Stock on the Plan Effective Date, and will be subject to dilution by the Management and Director Equity Incentive Plan.

   (b) Impairment and Voting.

  Class 6 is impaired under the Plan. The holders of Noteholder Claims are entitled to vote to accept or reject the Plan.

   7. <u>Class 7 — General Unsecured Claims</u>.

   (a) Distributions.

  Holders of Allowed Class 7 Claims shall receive, in full and final satisfaction of such Allowed Class 7 Claims, a one-time Cash distribution equal to the lesser of **(i)** their pro rata share of $1,000,000 or **(ii)** a one-time Cash distribution [~~equal to~~]**of** 10% of the amount of their Allowed Class 7 Claims.

   (b) Impairment and Voting.

  Class 7 is impaired under the Plan. The holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

   8. <u>Class 8 — Equity Interests</u>.

   (a) Distributions.

  All existing Equity Interests of Young and certain other Equity Interests at subsidiary levels shall be impaired, with no distribution to be made under the Plan to Holders thereof, and all such existing Equity Interests of Young and all warrants,

conversion rights, rights of first refusal and other rights, contractual or otherwise, to

acquire or receive any Equity Interests in Young or any other Debtor, if any, shall be

deemed cancelled as of the Plan Effective Date.

(b)      Impairment and Voting.

Class 8 is impaired under the Plan.  The holders of Equity Interests are

deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

### III.
### MEANS OF IMPLEMENTING THE PLAN

A.      <u>Limited Consolidation for Voting, Confirmation and Distribution Purposes</u>.

Pursuant to the Plan, the Estates of the various Debtor entities will be

treated as if they were consolidated solely for the purpose of voting,

[confirmation]**Confirmation** and distributions to be made under the Plan.  Accordingly,

for purposes of implementing the Plan: (1) all assets and liabilities of the Debtors will be

treated as if they are pooled; and (2) with respect to any guarantees by one Debtor of the

obligations of any other Debtor, and with respect to any joint or several liability of any

Debtor with any other Debtor, the holder of any Claims for such obligations will receive

a single recovery on account of any such joint obligations of the Debtors.

Such election to treat the Estates as if they were consolidated solely for the

purpose of implementing the Plan will not affect:  (1) the legal and corporate structures of

the Debtors, subject to the right of the Debtors to effectuate the Plan; (2) pre-and post-

Effective Date guarantees, liens and security interests that are required to be maintained

(a) in connection with contracts or leases that were entered into during the Chapter 11

Cases or executory contracts and unexpired leases that have been or will be assumed or

(b) pursuant to the Plan; (3) Interests between and among the Debtors; (4) distributions from any insurance policies or proceeds of such policies; (5) preservation of the separate Estates for purposes of [confirmation]**Confirmation** of the Plan; and (6) the revesting of assets in the separate Reorganized Debtors.  In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the Creditors' Committee and the Debtors.

The Court may, in the exercise of its general equitable discretionary powers under section 105(a) of the Bankruptcy Code, permit the Debtors to treat the Estates as consolidated for the limited purpose of voting, [confirmation]**Confirmation** and distributions under the Plan, to ensure the equitable treatment of creditors.  The Creditors' Committee believes that treating the Debtors as consolidated for the limited purpose of implementing the Plan, and the pooling of the assets and liabilities of the Debtors for purposes of implementing the Plan, is in the best interests of creditors.

B.     Indebtedness Upon Emergence.

The Credit Agreement, and the $338,125,000 principal amount of secured term loans (the "Term Loans") outstanding thereunder, will be reinstated on the Effective Date.  The Obligations under the Credit Agreement are guaranteed by all of the current and future Restricted Subsidiaries [of the]**(as such term is defined in the Credit Agreement) of** Young Broadcasting and are secured by substantially all of the assets of Young Broadcasting and its current and future Restricted Subsidiaries.  The Term Loans mature on November 3, 2012.  The base interest rate under the Credit Agreement is the London Interbank Offered Rate (LIBOR) plus 2.50%.  The default interest rate is 2%

higher than the base interest rate.[5]  The Company must maintain unrestricted [~~cash~~]**Cash** and Cash Equivalents of at least $10,000,000 in the aggregate and, among other things, it is an Event of Default if (a) Vincent Young, or certain persons controlled by Vincent Young (as detailed more fully in the Credit Agreement) fail to hold, in the aggregate, record and beneficial title to at least 40% (by number of votes) of the Voting Stock of Young Broadcasting or, (b) a Person, other than a Permitted Holder (as defined in the Credit Agreement), shall be deemed to have beneficial ownership more than 30% (by number of votes) of the total outstanding Voting Stock of Young Broadcasting and Vincent Young shall not have the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the board of directors.  **The Reorganized Company will not access the prepetition unfunded revolver under the Credit Agreement.**

   C. Funding of Distributions and Payment of Cure Costs.

    The Reorganized Company will make distributions and pay interest and amortization on the Term Loans and transaction costs required under the Plan from (1) the Equity Contribution, (2) the Reorganized Company's [~~cash~~]**Cash** balances and [~~cash~~]**Cash** from operations; and (3) any other means of financing or funding that the Debtors or the Reorganized Company determine is necessary or appropriate to fund distributions required under the Plan.

---

[5] **The Creditors' Committee intends to assert at the Confirmation Hearing that pre-reinstatement interest accruing pursuant to the Credit Agreement is properly calculated at the non-default contract rate (the "Non-Default Rate").  Nevertheless, for informational purposes only, this Disclosure Statement Supplement assumes that post-default, pre-reinstatement interest under the Credit Agreement is calculated at the default rate (the "Default Rate").  To the extent that the Court finds that the Non-Default Rate is the appropriate interest rate, the Backstop Parties reserve the right to reduce their Commitment by an amount equal to the difference between the Default Rate and the Non-Default Rate.**

D.     Corporate Governance and Management of the Reorganized Company.

1.     Board of Directors.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, on the Plan Effective Date, (i) each director of the [~~Reorganized Company~~]**Debtors** (other than Vincent Young) will be deemed to have resigned, (ii) the New Board will be constituted in the manner set forth below and, except for the New Board, the officers and directors of each subsidiary of the Reorganized Company will be determined with the consent of the Backstop Parties.  Each such director and officer will serve from and after the Plan Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws (or comparable constituent documents) of the respective subsidiary of the Reorganized Company, as the same may be amended pursuant to the Plan or otherwise from time to time, and applicable state law.

[~~The board of directors of the Reorganized Company shall consist of seven (7) board members (one of whom shall be Vincent Young as the Reorganized Company's Chief Executive Officer).  At least three of the board members shall be independent.  Five (5) members of the New Board shall be designated by the existing board, subject to the approval of the Backstop Parties, and one (1) member of the New Board shall be designated by the Creditors' Committee (which member shall be independent), each of whom shall be approved by the existing board members.  The organizational documents will provide for a staggered board under §141(d) of the Delaware General Corporation Law whereby there will be three classes of directors.  The first class would include the Chief Executive Officer and have a one year term; the~~

~~second class would include the Creditors' Committee board nominee and have a two-year term; and the third class would include the five remaining board members and have a three-year term.~~]

To comply with the Credit Agreement, the following procedures for electing the board of directors of the Reorganized Company have been established. The board of directors will have seven members, divided into two classes of directors. There will be 6 Class A Directors and one Class B Director, who shall serve non-staggered, one-year terms.[6] By resolution of the Board of Directors, the current directors shall nominate the new directors.

At the Plan Effective Date, the Class B Director shall be Vincent Young. At the Plan Effective Date, the Class A Directors shall be designated by the Backstop Parties holding a majority of the equity commitment, and at least three shall be independent directors. Upon the later of the Class B Conversion or the termination of Vincent Young's Employment Agreement, at the option of the Board of Directors, the Class B Director shall be required to resign.

2.    Organizational Documents. The Reorganized Company will adopt the Amended and Restated By-Laws and the Amended and Restated Certificate of Incorporation, subject to the consent of the Backstop Parties.

---

[6]    Alternatively, the board of directors of the Reorganized Company may consist of seven (7) board members (one of whom would be Vincent Young as the Reorganized Company's Chief Executive Officer). Five (5) members of the New Board shall be designated by the existing board, subject to the approval of the Backstop Parties. At least three of these board members would be independent, and one (1) member of the New Board would be independent and approved by the Creditors' Committee. The organizational documents will provide for a staggered board under §141(d) of the Delaware General Corporation Law whereby there will be three classes of directors. The first class would include the Chief Executive Officer and have a one year term; the second class would include the Creditors' Committee board nominee and have a two year term; and the third class would include the five remaining board members and have a three year term.

3. <u>Stockholders' Agreement</u>. [~~At the request of each Backstop Party,~~ ]Vincent Young and the Backstop Parties [~~will~~]**may** enter into a stockholders' agreement on terms to be mutually agreed upon.

4. <u>Management and Director Equity Incentive Plan</u>. [~~10%~~]**The Management and Director Equity Incentive Plan will have 500,000 shares** of[ ~~the~~] Class A New Common Stock [~~of the Reorganized Company, on a fully-diluted basis, is~~ ]reserved for issuance [~~as~~]**for** grants of equity, restricted stock or options in connection with the Reorganized Company's Management and Director Equity Incentive Plan, which plan shall be administered by the board of directors of the Reorganized Company. In addition to the Reorganized Company's Management and Director Equity Incentive Plan, the new board of directors may consider additional equity and [~~cash~~]**Cash** incentives based on significant value creation, with value targets and specified timelines to be agreed.

E. <u>Officers of Reorganized Debtors</u>. Vincent Young, James A. Morgan and Deborah A. McDermott, who will be the senior management of the Debtors immediately prior to the Effective Date, shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers shall serve in accordance with applicable non-bankruptcy law and their New Employment Agreements with the Reorganized Company.

F. <u>Powers of Officers</u>.

The officers of the Debtors or the Reorganized Company, as the case may be, shall have the power to enter into and to execute any Plan Supplement Document to which the Reorganized Company is to be a party and (subject to the approval of the board

of directors of Reorganized Company) to take such other or further action as they deem reasonable and appropriate to effectuate the terms of the Plan.

G.   New Employment Agreements.  On the Effective Date, and subject to the occurrence thereof, the Reorganized Company shall be deemed to have adopted the New Employment Agreements for Vincent Young, James A. Morgan and Deborah A. McDermott, with any changes thereto (except for ministerial changes) subject to the Creditors' Committee and Backstop Parties' consent.[ The solicitation of votes on the Plan shall include, and be deemed to be, a solicitation for approval of the New Employment Agreements. Entry of the Confirmation Order shall constitute such approval. ]

H.   Authorization of Plan Securities.

The issuance by the Reorganized Company of the Preferred Stock, the New Common Stock and the Rights is authorized under the Plan without the need for any further corporate action and without any further action by holders of Claims or Interests. Such securities shall be distributed as described in Article VI of the Plan.  None of the Plan Securities shall be registered under applicable securities laws and neither the Debtors nor the Reorganized Debtors shall have any obligation to register the Plan Securities.

I.   Securities To Be Issued Under The Plan

Pursuant to the Plan, on the Effective Date, all Noteholder Claims and Equity Interests will be cancelled and extinguished.  Furthermore, pursuant to the Plan, the Reorganized Company is authorized, without further act or action under applicable law, regulation, order or rule to issue the following Plan securities: (i) the New Class Common Stock; (ii) the Preferred Stock; and (iii) the Rights.

1. __The New Common Stock__.

    (a)    Class A New Common Stock.

As of the Effective Date, the authorized common stock of the Reorganized Company will consist of [[⸺]]__10,000,000__ shares of Class A New Common Stock, par value [[ ]]$0.01[ ] per share, of which [[⸺]]__5,000,000__ shares shall be issued and distributed pursuant to the Plan.  An aggregate of [[⸺]]__500,000__ shares of Class A New Common Stock will be issued to Holders of Allowed Class 6 Claims[ and]__,__ an aggregate of [[ ]]__1,750,000__ shares will be issued pursuant to the Rights Offering__, and an aggregate of 500,000 shares will be issued to the Backstop Parties, on a *pro rata* basis based on their commitments, as a Commitment Fee__.  All of the Class A New Common Stock will be subject to dilution by the Management and Director Equity Incentive Plan.  The Class A New Common Stock will not be listed on any exchange and will be subject to certain transfer restrictions.

__Shares of Class A New Common Stock will vote together with the shares of Class B New Common Stock in the election of directors.  Each share of Class A New Common Stock will entitle the holder thereof to cast 20 votes per share in the election of Class A Directors and one vote per share in the election of Class B Directors.  On matters affecting the rights, powers and preferences of the Class A New Common Stock, the shares of Class A New Common Stock will vote as a single class, with each share of Class A New Common Stock entitling the holder thereof to cast one vote.  On all other matters, each share of Class A New Common Stock will be entitled to one vote per share.__

Holders of the Class A New Common Stock shall be entitled to receive their *pro rata* share of dividends when and if declared by the board of directors of the Reorganized Company; <u>provided</u>, <u>however</u>, that payment of dividends on Class A New Common Stock shall be subject to the approval of the Holders of the Preferred Stock.

(b)     Class B New Common Stock.

As of the Effective Date, the authorized common stock of the Reorganized Company will consist of [[——]]**1,000,000** shares of Class B New Common Stock, par value [[$]$0.01[]] per share, of which [[——]]**500,000** shares shall be issued and distributed pursuant to the Plan.  All of Class B New Common Stock will be issued to Vincent Young.  [~~The Class B New Common Stock shall constitute 40% of the Voting Stock.~~ ]The Class B New Common Stock shall represent 10% of the New Common Stock on the Plan Effective Date, [~~and will be ~~]subject to dilution by the Management and Director Equity Incentive Plan.

**Shares of Class B New Common Stock will vote together with the shares of Class A New Common Stock in the election of directors.  Each share of Class B New Common Stock will entitle the holder thereof to cast one vote per share in the election of Class A Directors and 1,000 votes per share in the election of Class B Directors.  On matters affecting the rights, powers and preferences of the Class B New Common Stock, the shares of Class B New Common Stock will vote as a single class, with each share of Class B New Common Stock entitling the holder thereof to cast one vote.  Shares of Class B New Common Stock will have no other voting rights.**

The Class B New Common Stock shall automatically convert into Class A New Common Stock **(the "Class B Conversion")** upon the earlier of (i) an amendment to the Credit Agreement [~~eliminating the requirement that (a) 40% of the Voting Stock be held by Vincent Young or (b) Vincent Young~~]**that no longer requires that (a) Vincent Young and certain other persons described in Section 6.01(j) of the Credit Agreement hold, in the aggregate, record and beneficial title to at least 40% (by number of votes) of the Voting Stock of the Reorganized Company, or (b) if any "person" or "group", other than Permitted Holders (as defined in the Credit Agreement), is or becomes the "beneficial owner", directly or indirectly, of more than 30% (by number of votes) of the total outstanding Voting Stock of the Reorganized Company, Permitted Holders must (1) "beneficially own" a higher percentage of such Voting Stock than such other person or group or (2)** have the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the board of directors [~~if a Person shall be deemed to have beneficial ownership more than 30% (by number of votes) of the total outstanding Voting Stock, (ii) the termination of the Credit Agreement, or (iii) satisfaction of all obligations under the Credit Agreement. Upon conversion,~~]**of the Reorganized Company. Upon conversion, (i)** such shares shall be apportioned to senior management existing as of the Plan Effective Date (unless any of them voluntarily left the employment of the Reorganized Company prior to such conversion) as determined by Vincent Young**, and (ii) only to the extent that Vincent Young's employment agreement has been terminated, the Class B Director will resign from the New Board.**

2.     Preferred Stock.  As of the Effective Date, the authorized Preferred Stock of the Reorganized Company will consist of [[———]45,600 shares of Preferred Stock, [par value [$0.01] per share, of which [———] shares will be issued]**senior in priority to the New Common Stock, with a liquidation preference of $1,000 per share, to be authorized** pursuant to the **Reorganized Company charter, 50% of which shall be distributed to the** Rights Offering **participants**.  The Preferred Stock shall earn a 15% cumulative dividend, which dividend will cumulate on an annual basis.  Dividends shall be payable in kind.  Payment of any dividend on the Preferred Stock is senior to any dividends on any other class of equity securities.

3.     The Rights.  Pursuant to the Plan (and as described more fully in Section III.K below), Holders of Allowed Class 6 Claims that are Qualified Institutional Buyers **(the "Eligible Holders")** will be entitled to purchase up to [[———]22,800 Units (defined below) for a purchase price of $[[———] per Unit.  The Rights Offering will generate $38]**1,000 per Unit.   Certain members of management will be offered the opportunity to purchase up 1,000 Units in the Rights Offering.  To the extent such members of management elect to purchase any Units, the aggregate Units issuable to Eligible Holders will be reduced after the Expiration Time (as defined below) by such amount.  The Rights Offering and the Guaranteed Minimum Subscription Amount will generate $45.6** million **in the aggregate**.  The Preferred **Stock** and New Common Stock issuable upon exercise of the Rights will not be listed on any exchange and will be subject to certain transfer restrictions.

J.    Securities Law Matters.

1.    1145 Exemption.  Section 1145 of the Bankruptcy Code exempts from registration under the Securities Act securities issued under a chapter 11 plan either entirely in exchange for a claim against or interest in a debtor or issued principally in such exchange and partly for [cash]**Cash** or property.  The Creditors' Committee believes that the Preferred Stock and the New Common Stock issued to Holders of Allowed Class 6 Claims under Articles IV and VI of the Plan and pursuant to the Rights Offering satisfies the requirements of the "principally in exchange and partly for cash" aspects of Section 1145.

2.    Filing of Form 15.  It is anticipated that after the issuance of the New Common Stock there will be fewer than 300 holders of record of the Common Stock.  After the Plan Effective Date, Reorganized Company will file a Form 15 with the SEC terminating its periodic filing requirements pursuant to the Securities Exchange Act of 1934, as amended, to the extent legally practicable.

K.    Rights Offering.

1.    Rights Offering.  Pursuant and subject to Article VI the Plan, each Holder of an Allowed Class 6 Claim that is a Qualified Institutional Buyer [(each an "Eligible Holder") ]as of [November 2, 2009 (]the ["]Voting Record Date[")], will have the opportunity, but not the obligation, to participate in the Rights Offering entitling such Holder to purchase up to such number of **22,800** units (each a "Unit") **(less any Units issued to certain members of management, as described below)** equal to its proportionate ownership of Allowed Class 6 Claims (such Eligible Holder's "Pro Rata Share") consisting of [[___]]**76.7544** shares of Class A New Common Stock and [[___] shares]**one share** of Preferred Stock at a purchase price (the "Purchase Price") of $[[___]

per Unit]**1,000 per Unit, up to such maximum number of Units as would result in such Holder holding no more than 4.9% of the New Common Stock.  After the Expiration Time, certain members of management will be offered the opportunity to purchase up to 1,000 Units.  To the extent such members of management elect to purchase  Units, the aggregate number of Units issuable to Eligible Holders will be reduced by such amount, and any such Eligible Holder shall receive its pro rata share of the reduced aggregate amount of Units**.

**Pursuant to the Equity Commitment Agreement, the Backstop Parties will severally purchase an aggregate of at least 22,800 Units, each consisting of 76.7544 shares of New Common Stock and one share of Preferred Stock, at a price of $1,000 per Unit, for a total aggregate price of at least $22.8 million (the "Guaranteed Minimum Subscription Amount").**

The Rights Offering shall commence on the later of (i) three days after an order approving the Disclosure Statement Supplement is entered and (ii) the date the Rights Exercise Form is distributed.  The Rights Offering shall terminate at [4:00 p.m. New York City time on December 11, 2009 (the "]**the** Expiration Time[" or "Voting Deadline"),] or such later date as the Creditors' Committee, subject to the approval of the Backstop Parties, may specify in a notice provided to the Eligible Holders before 9:00 a.m. New York City time on the Business Day before the then-effective Expiration Time. The Expiration Time is the final time by which an Eligible Holder may elect to subscribe to the Rights Offering.  Each Eligible Holder intending to participate in the Rights Offering must affirmatively elect to exercise its Right(s) on or prior to the Expiration Time.

At the Expiration Time, the Rights shall be allocated to the Eligible Holders pursuant to each such holders' Pro Rata Share of Allowed Class 6 Claims as of Voting Record Date. Any unexercised Rights shall then be allocated to the Backstop Parties based on their respective backstop commitments, or as otherwise agreed among the Backstop Parties.

2.  Exercise of Rights. Each Eligible Holder may exercise all or any portion of such Holder's Rights pursuant to the procedures outlined below, as appropriate, but the exercise of any Rights shall be irrevocable. All questions concerning the timeliness, viability, form, and eligibility of any exercise of Rights shall be determined by the Creditors' Committee, with the Backstop Parties' [Consent]**consent and the Debtors' consent, which consent shall not be reasonably withheld**, and the Creditors' Committee' good faith determination shall be final and binding. The Creditors' Committee, in its discretion reasonably exercised in good faith and with the Backstop Parties' [Consent]**consent and the Debtors' consent, which consent shall not be reasonably withheld**, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject any purported exercise of any Rights. Completed Rights Exercise Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Creditors' Committee determines in its discretion reasonably exercised in good faith and with Backstop Parties [Consent. The]**consent and the Debtors' consent, which consent shall not be reasonably withheld, the** Voting Agent will use commercially reasonable efforts to give notice to any Eligible Holder regarding any defect or irregularity in connection with any purported exercise of Rights by such Holder

and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that the Voting Agent shall not incur any liability for failure to give such notification.  In order to exercise the Rights, each Eligible Holder must return a duly completed Rights Exercise Form (making a binding and irrevocable commitment to participate in the Rights Offering) to EPIQ Bankruptcy Services, LLC (the "Voting Agent") so that such form is actually received by the Voting Agent on or before the Expiration Time.  If, on or prior to the Expiration Time the Voting Agent for any reason does not receive from a given Holder of Rights a duly completed Rights Exercise Form, such Holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering.  Within one (1) day following entry of the Confirmation Order[,] the Voting Agent will notify each Eligible Holder of its final allocation of Units and the Purchase Price.  Each Eligible Holder shall be required to tender the Purchase Price to **[Wells Fargo Bank]** (the [Voting]**"Escrow** Agent**")** so that it is actually received within three (3) [business days]**Business Days** following entry of the Confirmation Order.

The payments made in accordance with the Rights Offering shall be deposited and held by the [Voting]**Escrow** Agent in an escrow account **at Wells Fargo Bank**, or similarly segregated account or accounts which shall be separate and apart from the [Voting]**Escrow** Agent's general operating funds and any other funds subject to any Lien or any cash collateral arrangements and which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date, or such other later date, at the option of the Reorganized Debtors, with the Backstop Parties' Consent, but not later than twenty (20)

days after the Effective Date. The [~~Voting~~]**Escrow** Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any Lien or other encumbrance. To facilitate the exercise of the Rights, the Debtors will mail the Rights Exercise Form to each Holder of an Allowed Class 6 Claim, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Rights Exercise Form, as well as instructions for the payment of the eventual Purchase Price for that portion of the Rights sought to be exercised by such Holder. The Creditors' Committee may adopt, with the Backstop Parties' Consent, such additional detailed procedures consistent with the provisions of the Plan to more efficiently administer the exercise of the Rights.

      3.    <u>Transfer and Revocation of the Rights</u>. The Rights are not Transferable. Any such Transfer or attempted Transfer will be null and void and the Creditors' Committee will not treat any purported transferee as the holder of any Rights. Once an Eligible Holder has properly exercised its Rights, such exercise cannot be revoked.

      4.    <u>Use of Proceeds from the Rights Offering</u>. The proceeds of the Rights Offering shall be used to fund payments under the Plan and to meet working capital and other corporate needs of the Reorganized Debtors, thereby facilitating their emergence from chapter 11.

      5.    <u>Risks Relating to the Rights Offering</u>. The Creditors' Committee and the Backstop [~~parties~~]**Parties** may, at any time prior to the Confirmation Hearing, decide not to continue with the Rights Offering or terminate the Rights Offering. If the

Rights Offering is terminated, the Plan could probably not satisfy the requirement for [~~confirmation~~]**Confirmation**.

      6.        <u>Private Placement Exemption</u>. The Rights Offering will only be made available to Eligible Holders and "accredited investors," as such term is defined by Rule 501 of Regulation D promulgated under the federal securities laws. Therefore, the Preferred Stock and New Common Stock issued pursuant to the Rights Offering will be exempt from registration under the Securities Act by virtue of Section 4(2) thereof and Regulation D promulgated thereunder. In addition, the Creditors' Committee believes that the Class A New Common Stock issuable to Holders of Allowed Class 6 Claims will also be exempt from registration under the Securities Act by virtue of Section 1145.

**PROVISIONS REGARDING VOTING, DISTRIBUTIONS,
AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED
ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS AND EQUITY INTERESTS**

      A.      <u>Voting on Plan</u>.

      Each holder of Class 6 Noteholder Claims and Class 7 General Unsecured Claims shall be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Court.

      B.      <u>Objections to and Resolution of Claims</u>.

      1.        <u>Bar Date for Administrative Claims</u>. The Confirmation Order will establish a bar date for filing applications for the allowance of Administrative Claims (except for Fee Claims, Ordinary Course Administrative Claims, Substantial Contribution Claims and any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code) which date (the "<u>Administrative Claims Bar Date</u>") will be the

first [~~business day~~]**Business Day** that is forty-five (45) days after the Confirmation Date. Holders of Administrative Claims, except for Fee Claims, Ordinary Course Administrative Claims, Substantial Contribution Claims and any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code, not paid prior to the Confirmation Date shall submit requests for payment on or before the Administrative Claims Bar Date or forever be barred from doing so and from receiving payment thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute notice of the Administrative Claims Bar Date. The Reorganized Company shall have until the Claims Objection Deadline (or such longer period as may be allowed by order of the Court) to review and object to all applications for the allowance of Administrative Claims.

        2.        <u>Objections to and Resolution of Administrative Claims and Claims</u>. Objections to Claims must be filed and served on the holders of such Claims by the date that is ninety days after the Plan Effective Date (the "<u>Claims Objection Bar Date</u>"). If an objection has not been filed to a proof of Claim or an amendment has not been made to the Debtors' schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or Debtors' schedules relates shall be treated as an Allowed Claim. No payments or distributions shall be made on account of a Claim until such Claim becomes an Allowed Claim. The Debtors or Reorganized Company will have no obligation to review and/or respond to any Claim that is not filed by the applicable bar date unless: (i) the filer has obtained an order from

the Bankruptcy Court authorizing it to file such Claim; or (ii) the Reorganized Company have consented to the filing of such Claim in writing.

3. Estimation. The Debtors or the Reorganized Company, as the case may be, may at any time request that the Court estimate, subject to 28 U.S.C. § 157, any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Company have previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the estimate to be used by the Debtors in calculating potential Distributions under the Plan, or (c) a maximum limitation on such Claim, as determined by the Court. In the case of Unliquidated Claims arising from personal injury tort or wrongful death actions, the Court may estimate such Claims for the purpose of confirming a plan of reorganization. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Company may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

C. Administrative Claims of Indenture Trustees.

To the extent permitted and provided for under the Prepetition Indentures, in addition to any other Administrative Claim that may be filed by the Indenture Trustees pursuant to the provisions set forth herein, the 8 ¾ Indenture Trustee and the 10% Indenture Trustee shall have an Allowed Administrative Claim in an amount equal to such Indenture Trustee's Indenture Trustee Expenses. If the Debtors or the Reorganized Company disputes the reasonableness of any such Indenture Trustee's Indenture Trustee

Expenses, the Debtors or the Reorganized Company or such affected Indenture Trustee may submit such dispute to the Court for a determination of the reasonableness or amount of such Indenture Trustee Expenses. The Indenture Trustees shall be entitled to payment of or the assertion of its Indenture Trustee Charging Lien for any disputed Indenture Trustee Expenses. Nothing contained herein shall affect the right of an Indenture Trustee from asserting its Indenture Trustee Charging Lien, to the extent applicable under the terms of the respective Prepetition Indenture, provided, however, that upon the payment in full of such Indenture Trustee's Indenture Trustee Expenses, such Indenture Trustee's Indenture Trustee Charging Lien shall be deemed released and discharged in full.

     D.     <u>Cancellation and Surrender of Existing Securities and Agreements</u>.

Notwithstanding any other provision of the Plan and except for Prepetition Lender Claims, Intercompany Claims and Intercompany Interests, on the Plan Effective Date, any promissory note, other instrument or security evidencing a Claim or Equity Interest shall be deemed canceled, <u>provided</u>, <u>however</u>, that the 8¾ Note Indenture and the 10% Note Indenture shall continue to survive and be in full force and effect for the sole purposes of making distributions under the Plan and asserting any Indenture Trustee Charging Lien thereunder.

     E.     <u>Nonconsensual Confirmation</u>.

If at least one (1) Class of Claims or Interests that is Impaired under the Plan votes to accept the Plan, the Creditors' Committee may seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

## V.
## EFFECT OF CONFIRMATION OF THE PLAN.

A.     <u>Continued Corporate Existence</u>.

After the Plan Effective Date, the Reorganized Company**, to the extent not a violation of the Credit Agreement,** may enter into any restructuring transactions (the "<u>Restructuring Transactions</u>") and take such actions as the Reorganized Company may determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Company, all to the extent not inconsistent with any other terms of the Plan. Such Restructuring Transactions may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Reorganized Company to be necessary or appropriate without further order of the Bankruptcy Court. Furthermore, after the Plan Effective Date, the Reorganized Company may operate their businesses and use, acquire, dispose of property and settle and compromise claims or interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Rules.

B.     <u>Dissolution of Creditors' Committee</u>.

The Creditors' Committee shall continue in existence until the Plan Effective Date and shall continue to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Court prior to the Plan Effective Date. On the Plan Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all of their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or

employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate except that the Creditors' Committee shall continue to have standing and a right to be heard with respect to (i) all Fee Claims, (ii) any appeals of the Confirmation Order, (iii) any adversary proceedings pending as of the Plan Effective Date to which it may be a party and (iv) post-Plan Effective Date modifications to the Plan.

C.    Vesting of Property.

Except as otherwise provided in the Plan and the Confirmation Order, on the Plan Effective Date, all of the assets of the Debtors shall vest in the Reorganized Company, free and clear of all claims, liens and interests**, but not free and clear of the claims, liens and interests of the Prepetition Agent and Prepetition Lenders**.  The Reorganized Company, or its designee, shall make all distributions under the Plan.

D.    Provisions Governing Distributions.

1.    Allowed Claims.

[(a)    ]Delivery of Distributions [.]

Distributions under the Plan shall be made by the Reorganized Company or its designee to the Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed Noteholder Claims and Allowed General Unsecured Claims at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 on or prior to the Voting Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Company have been notified in writing of a change of address).  Distributions on account of the Noteholder Claims shall be made initially to their respective Indenture Trustees who shall, in turn, make the distributions to the Holders of Allowed Noteholder Claims.

**Distributions to the Prepetition Lenders shall be made in accordance with the terms of the Credit Agreement.**

**(a)** [(b) Distribution of Cash.

Any payment of Cash by the Reorganized Company pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Company by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Company.

**(b)** [(c) Fractional Cents.

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding up or down, as applicable, of such fraction to the nearest whole cent.

**(c)** [(d) Unclaimed Distributions.

Any Distribution of Cash under the Plan to the holder of an Allowed Claim which remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan shall be transferred to and become property of the Reorganized Company notwithstanding state or other escheat or similar laws to the contrary, and any and all entitlement by the holder of such Claim to such Distribution shall be extinguished and forever barred.

**(d)** [(e) Saturdays, Sundays, or Legal Holidays.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

(e)　　[(f) Distributions to Holders of Allowed Claims as of the Voting Record Date.

As of the close of business on the Voting Record Date, the Claims register shall be closed, and there shall be no further changes in the record holders of any Claims. The Debtors and the Reorganized Company shall have no obligation to recognize any Claim filed or transfer of any Claims occurring after the Voting Record Date. The Debtors and the Reorganized Company shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Voting Record Date. Notwithstanding the foregoing, the record date for distributions to be made by the Indenture Trustees to the holders of Noteholder Claims shall be the Plan Effective Date.

E.　　Discharge, Releases, Exculpation, Injunctions and Insurance[.]

1.　　**Discharge of the Debtors. Except as otherwise provided in the Plan, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property or Estates. The Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan. Except as provided in the Plan or in the Confirmation Order, Confirmation shall, as of the Plan Effective Date, discharge the Debtors from all Claims or other liabilities that arose on or before the Plan Effective Date and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such**

debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim based on such debt has accepted the Plan. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Plan Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim. **The foregoing release, discharge and settlement provisions of this paragraph shall not apply to the claims, liens and interests of the Prepetition Agent and Prepetition Lenders under the Credit Agreement.**

2. **Injunction**. Except as provided in the Plan or the Confirmation Order, as of the Plan Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan shall be permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities: (i) commencing or continuing in any manner any action or other proceeding against the Debtors, the Reorganized Company or their respective property, other than to enforce any right pursuant to the Plan to receive a Distribution on account of such Claim; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Company or their respective property, other than as permitted pursuant to (i) above; (iii)

**creating, perfecting or enforcing any lien or encumbrance against the Debtors, the Reorganized Company or their respective property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Company; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

**As of the Plan Effective Date, and except with respect to the Prepetition Agent and the Prepetition Lenders, all entities that have held, currently hold or may hold any Claims, obligations, suits, judgments, damages, demands, debts, rights, [causes]Causes of [action]Action or liabilities that are released pursuant to the Plan shall be permanently enjoined from taking any of the following actions against any released entity or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, [causes]Causes of [action]Action or liabilities: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

3.    Preservation of Causes of Action.  Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in

connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Company shall retain and may enforce, and shall have the sole right to enforce, any claims, demands, rights and [causes]**Causes** of [action]**Action** that any Debtor may hold against any entity. The Reorganized Company or its successors may pursue such retained claims, demands, rights or [causes]**Causes** of [action]**Action**, as appropriate, in accordance with the best interests of the Reorganized Company or its successors holding such claims, demands, rights or [causes]**Causes** of [action]**Action**.  Further, the Reorganized Company retains its right to file and pursue, and shall have the sole right to file and pursue, any adversary proceedings against any trade creditor or vendor related to debit balances or deposits owed to any Debtor.

    4.     <u>Votes Solicited in Good Faith</u>.  The Debtors and the Creditors' Committee have, and upon [confirmation]**Confirmation** of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Creditors' Committee and the Debtors (and each of their respective affiliates, agents, directors, officers, members, employees, advisors and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the Distributions contemplated thereunder and therefore have not been, and on account thereof will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the Distributions contemplated thereunder.

    5.     **Debtors' Releases.**  [Each of]**Except with respect to any of the Debtors' claims against Paul Dinovitz, any related claims, and as otherwise**

**provided for in the Plan,** the Debtors shall unconditionally release, and shall be deemed to forever release unconditionally, each of the Exculpated Parties **(other than the Prepetition Agent and Prepetition Lenders with respect to defenses under the Credit Agreement, if any)** from any and all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and [causes]**Causes** of [action]**Action**, whatsoever (other than the right to enforce the obligations under the Confirmation Order and the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Plan Effective Date in any way relating to the Debtors, the Debtors' bankruptcy cases, the Plan, or the Disclosure Statement.

6.    **Releases by Holders of Claims and Equity Interests.**  On the Plan Effective Date, each Holder of a Claim or Equity Interest**, but not including the Prepetition Agent and Prepetition Lenders,** shall be deemed to unconditionally release and forever waive all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and [causes]**Causes** of [action]**Action**, whatsoever (other than the right to enforce the obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any transactions or matters with the

Debtors, their estates or in connection with the Debtors' bankruptcy cases, the Plan, the Disclosure Statement or for any act or omission that occurred or could have occurred on or prior to the Plan Effective Date (collectively "Released Claims") against (i) any Debtor or Reorganized Debtor, (ii) any affiliate or subsidiary of any Debtor or Reorganized Debtor, (iii) the Exculpated Parties, except for any claim or cause of action arising from fraud or willful misconduct; **and except as** provided[, however, that the foregoing shall not apply to Holders of Class 2 Claims with respect to debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action arising under or in connection with**] in** the [Credit Agreement]**Plan**.

<u>7.</u> <u>Exculpation and Limitation of Liability</u>. On the Plan Effective Date, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, however, that the foregoing provisions of this release shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan;

**provided still further, that the foregoing Exculpation shall not be deemed to, release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising pursuant to the Plan or the Confirmation Order.**

8.      Limitation of Governmental Releases.  Notwithstanding Articles VII.I and VII.K of the Plan, the Plan shall not release, discharge, or exculpate any non-Debtor party from any debt owed to the United States Government and/or its agencies, including the PBGC (the "Government"), or from any liability arising under the Internal Revenue Code, ERISA, as amended, or the environmental laws, securities laws or criminal laws of the United States.  In addition, notwithstanding Articles VII.I and VII.K of the Plan, the Plan shall not enjoin or prevent the Government from collecting any such liability from any such non-Debtor party.

9.      Reinstatement and Continuation of Insurance Policies.  Unless otherwise assumed during the pendency of the Chapter 11 Cases, from and after the Plan Effective Date, each of the Debtors' insurance policies in existence on and as of the Confirmation Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

The Debtors' discharge and release from all Claims and Equity Interests, as provided therein, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Company (including, without limitation, its officers and directors) or any other person or entity. Notwithstanding any other provision of the Plan or the Confirmation Order, nothing in

the Plan shall (i) impair (w) the right of any insurer to defend against any claim asserted

against such insurer, (x) an insurer's status as a secured creditor to the extent applicable

under the terms of the Plan, including the right to recover from any Collateral (in

accordance with the applicable insurance policy), (y) an insurer's right to draw on third-

party letters of credit (in accordance with the terms of the applicable insurance policy and

letter of credit) or (z) any insurer's right of setoff pursuant to section 553 of the

Bankruptcy Code to the extent applicable and/or (ii) affect an insurer's right to seek

arbitration of disputes between the Debtors and such insurer to the extent provided for

under the terms of the applicable insurance agreement.

> 10.    Officers' and Directors' Indemnification Rights and Insurance.
The Reorganized Company will obtain reasonably sufficient tail coverage under a

directors and officers' liability insurance policy for the current directors and officers for a

period of six years (the "Tail Policy").  As of the Plan Effective Date, the Debtors shall

assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the

Bankruptcy Code.  Entry of the Confirmation Order will constitute the Bankruptcy

Court's approval of the Debtors' foregoing assumption of each of D&O Liability

Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan,

Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity

obligations assumed by the foregoing assumption of the D&O Liability Insurance

Policies, and each such indemnity obligation will be deemed and treated as an Executory

Contract that has been assumed by the Debtors under the Plan as to which no proof of

claim need be filed.

[~~Notwithstanding any other provisions of the Plan, all~~]**All** indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, articles of limited partnership, board resolutions or employment contracts) for the directors who were in place as of the Petition Date and current officers, employees, attorneys, other professionals and agents of the Debtors shall be assumed, and shall survive effectiveness of the Plan only to the extent necessary to enforce claims by the Reorganized Company under the Tail Policy. All indemnification provisions in place on and prior to the Plan Effective Date for current directors and officers of the Debtors and their subsidiaries and such current and former directors and officers' respective Affiliates shall survive the Plan Effective Date for Claims related to or in connection with any actions, omissions or transactions occurring prior to the Plan Effective Date only to the extent necessary to enforce claims by the Reorganized Company under the Tail Policy.

        11.    <u>Term of Bankruptcy Injunction or Stays</u>.  All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Plan Effective Date.

        F.    <u>Administrative Claims Incurred After the Confirmation Date</u>.

        Administrative Claims incurred by the Reorganized Company after the Confirmation Date, including (without limitation) Claims for Professionals' fees and expenses incurred after such date, may be paid by the Reorganized Company without Court approval.

        G.    <u>Treatment of Executory Contracts and Unexpired Leases</u>.

        1.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>.  On the Plan Effective Date, pursuant to section 365 of the Bankruptcy

Code, each Debtor or Reorganized Debtor shall assume all of the executory contracts and unexpired leases (including any and all rights under any contract or agreement) to which it is a party or beneficiary except for those executory contracts and unexpired leases (a) listed on an exhibit to the Plan (which may be amended at any time prior to the Plan Effective Date) or (b) previously assumed or rejected by the Debtors. Contracts or leases entered into after the Petition Date will be performed by the Reorganized Company in the ordinary course of their business.

Notwithstanding anything to the contrary in any contract, agreement or lease to which a Debtor or Reorganized Company is a party, (i) the transactions contemplated by the Plan and (ii) the consequences of the Plan's implementation shall not trigger any change in control or similar provisions and shall not be voided by any restraints against assignment in any contract, agreement or lease governed by the Plan. The Confirmation Order shall constitute an order of the Court approving all such assumption and assignments and rejections pursuant to section 365 of the Bankruptcy Code.

2. Cure. Except as otherwise agreed to by the parties, on the Initial Distribution Date, the Reorganized Company shall cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code. Unless the parties to the contract or lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later to occur of (i) ten (10) days after the entry of a Final Order determining the amount, if any, of the Debtors or the Reorganized Company' liability with respect thereto and (ii) the Initial Distribution Date.

3. <u>Rejection Damage Claims</u>. All Claims for damages arising from the rejection of executory contracts or unexpired leases must be filed with the Court in accordance with the terms of the order authorizing such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their respective estates and the Reorganized Company. All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as Class 7 General Unsecured Claims.

H. <u>Affiliation Agreements</u>.

The Debtors shall use their commercially reasonable efforts to renew the ABC affiliation agreements prior to the expiration thereof. The Debtors shall decline to renew their lease at 599 Lexington when it expires at the end of 2009 (with respect to both corporate headquarters and Adam Young Inc.).

I. <u>Termination of Lease</u>.

As of the effective time of an applicable Restructuring Transaction, any contract, agreement or lease to be held by any Debtor or another surviving, resulting or acquiring corporation in an applicable Restructuring Transaction, shall be deemed assigned to the applicable entity, pursuant to section 365 of the Bankruptcy Code.

## VI.
## RETENTION OF JURISDICTION.

The Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases pending on the

Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Plan Effective Date; (3) to ensure that Distributions to holders of Allowed Claims and Interests are accomplished as provided therein; (4) to resolve disputes as to the ownership of any Claim or Interest; (5) to hear and determine timely objections to, or other proceedings challenging the allowance of, Administrative Claims and Claims, (6) to hear and determine any disputes arising as to the reasonableness of an Indenture Trustee's Indenture Trustee Expenses; (7) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (8) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (9) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order; (10) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (11) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (12) to hear and determine any issue for which the Plan requires an order of, or other relief from, the Court; (13) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (14) to hear and determine any [causes]**Causes** of [action]**Action** preserved under the Plan under sections 544, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code; (15) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (16) to hear and determine any matter regarding the

existence, nature, and scope of the releases and exculpation provided in Article VII of the Plan; and (17) to enter a final decree closing the Chapter 11 Cases.[ The Bankruptcy Court shall not retain any jurisdiction to interpret and enforce the Credit Agreement or any disputes arising therefrom from and after the Plan Effective Date.]

## VII.
## MISCELLANEOUS PROVISIONS

A.     Payment of Statutory Fees.

All fees payable on or before the Plan Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Plan Effective Date and all such fees payable after the Plan Effective Date shall be paid by the applicable Reorganized Debtor as and when such fees become due.

B.     Modification of the Plan.

1.     Pre-Confirmation Modifications.  The Creditors' Committee may alter, amend, or modify the Plan before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

2.     Post-Confirmation Immaterial Modifications.  After the Confirmation Date, the Creditors' Committee may, with the approval of the Court, without notice to all holders of Claims or Interests, insofar as it does not materially and adversely affect the holders of Claims or Interests, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite [consummation]Consummation of the Plan.

3.     Post-Confirmation Material Modifications.  After the Confirmation Date, the Creditors' Committee may, alter or amend the Plan in a manner which, as determined by the Bankruptcy Court, materially and adversely affects holders of Claims

or Interests, provided that such alteration or modification is made after a hearing as provided in section 1127 of the Bankruptcy Code.

      C.      <u>Governing Law</u>.

      Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules) the laws of the State of New York (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

      D.      <u>Filing or Execution of Additional Documents</u>.

      On or before the Plan Effective Date, the Debtors shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

      E.      <u>Withholding and Reporting Requirements</u>.

      In connection with the Plan and all instruments issued in connection herewith and Distributions thereunder, the Reorganized Company shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions thereunder shall be subject to any such withholding and reporting requirements.

      F.      <u>Exemption From Transfer Taxes</u>.

      Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer and exchange under the Plan of the Rights, the Preferred Stock and the New Common Stock, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan, shall not be subject to any stamp tax or other similar tax.

G. Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a).

The Creditors' Committee may request that the Confirmation Order include (a) a finding that Bankruptcy Rule 3020(e) and Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

H. Exhibits/Schedules.

All exhibits and schedules to the Plan and the Plan Supplement are incorporated into and constitute a part of the Plan as if fully set forth therein.

I. Pension Plan.

**The Debtors will file an application requesting the PBGC to make a determination that the Pension Plan qualifies to be terminated under PGBC's distress termination procedures because the Plan has unfunded vested benefits (i.e. insufficient assets to pay all benefits owed to participants). There can be no assurance at this time that the PBGC will consent to or that the Bankruptcy Court will approve, the Debtors' request for a distressed termination.** To the extent not otherwise terminated or compromised by order of the Bankruptcy Court, the Debtors' and the Reorganized Company's continuing obligations under the Pension Plan shall be unaffected by the Chapter 11 Cases and the Plan.

J. Notices.

All notices, requests, and demands thereunder to be effective shall be in writing and, unless otherwise expressly provided therein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:

       Young Broadcasting Inc.
       599 Lexington Avenue
       New York, New York 10022
       Attention: James A. Morgan

with a copy to:

       Sonnenschein Nath & Rosenthal LLP
       1221 Avenue of the Americas
       New York, New York 10020
       Attention:  Peter D. Wolfson, Esq. and
                  Jo Christine Reed, Esq.
       Tel: (212) 768-6840
       Fax: 212 768-6800.

To the Creditors' Committee:

       Paul, Weiss, Rifkind, Wharton & Garrison LLP
       1285 Avenue of the Americas
       New York, New York 10019-6064
       Attention:  Andrew N. Rosenberg, Esq. and
                  Jeffrey D. Saferstein, Esq.
       Tel.:  (212) 373-3000
       Fax:  (212) 757-3990.

The Office of the United States Trustee:

       33 Whitehall Street
       New York, New York [~~10004,~~]**10004**
       Attention:  Richard C. Morrissey, Esq.
       Tel.: (212) 510-0500.

K.      <u>Plan Supplement</u>.

Forms of the documents relating the Amended and Restated Certificate of Incorporation, the Amended and Restated By-Laws, a notice setting forth the identities, terms and nature of the compensation of the Reorganized Company's senior officers and directors and the Employment Agreements to be entered into with the Reorganized Company's senior officers, and such other documents and information as the Creditors' Committee determine to be necessary or appropriate to the implementation and/or [~~confirmation~~]**Confirmation** of the Plan shall be contained in the Plan Supplement,

which will be filed with the Clerk of the Court at least 5 days before[ the] December 11,

2009 (the "Voting Deadline"), in accordance with the Disclosure Statement Order;

provided, however, that the Creditors' Committee may amend any of the Plan

Supplement documents through and including the Plan Effective Date in a manner

consistent with the Plan and with the prior written consent of **the Debtors or** any other

non-Debtor third parties to the relevant document.  The Plan Supplement may be

inspected in the office of the Clerk of the Court during normal court hours and shall be

available online at www.epiq11.com.  Holders of Claims or Equity Interests may also

obtain a copy of the Plan Supplement upon written request to the Voting Agent in

accordance with the Disclosure Statement Order.

     L.     <u>Conflict</u>.

     The terms of the Plan shall govern in the event of any inconsistency with

the summary of the Plan set forth in the Disclosure Statement.  The terms of the

Confirmation Order shall govern in the event of any inconsistency with the Plan or the

summary of the Plan set forth in the Disclosure Statement.

     M.     <u>Setoff by the United States</u>.

     The valid setoff rights, if any, of the United States of America will be

unaffected by the Plan or Confirmation thereof.

## VIII.
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS.

     A.     <u>Conditions Precedent to Confirmation</u>.

     The Plan shall not be confirmed by the Bankruptcy Court unless and until

the following conditions have been satisfied in full or waived pursuant to Article XI of

the Plan:

1. The Confirmation Order shall have been entered by the Bankruptcy Court and shall be reasonably acceptable in form and substance to the Creditors' Committee, the Backstop Parties and the Debtors.

2. All exhibits to the Plan are in form and substance reasonably satisfactory to the Creditors' Committee, the Backstop Parties and the Debtors.

3. The Bankruptcy Court shall have found that adequate and sufficient notice of the Disclosure Statement and the Confirmation Hearing, along with all deadlines for voting on or objecting to the Plan has been given to all relevant parties in accordance with the solicitation procedures governing such service and in substantial compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b).

B.  Conditions Precedent to Effectiveness.

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Article XI of the Plan:

1. The Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Creditors' Committee, the Backstop Parties and the Debtors.

2. The Confirmation Order shall have been entered by the Bankruptcy Court, in a form reasonably acceptable to the Creditors' Committee, the Backstop Parties and the Debtors, approving and authorizing the Debtors and the Reorganized Company to take all actions necessary or appropriate to implement the Plan, including completion of the transactions contemplated by the Plan and the implementation and consummation of contracts, instruments, releases and other agreements or documents created in connection with the Plan.

3. The Confirmation Order shall have become a Final Order and is in full force and effect.

4. The FCC Consent shall have been issued by the FCC [~~and have become final~~]without any condition which would have a material adverse effect on the Reorganized Debtor; provided, however, that subject to applicable law with the consent of the Backstop Parties, a customary trust may be set up until FCC approval is obtained.

5. The **waiting period (and any extension thereof) applicable to the Plan under the HSR Act shall have been terminated or shall have expired.**

**6.** **The** terms of the Voting Stock and corporate governance of the Reorganized Company shall be reasonably acceptable to the Creditors' Committee[~~and~~]**,** the Backstop Parties **and the Debtors**.

C.    Waiver of Conditions.

The Creditors' Committee with the consent of each Backstop Party, and, in the case of the conditions set forth in Articles XI.A.1, XI.A.2, XI.B.1 and XI.B.2 of the Plan, with the consent of the Debtors, may waive any or all of the conditions set forth in Articles XI.A and XI.B at any time without leave or order of the Court.

D.    Effect of Failure of Conditions.

In the event that the Plan Effective Date does not occur on or prior to [[~~          ], 2009,~~]**March 15, 2010,** or such later date as may be agreed to by the Creditors' Committee (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and

nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

E.      <u>Vacatur of Confirmation Order</u>.

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

F.      <u>Revocation, Withdrawal, or Non-Consummation</u>.

1.      <u>Right to Revoke or Withdraw</u>.  The Creditors' Committee reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.

2.      <u>Effect of Withdrawal, Revocation, or Non-Consummation</u>.  If the Creditors' Committee revokes or withdraws the Plan prior to the Confirmation Date, or if the Plan Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, insurance policies or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained therein, and no acts taken in preparation for [consummation of the Plan]**Consummation**,

shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## IX.
## CONFIRMATION OF THE PLAN

The following is a brief summary of the provisions of the Bankruptcy Code respecting acceptance and Confirmation of a plan of reorganization. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

A.      Confirmation

1.      Acceptance.  Classes 6 and 7 of the Plan are impaired under the Plan and are entitled to vote to accept or reject the Plan.  Classes 1, 2, 3, 4, and 5 of the Plan are unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan.  Class 8 is impaired and is deemed to have rejected the Plan.  Therefore, holders of interests in Class 8 are not entitled to vote to accept or reject the Plan.

The Creditors' Committee reserves the right to amend the Plan in accordance with Article IX.B of the Plan or to seek nonconsensual [confirmation]**Confirmation** of the Plan under section 1129(b) of the Bankruptcy Code, or both, with respect to any [class]**Class** of Claims that is entitled to vote to accept or reject the Plan, if such [class]**Class** rejects the Plan.

2.      Unfair Discrimination and Fair and Equitable Tests.  To obtain non-consensual [confirmation]**Confirmation** of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and

equitable" with respect to each impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."

The "cramdown" test for unsecured creditors provides that either (i) each impaired unsecured creditor receives or retains under the plan, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting [class]**Class** will not receive any property under the plan.

The "cramdown" test for equity interests provides that either (i) each holder of an equity interest will receive or retain under the plan, property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its equity interest or (ii) the holder of an equity interest that is junior to the non-accepting [class]**Class** will not receive or retain any property under the Plan.

3.    Best Interests of Creditors – Liquidation Analysis.  The "best interests of creditors" requires that, in order to be confirmed, a plan must be in the best interests of each holder of a claim or equity interest in an impaired [class]**Class** that has not voted to accept the plan.  Accordingly, if an impaired [class]**Class** does not unanimously accept a plan, the best interests test requires that the bankruptcy court find that the plan provides to each non-consenting holder in such impaired [class]**Class** a recovery on account of such holder's claim or equity interest that has a value at least equal to the value of the distribution that each such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.

Section V.C of the Debtors' Disclosure Statement contains a liquidation analysis.

4.    Feasibility of the Plan.  The Bankruptcy Code requires an evidentiary showing that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Plan meets this requirement, Allen & Co. has analyzed the Reorganized Company's ability to meet their financial obligations as contemplated thereunder.  Allen & Co. based part of its analysis upon the projections prepared by the Debtors attached as Exhibit B to the Debtors' Disclosure Statement.  As set forth in Exhibits 4.A – 4.C (the "Projections"), Allen & Co. modified the Debtors' Projections to conform to the terms, including the capital structure, proposed by the Plan.  These Projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court, and for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place on or about [December 31, 2009.]**February 28, 2010.**  The Projections include balance sheets, statements of operations and statements of cash flows.  Based upon the Projections, the Creditors' Committee believes that the Reorganized Company will be able to make all payments required to be made pursuant to the Plan.  The Creditors' Committee believes that [confirmation]**Confirmation** of the Plan is not likely to be followed by a liquidation of the Reorganized Company or a need for a further financial reorganization of the Reorganized Company.  Upon [consummation of the Plan]**Consummation**, the Reorganized Company will have access to sufficient [cash]**Cash** to fund distributions under the Plan and to support and meet the Reorganized Company's ongoing financial needs.

As part of its analysis, Allen & Co. also considered the feasibility of the plan under a delayed recovery scenario (the "Delayed Recovery Scenario") (see Exhibit 4.D), which is more conservative than the Projections in that it assumes that the broadcast advertising sector does not exhibit any growth (except with respect to political advertising) until 2011, which has the effect of reducing revenue in each year of the Projections. The Delayed Recovery Scenario also includes [a lower base-year in 2009 and ]an additional $2 million in annual expenses as compared to the Debtors' Projections. Under this scenario, the Debtors' 2010 – 2013 broadcast cash flow was reduced an average of [20.7]**16.8**% in each year, or $[10.2]**7.9** million lower per annum, compared to the Debtors' Projections. Under the Delayed Recovery Scenario, the Debtors continue to have sufficient access to [cash]**Cash** to fund the distributions under the Plan and to support and meet the Reorganized Company's ongoing financial needs. In fact, even under these more conservative assumptions, the Reorganized Company is expected to emerge from bankruptcy with a [cash]**Cash** balance of $[27.5]**25.3** million and generate positive free cash flow (after interest and required amortization payments) in each subsequent year.

    B.    <u>Alternatives to Confirmation and Consummation of the Plan</u>.

        1.    <u>Alternative Plans of Reorganization</u>. As discussed in the Debtors' Disclosure Statement, the Debtors have proposed an alternate plan of reorganization. If neither of the Plans are confirmed, the Debtors or the Creditors' Committee (or, if the exclusive period in which to file a plan of reorganization has expired or is terminated by the Bankruptcy Court, any other party in interest) could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization or continuation of the Debtors' business or an orderly liquidation of its assets.

The Creditors' Committee believes that the Plan is a significantly more attractive alternative than those alternatives, because it provides Noteholders meaningful distribution and allows Noteholders who are Qualified Institutional Buyers to participate in the Rights Offering.

As part of its work, Allen & Co. prepared a comparison of recoveries under the alternative plans and analyzed the potential recovery amounts for the Noteholders, assuming a sale of the Reorganized Company in November 2012. That analysis is summarized in Table 1 below. For purposes of this analysis, Allen & Co. assumed an exit multiple range of 7x – 11x, with a midpoint of 9x, applied to the Debtors' projected average 2012 / 2013 projected Broadcast Cash Flow ("BCF"). Using the midpoint exit multiple of 9x, Noteholders who did not participate in the Rights Offering would receive $[18.1]17.0 million upon the sale in connection with the common equity distribution. For Noteholders also choosing to participate in the Rights Offering, the resulting rate of return on the new investment amount at a 9x exit multiple from [the date of consummation of the Plan]Consummation through 2012 is [69.2]60.5%. For example, using a 9x exit multiple, for every $1,000 invested in the Rights Offering, Noteholders would receive $[4,842]4,132 in 2012.

Allen & Co. then calculated the present value of the indicated sales proceeds using a range of equity discount rates with a midpoint of 25%. Under this analysis, the recovery value for the Noteholders who did not participate in the Rights Offering at a 9x exit multiple would be $[9.3]9.0 million. This compares favorably to the implied value of the recovery for the Noteholders under the Debtors' Plan, which provides warrants for 2.5% of the Company's common stock at a $300 million enterprise

value strike price.  Under the Debtors' Plan, the Noteholders would receive total value on these assumptions of $[3.7]**4.0** million based on an exit multiple of 9x.  Applying a Black Scholes value of the warrant offered to the Noteholders under the Debtors' Plan, Allen & Co. estimated the value of the consideration to be received by the Noteholders to be $1.8 million.  As with other analyses of this type performed by Allen & Co., these amounts represent a substantial discount to the recovery values under the Plan.

**Table 1: Present Value of Noteholder Consideration Received at a 9x Exit Multiple**

| | 9.0x Exit Multiple, 25% Discount Rate | |
| ($ in Millions) | The Projections | Delayed Recovery Scenario |
|---|---|---|
| Creditors' Committee Plan | $9.0 | $4.5 |
| Debtors' Plan | $4.0 | $2.7 |
| Black Scholes Model of Debtors' Plan | $1.8 | $1.8 |

Allen & Co. also analyzed the potential recovery amounts for the Noteholders using the Delayed Recovery Scenario.  Using the same methodology as outlined above, under the Delayed Recovery Scenario, the Noteholders who did not participate in the Rights Offering would receive $[8.4]**8.5** million **upon the sale** assuming a 9x exit multiple.  For Noteholders also choosing to participate in the Rights Offering, the indicated rate of return at a 9x exit multiple would be [45.2]**41.3**%.  For example, using a 9x exit multiple, for every $1,000 invested in the Rights Offering, Noteholders would to receive $[3,062]**2,823** in 2012 under the Delayed Recovery Scenario.

On a present value basis, assuming a discount rate of 25%, the potential recovery value for the Noteholders who did not participate in the Rights Offering under the Delayed Recovery Scenario is $[4.3]4.5 million assuming a 9x exit multiple. Under the Debtors' Plan, the Noteholders would receive total value on these assumptions of $[2.3]2.7 million based on an exit multiple of 9x. Again, the recovery value for the Noteholders under the Plan is likely to be greater than those recoveries for the Class in the Debtors' Plan.

Exit Value Multiple Sensitivity

The table below indicates the recovery values for the Noteholders under the scenarios described above, using a range of exit multiples of 7x – 11x. In the majority of cases indicated below, the recovery value for the Noteholders is likely to be greater than it would be under the Debtors' Plan.

Table 2: Present Value of Noteholder Consideration Received at 7x - 11x Exit Multiples

| ($ in Millions) | Exit Multiple | | | | |
| --- | --- | --- | --- | --- | --- |
| | 7.0x | 8.0x | 9.0x | 10.0x | 11.0x |
| **Creditors' Committee Plan** | | | | | |
| The Projections | $4.4 | $6.7 | $9.0 | $11.4 | $13.7 |
| Delayed Recovery Scenario | 0.6 | 2.5 | 4.5 | 6.5 | 8.4 |
| **Debtors' Plan** | | | | | |
| The Projections | $2.7 | $3.3 | $4.0 | $4.6 | $5.3 |
| Delayed Recovery Scenario | 1.6 | 2.2 | 2.7 | 3.2 | 3.8 |
| Black Scholes Model of Debtors' Plan | $1.8 | $1.8 | $1.8 | $1.8 | $1.8 |

Rights Offering

As discussed above, the Plan also offers qualified Noteholders the opportunity to participate in a Rights Offering. The table below summarizes the rates of return on a potential investment in the Rights Offering, assuming a 9x exit multiple on a sale of the Reorganized Company in November 2012. The implied returns are shown on a

percentage basis and the indicated return of capital for every $1,000 invested under both the Debtors' Projections and the Delayed Recovery Scenario.

**Table 3: Return on New Invested Capital**

| ($ in Millions) | 9.0x Exit Multiple | |
| --- | --- | --- |
| | The Projections | Delayed Recovery Scenario |
| IRR on New Money Invested | 60.5% | 41.3% |
| Return of Capital for $1,000 Invested | $4,132 | $2,823 |

    2.      <u>Dismissal of the Debtors' Chapter 11 Case.</u> Dismissal of the Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Chapter 11 Case, the Debtor would lose the protections afforded by the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiating with its creditors, and possibly costly and protracted litigation. Dismissal would permit unpaid unsecured creditors to seek to obtain and enforce judgments against the Debtor. The Creditors' Committee believes that these actions would seriously undermine the Debtors' ability to finance its operations and could ultimately lead to the Debtors' liquidation under either chapter 7 or chapter 11 of the Bankruptcy Code. Therefore, the Creditors' Committee believes that dismissal of the Chapter 11 Case is not a viable alternative to the Plan.<u>Liquidation Under Chapter 7 or Chapter 11</u>. If neither the Plan nor the Debtors' Plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors and equity interest holders in accordance with the priorities established by the Bankruptcy Code. A full discussion of the consequences of a liquidation is discussed in Section V.C of the Debtors' Disclosure Statement.

# X.
# VALUATION ANALYSIS

A.    Projected Financial Statements.

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. As discussed in Section IX.4 above and in Section V.D of the Debtors' Disclosure Statement, this standard is referred to as "feasibility." In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Creditors' Committee's financial advisor analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct its business.

The Projections assume an Effective Date of [December 31, 2009]**February 28, 2010** with Allowed Claims and Allowed Interests treated as described in the Plan. Except as otherwise provided in the Plan, expenses incurred as a result of the Chapter 11 Cases are assumed to be paid on the Effective Date. If the Debtors do not emerge from chapter 11 as currently scheduled, additional Administrative Expense will be incurred until such time as a plan of reorganization is confirmed and becomes effective. These Administrative Expenses could significantly impact the Debtors' cash flows if the Effective Date is materially later than the Effective Date assumed in these Projections. It is important to note that the Projections and estimates of equity values for the Reorganized Debtors may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of the Reorganized Debtors. These assumptions include growth of business, labor and other

operating costs, regulatory environment, inflation, and the level of investment required for capital expenditures and working capital. The estimates of value for the Reorganized Debtors are not intended to reflect the values that may be attainable in public or private markets. They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

**THE CREDITORS' COMMITTEE UNDERSTANDS THAT THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE CREDITORS' COMMITTEE FURTHER UNDERSTANDS THAT THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NOT REVIEWED THE ACCOMPANYING PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE CREDITORS' COMMITTEE DOES NOT INTEND TO, AND DISCLAIMS ANY OBLIGATION TO, (I) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF THE REORGANIZED COMPANY'S NEW PREFERRED STOCK, NEW COMMON STOCK, AND RIGHTS OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (II) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (III) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

**THE PROJECTIONS PROVIDED IN CONNECTION WITH THIS DISCLOSURE STATEMENT, INCLUDING THE DELAYED RECOVERY SCENARIO ARE BASED ON THE DEBTORS' PROJECTIONS AS PROVIDED BY THE DEBTORS' MANAGEMENT AND HAVE BEEN MODIFIED TO REFLECT OF THE CAPITAL STRUCTURE AS OUTLINED IN THE PLAN, AND, IN THE CASE OF THE MORE CONSERVATIVE DELAYED RECOVERY SCENARIO, TO REFLECT A POSSIBLE CHANGE IN CONDITIONS IN THE BROADCAST INDUSTRY SECTOR. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY THE CREDITORS' COMMITTEE, AFTER CONSULTATION WITH THE DEBTORS AND THEIR FINANCIAL ADVISORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND**

THE DEBTORS' CONTROL. OTHER THAN REDUCING PROJECTED EXPENSES, NO IMPACT FROM THE REORGANIZED COMPANY BEING A PRIVATE COMPANY AFTER THE EFFECTIVE DATE HAS BEEN CONSIDERED. THE CREDITORS' COMMITTEE CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE MATERIAL ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. FINALLY, THE PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF THE DEBTORS, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE.

      B.    Valuation.

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE COMMON EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

Allen & Co. has advised the Creditors' Committee with respect to the reorganization value of the Reorganized Company on a going concern basis. Solely for purposes of the Plan and based on the Debtors' Projections, the estimated range of common equity values (excluding $[38]**45.6** million of New Preferred Equity) of the Reorganized Company on a present value basis is assumed to be $[103]**100** million (the midpoint of a range of $[45]**43** - $[175]**171** million) as of an assumed Effective Date of [December 31, 2009.]**February 28, 2010.**

Using the Delayed Recovery Scenario, the estimated common equity value (excluding $[38]45.6 million of New Preferred Equity) of [The]the Reorganized Company on a present value basis is assumed to be $[48]50 million (the midpoint of a range of $[5]6 - $[101]105 million) as of an assumed Effective Date of [December 31, 2009.]February 28, 2010.

THE ESTIMATED RANGE OF THE REORGANIZATION COMMON EQUITY VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF [[DECEMBER 31, 2009],]FEBRUARY 28, 2010, REFLECTS WORK PERFORMED BY ALLEN & CO. ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO ALLEN & CO. AS OF OCTOBER 1ST, 2009. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT ALLEN & CO.'S CONCLUSIONS, ALLEN & CO. DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

With respect to the Debtors' Projections, with the input of their financial advisors, and included in the Projections, Allen & Co. assumed that such Projected Financial Information has been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Company. Allen & Co.'s estimate of a range of reorganization common equity values assumes that the Debtors' Projections will be achieved by the Reorganized Company in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. Certain of the results forecasted by the Debtors' management are significantly better than the recent historical results of the Debtors' operations. As a result, to the extent that the estimate of enterprise values is dependent upon the Reorganized Company performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Projected

Financial Information, such performance may have a material impact on the Projections and on the estimated range of values derived therefrom. As such, Allen & Co. also analyzed the valuation of the Reorganized Company based on the Delayed Recovery Scenario, as described in Section IX.4.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND COMMON EQUITY VALUE OF THE REORGANIZED COMPANY, ALLEN & CO.:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO ALLEN & CO. BY THE DEBTORS' MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESS AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF THE DEBTORS' SENIOR MANAGEMENT TO DISCUSS THE DEBTORS' OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT ALLEN & CO. DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF THE DEBTORS;

- CONSIDERED MULTIPLES PAID IN RELEVANT PRECEDENT TRANSACTIONS IN THE TELEVISION BROADCASTING INDUSTRY;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH ALLEN & CO. CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, ALLEN & CO. DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY

VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF THE REORGANIZED COMPANY, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY ALLEN & CO. REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED COMPANY. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED COMPANY THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.  THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED COMPANY SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN.  SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN.  IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

1.    Valuation Methodology.  In preparing its valuation estimate, Allen & Co. performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete

description of the analyses and factors undertaken to support Allen & Co.'s conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

Allen & Co. performed a variety of analyses in preparing the valuation of the Debtors, including but not limited to a Comparable Public Company Analysis, a Precedent Transaction Analysis and a Levered Discounted Cash Flow Analysis. Based on these analyses, Allen & Co. primarily relied on the Levered Discounted Cash Flow Analysis to determine the common equity value of the Reorganized Company. Comparable Public Company Analysis.

A Comparable Public Company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses (in this case, television broadcasting), business risks, target market segments, location of markets, network affiliation, growth prospects, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. In performing the Comparable Public Company Analysis, the following publicly traded companies in the television broadcasting sector were deemed generally comparable to Young Broadcasting in some or all of the factors described above and were selected: Belo Corporation, Sinclair Broadcasting, Gray Television, LIN

TV, Nexstar, and Entravision.  See Exhibit 5.A.  Allen & Co. analyzed the current trading

value for the comparable companies as a multiple of BCF.

The Comparable Company Analysis indicated a range of multiples of

average 2009 and 2010 BCF for the comparable companies of [7.4]**7.2**x to [10.3]**9.6**x.

This range implied an enterprise value range of between $[310]**299** million and

$[428]**396** million for the Debtors **(before applying any control premium)**, based on

the average 2009 pro forma and 2010E BCF indicated in the Debtors' Projections.

Though it performed these analyses, Allen & Co. did not attribute significant weight to

them.  Allen & Co. believes that the values yielded from the comparable company

analysis should not be relied upon.  Allen & Co. indicated that the television broadcasting

sector has exhibited very high volatility in valuation multiples over the past year, and

values indicated for the Reorganized Company based on these multiples at a specific

point in time during such periods of high volatility are not meaningful.  Additionally,

Allen & Co. indicated that the comparable companies in the television broadcast sector

have significant leverage, and as such equity trading values may reflect assumptions

regarding the leverage in their capital structure, as opposed to the underlying

broadcasting business fundamentals.  Furthermore, cash flows and multiples are both at

historic lows for the broadcasting sector.  Unlike in many industries, in broadcasting,

trading multiples have historically been lower in periods of reduced earnings, placing

significant and disproportionate downward pressure on valuations.  Allen advised the

Creditors' Committee that as a result of these and other factors, it would not currently

rely on the Comparable Company Analyses as a reliable measure of  value for the

Debtors' assets, although this belief could be modified as corrections in the industry and economy occur.

Precedent Transaction Analysis.

Allen & Co. analyzed precedent transactions in the television broadcasting industry. Precedent transactions are based on the disclosed purchase price as a multiple of various operating statistics for companies in similar lines of businesses to Young Broadcasting. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to Young Broadcasting. As nearly all of the recent precedent transactions were for individual stations or groups of stations (as against a consolidated group with associated corporate overhead), Allen & Co. specifically focused on prices paid as a multiple of BCF, as this is typically reflective of the cash flow derived at the station-level Young Broadcasting. As there have been few comparable transactions in the recent past, most of the precedents used were from 2007 and prior. A summary of the Precedent Tax Analysis is provided in Exhibit 5.B hereto.

The precedent transactions analysis performed by Allen indicated a range of multiples of 4.5x – 17.6x last twelve months BCF and 8.1x – 16.8x BCF as projected one year forward, with a median of 14.5x last twelve months BCF and 13.3x BCF as projected one year forward. Based on this analysis, Allen & Co. calculated a median enterprise value of $[578]574 million for the Debtors. Though it performed these analyses, Allen & Co. did not attribute significant weight to them. Allen & Co. indicated to the Creditors' Committee its belief that the values yielded from the precedent transactions analysis should not be relied upon.

Allen & Co. believes that the majority of comparable precedent transactions had occurred prior to the recent decline in equity markets. As a result, Allen & Co. believes that the values yielded from the analysis were inappropriately high and that they did not reflect values achievable in the market today for broadcasting assets. Allen noted that because financing for broadcasting and other acquisitions had become much more difficult to arrange since mid-2008, the values of transactions occurring during a period of relative liquidity in the capital markets were not comparable to the current circumstances. This belief could be modified as circumstances in the industry and the economy change.

<u>Levered Discounted Cash Flow Analysis</u>

In reaching its view on the valuation of the Reorganized Company, Allen & Co. primarily relied upon a Levered Discounted Cash Flow Analysis ("<u>Levered DCF</u>"), which assumed operation of the Reorganized Company under the proposed capital structure outlined in the Plan, and a sale of the Reorganized Company in November 2012. A November 2012 sale date corresponds with the date that the Reorganized Company's existing debt is due. Although it is unclear when a recovery in the broadcast market and overall economy will become evident, it is assumed that by three years from now, the economic environment will have entered a period of greater normalcy in economic conditions and capital markets. In the event that the Reorganized Company is not sold upon the expiration of the reinstated debt facility, Allen & Co. believes, based on its analysis of the Debtors' Projections and the Delayed Recovery Scenario, that the Reorganized Company will have sufficient [cash]**Cash** accumulated and ongoing earnings to refinance its debt obligations at favorable terms. The range of

values assumed for the Reorganized Company in 2012 is based on a number of considerations, including Comparable Public Company trading multiples, multiples paid in Precedent Transactions, and in the case of KRON, the precedent "Stick Valuations" for similar broadcast properties. The median of BCF multiples indicated by the Precedent Transaction Analysis is 14.5x last twelve months BCF and 13.3x BCF as projected one year forward. As discussed above, given that the majority of comparable precedent transactions occurred prior to the recent decline in equity markets, Allen & Co. used a range of multiples of 7x – 11x, representing a discount to the precedent transactions to account for the more difficult current economic environment. Allen also noted that this range of multiples fell within the current range of trading multiples for Comparable Public Companies in the broadcast sector. Based on this range of multiples as applied to the Debtors' projected average 2012 / 2013 BCF, the implied enterprise value for the Reorganized Company in 2012, excluding KRON, would be $[355]**343** - $[558]**539** million.

For purposes of determining a sale value for KRON, Allen & Co. used a "Stick Valuation" based on precedent transactions involving broadcast properties in major metropolitan areas, based on transaction value per TV household. The mean value per TV household of $24.54 was applied to the KRON broadcast coverage area to determine a value of approximately $58 million for KRON in 2012.

Based on the above valuation methodologies, the total implied enterprise value of the Reorganized Company in 2012 would be $[413]**401** - $[616]**597** million. Based on the estimated outstanding debt and preferred obligations outstanding at the time of the sale, the implied common equity value of the Reorganized Company would be

$[99]**91** - $[302]**287** million.  In order to determine the present value of the equity of the Reorganized Company, Allen & Co. discounted the future equity value by a theoretical or observed discount rate determined by calculating a range of equity discount rates based on the Capital Asset Pricing Model and assuming a premium associated with small cap companies. Allen & Co.'s valuation for the Reorganized Company is based on the business plan Projections of the Reorganized Company's operating results and assumes that excess cash flow generated after required debt service obligations is accumulated on the Reorganized Company's balance sheet.  Using a discount rate range of 20% - 30%, the implied present value of the common equity of the Reorganized Company is $[45]**43** - $[175]**171** million (with a midpoint value of $[103]**100** million).

Using the above Levered DCF valuation methodology, and applying it to the Delayed Recovery Scenario, the implied future enterprise value of the company is $[343]**346** – [506]**510** million.  Based on the estimated outstanding debt and preferred obligations anticipated to be outstanding at the time of the sale, the implied future common equity value of the Reorganized Company would be $12 - $[175]**177** million. Using a discount rate of 20% - 30%, the implied present value of the common equity of the Reorganized Company is $[5]**6** - $[101]**105** million (with a midpoint value of $[53]**50** million).

This approach relies on the company's ability to project future cash flows with some degree of accuracy.  Because the Debtors' Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be

realized. Allen & Co. cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtors' Projections.  As discussed in Section IX.4, Allen & Co. also prepared a Delayed Recovery Scenario to analyze the potential impact of lower operating results on the value of the Reorganized Company.  The results of this analysis are discussed above.

## XI.
## RISK FACTORS

A.  Business Related Risks.

1.  Projected Financial Information.  The Projections annexed as Exhibit 4 to this Disclosure Statement are dependent upon the successful implementation of the business plan and the validity of the other assumptions contained therein.  These projections reflect numerous assumptions, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, certain assumptions with respect to competitors of the Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors.  In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtors.  Although the Creditors' Committee believes that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

B.  Certain Bankruptcy Related Considerations.

1.  Risk of Non-Confirmation of the Plan.  Although the Creditors' Committee believes that the Plan satisfies all of the requirements for [confirmation]**Confirmation** by the Bankruptcy Court, there can be no assurance that the

Bankruptcy Court will reach the same conclusion or that interested parties will not object to the Plan, thereby delaying or preventing [~~confirmation~~]**Confirmation**.  Moreover, there can be no assurance that modifications to the Plan will not be required for [~~confirmation~~]**Confirmation** or that such modifications would not necessitate the resolicitation of votes to accept the Plan, as modified.

Furthermore, even if the requisite acceptances of the Plan are received, the Bankruptcy Court may not confirm the plan as proposed. A dissenting Holder of a claim against the Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code.  And, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm a proposed plan if it found that any of the statutory requirements for [~~confirmation~~]**Confirmation** had not been met.

Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting [~~classes~~]**Classes**, (b) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization and (c) the value of distributions to nonaccepting Holders of Claims within a particular [~~class~~]**Class** under the plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by the Bankruptcy Court.  If the Plan is not confirmed by the Bankruptcy

Court, the Debtors' Plan would likely be confirmed. Section IV.B of the Debtors' Disclosure Statement contains a full discussion of stakeholder recoveries under the Debtors' Plan.

        2.      <u>Risk of Non-Occurrence of the Effective Date</u>. Operating in bankruptcy imposes significant risks on the Debtors' operations. Although the Creditors' Committee believes that the Effective Date will occur on or about [~~December 31, 2009,~~]**February 28, 2010,** there can be no assurance as to such timing or that the conditions to the Effective Date contained in the Plan will ever occur.

        3.      <u>Reinstatement</u>. The Creditors' Committee will seek under the Plan to reinstate and render unimpaired the Prepetition Lender Claims pursuant to section 1124 of the Bankruptcy Code. The Prepetition Lenders, the Prepetition Agent and/or other interested parties may challenge reinstatement and unimpairment on allegations that existence of certain defaults and events of default under the Credit Agreement prevent reinstatement of the claims arising under it. Because the Plan is contingent on reinstatement and unimpairment, failure to reinstate the Credit Agreement would require revision or abandonment of this Plan. Moreover, if reinstatement and unimpairment does not occur and current capital market conditions persist, the Debtors may not be able to secure adequate new financing and the cost of any such new financing would likely be materially higher.

        4.      <u>Competition in the Broadcast Industry</u>. The Debtors experience competition from numerous types of broadcasting service providers. *See* Debtors' Disclosure Statement § II.A.4. Accordingly, there can be no assurance that the Debtors will be able to compete successfully against other providers of such services, or that the

Debtors will be able to achieve profitability from such services in future years. In addition, the broadcasting industry in general is subject to rapid and significant changes in technology. These changes may increase competitive pressures on the Reorganized Debtors or require capital investments by the Reorganized Debtors in excess of its available resources. Because of the rapid and high level of technological change in the industry, the effect on the businesses of the Reorganized Debtors cannot be predicted with any certainty.

C.      Government Regulation.

The broadcasting industry is extensively regulated by the FCC. *See* Debtors' Disclosure Statement § I.K. There can be no assurance the FCC will renew, or permit the transfer or assignment of, the Debtors' broadcast licenses. Moreover, because of the transfers or assignments of broadcast licenses under the Plan, the FCC must approve any such transfer or assignment. A loss of the Debtors' broadcast licenses, or the failure of the FCC to approve the transfer or assignment of licenses pursuant to the Plan, would have a material adverse effect on the Debtors.

D.      Reliance on Key Personnel.

One of the Debtors' primary assets is their highly skilled professionals, who have the ability to pursue other employment opportunities and deprive the Debtors of the skill and knowledge essential for performance of new and existing contracts. A loss of a significant number of key professionals could have a material adverse effect on the Debtors. The Debtors' successful transition through the restructuring process is dependent in part on their ability to retain and motivate their officers and key employees. There can be no assurance that the Debtors will be able to retain and employ qualified management and technical personnel.

E.     Liquidity and Capital Resources.

Prior to the Petition Date, the Debtors incurred significant operating losses.  *See* Debtors' Disclosure Statement § III.A.   The Creditors' Committee believes that the Debtors' [~~cash~~]**Cash**, short-term investments, and the equity contribution contemplated by the Plan should enable the Reorganized Debtors to fund operations.  There can be no assurance, however, that the Reorganized Debtors will achieve or sustain profitability or positive cash flow in the future.

F.     Preferred Stock Dividends.

In the case of a distribution of additional shares of New Preferred Stock by the Reorganized Company in respect of the New Preferred Stock, the amount includable in gross income by a holder will be the fair market value of the additional New Preferred Stock on the date that the distribution is made.  Accordingly, holders of New Preferred Stock will be required to include amounts in gross income for U.S. federal income tax purposes in advance of the receipt of [~~cash~~]**Cash**.  In addition, if New Preferred Stock is issued with an "issue price" (that is, fair market value) that is less than its liquidation preference, a holder may be required to include such difference in income as dividend income over the term of the New Preferred Stock.  **No distribution of Preferred Stock dividends shall be made where prohibited by the Credit Agreement.**

## XII.
## CERTAIN UNITED STATES FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

**IRS Circular 230 disclosure**: To ensure compliance with requirements imposed by the IRS, you are hereby notified that: (a) any discussion of U.S. federal tax issues in this document is not intended or written by us to be relied upon, and cannot be relied upon by holders of Claims ("Holders"), for the purpose of avoiding penalties that may be imposed on such Holders under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) each Holder should seek advice based on its particular circumstances from an independent tax advisor.

The following is a summary of the anticipated material federal income tax consequences of the implementation of the Plan to the Debtors and certain Class 6 holders of Noteholder Claims (defined for purpose of this Section XII as "Noteholders") and Class 7 holders of General Unsecured Claims (defined for purpose of this Section XII as "Unsecured Claimholders"). Collectively, the Noteholders and the Unsecured Claimholders are defined for the purpose of this Section XII as "Creditors."

A.     Scope of This Summary

This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), final and temporary Treasury Regulations promulgated thereunder, administrative pronouncements or practices, and judicial decisions, all in effect as of the date hereof. Future legislative, judicial, or administrative modifications, revocations, or interpretations, which may or may not be retroactive, may result in federal income tax consequences significantly different from those discussed herein. This summary is not binding on the Internal Revenue Service (the "IRS") or the U.S. courts, and no assurance can be given that the conclusions reached in this summary will not be challenged by the IRS or will be sustained by a U.S. court if so challenged. In addition, the Debtors have not requested, and do not intend to request, a ruling from the IRS regarding any of the federal income tax consequences of the implementation of the Plan to the Debtors or Creditors.

This summary does not address the federal income tax consequences to certain categories of Creditors subject to special rules, including Creditors that are (a) banks, financial institutions, or insurance companies, (b) regulated investment companies, mutual funds, or small business investment companies, (c) brokers or dealers

in securities, (d) tax-exempt organizations, (e) investors in pass-through entities, and (f) foreign taxpayers.  Furthermore, this summary is limited to U.S. federal income tax consequences and does not discuss state, local or foreign tax consequences.

This summary is for general information purposes only and does not purport to be a complete analysis or listing of all potential federal income tax consequences that may apply to the Debtors and Creditors as a result of the implementation of the Plan.  In addition, this summary does not take into account the individual facts and circumstances of any particular Creditor that may affect the federal income tax consequences to such Creditor of the implementation of the Plan. Accordingly, this summary is not intended to be, and should not be construed as, legal or federal income tax advice with respect to any Creditor.  Each Creditor should consult its own tax advisor regarding the federal, state, local, and foreign tax consequences of the Plan.

B.   Consequences to the Debtors

It is not expected that the implementation of the Plan will create a federal tax liability or a tax refund for the Debtors.

1.   Satisfaction of Claims

Pursuant to the Plan, the Debtors will pay an amount of Cash in satisfaction of the Claims of the Unsecured Claimholders that is less than the full amount of such Claims.  As a result, the Debtors would realize cancellation of indebtedness income ("COD Income"), or in certain circumstances, loss deductions for federal income tax purposes.  Similarly, the anticipated exchange of Noteholder Claims for Class A New Common Stock would also give rise to COD Income for the Debtors.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness

satisfied, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of [~~cash~~]**Cash** paid and the fair market value of any other consideration (including stock of the Debtor) given in satisfaction of such indebtedness at the time of the exchange.

COD Income is generally included in gross income. However, section 108 of the Tax Code permits a debtor to exclude COD Income from its gross income if the debtor is in bankruptcy. The consequence of the COD exclusion is reduction of the Debtors' tax attributes to the extent of the COD Income, generally in the following order: NOLs, the general business credit, the minimum tax credit, capital loss carryovers, basis, passive activity loss and credit carryovers, and foreign tax credit carryovers. Attribute reduction is calculated after income for the year that cancellation is determined, so that NOLs are generally available to offset non-COD Income for such year, subject to any applicable limitation under [~~Section~~]**section** 382 of the Tax Code. After the reduction, any remaining NOL carryforwards are fully deductible against post-reorganization income of the new loss corporation, also subject to any applicable limitation under [~~Section~~]**section** 382 of the Tax Code. [~~As a result of attribute reduction, the Debtors expect that substantially all of their NOLs will be eliminated~~]**Although dependent upon the facts at the time the Plan is Consummated, it is currently expected that a portion of the Debtors' NOL carryforwards will be available for use** after the tax year [~~2009.~~]**2009, subject to the applicable limitations under section 382 of the Tax Code.**

    2.    <u>Issuance of Rights, Class A New Common Stock and New Preferred Stock</u>

In general, for federal income tax purposes, a corporation does not recognize gain or loss on the receipt of [cash]Cash or other property in exchange for its own stock.  Therefore, the issuance of Rights and shares of Class A New Common Stock and New Preferred Stock pursuant to the Plan should not be a taxable event.

3.        [NOL Carryforward and Net Unrealized Built-in Loss]Section 382 Limitation

Generally, section 382 of the Tax Code imposes an annual limitation on a corporation's utilization of its pre-change NOL carryforwards and its net unrealized built-in loss ("NUBIL") in a post-change taxable period following an "ownership change" (a "Section 382 Ownership Change").  On the Effective Date, the Creditors' Committee expects that consummation of the Rights Offering will result in a Section 382 Ownership Change.

When the limitation under section 382 (the "Section 382 Limitation") applies as a result of an ownership change occurring in a bankruptcy proceeding, the taxpayer can offset taxable income in taxable years or portions thereof following the Section 382 Ownership Change by an amount of NOLs generally equal to the product of (i) the applicable federal long-term tax-exempt rate in effect on the date of the ownership change and the lesser of (i) the aggregate value of the Debtors' stock immediately after the ownership change and (ii) the value of the Debtors' assets immediately before the ownership change (determined without regard to the Debtors' liabilities).  The annual limitation is, in general, prorated to account for the period following an ownership change that is less than a full taxable year.

[As noted above, it is expected that the NOL carryforwards of the Debtors will be eliminated as a result of the consummation of the Plan.  The annual limitation, however, will apply to certain losses following the Section 382 Ownership Change if]**If a loss corporation has a net unrealized built-in gain ("NUBIG") of more than a *de minimus* amount on the change date and later recognizes all or a portion of such built-in gain during a specified recognition period, the Section 382 Limitation may be increased.  In general, a NUBIG exists if the fair market value of the assets of the loss corporation exceeds the aggregate adjusted tax basis of such assets.  Such corporation can use NOL carryforwards in excess of the Section 382 Limitation in the five years following the ownership change (the "Recognition Period") to the extent of the corporation's recognized built-in gains for the taxable year.  If, instead,** a NUBIL exists as a result of the Section 382 Ownership Change**, recognized built-in loss of any recognition period taxable year is treated as a pre-change loss by the new loss corporation**.   In general, a NUBIL exists if the adjusted tax basis of the assets of the loss corporation exceeds the fair market value of such assets by more than a *de minimis* amount on the change date. Generally, use of a NUBIL is subject to the same limitations applicable to NOL carryforwards to the extent such built-in loss is "recognized" during the [five-year period following the ownership change pursuant to Section 382(h)(1)(B) (the "]Recognition Period["].  Recognized built-in loss ("RBIL") is the measure of NUBIL that is recognized during the Recognition Period.  A portion of post-change deductions**,** such as depreciation and amortization**, as well as post-change basis recovery,** are treated as RBIL to the extent they represent the excess of the adjusted tax basis of such asset over the fair market value of an asset on the change date.  Depending

on the value of the Debtors' assets **on the Effective Date of the Plan**, the Debtors could be in [a]**either a NUBIG or** NUBIL position following the reorganization[~~and the use of a portion of the Debtors' tax basis in their assets would be subject to the Section 382 Limitation~~].  The existence of a **NUBIG or** NUBIL is ultimately a question of fact and depends on the actual value of the assets of the Debtors at the time of the ownership change and their actual adjusted tax basis at such date.

        *Unused Limitation Carryforward.*  Any unused annual limitation may be carried forward on a cumulative basis for the twenty-year period following the ownership change.

        *Chapter 11 Exception.*  Pursuant to the title 11 exception to the Section 382 Limitation provided in section 382(l)(5) of the Tax Code (the "Bankruptcy Exception"), the Section 382 Limitation does not apply to an ownership change in a chapter 11 case if qualifying shareholders and creditors of the loss corporation (determined immediately before the ownership change) receive stock of the reorganized corporation which represents at least 50% of the total voting power and value of the corporation's stock (determined immediately after the ownership change).  For this purpose, stock transferred to creditors will be taken into account only to the extent such stock is transferred in satisfaction of indebtedness and only if (i) such indebtedness was held by the creditor at least 18 months before the filing of the chapter 11 case, or (ii) such indebtedness arose in the ordinary course of the Debtors' trade or business and is held by the creditor who at all times held the beneficial interest in such indebtedness.  Because the ownership change is expected to occur as a result of the Rights Offering, the Bankruptcy Exception is not expected to apply.

C.      Consequences to Noteholders

Pursuant to the Plan, Noteholders will have the right to participate in the Rights Offering described in Article VI of the Plan.

1.      Rights Offering

*Receipt of Subscription Rights.*  A Noteholder will generally recognize income on the receipt of a subscription right in the Rights Offering to the extent of the fair market value, if any, of the right received.  A Noteholder will have basis in the subscription right received equal to the fair market value, if any, of the subscription right.

*Exercise of Subscription Rights.*  A Noteholder will not recognize gain or loss on exercise of a subscription right received in the Rights Offering.  The Noteholder's tax basis in the New Preferred Stock and New Common Stock acquired through exercise of a right will equal the exercise price for the right.  The holding period for the New Preferred Stock and New Common Stock acquired through exercise of a right will begin on the exercise date.

*Expiration of Subscription Rights.*  Generally if the holder of a right to purchase stock allows such right to expire unexercised, the holder would recognize a capital loss in an amount equal to the holders adjusted tax basis in such right.

Noteholders may not sell or otherwise dispose of a subscription right except by exercising such right or allowing such right to expire.

2.      Exchange of Noteholder Claims for Class A New Common Stock

The federal income tax consequences of the Plan to a Noteholder depend upon, among other things, whether a Noteholder's Claim being exchanged constitutes a "security" for federal income tax purposes (a "Tax Security").  The term "security" is not defined in the Tax Code but is generally understood to include rights to purchase stock

and debt instruments with a maturity more than 10 years from the date of issuance, although the determination whether a particular claim or debt constitutes a Tax Security depends upon an overall evaluation of the nature of the claim or debt.  In some circumstances, an instrument with an original term of 5 years or less may qualify.

The Tax Code's corporate reorganization provisions generally provide that a holder recognizes no gain or loss upon exchanging an issuer's Tax Securities for stock or other Tax Securities of such issuer (except that consideration received for a claim for accrued but unpaid interest must be included as current income).  By contrast, a holder will recognize gain upon exchanging (i) an issuer's obligations that are not Tax Securities for Tax Securities of such issuer, or (ii) an issuer's Tax Securities for obligations of such issuer that are not Tax Securities.  To the extent a Claim holder's receipt of the Class A New Common Stock is attributable to accrued interest, the exchanging holder will recognize current income.

*Claims and Consideration Constituting Tax Securities*.  We have assumed that the Reorganized Company will take the position that the receipt of Class A New Common Stock in respect of Noteholder Claims pursuant to the Plan should generally be treated as a "reorganization" for United States federal income tax purposes.  Accordingly, a Noteholder that receives Class A New Common Stock in satisfaction of a Noteholder Claim will generally not recognize any gain, and not be permitted to recognize any loss realized in such exchange (except to the extent of any Class A New Common Stock allocable to accrued interest) and will have a holding period for the Class A New Common Stock that includes the holding period of the Notes.  Such a Noteholder's aggregate tax basis in the Class A New Common Stock received in the exchange should

be the same as the aggregate tax basis of such Noteholder's Notes surrendered in exchange therefor.

*Claims Not Constituting Tax Securities.* If, contrary to the above assumption, the exchange of Class A New Common Stock for the Noteholder Claims pursuant to the Plan were not treated as a reorganization, then such exchange would be treated as a taxable transaction for United States federal income tax purposes. As a result, a Noteholder would generally recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (a) such Noteholder's adjusted tax basis in the Notes and (b) the fair market value of the Class A New Common Stock received in exchange therefor. Subject to the discussion of market discount in Section E, any such gain or loss would be long-term capital gain or loss if the Noteholder's holding period for its Notes is more than one year as of the date of the exchange. Long-term capital gains are subject to tax at reduced rates for non-corporate taxpayers. The deductibility of capital loss may be subject to limitations. A holder's aggregate tax basis in the Class A New Common Stock received in exchange for its Notes would generally be equal to the aggregate fair market value of such Class A New Common Stock on the Effective Date. The holding period for the Class A New Common Stock received pursuant to the Plan would begin on the day after the Effective Date.

D.    <u>Consequences to Unsecured Claimholders</u>

Pursuant to the Plan, the Unsecured Claimholders will receive a one-time Cash distribution equal to the lesser of **(i)** their *pro rata* share of $1,000,000 or [a one-time Cash distribution equal to]**(ii)** 10% of the amount of their Allowed Class 7 Claims in full satisfaction and discharge of their Allowed Class 7 Claims.

In general, each Unsecured Claimholder will recognize gain or loss in an amount equal to the difference between (a) the amount of any [cash]**Cash** received by such Unsecured Claimholder in satisfaction of such Claim (other than any Claim for accrued but unpaid interest) and (b) the Unsecured Claimholder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). Where gain or loss is recognized by an Unsecured Claimholder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Unsecured Claimholder, whether the Claim constitutes a capital asset in the hands of the Unsecured Claimholder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the Unsecured Claimholder had previously claimed a bad debt deduction.

To the extent that any amount received by an Unsecured Claimholder is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Unsecured Claimholder as interest income (to the extent not previously included in the Unsecured Claimholder's gross income).

E.    <u>Market Discount</u>

The market discount provisions of the Tax Code may apply to Creditors. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount. A holder

should not be required to recognize any accrued but unrecognized market discount upon the disposition of its Notes for Class A New Common Stock pursuant to the Plan if such disposition is treated as a recapitalization for United States federal income tax purposes. However, any accrued but unrecognized market discount will be treated as accrued market discount with respect the Class A New Common Stock (the "exchanged basis property") and such accrued but unrecognized market discount may be recognized as ordinary income upon the disposition of the holder's Class A New Common Stock. Thus, upon a taxable disposition of Class A New Common Stock a portion of the capital gain will be converted into ordinary income due to the market discount rules. Further, if the exchange of Notes for Class A New Common Stock was treated as a taxable transaction for United Stated federal income tax purposes, a holder would be required to recognize accrued but unrecognized market discount as ordinary income upon the disposition of its Notes.

F.     Ownership of Class A New Common Stock and New Preferred Stock

*Dividends.*  The gross amount of any distribution made in respect of Class A New Common Stock or New Preferred Stock by the Reorganized Company will generally be subject to United States federal income tax as dividend income to the extent paid out of the Reorganized Company's current or accumulated earnings and profits, as determined under U.S. federal income tax principles.  Such amount will be includable in gross income by a Noteholder as ordinary income on the date that the Noteholder actually or constructively receives the distribution in accordance with the Noteholder's regular method of accounting for U.S. federal income tax purposes.  In the case of a distribution of additional shares of New Preferred Stock by the Reorganized Company in respect of the New Preferred Stock, the amount includable in gross income by a holder will be the

fair market value of the additional New Preferred Stock on the date that the distribution is made.  Accordingly, holders of New Preferred Stock will be required to include amounts in gross income for U.S. federal income tax purposes in advance of the receipt of [~~cash~~]**Cash**.  The initial tax basis of any New Preferred Stock that is distributed will equal its fair market value on the date of distribution, and the holding period of any such New Preferred Stock will begin on the day after the date of distribution.  If New Preferred Stock is issued with an "issue price" (that is, fair market value) that is less than its liquidation preference, a holder may be required to include such difference in income as dividend income over the term of the New Preferred Stock.

A distribution which is treated as a dividend for United States federal income tax purposes may qualify for the 70% dividends-received deduction if such amount is distributed to a holder that is a corporation and certain holding period and taxable income requirements are satisfied.  Any dividend received by a holder that is a corporation may be subject to the "extraordinary dividend" provisions of the Tax Code. Distributions in excess of current and accumulated earnings and profits will be treated as a non-taxable return of capital to the extent of the Noteholder's basis in the Class A New Common Stock or New Preferred Stock and thereafter as capital gain, which will be treated as long-term capital gain if such holder's holding period in its Class A New Common Stock or New Preferred Stock exceeds one year as of the date of the distribution.  Dividends paid by the Reorganized Company will be eligible for the dividends received deduction allowed to corporations.  Dividends received by non-corporate holders in taxable years beginning before January 1, 2011 may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

Noteholders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any distribution received from the Company.

        *Sale or Other Dispositions.* Generally a holder of stock will recognize gain or loss upon the taxable sale, exchange or other disposition of stock in an amount equal to the difference between the holder's adjusted tax basis in the stock and the sum of the [cash]**Cash** plus the fair market value of any property received from such disposition. Generally such gain or loss will be capital gain or loss and will be long-term capital gain or loss if, on the date of the taxable sale, exchange or other disposition, the holder has held the stock for more than one year. Any gain recognized by a Noteholder upon a subsequent taxable disposition of Class A New Common Stock received pursuant to the Plan in satisfaction of a Claim (or any stock or other property received for them in a later tax-free exchange) may be treated as ordinary income to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) previously claimed with respect to its Claim and any ordinary loss deduction incurred upon satisfaction of its Claim, less any income (other than interest income) recognized by the holder upon satisfaction of its Claim, (ii) with respect to a cash-basis holder, any amounts that would have been included in its gross income if the holder's Claim had been satisfied in full but were not included by reason of the [cash]**Cash** method of accounting, and (iii) any accrued market discount that is assigned to the Class A New Common Stock, as discussed in Section E. Market Discount, above.

    G.    <u>Information Reporting; Backup Withholding Tax</u>

        Distributions made pursuant to the Plan will generally be subject to applicable federal income tax information reporting and withholding. The Tax Code imposes backup withholding tax on certain payments, including payments of interest and

dividends, if a taxpayer (a) fails to furnish its correct taxpayer identification number (generally on Form W-9), (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has previously failed to report properly items subject to backup withholding tax, or (d) fails to certify, under penalty of perjury, that such taxpayer has furnished its correct taxpayer identification number and that the IRS has not notified such taxpayer that it is subject to backup withholding tax. However, taxpayers that are corporations generally are excluded from these information reporting and backup withholding tax rules. Backup withholding is not an additional federal income tax. Any amounts withheld under the backup withholding tax rules will be allowed as a credit against a taxpayer's federal income tax liability, if any, or will be refunded to the extent it exceeds such liability, if such taxpayer furnishes required information to the IRS. A taxpayer that does not provide a correct taxpayer identification number may be subject to penalties imposed by the IRS. Each taxpayer should consult its own tax advisor regarding the information reporting and backup withholding tax rules.

# XIII.
## CONCLUSION

The Creditors' Committee believes that the Plan provides the best

available recovery to its stakeholders and should be confirmed.


Dated: [October 9,]**November 4,** 2009
    New York, New York

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:    /s/   Andrew N. Rosenberg      
                (A Member of the Firm)

Andrew N. Rosenberg (arosenberg@paulweiss.com)
Jeffrey D. Saferstein (jsaferstein@paulweiss.com)
Jonathan T. Koevary (jkoevary@paulweiss.com)
Samantha G. Amdursky (samdursky@paulweiss.com)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:   (212) 757-3990

Counsel for the Official Committee of Unsecured Creditors

Document comparison by Workshare Professional on Wednesday, November 04, 2009 11:20:45 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://US/US1/5785004/1 |
| Description | #5785004v1<US1> - Young Supplemental Disclosure Statement Filed 10/9/2009 |
| Document 2 ID | interwovenSite://US/US1/5785004/7 |
| Description | #5785004v7<US1> - Young Supplemental Disclosure Statement Filed 10/9/2009 |
| Rendering set | pw standard colors |

| Legend: | |
|---|---|
| **<u>Insertion</u>** | |
| [~~Deletion~~] | |
| ~~Moved from~~ | |
| <u>Moved to</u> | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 319 |
| Deletions | 289 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 608 |