PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Andrew N. Rosenberg
Jeffrey D. Saferstein
Jonathan T. Koevary
Samantha G. Amdursky
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| In re | Chapter 11 |
| YOUNG BROADCASTING INC., et al., | Case No. 09-10645 (AJG) (Jointly Administered) |
| Debtors. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAN SUPPLEMENT TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

THE DOCUMENTS CONTAINED IN THIS SUPPLEMENT TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' AMENDED JOINT PLAN OF REORGANIZATION ARE DRAFTS AND REMAIN SUBJECT TO CHANGE. ALL RIGHTS ARE RESERVED TO AMEND, SUPPLEMENT OR OTHERWISE MODIFY THIS PLAN SUPPLEMENT PRIOR TO THE CONFIRMATION HEARING.

This is the Plan Supplement filed in support of the Official Committee of Unsecured Creditors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated November 4, 2009 (as amended, supplemented or modified from time to time, the "Plan"). The hearing to consider confirmation of the Plan is scheduled for December 21, 2009 at 10:00 a.m. (Prevailing Eastern Time).

Dated: December 7, 2009
      New York, New York

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:   /s/  Andrew N. Rosenberg
        (A Member of the Firm)

    Andrew N. Rosenberg (arosenberg@paulweiss.com)
    Jeffrey D. Saferstein (jsaferstein@paulweiss.com)
    Jonathan T. Koevary (jkoevary@paulweiss.com)
    Samantha G. Amdursky (samdursky@paulweiss.com)
    1285 Avenue of the Americas
    New York, New York 10019-6064
    Telephone: (212) 373-3000
    Facsimile: (212) 757-3990

Counsel for the Official Committee of Unsecured Creditors

# PLAN SUPPLEMENT

1.  Amended and Restated Certificate of Incorporation of Young Broadcasting Inc.

2.  Fourth Amended and Restated By-Laws of Young Broadcasting Inc.

3.  Notice Setting Forth the Identities and Terms and Nature of the Compensation of the Reorganized Company's Senior Officers and Directors

4.  Form of Employment Agreements for Officers

5.  Form of Management and Director Equity Incentive Plan

**EXHIBIT 1**

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## YOUNG BROADCASTING INC.

1.      The name of the Corporation is Young Broadcasting Inc.

2.      The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, DE, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3.      The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

4.      (a)      The total number of shares of stock which the Corporation shall have authority to issue is eleven million, forty-five thousand, six hundred (11,045,600) shares, of which eleven million (11,000,000) shall be shares of Common Stock, $0.01 par value, and forty-five thousand, six hundred (45,600) shall be shares of Preferred Stock, $0.01 par value.

(b)      The rights, preferences, privileges and restrictions granted to and imposed upon the Common Stock are as follows:

(i)      _Designation_.  Except as set forth herein, ten million (10,000,000) shares of the Common Stock shall be designated "Class A Common Stock" (hereinafter called "Class A Common"); one million (1,000,000) shares of the Common Stock shall be designated "Class B Common Stock" (hereinafter called "Class B Common").  Each share of Common Stock shall be identical in all respects with each other share of Common Stock, except as otherwise provided herein.

(ii)      _Voting Rights_.

(A)      _Class A Common_.  Except as set forth herein or as otherwise required by law, each outstanding share of Class A Common shall be entitled to vote on each matter on which the stockholders of the Corporation shall be entitled to vote, and each holder of Class A Common shall be entitled to one (1) vote for each share of such stock held by such holder.  Notwithstanding the foregoing, each holder of Class A Common shall be entitled to twenty (20) votes for each share of such stock held by such holder in the election of Class A Directors (as defined in the Fourth Amended and Restated By-Laws of the Corporation).

(B)      _Class B Common_.  Except as set forth herein or as otherwise required by law, each outstanding share of Class B Common shall be entitled to vote only in the election of directors of the Corporation and in matters affecting the rights, powers and preferences of Class B Common, and each holder of Class B Common shall be entitled to

1

one (1) vote for each share of such stock held by such holder. Notwithstanding the foregoing, each holder of Class B Common shall be entitled to one thousand (1000) votes for each share of such stock held by such holder in the election of Class B Directors (as defined in the Fourth Amended and Restated By-Laws of the Corporation).

(C)  *Class Voting.*  On any matter on which the holders of shares of Class A Common and the holders of shares of Class B Common are entitled to vote, except as otherwise required by law, all classes of Common Stock entitled to vote together as a single class.  Notwithstanding the foregoing, in matters affecting the rights, powers and preferences of Class B Common, the holders of Class A Common and the holders of Class B Common shall vote as separate classes and not jointly on each such matter, and the vote required to approve each such matter is the affirmative vote of the holders of a majority of the outstanding shares of the Class A Common and the holders of a majority of the outstanding shares of the Class B Common, each voting as a separate class and not jointly.

(iii)  <u>Dividends</u>.  The Board of Directors of the Corporation may cause dividends to be paid to holders of shares of Common Stock out of funds legally available for the payment of dividends.  Except as otherwise provided in Section 4(c), any dividend or distribution on the Common Stock shall be payable on shares of Class A Common and Class B Common share and share alike to the exclusion of the holders of shares of Preferred Stock of any and all series; provided that in the case of dividends payable in shares of Common Stock of the Corporation, or options, warrants or rights to acquire shares of such Common Stock or securities convertible into or exchangeable for shares of such Common Stock, the shares, options, warrants, rights or securities so payable shall be payable in shares of, or options, warrants or rights to acquire or securities convertible into or exchangeable for, Common Stock of the same class upon which the dividend or distribution is being paid.

(iv)  <u>Liquidation Rights</u>.  In the event of any dissolution, liquidation or winding up of the affairs of the Corporation, distributions will be made to holders of the Common Stock pursuant to Section 4(c)(iii)(B).

(v)  <u>Preemptive Rights</u>.  No holder of Common Stock of the Corporation of any class shall be entitled as of right to subscribe for or receive any part of the authorized stock of the Corporation or any part of any new, additional or increased issue of stock of any class or of any obligations convertible into any class or classes of stock, but the Board of Directors may, without offering any such shares of stock or obligations convertible into stock to stockholders of any class, issue and sell or dispose of the same to such persons and for such considerations permitted by law as it may from time to time in its absolute discretion determine.

Doc# US1 5831764v5

(vi)   Conversion.

(A)   *Conversion of Class B Common.*  Shares of Class B Common from time to time outstanding shall automatically convert into Class A New Common Stock (the "Class B Conversion") upon the earlier of (i) an amendment to the Credit Agreement that no longer requires that (a) Vincent Young and certain other persons described in Section 6.01(j) of the Credit Agreement hold, in the aggregate, record and beneficial title to at least 40% (by number of votes) of the Voting Stock of the Corporation, or (b) if any "person" or "group", other than Permitted Holders (as defined in the Credit Agreement), is or becomes the "beneficial owner", directly or indirectly, of more than 30% (by number of votes) of the total outstanding Common Stock of the Corporation. Permitted Holders must (1) "beneficially own" a higher percentage of such Voting Stock than such other person or group or (2) have the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the board of directors of the Corporation.

(B)   *Conversion Procedure.*  In the event of the automatic conversion of shares of Class B Common into shares of Class A Common, the holders of such shares shall surrender the certificate or certificates representing the shares of Class B Common at the principal office of the Corporation (or such other office or agency of the Corporation as the Corporation may designate by written notice to the holders of Common Stock) at any time during its usual business hours, together with a written notice stating the name or names (with addresses) and denominations in which the certificate or certificates for converted shares of Class A Common are to be issued and shall include instructions for the delivery thereof; provided, however, that, notwithstanding that any certificate for Class B Common shall not have been surrendered for cancellation, all such shares of Class B Common shall no longer be deemed outstanding on and after the effective date of conversion as set forth in subparagraph (vi)(A) or (vi)(B), as the case may be, and all rights with respect to such Class B Common shall forthwith on the effective date of such transfer cease and terminate, except only the right of the holder or holders thereof to receive the same number of shares of Class A Common on the conversion thereof.  Furthermore, the Corporation shall issue shares to Persons other than those indicated on the certificate or certificates representing the shares of Class B Common only in compliance with the Securities Act of 1933, as amended, and any other applicable state or federal securities law.  Such conversion, to the extent permitted by law, shall be deemed to have been effected as of the close of business on the date on which such certificate or certificates shall have been surrendered and such notice shall have been received by the Corporation, and at such time the rights of the holder of the shares of Class B Common as such holder shall cease and the person or persons in whose name or names the certificate or certificates for the shares of Class A Common are to be

3

issued upon such conversion shall be deemed to have become the holder or holders of record of such shares of Class A Common.

(C)      *Stock Splits; Adjustments.*

(1)      If the Corporation shall in any manner subdivide (by stock split, stock dividend or otherwise) or combine (by reverse stock split or otherwise) the outstanding shares of the Class A Common or Class B Common, the outstanding shares of the other class of Common Stock shall be subdivided or combined, as the case may be, to the same extent, share and share alike, and effective provision shall be made for the protection of the conversion rights hereunder.

(2)      In case of any reorganization, reclassification or change of shares of the Common Stock (other than a change in par value or from par to no par value as a result of a subdivision or combination), or in case of any consolidation of the Corporation with one or more corporations or a merger of the Corporation with another corporation, or in the case of any sale, lease or other disposition of all or substantially all of the assets of the Corporation, each holder of a share of Common Stock, irrespective of class, shall have the right at any time thereafter, so long as the conversion right hereunder with respect to such share would exist had such event not occurred, to convert such share into the kind and amount of shares of stock and other securities and properties (including cash) receivable upon such reorganization, reclassification, change, consolidation, merger, sale, lease or other disposition by a holder of the number of shares of the class of Common Stock into which such shares of Common Stock might have been converted immediately prior to such reclassification, change, consolidation, merger, sale, lease or other disposition. In the event of such a reorganization, reclassification, change, consolidation, merger, sale, lease or other disposition, (a) the holders of outstanding shares of Class A Common and Class B Common shall be entitled to receive the same consideration, share and share alike, except for voting rights with respect to securities receivable upon such reorganization, reclassification, change, consolidation, merger, sale, lease or other disposition (in which case such voting rights may differ to the extent, and only to the extent, that the voting rights with the shares of Class A Common and Class B Common differ as provided herein), and (b) effective provision shall be made in the certificate of incorporation of the resulting or surviving corporation or otherwise for the protection of the conversion rights of the shares of Common Stock of each class that shall be applicable, as nearly as reasonably may be, to any such other shares of stock and other securities and property deliverable upon conversion of shares of Common Stock into which such Common Stock might have been converted immediately prior to such event.

4

(D) *Reservation of Shares*. The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common or its treasury shares, solely for the purpose of issuance upon the conversion of shares of Class B Common, such number of shares of such class as are then issuable upon the conversion of all outstanding shares of Class B Common.

(E) *No Charge*. The issuance of certificates for shares of any class of Common Stock upon conversion of shares of any other class of Common Stock shall be made without charge to the holders of such shares for any issuance tax in respect thereof or other cost incurred by the Corporation in connection with such conversion and the related issuance of shares of Common Stock; provided, however, that the Corporation shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than that of the holder of the Common Stock converted and no such issuance and delivery shall be made unless and until the person requesting such issuance has paid to the Corporation the amount of any such tax or has established to the satisfaction of the Corporation that such tax has been paid.

(c)     The rights, preferences, privileges and restrictions granted to and imposed upon the Preferred Stock are as follows:

(i)     Designation. Forty-five thousand and six hundred (45,600) shares of the authorized and unissued Preferred Stock of the Corporation are hereby designated "Series A Preferred Stock" with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations.

(ii)     Dividends.

(A)     The record holders of Series A Preferred Stock on each PIK Record Date shall receive on each PIK Dividend Payment Date during the PIK Dividend Payment Period per share dividends in additional fully paid and nonassessable shares of Series A Preferred Stock legally available for such purpose (such dividends being herein called "PIK Dividends"). PIK Dividends shall be paid by delivering to the record holders of Series A Preferred Stock a number of shares of Series A Preferred Stock equal to (i) the number of shares of Series A Preferred Stock held by such holder on the applicable PIK Record Date, multiplied by (ii) twenty-five percent (25%) of the Annual Per Share PIK Dividend Amount. Any additional shares of Series A Preferred Stock issued pursuant to this paragraph shall be governed by this resolution and shall be subject in all respects, except as to the date of issuance and date from which PIK Dividends accrue and cumulate as set forth below, to the same terms as the shares of Series A Preferred Stock

originally issued hereunder; provided, however, in no event shall any PIK Dividends accrue prior to [_____].

(B)     Prior to each PIK Record Date immediately preceding each PIK Dividend Payment Date, the Board of Directors of the Corporation shall declare PIK Dividends on the Series A Preferred Stock in accordance with subparagraph A above, payable on the next PIK Dividend Payment Date. PIK Dividends on shares of Series A Preferred Stock shall accrue and be cumulative from the later of (i) [_____] and (ii) the date of issuance of such shares, notwithstanding the failure of the Board of Directors to declare and/or issue PIK Dividends with respect to any PIK Dividend Period. PIK Dividends shall be payable in arrears during the PIK Dividend Payment Period on each PIK Dividend Payment Date, commencing on the first PIK Dividend Payment Date subsequent to [_____], and for shares issued as PIK Dividends, commencing on the first PIK Dividend Payment Date after such shares are issued. If any PIK Dividend Payment Date occurs on a day that is not a Business Day, any accrued PIK Dividends otherwise payable on such PIK Dividend Payment Date shall be paid on the next succeeding Business Day. PIK Dividends shall be paid on each PIK Dividend Payment Date to the holders of record of the Series A Preferred Stock as their names shall appear on the share register of the Corporation on the PIK Record Date immediately preceding such PIK Dividend Payment Date. PIK Dividends on account of arrears for any past PIK Dividend Periods may be declared and paid at any time to the holders of record on the PIK Record Dates applicable to such past PIK Dividend Periods.

(C)     In addition to the PIK Dividends, the Corporation may declare, pay or set apart for payment cash and/or property to be distributed or paid as a dividend in respect of shares of Series A Preferred Stock.

(D)     So long as any shares of Series A Preferred Stock shall be outstanding, the Corporation shall not declare, pay or set apart for payment on any Common Stock any dividends or distributions whatsoever, whether in cash, property or otherwise (other than dividends payable in shares of Common Stock pursuant to Section 4(b)(vi)(C)), nor shall any Common Stock be purchased, redeemed or otherwise acquired by the Corporation or any of its subsidiaries of which it owns not less than a majority of the outstanding voting power, nor shall any monies be paid or made available for a sinking fund for the purchase or redemption of any Common Stock, without the prior written consent of the holders of at least [a majority] of the outstanding shares of Series A Preferred Stock and unless all dividends to which the holders of Series A Preferred Stock shall have been entitled for all previous PIK Dividend Periods shall have been (A) paid or (B) declared; and

(E)     In the event that full dividends, in cash or property, if declared, are not paid or made available to the holders of all outstanding shares of Series A Preferred Stock and funds or property available for payment of dividends shall be insufficient to permit payment in full to holders of all such stock of the full preferential amounts to which they are then entitled, then the entire amount available for payment of dividends shall be distributed ratably among all such holders of Series A Preferred Stock in proportion to the full amount to which they would otherwise be respectively entitled.

(F)     Notwithstanding anything contained herein to the contrary, no dividends on shares of Series A Preferred Stock shall be declared by the Board of Directors of the Corporation or paid or set apart for payment by the Corporation at such time if such declaration or payment shall be restricted by the Credit Agreement or prohibited by law.

(iii)     <u>Liquidation</u>.

(A)     <u>Preferred Stock</u>.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Series A Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders before any payment shall be made to the holders of Common Stock by reason of their ownership thereof, an amount per share equal to one thousand dollars ($1,000), plus any dividends declared but unpaid thereon (the amount payable pursuant to this sentence is hereinafter referred to as the "Series A Liquidation Amount").  If upon any such liquidation, dissolution or winding up of the Corporation, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series A Preferred Stock the full amount to which they shall be entitled under this Section 4(c)(iii), the holders of shares of Series A Preferred Stock shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

(B)     <u>Common Stock</u>.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after the payment of all preferential amounts required to be paid to the holders of shares of Series A Preferred Stock, the remaining assets of the Corporation available for distribution to its stockholders shall be distributed among the holders of shares of Common Stock, pro rata based on the number of shares held by each such holder.

(C)     Each of the following events shall be considered a "Deemed Liquidation Event" unless the holders of at least [a

majority] of the outstanding shares of Series A Preferred Stock elect otherwise by written notice sent to the Corporation at least [__] days prior to the effective date of any such event:

(1)    a merger or consolidation in which (i) the Corporation is a constituent party or (ii) a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation, except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation (provided that, for the purpose of this Section 4(c)(iii), all shares of Common Stock issuable upon exercise of Options (as defined below) outstanding immediately prior to such merger or consolidation or upon conversion of Convertible Securities (as defined below) outstanding immediately prior to such merger or consolidation shall be deemed to be outstanding immediately prior to such merger or consolidation and, if applicable, converted or exchanged in such merger or consolidation on the same terms as the actual outstanding shares of Common Stock are converted or exchanged); or

(2)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

(iv)    Voting Rights.

(A)    Except as set forth in this subsection (iv) or as otherwise required by law, each outstanding share of Series A Preferred Stock shall not be entitled to vote on each matter on which the stockholders of the Corporation shall be entitled to vote; provided, that for purposes of Sections 4(c)(iii), and at any time such holders are entitled to vote as required by law, each such holder shall be entitled to one vote per share of Series A Preferred Stock held by such holder.

8

(B)     Whenever, at any time or times, dividends payable on the shares of Series A Preferred Stock have not been paid for two or more consecutive PIK Dividend Payment Periods, the holders of the Series A Preferred Stock shall have the right to elect two directors (the "Preferred Directors") at the Issuer's next annual meeting of stockholders (or at a special meeting called for that purpose prior to such next annual meeting) and at each subsequent annual meeting of stockholders until full dividends have been paid on the Series A Preferred Stock, at which time such right shall terminate with respect to the Series A Preferred Stock, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent default of the character above mentioned; provided that it shall be a qualification for election for any Preferred Director that the election of such Preferred Director shall not cause the Issuer to violate any corporate governance requirements of any securities exchange or other trading facility on which securities of the Issuer may then be listed or traded that listed or traded companies must have a majority of independent directors. Upon any termination of the right of the holders of shares of Series A Preferred Stock to vote for directors as provided above, the Preferred Directors shall cease to be qualified as directors and the term of office of all Preferred Directors then in office shall terminate immediately. Any Preferred Director may be removed at any time, with or without cause, and any vacancy created thereby may be filled, only by the affirmative vote of the holders a majority of the shares of Series A Preferred Stock at the time outstanding voting separately as a class, to the extent the voting rights of such holders described above are then exercisable. If the office of any Preferred Director becomes vacant for any reason other than removal from office as aforesaid, the remaining Preferred Director may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred.

(v)     <u>Series A Preferred Stock Protective Provisions</u>.  The Corporation shall not, without first obtaining the affirmative vote or written consent of the holders of at least [a majority] of the outstanding shares of Series A Preferred Stock held by all holders, voting together as a separate class:

(A)     liquidate, dissolve or wind-up the business and affairs of the Corporation, effect any Deemed Liquidation Event, or consent to any of the foregoing;

(B)     amend, alter or repeal any provision of the Certificate of Incorporation or Bylaws of the Corporation in a manner that adversely affects the powers, preferences or rights of the Series A Preferred Stock;

(C)     create, or authorize the creation of, any additional class or series of capital stock unless the same ranks junior to

9

the Series A Preferred Stock with respect to the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends and rights of redemption, or increase the authorized number of shares of Series A Preferred Stock or increase the authorized number of shares of any additional class or series of capital stock unless the same ranks junior to the Series A Preferred Stock with respect to the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends and rights of redemption;

        (D)     (i) reclassify, alter or amend any existing security of the Corporation that is pari passu with the Series A Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to the Series A Preferred Stock in respect of any such right, preference or privilege, or (ii) reclassify, alter or amend any existing security of the Corporation that is junior to the Series A Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to or pari passu with the Series A Preferred Stock in respect of any such right, preference or privilege; or

        (E)     purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of capital stock of the Corporation other than (i) redemptions of or dividends or distributions on the Series A Preferred Stock as expressly authorized herein, (ii) dividends or other distributions payable on the Common Stock solely in the form of additional shares of Common Stock and (iii) repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Corporation or any subsidiary in connection with the cessation of such employment or service at the lower of the original purchase price or the then-current fair market value thereof.

    (vi)    <u>Redemption</u>.

        (A)     At any time after [_____], the Corporation may, in its sole discretion, to the extent permitted pursuant to the terms of the Credit Agreement or applicable law, redeem the then outstanding shares of Series A Preferred Stock by paying in cash therefor a sum per share equal to the Series A Liquidation Amount per share of such Series A Preferred Stock (the time of such redemption, the "Mandatory Redemption Time").

        (B)     All holders of record of shares of Series A Preferred Stock shall be sent written notice of the Mandatory Redemption

10

Time and the place designated for mandatory redemption of all such shares of Series A Preferred Stock pursuant to this subsection (vi). Such notice need not be sent in advance of the occurrence of the Mandatory Redemption Time. Upon receipt of such notice, each holder of shares of Series A Preferred Stock shall surrender his, her or its certificate or certificates for all such shares (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation at the place designated in such notice. If so required by the Corporation, certificates surrendered for redemption shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the Series A Preferred Stock redeemed pursuant to this subsection (vi), including the rights, if any, to receive notices and vote (other than as a holder of Common Stock), will terminate at the Mandatory Redemption Time (notwithstanding the failure of the holder or holders thereof to surrender the certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of their certificate or certificates (or lost certificate affidavit and agreement) therefor, to receive the cash provided for in the next sentence of this subsection (vi). As soon as practicable after the Mandatory Redemption Time and the surrender of the certificate or certificates (or lost certificate affidavit and agreement) for Series A Preferred Stock, the Corporation shall deliver to such holder, or to his, her or its nominees, cash in the amount of the product of the number of shares of Series A Preferred Stock held by such holder multiplied by the Series A Liquidation Amount.

(C)     Conversion. The holders of the Preferred Stock shall not have conversion rights.

5.     Participation of Non-Citizens. The following provisions are included for the purpose of insuring that control and management of the Corporation complies with the Communications Act:

(a)     The Corporation shall not issue to or for the account of any Alien or permit the transfer on its books of any of its capital stock if, after giving effect to such issuance or transfer, the capital stock held by or for the account of any Alien or Aliens, as determined in accordance with applicable rules and policies of the FCC, would (i) exceed, individually or in the aggregate, twenty-five percent (25%) of the Corporation's capital stock at any time outstanding or (ii) otherwise violate Section 310(b) of the Communications Act.

(b)     No Alien or Aliens shall be entitled to vote or direct or control the vote of more than twenty-five percent (25%) of the total voting power of all of

11

the shares of capital stock of the Corporation outstanding and entitled to vote at any time and from time-to-time.

(c)     No Alien shall be qualified to act as an officer of the Corporation, and no more than twenty-five percent (25%) of the total number of directors of the Corporation at any time and from time-to-time may be Aliens, if to do so would otherwise violate the Communications Act.

(d)     The Board of Directors shall have all powers necessary to administer the provisions of this Article 5 or otherwise to ensure compliance with the Communications Act.

6.     Definitions.  As used in this Restated Certificate of Incorporation, the following terms shall have the meanings shown below:

(a)     "Affiliate" shall mean, with respect to any Person, any other Person, directly or indirectly controlling, controlled by or under common control with such Person.

(b)     "Alien" or "Aliens" shall mean one or more of the following Persons: (A) a Person who is a citizen of a country other than the United States; (B) any entity organized under the laws of a government other than the government of the United States or any state, territory or possession of the United States; (C) a government other than the government of the United States or of any state, territory or possession of the United States; or (D) a representative of, or an individual or entity controlled by, any of the foregoing.

(c)     "Annual Per Share PIK Dividend Amount" shall mean a fraction of one share of Series A Preferred Stock equal to fifteen percent (15%) per annum of one share of the Series A Preferred Stock.

(d)     "Bankruptcy Code" shall mean Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on February 13, 2009.

(e)     "Communications Act" shall mean the Communications Act of 1934, and the rules, regulations and policies of the Federal Communications Commission, as amended from time-to-time.

(f)     "control" (including with correlative meaning the terms "controlling" "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or by contract or otherwise.

(g)     "Credit Agreement" shall mean that certain Fourth Amended and Restated Credit Agreement, dated May 3, 2005 (as amended by that certain First Amendment to Credit Agreement, dated May 30, 2006, and as further amended, restated, supplemented or otherwise modified from time to time), among Young

12

Broadcasting Inc., certain lenders and Wachovia Bank, National Association as Administrative Agent and Collateral Agent.

        (h)     "Person" shall mean an individual, a partnership, a corporation, a trust, a joint venture, an unincorporated organization, a government or agency thereof, or other entity.

        (i)     "PIK Dividend Payment Date" shall mean March 31, June 30, September 30, and December 31, of each year during the PIK Dividend Payment Period.

        (j)     "PIK Dividend Payment Period" shall mean the period from, and including, [_____], to and including the Redemption Date.

        (k)     "PIK Dividend Period" shall mean the period from, and including, [_____], to, but not including, the first PIK Dividend Payment Date and thereafter, each quarterly period, including any PIK Dividend Payment Date to, but not including, the next PIK Dividend Payment Date.

        (l)     "PIK Record Date" shall mean the date that is ten Business Days prior to any PIK Dividend Payment Date.

     7.     The Corporation is to have perpetual existence.

     8.     For the management of the business and for the conduct of the affairs of the Corporation, and in further definition, limitation and regulation of the powers of the Corporation and of its directors and of its stockholders or any class thereof, as the case may be, it is further provided:

        (a)     The management of the business and the conduct of the affairs of the Corporation shall be vested in its Board of Directors. The number of directors which shall constitute the whole Board of Directors shall be fixed by, or in the manner provided in, the By-Laws subject to the limitations, if any, set forth in this Restated Certificate of Incorporation, as the same may be amended from time-to-time. The phrase "whole Board" and the phrase "total number of directors" shall be deemed to have the same meaning, to wit, the total number of directors which the Corporation would have if there were no vacancies. No election of directors need be by written ballot.

        (b)     The power to adopt, amend, or repeal the By-Laws of the Corporation may be exercised by the Board of Directors of the Corporation; provided, however, that any provision for the classification of directors of the Corporation for staggered terms pursuant to the provisions of subsection (d) of Section 141 of the General Corporation Law of the State of Delaware shall be set forth in an initial By-Law or in a By-Law adopted by the stockholders entitled to vote of the Corporation unless provisions for such classification shall be set forth in this Restated Certificate of Incorporation.

        (c)     Whenever the Corporation shall be authorized to issue only one class of stock, each outstanding share shall entitle the holder thereof to notice of, and

Doc#: US1:5831764v5

the right to vote at, any meeting of stockholders. Whenever the Corporation shall be authorized to issue more than one class of stock, no outstanding share of any class of stock which is denied voting power under the provisions of this Restated Certificate of Incorporation shall entitle the holder thereof to the right to vote at any meeting of stockholders except as the provisions of paragraph (2) of subsection (b) of section 242 of the General Corporation Law of the State of Delaware shall otherwise require or as otherwise provided herein.

        9.     The personal liability of the directors of the Corporation is hereby eliminated to the fullest extent permitted by paragraph (7) of subsection (b) of Section 102 of the General Corporation Law of the State of Delaware, as the same may be amended and supplemented.

        10.    The Corporation shall, to the fullest extent permitted by Section 145 of the General Corporation Law of the State of Delaware, as the same may be amended and supplemented, indemnify any and all persons whom it shall have power to indemnify under said section from and against any and all of the expenses, liabilities or other matters referred to in or covered by said section, and the indemnification provided for herein shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any By-Law, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

        11.    Except as otherwise specifically provided in this Restated Certificate of Incorporation, from time to time any of the provisions of this Restated Certificate of Incorporation may be amended, altered or repealed, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted in the manner and at the time prescribed by said laws.

        12.    Notwithstanding any other provision herein to the contrary, the Company shall not issue non-voting equity securities; provided, however, that such prohibition on the issuance of non-voting equity securities shall have no force and effect except to the extent and for so long as section 1123 of the Bankruptcy Code is applicable to the Company.

Doc#: US1:5831764v5

# EXHIBIT 2

# FOURTH AMENDED AND RESTATED

## BY–LAWS OF

## YOUNG BROADCASTING INC.

### (As of December [__], 2009)

### ARTICLE I

### <u>Stockholders</u>

SECTION 1    <u>Annual Meeting</u>.  The annual meeting of the stockholders of the Corporation shall be held on such date, at such time and at such place within or without the State of Delaware as may be designated by the Board of Directors, for the purpose of electing Directors and for the transaction of such other business as may be properly brought before the meeting.

SECTION 2    <u>Special Meetings</u>.  Except as otherwise provided in the Certificate of Incorporation, a special meeting of the stockholders of the Corporation may be called at any time by the Board of Directors or the Chairman of the Board and shall be called by the Chairman of the Board or the Secretary at the request in writing of stockholders holding together at least twenty-five percent of the number of shares of stock outstanding and entitled to vote at such meeting.  Any special meeting of the stockholders shall be held on such date, at such time and at such place within or without the State of Delaware as the Board of Directors or the officer calling the meeting may designate.  At a special meeting of the stockholders, no business shall be transacted and no corporate action shall be taken other than that stated in the notice of the meeting unless all of the stockholders are present in person or by proxy, in which case any and all business may be transacted at the meeting even though the meeting is held without notice.  For purposes of these By-Laws, references to "shares" or to "holders of a majority of shares entitled to vote", or the like, shall mean, unless the context requires otherwise, that each share shall be counted as the number of votes to which such share is entitled in a vote of the stockholders.  For example, a share entitled to 10 votes shall be counted as 10 shares.

SECTION 3    <u>Notice of Meetings</u>.  Except as otherwise provided in these By-Laws or by law, a written notice of each meeting of the stockholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder of the Corporation entitled to vote at such meeting at his address as it appears on the records of the Corporation.  The notice shall state the place, date and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

SECTION 4    <u>Quorum</u>.  At any meeting of the stockholders, the holders of a majority in number of the total votes entitled to be cast at such meeting, present in person or represented by proxy, shall constitute a quorum of the stockholders for all

purposes, unless the representation of a larger number of votes shall be required by law, by the Certificate of Incorporation or by these By-Laws, in which case the representation of the number of votes so required shall constitute a quorum; provided that at any meeting of the stockholders at which the holders of any class of stock of the Corporation shall be entitled to vote separately as a class, the holders of a majority in number of the total outstanding shares of such class, present in person or represented by proxy, shall constitute a quorum for purposes of such class vote unless the representation of a larger number of shares of such class shall be required by law, by the Certificate of Incorporation or by these By-Laws.

SECTION 5   Adjourned Meetings.  Whether or not a quorum shall be present in person or represented at any meeting of the stockholders, the holders of a majority in number of the shares of stock of the Corporation present in person or represented by proxy and entitled to vote at such meeting may adjourn from time to time; provided, however, that if the holders of any class of stock of the Corporation are entitled to vote separately as a class upon any matter at such meeting, any adjournment of the meeting in respect of action by such class upon such matter shall be determined by the holders of a majority of the shares of such class present in person or represented by proxy and entitled to vote at such meeting.  When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the stockholders, or the holders of any class of stock entitled to vote separately as a class, as the case may be, may transact any business which might have been transacted by them at the original meeting.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting.

SECTION 6   Organization.  (a)  The Chairman of the Board, or in his absence, the President, shall call all meetings of the stockholders to order, and shall act as chairman of such meetings.  In the absence of the Chairman of the Board and the President, the holders of a majority in number of the shares of stock of the Corporation present in person or represented by proxy and entitled to vote at such meeting shall elect a chairman.

(b)   The Secretary of the Corporation shall act as Secretary of all meetings of the stockholders; but in the absence of the Secretary, the Chairman may appoint any person to act as Secretary of the meeting.  It shall be the duty of the Secretary to prepare and make, at least ten days before every meeting of stockholders, a complete list of stockholders entitled to vote at such meeting, arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or if not so specified, at the place where the meeting is to be held, for the ten (10) days next preceding the meeting, to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, and shall be produced and kept at the time

and place of the meeting during the whole time thereof and subject to the inspection of any stockholder who may be present.

SECTION 7   Voting.  (a) Each stockholder shall have the number of votes per share of capital as provided in the Certificate of Incorporation or by law for each share of the capital stock of the Corporation registered in the name of such stockholder upon the books of the Corporation.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for him by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  When directed by the presiding officer or upon the demand of any stockholder, the vote upon any matter before a meeting of stockholders shall be by ballot.  Except as otherwise provided by law or by the Certificate of Incorporation, Directors shall be elected by a plurality of the votes cast at a meeting of stockholders by the stockholders entitled to vote in the election and, whenever any corporate action, other than the election of Directors is to be taken, it shall be authorized by a majority of the votes cast at a meeting of stockholders by the stockholders entitled to vote thereon.  Where the Certificate of Incorporation provides that a class or series of stock shall be entitled to vote as a separate class or series on any particular corporate action, such corporate action shall be authorized by such class or series by a majority of the votes cast by such class or series at a meeting of the stockholders by the stockholders entitled to vote thereon.

(b)      Shares of the capital stock of the Corporation belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of Directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes.

SECTION 8   Inspectors.  When required by law or directed by the presiding officer or upon the demand of any stockholder entitled to vote, but not otherwise, the polls shall be opened and closed, the proxies and ballots shall be received and taken in charge, and all questions touching the qualification of votes, the validity of proxies and the acceptance or rejection of votes shall be decided at any meeting of the stockholders by two or more Inspectors who may be appointed by the Board of Directors before the meeting, or if not so appointed, shall be appointed by the presiding officer at the meeting.  If any person so appointed fails to appear or act, the vacancy may be filled by appointment in like manner.

SECTION 9   Consent of Stockholders in Lieu of Meeting.  Unless otherwise provided in the Certificate of Incorporation, any action required to be taken or which may be taken at any annual or special meeting of the stockholders of the Corporation, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of any such corporate action

without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

## ARTICLE II

### Board of Directors

SECTION 1    Number and Qualifications.  Except as otherwise provided in the Certificate of Incorporation, the business and affairs of the Corporation shall be managed by or under the direction of a Board of Directors.  The initial number of Directors shall be seven.  The number of Directors which shall constitute the whole Board of Directors shall be as fixed from time to time by resolution passed by a majority of the whole Board of Directors.  Directors need not be stockholders of the Corporation. Each of the Directors shall be at least eighteen years of age.  The Board shall consist of two classes of Directors (Classes A and B).  Six of the Directors shall be Class A Directors and one of the Directors shall be a Class B Director, until the occurrence of a Class B Conversion (as defined in the Certificate of Incorporation).  Upon the occurrence of a Class B Conversion, all seven directors shall be Class A Directors.  Directors shall serve for one-year terms.

SECTION 2    Removal, Vacancies and Additional Directors.

(a)    The stockholders may, at any special meeting the notice of which shall state that it is called for that purpose, remove, with or without cause, any Class A Director and fill the vacancy.  Vacancies caused by any such removal and not filled by the stockholders at the meeting at which such removal shall have been made, or any vacancy caused by the death or resignation of any Director or for any other reason, and any newly created directorship resulting from any increase in the authorized number of Directors, may be filled by the affirmative vote of a majority of the Directors then in office, although less than a quorum, and any Director so elected to fill any such vacancy or newly created directorship shall hold office until his successor is elected and qualified or until his earlier resignation or removal.

(b)    When one or more Directors shall resign effective at a future date, a majority of the Directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each Director so chosen shall hold office as herein provided in connection with the filling of other vacancies.

(c)    Upon the occurrence of a Class B Conversion, the Class B director shall resign, and a new Director shall be appointed pursuant to Section 2(b) above.

SECTION 3    Place of Meeting.  The Board of Directors may hold its meetings in such place or places in the State of Delaware or outside the State of Delaware as the Board from time to time shall determine.

SECTION 4  Regular Meetings.  Regular meetings of the Board of Directors shall be held at such times and places as the Board from time to time by resolution shall determine.  No notice shall be required for any regular meeting of the Board of Directors; but a copy of every resolution fixing or changing the time or place of regular meetings shall be mailed to every Director at least five days before the first meeting held in pursuance thereof.

SECTION 5  Special Meetings.  Special meetings of the Board of Directors shall be held whenever called by direction of the Chairman of the Board or by any two of the Directors then in office.  Notice of each special meeting of the Board of Directors, specifying the place, date and time thereof, shall be duly given to each Director (i) by giving notice to such Director in person or by telephone at least 24 hours in advance of the meeting; (ii) by sending an electronic mail, or delivering written notice by hand, to such Director's last known business, home or electronic mail address at least one business day in advance of the meeting, (iii) by sending a facsimile transmission to such Director's last known business or home facsimile number at least one business day in advance of the meeting; or (iv) by sending written notice, via a reputable overnight courier delivered during business hours, to such Director's last known business or home address at least 72 hours in advance of the meeting.  Notice of any special meeting need not be given to any Director who submits a signed waiver of notice, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to him or her.  Unless otherwise indicated in the notice thereof, any and all business other than an amendment of these By-Laws may be transacted at any special meeting, and an amendment of these By-Laws may be acted upon if the notice of the meeting shall have stated that the amendment of these By-Laws is one of the purposes of the meeting.  At any meeting at which every Director shall be present, even though without any notice, any business may be transacted, including the amendment of these By-Laws.

SECTION 6  Quorum.  Subject to the provisions of Section 2 of this Article II, a majority of the members of the Board of Directors in office (but in no case less than four Directors) shall constitute a quorum for the transaction of business and the vote of the majority of the Directors present at any meeting of the Board of Directors at which a quorum is present shall be the act of the Board of Directors.  If at any meeting of the Board there is less than a quorum present, a majority of those present may adjourn the meeting from time to time.

SECTION 7  Organization.  The Chairman of the Board shall preside at all meetings of the Board of Directors.  In the absence of the Chairman of the Board, a chairman shall be elected from the Directors present.  The Secretary of the Corporation shall act as secretary of all meetings of the Directors; but in the absence of the Secretary, the Chairman may appoint any person to act as secretary of the meeting.

SECTION 8  Committees.  (a) The Board of Directors, by resolution adopted by a majority of the entire Board, shall designate a Compensation Committee, consisting of three Directors, two of whom shall be Independent Directors.  The Compensation Committee shall have authority to (i) review and recommend to the Board

of Directors the direct and indirect compensation and employee benefits of the elected officers of the Corporation; (ii) review and recommend to the Board of Directors, and administer, stock option, incentive stock and bonus plans that include elected officers; and (iii) review the Corporation's policies relating to the compensation of senior management of the Corporation.

(b)     The Board of Directors may, by resolution adopted by a majority of the whole Board, designate one or more other committees, each committee to consist of one or more of the Directors of the Corporation.

(c)     The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee; in the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.  Notwithstanding the foregoing, any member who is an Independent Director shall only be replaced by an alternate who is an Independent Director.

(d)     Any such committee, to the extent provided by resolution adopted by a majority of the whole Board, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and the affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the Certificate of Incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, or amending these By-Laws; and unless such resolution, these By-Laws or the Certificate of Incorporation expressly so provide, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock.

SECTION 9     Conference Telephone Meetings.  Unless otherwise restricted by the Certificate of Incorporation or by these By-Laws, the members of the Board of Directors or any committee designated by the Board, may participate in a meeting of the Board or such committee, as the case may be, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at such meeting.

SECTION 10     Consent of Directors or Committee in Lieu of Meeting. Unless otherwise restricted by the Certificate of Incorporation or by these By-Laws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing and the writing or writings are filed with the minutes of proceedings of the Board or committee, as the case may be.

# ARTICLE III

## Officers

SECTION 1    Officers.  (a) The officers of the Corporation shall be a Chairman of the Board, a President, one or more Vice Presidents, a Secretary and a Treasurer, and such additional officers, if any, as shall be elected by the Board of Directors pursuant to the provisions of Section 7 of this Article III.  The Chairman of the Board, the President, one or more Vice Presidents, the Secretary and the Treasurer shall be elected by the Board of Directors.  The failure to hold such election shall not of itself terminate the term of office of any officer.  All officers shall hold office at the pleasure of the Board of Directors.  Any officer may resign at any time upon written notice to the Corporation.  Officers may, but need not, be Directors.  Any number of offices may be held by the same person.

(b)    The initial officers of the Corporation shall be Vincent Young, James A. Morgan and Deborah A. McDermott.

(c)    All officers, agents and employees shall be subject to removal, with or without cause, at any time by the Board of Directors.  The removal of an officer without cause shall be without prejudice to his contract rights, if any.  The election or appointment of an officer shall not of itself create contract rights.  All agents and employees other than officers elected by the Board of Directors shall also be subject to removal, with or without cause, at any time by the officers appointing them.

(d)    Any vacancy caused by the death of any officer, his resignation, his removal, or otherwise, may be filled by the Board of Directors, and any officer so elected shall hold office at the pleasure of the Board of Directors.

(e)    In addition to the powers and duties of the officers of the Corporation as set forth in these By-Laws, the officers shall have such authority and shall perform such duties as from time to time may be determined by the Board of Directors.

SECTION 2    Powers and Duties of the Chairman of the Board.  The Chairman of the Board shall be the chief executive officer of the Corporation and, subject to the control of the Board of Directors, shall have general charge and control of all its business and affairs and shall perform all duties incident to the office of the Chairman of the Board.  He shall preside at all meetings of the stockholders and at all meetings of the Board of Directors and shall have such other powers and perform such other duties as may from time to time be assigned to him by these By-Laws or by the Board of Directors.

SECTION 3    Powers and Duties of the President.  The President shall be the chief operating officer of the Corporation and, subject to the control of the Board of Directors and the Chairman of the Board, shall have general charge and control of all its operations and shall perform all duties incident to the office of President.  In the absence of the Chairman of the Board, he shall preside at all meetings of the stockholders and shall have such other powers and perform such other duties as may from time to time be

assigned to him by these By-Laws or by the Board of Directors or the Chairman of the Board.

SECTION 4    Powers and Duties of the Vice Presidents.  Each Vice President shall perform all duties incident to the office of Vice President and shall have such other powers and perform such other duties as may from time to time be assigned to him by these By-Laws or by the Board of Directors, the Chairman of the Board or the President.

SECTION 5    Powers and Duties of the Secretary.  The Secretary shall keep the minutes of all meetings of the Board of Directors and the minutes of all meetings of the stockholders in books provided for that purpose; he shall attend to the giving or serving of all notices of the Corporation; he shall have custody of the corporate seal of the Corporation and shall affix the same to such documents and other papers as the Board of Directors or the President shall authorize and direct; he shall have charge of the stock certificate books, transfer books and stock ledgers and such other books and papers as the Board of Directors or the President shall direct, all of which shall at all reasonable times be open to the examination of any Director, upon application, at the office of the Corporation during business hours; and he shall perform all duties incident to the office of Secretary and shall also have such other powers and shall perform such other duties as may from time to time be assigned to him by these By-Laws or the Board of Directors, the Chairman of the Board or the President.

SECTION 6    Powers and Duties of the Treasurer.  The Treasurer shall have custody of, and when proper shall pay out, disburse or otherwise dispose of, all funds and securities of the Corporation which may have come into his hands; he may endorse on behalf of the Corporation for collection checks, notes and other obligations and shall deposit the same to the credit of the Corporation in such bank or banks or depositary or depositaries as the Board of Directors may designate; he shall sign all receipts and vouchers for payments made to the Corporation; he shall enter or cause to be entered regularly in the books of the Corporation kept for the purpose full and accurate accounts of all moneys received or paid or otherwise disposed of by him and whenever required by the Board of Directors or the President shall render statements of such accounts; he shall, at all reasonable times, exhibit his books and accounts to any Director of the Corporation upon application at the office of the Corporation during business hours; and he shall perform all duties incident to the office of Treasurer and shall also have such other powers and shall perform such other duties as may from time to time be assigned to him by these By-Laws or by the Board of Directors, the Chairman of the Board or the President.

SECTION 7    Additional Officers.  The Board of Directors may from time to time elect such other officers (who may but need not be Directors), including without limitation, a Chief Financial Officer, a Controller, Assistant Treasurers, Assistant Secretaries and Assistant Controllers, as the Board may deem advisable and such officers shall have such authority and shall perform such duties as may from time to time be assigned to them by the Board of Directors, the Chairman of the Board or the President. The Board of Directors may from time to time by resolution delegate to the Chief

Financial Officer or any Assistant Treasurer or Assistant Treasurers any of the powers or duties herein assigned to the Treasurer; and may similarly delegate to any Assistant Secretary or Assistant Secretaries any of the powers or duties herein assigned to the Secretary.

SECTION 8    Giving of Bond by Officers.  All officers of the Corporation, if required to do so by the Board of Directors, shall furnish bonds to the Corporation for the faithful performance of their duties, in such penalties and with such conditions and security as the Board shall require.

SECTION 9    Voting Upon Stocks.  Unless otherwise ordered by the Board of Directors, the Chairman of the Board, the President or any Vice President shall have full power and authority on behalf of the Corporation to attend and to act and to vote, or in the name of the Corporation to execute proxies to vote, at any meetings of stockholders of any corporation in which the Corporation may hold stock, and at any such meetings shall possess and may exercise, in person or by proxy, any and all rights, powers and privileges incident to the ownership of such stock.  The Board of Directors may from time to time, by resolution, confer like powers upon any other person or persons.

SECTION 10   Compensation of Officers.  The officers of the Corporation shall be entitled to receive such compensation for their services as shall from time to time be determined by the Board of Directors.

## ARTICLE IV

### Stock—Seal—Fiscal Year

SECTION 1    Shares of Stock.  Shares of the capital stock of the Corporation may be certificated or uncertificated, as provided under the General Corporation Law of the State of Delaware.  Each stockholder, upon written request to the transfer agent or registrar of the Corporation, shall be entitled to a certificate of the capital stock of the Corporation in such form as may from time to time be prescribed by the Board of Directors.  Such certificate shall certify the number of shares of the Corporation owned by the stockholder, shall bear the Corporation seal and shall be signed by the Chairman of the Board of Directors, the Chief Executive Officer, the President or a Vice President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation.  The Corporation seal and the signatures by Corporation officers may be facsimiles if the certificate is manually countersigned by an authorized person on behalf of a transfer agent or registrar other than the Corporation or its employee.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on such certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such officer, transfer agent or registrar were such officer, transfer agent or registrar at the time of its issue.  Every certificate for shares of stock which are subject to any restriction on transfer and every certificate issued when the

Corporation is authorized to issue more than one class or series of stock shall contain such legend with respect thereto as is required by law.

SECTION 2    Lost, Stolen or Destroyed Certificates.  Whenever a person owning a certificate for shares of stock of the Corporation alleges that it has been lost, stolen or destroyed, he shall file in the office of the Corporation an affidavit setting forth, to the best of his knowledge and belief, the time, place and circumstances of the loss, theft or destruction, and, if required by the Board of Directors, a bond of indemnity or other indemnification sufficient in the opinion of the Board of Directors to indemnify the Corporation and its agents against any claim that may be made against it or them on account of the alleged loss, theft or destruction of any such certificate or the issuance of a new certificate in replacement therefor.  Thereupon the Corporation may cause to be issued to such person a new certificate in replacement for the certificate alleged to have been lost, stolen or destroyed.  Upon the stub of every new certificate so issued shall be noted the fact of such issue and the number, date and the name of the registered owner of the lost, stolen or destroyed certificate in lieu of which the new certificate is issued.

SECTION 3    Transfers of Stock.  Stock of the Corporation shall be transferable in the manner prescribed by applicable law and in these Bylaws.  Transfers of stock shall be made on the books of the Corporation, and in the case of certificated shares of stock, only by the person named in the certificate or by such person's attorney lawfully constituted in writing and upon the surrender of the certificate therefore, properly endorsed for transfer and payment of all necessary transfer taxes; or, in the case of uncertificated shares of stock, upon receipt of proper transfer instructions from the registered holder of the shares or by such person's attorney lawfully constituted in writing, and upon payment of all necessary transfer taxes and compliance with appropriate procedures for transferring shares in uncertificated form; provided, however, that such surrender and endorsement, compliance or payment of taxes shall not be required in any case in which the officers of the Corporation shall determine to waive such requirement.  No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

SECTION 4    Regulations.  The Board of Directors shall have power and authority to make such rules and regulations as it may deem expedient concerning the issue, transfer and registration of certificates for shares of stock of the Corporation.

SECTION 5    Record Date.  (a) In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, as the case may be, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action.

(b)     If no record date is fixed, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the day on which the first written consent is expressed; and the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

SECTION 6     Dividends.  Subject to the provisions of the Certificate of Incorporation, the Board of Directors shall have power to declare and pay dividends upon shares of stock of the Corporation, but only out of funds available for the payment of dividends as provided by law.  Subject to the provisions of the Certificate of Incorporation, any dividends declared upon the stock of the Corporation shall be payable on such date or dates as the Board of Directors shall determine.  If the date fixed for the payment of any dividend shall in any year fall upon a legal holiday, then the dividend payable on such date shall be paid on the next day not a legal holiday.

SECTION 7     Corporate Seal.  The Board of Directors shall provide a suitable seal, containing the name of the Corporation, which seal shall be kept in the custody of the Secretary.  A duplicate of the seal may be kept and be used by any officer of the Corporation designated by the Board or the Chairman of the Board.

SECTION 8     Fiscal Year.  The fiscal year of the Corporation shall be such fiscal year as the Board of Directors from time to time by resolution shall determine.

## ARTICLE V

## Miscellaneous Provisions

SECTION 1     Checks, Notes, Etc.  All checks, drafts, bills of exchange, acceptances, notes or other obligations or orders for the payment of money shall be signed and, if so required by the Board of Directors, countersigned by such officers of the Corporation and/or other persons as the Board of Directors from time to time shall designate.  Checks, drafts, bills of exchange, acceptances, notes, obligations and orders for the payment of money made payable to the Corporation may be endorsed for deposit to the credit of the Corporation with a duly authorized depositary by the Treasurer, or otherwise as the Board of Directors may from time to time, by resolution, determine.

SECTION 2     Loans.  No loans and no renewals of any loans shall be contracted on behalf of the Corporation except as authorized by the Board of Directors.  When authorized so to do, any officer or agent of the Corporation may effect loans and

advances for the Corporation from any bank, trust company or other institution or from any firm corporation or individual, and for such loans and advances may make, execute and deliver promissory notes, bonds or other evidences of indebtedness of the Corporation. When authorized so to do, any officer or agent of the Corporation may pledge, hypothecate or transfer, as security for the payment of any and all loans, advances, indebtedness and liabilities of the Corporation, any and all stocks, securities and other personal property at any time held by the Corporation, and to that end may endorse, assign and deliver the same. Such authority may be general or confined to specific instances.

SECTION 3   Waivers of Notice. Whenever any notice whatever is required to be given by law, by the Certificate of Incorporation or these By-Laws to any person or persons, a waiver thereof in writing, signed by the person or persons entitled to the notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

SECTION 4   Offices Outside of Delaware. Except as otherwise required by the laws of the State of Delaware, the Corporation may have an office or offices and keep its books, documents and papers outside of the State of Delaware at such place or places as from time to time may be determined by the Board of Directors or the Chairman of the Board.

SECTION 5   Indemnification of Directors, Officers and Employees. The Corporation shall indemnify to the full extent authorized by law any person made or threatened to be made a party to any action, suit or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, his testator or intestate is or was a director, officer, employee or agent of the Corporation or is or was serving, at the request of the Corporation, as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise.

## ARTICLE VI

## Amendments

These By-Laws and any amendment thereof may be altered, amended or repealed, or new By-Laws may be adopted, by the Board of Directors at any regular or special meeting by the affirmative vote of a majority of all of the members of the Board, provided in the case of any special meeting at which all of the members of the Board are not present, that the notice of such meeting shall have stated that the amendment of these By-Laws was one of the purposes of the meeting; but these By-Laws and any amendment thereof, including the By-Laws adopted by the Board of Directors, may be altered, amended or repealed and other By-Laws may be adopted by the holders of a majority of the total outstanding stock of the Corporation entitled to vote at any annual meeting or at any special meeting, provided, in the case of any special meeting, that notice of such proposed alteration, amendment, repeal or adoption is included in the notice of the meeting.

# EXHIBIT 3

# NOTICE OF OFFICERS AND DIRECTORS
## OF REORGANIZED YOUNG BROADCASTING INC.

A.    Officers:

      i.       Vincent Young, Chief Executive Officer

      ii.      James A. Morgan, Executive Vice President and Chief Financial Officer

      iii.     Deborah A. McDermott, President

The terms and nature of the Chief Executive Officers' compensation shall be set forth in Exhibit 4 of the Plan Supplement (the "Employment Agreement"). The terms and nature of the Executive Vice President and Chief Financial Officer's and President's compensation shall be set forth in employment agreements substantially similar to that of the Employment Agreement; provided, however, that the duties of the Executive Vice President and Chief Financial Officer and President shall be commensurate with their positions; provided further, however, that the compensation of the Executive Vice President and Chief Financial Officer and President shall be commensurate with the compensation provided for in the Company's Business Plan (60% of prior base compensation) and the benefits shall be approved by the Backstop Parties.[1]

B.    Directors:

      i.       Vincent Young, Chairman of the Board and Chief Executive Officer of Young Broadcasting Inc.

      ii.      Neil Subin, Managing Director of Trendex Capital Management, an investment advisor to and general partner of private investment funds focusing primarily on distressed and troubled companies. Mr. Subin currently is a member of the Board of Directors of Fibertower Corp., the Leap Wireless International, Inc. Liquidating Trust, the Federal-Mogul Corporation, and Primus Telecommunications Group, Inc. In addition, Mr. Subin is Chairman of the Board of Movie Gallery, Inc.

      iii.     Director, designated by the Backstop Parties and nominated by the current directors of the Debtors

      iv.      Independent Director, designated by the Backstop Parties and nominated by the current directors of the Debtors

      v.       Independent Director, designated by the Backstop Parties and nominated by the current directors of the Debtors

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Official Committee of Unsecured Creditors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.

vi.     Independent Director, designated by the Backstop Parties and nominated by the current directors of the Debtors

vii.    Independent Director, designated by the Official Committee of Unsecured Creditors and nominated by the current directors of the Debtors

# EXHIBIT 4

EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "<u>Agreement</u>") dated as of _____ \_\_\_\_ , 2009, (the "<u>Agreement Date</u>") between Young Broadcasting Inc., a Delaware corporation (the "<u>Company</u>"), and Vincent J. Young ("<u>Executive</u>").

RECITALS

WHEREAS, the parties hereto entered into an Employment Agreement dated August 8, 2007 (the "<u>Old Agreement</u>") under which Executive has served as the Company's Chief Executive Officer and Chairman of the Board; and

WHEREAS, on February 13, 2009, the Company and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed voluntary petitions pursuant to chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), and the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") under case number _____ (the "<u>Bankruptcy Proceeding</u>"); and

WHEREAS, in connection with the Debtors' emergence from the Bankruptcy Proceeding (the date of such emergence, the "<u>Emergence Date</u>"), the Company desires that Executive continue to serve in the capacities of Chief Executive Officer of the Company and Chairman of the Board and to both terminate the Old Agreement and replace the Old Agreement in its entirety with this Agreement; and

WHEREAS, the Bankruptcy Court has approved entry into this Agreement as part of the Plan.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the Company and Executive hereby agree as follows:

ARTICLE I.
DEFINITIONS

The terms set forth below have the following meanings (such meanings to be applicable to both the singular and plural forms, except where otherwise expressly indicated):

1.1     "<u>Accounting Firm</u>" — see Section 6.8(b).

1.2     "<u>Accrued Annual Bonus</u>" means the amount of any Annual Bonus earned but not yet paid with respect to the Year ended prior to the Date of Termination.

1.3     "<u>Accrued Base Salary</u>" means the amount of Executive's Base Salary which is accrued but not yet paid as of the Date of Termination.

1.4     "<u>Affiliate</u>" means any Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, the Company.  For the purposes of this definition, the term "control" when used with respect to any Person means the power to direct

or cause the direction of management or policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

1.5 "<u>Agreement</u>" — see the recitals to this Agreement.

1.6 "<u>Agreement Date</u>" means the date that is specified in the recitals to this Agreement.

1.7 "<u>Anniversary Date</u>" means any annual anniversary of the Agreement Date.

1.8 "<u>Annual Bonus</u>" — see Section 4.2(a).

1.9 "<u>Annual Incentive Plan</u>" — see Section 4.2(a).

1.10 "<u>Base Salary</u>" — see Section 4.1.

1.11 "<u>Beneficiary</u>" — see Section 9.4.

1.12 "<u>Board</u>" means the Board of Directors of the Company.

1.13 "<u>Cause</u>" means:

    (1) prior to a Change of Control, any of the following:

        (a) Executive's commission of any felony or of a misdemeanor involving fraud, dishonesty or moral turpitude; or

        (b) Executive's breach of any of the material provisions of this Agreement or of any of the material obligations of Executive to the Company, whether arising under this Agreement or under general principles of common law, provided that Executive has been provided written notice of such breach, which notice shall describe the breach in reasonable detail, and such breach is not cured in the reasonable and good faith judgment of the Board, within fifteen (15) days of the date of the notice.

    (2) following a Change of Control, any of the following:

        (a) Executive's commission of any felony or of a misdemeanor involving fraud, dishonesty or moral turpitude;

        (b) Executive's willful or intentional material breach of this Agreement; or

        (c) Willful or intentional misconduct by Executive in the performance of his duties under this Agreement.

In all cases, Executive shall have the rights described in Section 7.1(b).

1.14 "<u>Change of Control</u>" means the occurrence of any one of the following events other than in connection with implementation of the Plan:

(a)     Any person (as such term is used in Rule 13d-5 under the Exchange Act and defined in Section 3(a)(9) of the Exchange Act) or group (as such term is defined in Section 13(d)(3) of the Exchange Act), other than a Subsidiary, any employee benefit plan (or any related trust) of the Company or a Subsidiary, Vincent Young, any member of Vincent Young's family, or any trust or business principally owned by Vincent Young, any member of his family or any affiliate of Vincent Young or his family, becomes the beneficial owner of 50% or more of the New Common Stock or of securities of the Company that are entitled to vote generally in the election of directors of the Company ("Voting Securities") representing 50% or more of the combined voting power of all Voting Securities of the Company;

(b)     Individuals who, as of the Agreement Date, constitute the Board (the "Incumbent Directors") cease for any reason to constitute 75% of the members of the Board; *provided* that any individual who becomes a director after the Agreement Date whose election or nomination for election by the Company's shareholders was approved by 75% of the members of the Incumbent Board (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened "election contest" relating to the election of the directors of the Company (as such terms are used in Rule 14a-11 under the Exchange Act), "tender offer" (as such term is used in Section 14(d) of the Exchange Act) or a proposed Merger (as defined below)) shall be deemed to be members of the Incumbent Board;

(c)     Consummation by the Company of a merger, reorganization, consolidation or similar transaction (any of the foregoing, a "Merger") as a result of which the Persons who were the respective beneficial owners of the outstanding New Common Stock and Voting Securities of the Company immediately before such Merger are not expected to beneficially own, immediately after such Merger, directly or indirectly, more than 60% of, respectively, the New Common Stock and the combined voting power of the Voting Securities of the corporation resulting from such Merger in substantially the same proportions as immediately before such Merger; or

(d)     Approval by the shareholders of the Company of a plan of liquidation or dissolution of the Company or a plan or agreement for the sale or other disposition of all or substantially all of the assets of the Company (any of the foregoing, a "Sale or Disposition") as a result of which the Persons who were the respective beneficial owners of the outstanding New Common Stock and Voting Securities of the Company immediately before such Sale or Disposition are not expected to beneficially own, immediately after such Sale or Disposition, directly or indirectly, more than 60% of, respectively, the New Common Stock and the combined voting power of the Voting Securities of the corporation acquiring substantially all of the assets of the Company in such Sale or Disposition in substantially the same proportions as immediately before such Sale or Disposition.

Notwithstanding the foregoing, there shall not be a Change in Control if, (i) in advance of such event, Executive agrees in writing that such event shall not constitute a Change in Control; or (ii) the Class B New Common Stock is converted into Class A New Common Stock in connection with a termination or amendment of the Credit Agreement.

1.15     "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended.

1.16  "Code" means the Internal Revenue Code of 1986, as amended from time to time.

1.17  "Committee" means the Compensation Committee of the Board.

1.18  "Company" — see the recitals to this Agreement.

1.19  "Credit Agreement" means the Fourth Amended and Restated Credit Agreement dated May 3, 2005 and amended May 30, 2006 between the Company and the banks listed therein.

1.20  "Date of Termination" means the effective date of a Termination of Employment for any reason, including death or Disability, whether by either of the Company or by Executive.

1.21  "Deferral Payment" — see Section 6.2.

1.22  "Deferral Plan" means a non-qualified deferred compensation plan to be adopted by the Board as soon as practical following the Agreement Date, which plan shall comply with Section 409A.  The terms and conditions of the Deferral Plan shall be consistent with the provisions set forth in Section 6.2 below.

1.23  "Disability" means a mental or physical condition which, in the opinion of the Board, renders Executive unable or incompetent to carry out, with reasonable accommodations, the material job responsibilities that Executive held or the material duties to which Executive was assigned at the time the incapacity was incurred, which has existed for at least ninety (90) consecutive days or one hundred twenty (120) days within any twelve consecutive month period, and which in the opinion of a physician mutually agreed upon by the Company and Executive (provided that neither party shall unreasonably withhold his agreement) is expected to be permanent or to last for an indefinite duration or a duration in excess of six months.

1.24  "Emergence Date Option" — see Section 5.4.

1.25  "Employment Period" — see Section 3.1.

1.26  "Equity Incentive Compensation" means Options or any other form of equity-based incentive compensation, including stock appreciation rights, restricted stock, restricted stock units or deferred stock, including grants under the Management Incentive Plan, which is payable in the form of, or valued based upon, New Common Stock.

1.27  "Exchange Act" means the Securities Exchange Act of 1934.

1.28  "Executive" — see the recitals to this Agreement.

1.29  "Fair Market Value" means, as of any date, (a) the average of the high and low prices of the New Common Stock on such date reported on the Nasdaq Stock Market (or, if no sale of the New Common Stock was reported for such date, on the next preceding date on which such a sale of such security was reported), (b) if the New Common Stock is not listed on the Nasdaq Stock Market, but is listed on a national securities exchange, the average of the high and low prices of the New Common Stock on such date reported by such exchange or, if (or, if no sale of the New Common Stock was reported for such date, on the next preceding date on

which such a sale of such security was reported), (c) if the New Common Stock is not listed on the Nasdaq Stock Market or any national securities exchange, the average of the high bid and low asked quotations for the New Common Stock on such date in the over-the-counter market (or, if no quotation of the New Common Stock was reported for such date, on the next preceding date on which such a quotation of such security was reported), or (d) if there is no public market for the New Common Stock, the fair market value of the New Common Stock determined by the Committee in the good faith exercise of its discretion.

     1.30    "Good Reason" means the occurrence of any one or more of the following events unless Executive specifically agrees in writing that such event shall not be Good Reason:

     (a)    any material breach of this Agreement by the Company, including:

     (i)    the failure of the Company to comply with the provisions of Articles II, III, IV, V or VI of this Agreement;

     (ii)    any material adverse change in the status, responsibilities or perquisites of Executive;

     (iii)    any failure to nominate or elect Executive as Chief Executive Officer of the Company or as Chairman of the Board;

     (iv)    causing or requiring Executive to report to anyone other than the Board; or

     (v)    assignment of duties materially inconsistent with his position and duties described in this Agreement;

     (b)    the failure of the Company to assign this Agreement to a successor to the Company or failure of a successor to the Company to explicitly assume and agree to be bound by this Agreement;

     (c)    any requirement that Executive be principally based at any office or location more than 20 miles from the location of the office at which Executive was principally based immediately prior to the Agreement Date; or

     (d)    a Termination of Employment by Executive for any reason or no reason during the 60-day period commencing six months after a Change of Control.

     Notwithstanding the foregoing, no act or omission described in clauses (a) through (d) of this Section 1.30 shall constitute Good Reason unless Executive gives the Company 30 days' prior written notice of such act or omission and the Company fails to cure such act or omission within the 30-day period following the Company's receipt of such notice.

     1.31    "Including" means including without limitation.

     1.32    "Incumbent Directors" — see Section 1.14(b).

1.33    "<u>Management Incentive Plan</u>" means the Young Broadcasting Inc. 2009 Management Incentive Plan approved by the Bankruptcy Court on _____ , _____ .[1]

1.34    "<u>Maximum Annual Bonus</u>" — see Section 4.2.

1.35    "<u>Maximum Annual Goals</u>" — see Section 4.2.

1.36    "<u>Merger</u>" — see Section 1.14(c).

1.37    "<u>New Common Stock</u>" means Class A and Class B New Common Stock as such terms are defined in the Plan.

1.38    "<u>Notice of Consideration</u>" — see Section 7.1(b).

1.39    "<u>Notice of Termination for Cause</u>" — see Section 7.1(b).

1.40    "<u>Option</u>" means an option to purchase shares of New Common Stock.

1.41    "<u>Option Spread</u>" — see Section 5.4(f).

1.42    "<u>Option Term</u>" — see Section 5.4(e).

1.43    "<u>Parachute Value</u>" of a Payment shall mean the present value as of the date of a change of control of the Company for purposes of Section 280G of the Code of the portion of such Payment that constitutes a "parachute payment" under Section 280G(b)(2), as determined by the Accounting Firm under Section 6.8(b) for purposes of determining whether and to what extent the excise tax under Section 4999 of the Code will apply to such Payment.

1.44    "<u>Payment</u>" shall mean, with respect to any change of control of the Company for purposes of Section 280G of the Code, any payment or distribution in the nature of compensation (within the meaning of Section 280G(b)(2) of the Code) to or for the benefit of Executive, whether paid or payable pursuant to this Agreement or otherwise.

1.45    "<u>Permitted Transferee</u>" means the spouse of Executive, a lineal descendant of Executive or a spouse of a lineal descendant of Executive or a trust, limited partnership or other entity principally benefiting all or a portion of such individuals.

1.46    "<u>Person</u>" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, entity or government instrumentality, division, agency, body or department.

---

[1]    This plan will provide for New Common Stock equal to ten percent (10%), on a fully-diluted basis, to be reserved for issuance as grants of equity, restricted stock or options to directors and officers of the Company, including, but not limited to, Executive, James Morgan and Deborah McDermott to the extent they remain employed by the Company or serve as members of the Board (collectively, the "<u>Senior Executives</u>"). The specific allocation of equity grants under the plan among the Senior Executives is to be determined by the Board in consultation with the Senior Executives; provided, that 50% of the New Common Stock reserved for issuance of equity grants under the plan shall be allocated between Executive, James Morgan and Deborah McDermott collectively.

1.47    "Plan" means the joint plan of reorganization proposed by the Official Committee of Unsecured Creditors of Young Broadcasting *et al*. pursuant to the Bankruptcy Code and the Bankruptcy Rules.

1.48    "Prorata Annual Bonus" means an Annual Bonus based upon the actual Company performance through the Date of Termination, multiplied by a fraction of which the numerator is the numbers of days which have elapsed in such Year through the Date of Termination and the denominator is 365.

1.49    "Safe Harbor Amount" means 2.99 times Executive's "base amount," within the meaning of Section 280G(b)(3) of the Code.

1.50    "Sale or Disposition" — see Section 1.14(d).

1.51    "Section 409A" — see Section 7.5.

1.52    "Section 409A Penalties" — see Section 7.5.

1.53    "Severance Payment" means the payment of continuation of Base Salary to Executive pursuant to Section 7.3(c).

1.54    "Severance Period" means the interval of time between the Date of Termination and the expiration of the Employment Period, as if no Termination of Employment had occurred.

1.55    "Subsidiary" means, with respect to any Person, (a) any corporation of which more than 50% of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned by such Person, and (b) any partnership in which such Person has a direct or indirect interest (whether in the form of voting or participation in profits or capital contribution) of more than 50%.

1.56    "Target Annual Bonus" — see Section 4.2.

1.57    "Target Annual Goals" — see Section 4.2.

1.58    "Taxes" means the incremental United States federal, state and local income, employment, excise and other taxes payable by Executive with respect to any applicable item of income.

1.59    "Tax Gross-Up Payment" means an amount payable to Executive such that, after payment of Taxes on such amount, there remains a balance sufficient to pay the Taxes being reimbursed; provided, however, that for purposes determining the amount of the Tax Gross-Up Payments, Taxes shall not include any taxes, interest and penalties payable under Section 409A of the Code.

1.60    "Termination For Good Reason" means a Termination of Employment by Executive for a Good Reason.

1.61    "Termination of Employment" means a termination by the Company or by Executive of Executive's employment by the Company and, with respect to the time of payments of any amounts under this Agreement that are "deferred compensation" subject to Section 409A, means a "separation from service" within the meaning of Section 409A.

1.62    "Termination Without Cause" means a Termination of Employment by the Company for any reason other than (a) Cause, (b) Executive's death or (c) Executive's Disability.

1.63    "Voting Securities" — see Section 1.14(a).

1.64    "Withholding Taxes" means any United States federal, state, local or foreign withholding Taxes and other deductions required to be paid in accordance with applicable law by reason of compensation received pursuant to this Agreement.

1.65    "Year" means a calendar year period ending on December 31.

ARTICLE II.
DUTIES

2.1    Duties. The Company shall employ Executive during the Employment Period as its Chief Executive Officer, and Executive shall assume the authority, duties, and responsibilities as are commensurate and consistent with that position and title. During the Employment Period, or, if later, until Executive no longer holds any shares of Class B New Common Stock, the Company will use reasonable efforts to cause Executive to be appointed to, and serve as a member of, the Board, subject to approval by the shareholders of the Company. In connection with each annual meeting of shareholders of the Company during the Employment Period, the Company will recommend to the shareholders of the Company that Executive by reelected to the Board, and, if so elected, the Company will recommend that the Board nominate, elect and appoint Executive as the Chairman of the Board during the Employment Period. Executive shall report solely to the Board. Executive shall be the most senior executive of the Company, shall, subject to the supervision of the Board, have reasonable discretion commensurate and consistent with Executive's position and title to manage and direct the day-to-day affairs and operations of the Company and to hire and terminate any one or more employees of the Company, except that Executive shall be required to consult with the Board prior to any hiring or termination if such employee is an executive officer of the Company. All operations, staff, other executives, and divisions of the Company shall report solely to Executive, either directly to Executive or indirectly to Executive through subordinates of Executive who report to Executive. During the Employment Period, excluding any periods of disability, vacation, or sick leave to which Executive is entitled, Executive shall perform the duties properly assigned to him hereunder, shall devote substantially all of his business time, attention and effort to the affairs of the Company and shall use his reasonable best efforts to promote the interests of the Company.

2.2    Other Activities. Executive may serve on corporate, civic or charitable boards or committees, deliver lectures, fulfill speaking engagements, teach at educational institutions, or manage personal investments; provided that such activities do not individually or in the aggregate significantly interfere with the performance of his duties under this Agreement.

## ARTICLE III.
## EMPLOYMENT PERIOD

3.1     Employment Period.  Subject to the Debtors' emergence from the Bankruptcy Proceeding on the Emergence Date and the termination provisions hereinafter provided, the term of Executive's employment under this Agreement (the "Employment Period") shall begin on the Agreement Date and end on the Anniversary Date which is two years after such date. The employment of Executive by the Company shall not be terminated other than under the circumstances contemplated by Article VII.  Executive may terminate his employment under this Agreement at any time.  At least sixty (60) days prior to expiration of the Employment Period, the Company shall notify Executive if the Company will continue to employ Executive following expiration of the Employment Period and, if so, on what terms and in what capacity. Executive agrees and acknowledges that the Company has no obligation to extend the Employment Period or to continue Executive's employment following the expiration of the Employment Period, pursuant to this Agreement or otherwise.  Executive also agrees and acknowledges that, should Executive and the Company mutually agree to continue Executive's employment for any period following expiration of the Employment Period on an "at-will" basis (i.e., such that either the Company or Executive may terminate Executive's employment at any time, with or without reason and with or without notice), Executive shall be eligible to receive such severance, separation pay or salary continuation payments and benefits as are generally provided to at-will employees of the Company.

## ARTICLE IV.
## COMPENSATION

4.1     Base Salary.  The Company shall pay Executive in accordance with its normal payroll practices (but not less frequently than monthly) an annual salary at a rate of no less than $840,000 per annum ("Base Salary").  During the Employment Period, the Base Salary shall be reviewed at least annually by the Board after consultation with Executive and may from time to time be increased as determined by the Board.  Effective as of the date of any such increase, Base Salary as so increased shall be considered the new Base Salary for all purposes of this Agreement and may not thereafter be reduced.  Any increase in Base Salary shall not limit or reduce any other obligation of the Company to Executive under this Agreement.

4.2     Annual Bonus.

(a)     The Company shall pay to Executive an annual cash bonus ("Annual Bonus") in accordance with the terms hereof and the terms of the Company's annual incentive plan for executive officers, as amended from time to time (the "Annual Incentive Plan") for each Year during the Employment Period beginning in 2010.

(b)     If Executive achieves his target performance goals (the "Target Annual Goals"), as determined by the Committee on an annual basis after consulting with Executive, such Annual Bonus shall be not less than 100% of Executive's Base Salary (the "Target Annual Bonus").  If Executive achieves his maximum performance goals ("Maximum Annual Goals"), as determined by the Committee on an annual basis after consulting with Executive, such Annual Bonus shall be not less than 200% of Executive's Base Salary (the "Maximum Annual Bonus").

(c)     Notwithstanding any provision in Section 4.2(b) to the contrary, the amount of the Annual Bonus payable to Executive shall be subject to the terms and

conditions set forth in the Annual Incentive Plan, which provides that the Committee shall have full and complete discretion to determine whether to authorize the payment of an Annual Bonus and, if so, the amount of the Annual Bonus payable to Executive for a Year.

(d)     In the event that the Committee determines that an Annual Bonus is payable to Executive for a Year, the Company shall pay the entire Annual Bonus that is payable with respect to a Year in a lump-sum cash payment no later than March 15 of the year following the Year with respect to which the Annual Bonus is payable.

## ARTICLE V.
## STOCK GRANTS

5.1     <u>Class B New Common Stock Grants</u>.  Executive shall receive Class B New Common Stock, which stock shall be fully vested and shall automatically convert into Class A New Common Stock upon the earlier of (i) an amendment to the Credit Agreement eliminating the requirement that (a) 40% of the Voting Stock (as defined in the Credit Agreement) be held by Executive or (b) Executive have the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the board of directors if a Person (as defined in the Credit Agreement) shall be deemed to have beneficial ownership more than 30% (by number of votes) of the total outstanding Voting Stock, (ii) the termination of the Credit Agreement, or (iii) satisfaction of all obligations under the Credit Agreement and which stock shall represent ten percent (10%) of the New Common Stock on the effective date of the Plan, subject to dilution by the Management Incentive Plan.  Executive and the holders of New Common Stock may enter into a mutually agreeable stockholders' agreement which shall set forth the terms and conditions governing such Class B New Common Stock.

5.2     <u>Incentive Plans</u>.  The Board may consider, in conjunction with any new investors, awarding to Executive additional equity and cash incentives based on Company value creation, with value targets and specified timelines to be determined and agreed upon.

5.3     <u>Equity Incentive Compensation Grants</u>.  The Committee may at any time in its discretion consider Executive for possible future annual or other grants of Options or other forms of Equity Incentive Compensation.

5.4     <u>Terms and Conditions of Emergence Date Option</u>.  Any Option granted to Executive on the Emergence Date (the "<u>Emergence Date Option</u>"):

(a)     shall be a non-qualified Option;

(b)     shall vest as to six and a quarter percent (6.25%) of such Emergence Date Option on each quarterly anniversary of the Agreement Date during the four year period following the Emergence Date;

(c)     shall become fully vested and exercisable, in whole or in any part, upon a Change of Control;

(d)     shall become vested and exercisable immediately upon (i) a Termination Without Cause, (ii) a Termination for Good Reason, or (iii) the death or Disability of Executive, with respect to the portion of the Emergence Date Option scheduled to vest

during the Employment Period if Executive had continued to be employed by the Company;

(e)      shall have a term (the "Option Term") of at least 10 years; and

(f)      shall in all other respects be on such terms and conditions as are determined by the Committee and reflected in an Option award agreement.

## ARTICLE VI.
## OTHER BENEFITS

6.1      <u>Incentive, Savings and Retirement Plans</u>. In addition to Base Salary and an Annual Bonus, Executive shall be entitled to participate during the Employment Period in all incentive, savings and retirement plans, practices, policies and programs that are from time to time applicable to other senior executives of the Company.

6.2      <u>Deferral Plan</u>. Executive shall be entitled to receive a payment under the Deferral Plan in the amount of $[      ] (such amount, the "Deferral Payment"). The Deferral Payment shall be one hundred percent (100%) vested, not subject to forfeiture for any reason and payable on December 31, 2010, or such later date required by the Company's liquidity covenants (as determined by the Board) and Section 409A of the Code. For the avoidance of doubt, Executive shall not be required to continue employment with the Company in order to receive the Deferral Payment.

6.3      <u>Welfare Benefits</u>. During the Employment Period, Executive and/or his family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, practices, policies and programs provided by the Company (including medical, prescription, dental, disability, salary continuance, employee life, group life, dependent life, accidental death and travel accident insurance plans and programs) applicable to other senior executives of the Company. In addition, in the event Executive and/or his covered dependents lose coverage under the Company's group health plan due to Executive's Termination Without Cause, Termination for Good Reason, death or Disability, the Company shall offer Executive and his covered dependents the opportunity to continue group health coverage under the Company's group health plan as required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), and the Company shall pay the full cost of such coverage for the entire period during which Executive and/or his covered dependents are entitled to receive such group health coverage under COBRA. The Company shall pay the applicable premiums based on the type or level of group health coverage in effect for Executive and his covered dependents immediately prior to Executive's Termination of Employment.

6.4      <u>Fringe Benefits</u>. During the Employment Period, Executive shall be entitled to all fringe benefits that are from time to time available to other senior executives of the Company.

6.5      <u>Vacation</u>. During the Employment Period, Executive shall be entitled to paid vacation time in accordance with the plans, practices, policies, and programs applicable to other senior executives of the Company, but in no event shall such vacation time be less than five (5) weeks per calendar year.

6.6     Expenses. During the Employment Period, Executive shall be entitled to receive prompt reimbursement for all reasonable employment-related expenses incurred by Executive upon the receipt by the Company of accounting in accordance with practices, policies and procedures applicable to other senior executives of the Company.

6.7     Office; Support Staff. During the Employment Period, Executive shall be entitled to an office or offices of a size and with furnishings and other appointments, and to personal secretarial and other assistance, appropriate to his position and duties under this Agreement.

6.8     Tax Gross-Up Payment.

(a)     Anything in this Agreement to the contrary notwithstanding and except as set forth below and in Section 6.9, in the event it shall be determined that any Payment would be subject to the excise tax imposed under Section 4999 of the Code, then Executive shall be entitled to receive a Tax Gross-Up Payment with respect to all such excise taxes. Notwithstanding the foregoing provisions of this Section 6.8, if the Parachute Value of all Payments does not exceed one hundred and ten percent (110%) of the Safe Harbor Amount, then except as provided below, no Tax Gross-Up Payment shall be made to Executive and the amounts payable under this Agreement, shall be reduced (but not below zero) so that the Parachute Value of all Payments, in the aggregate, equals the Safe Harbor Amount. The Company's obligation to make the Tax Gross-Up Payments under this Section 6.8 shall not be conditioned upon Executive's Termination of Employment.

(b)     All determinations required to be made under this Section 6.8, including whether and when a Gross-Up Payment is required, the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by such nationally recognized certified public accounting firm as may be designated by the Company (the "Accounting Firm"). The Accounting Firm shall provide detailed supporting calculations both to the Committee and Executive within fifteen (15) business days of the receipt of notice from Executive that there has been a Payment or such earlier time as is requested by the Committee. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Tax Gross-Up Payment, as determined pursuant to this Section 6.8, shall be paid by the Company to Executive within five (5) business days of the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and Executive. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Tax Gross-Up Payments that will not have been made by the Company should have been made (the "Underpayment"), consistent with the calculations required to be made hereunder. In the event Executive is required to make a payment of any excise tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be promptly paid by the Company to or for the benefit of Executive.

Notwithstanding any other provision of this Section 6.8, the Company may, in its sole discretion, withhold and pay over to the Internal Revenue Service or any other applicable taxing authority, for the benefit of Executive, all or any portion of any Tax Gross-Up Payment, and Executive hereby consents to such withholding.

6.9    <u>Limitation on Change of Control Payments</u>.  Anything in this Agreement to the contrary notwithstanding, if the Committee determines upon a Change of Control that the Net Aggregate Change of Control Payments exceeds 10% of the Company's Market Capitalization, each of the Change of Control Payments payable to Executive shall be reduced by the percentage obtained by dividing (i) the Excess Change of Control Payments by (ii) the Gross Aggregate Change of Control Payments.  If the Change of Control payments are reduced pursuant to the preceding sentence and if after such reduction any amounts that were previously not tax deductible by the Company become tax deductible such that the Net Aggregate Change of Control Payments (after taking into account the reductions in the Change of Control Payments determined in the preceding sentence) is less than 10% of the Company's Market Capitalization, the percentage determined in the preceding sentence will be successively recomputed to proportionately increase the amount of each Change of Control Payment until the Net Aggregate Change of Control Payments (after taking into account any adjustments to the Change of Control Payments required by this sentence) equals 10% of the Company's Market Capitalization.

The following definitions shall apply for purposes of this Section 6.9:

(a)    "<u>Affected Executive</u>" means an executive officer of the Company who has an employment agreement with the Company that contains a limitation on Change of Control Payments that is substantially similar to the limitations set forth in this Section 6.9.

(b)    "<u>Applicable Tax Laws</u>" means the federal, state and local income tax laws applicable to the Company that have been enacted on or prior to the date the Change of Control occurs.  The term Applicable Tax Laws includes any changes in applicable tax rates and/or any other changes affecting the amount of the tax deduction to which the Company may be entitled with respect to any Change of Control Payment that are scheduled to become effective in subsequent tax years if such changes were enacted on or before the date a Change of Control occurs.  Applicable Tax Laws do not include any changes in applicable federal, state or local income tax laws that are enacted after the date a Change of Control occurs.

(c)    "<u>Change of Control Payment</u>" means any of the following payments or benefits to which Executive (or any Affected Executive) may become entitled on or after a Change of Control:

(i)    Any Severance Payment payable to Executive (and any severance payments payable to an Affected Executive pursuant to the corresponding provisions of each respective Affected Executive's employment agreement);

(ii)    Any Prorata Annual Bonus payable to Executive pursuant to Section 7.2 or 7.3(b) (and any prorate annual bonus payable to an Affected Executive pursuant to the corresponding provisions of each respective Affected Executive's employment agreement);

(iii)    The value of Equity Incentive Compensation that vests or becomes exercisable upon the occurrence of the Change of Control or upon termination of employment following a Change of Control;

(iv)     The Tax Gross-Up Payment made pursuant to Section 6.8 (or pursuant to the corresponding provisions of each respective Affected Executive's employment agreement); and

(v)     Any other benefit or payment of compensation that would not have been provided or paid to Executive (or to the Affected Executive) had there not been a Change of Control.

(d)     "Excess Change of Control Payments" means the amount by which the Net Aggregate Change of Control Payments (determined without regard to any adjustment to the Change of Control Payments required by this Section 6.8) exceed the Company's Market Capitalization.

(e)     "Gross Aggregate Change of Control Payments" means the sum of (i) the present value of the Change of Control Payments payable to Executive determined as if Executive had a Termination Without Cause immediately following a Change of Control, plus (ii) the present value of the Change of Control Payments payable to each other Affected Executive determined as if each Affected Executive had a termination of employment without cause (as defined in the respective Affected Executive's employment agreement) immediately following a Change of Control. The discount rate used to determine the present value of any Change of Control Payment under Section 6.8(c) will be the applicable federal rate in effect under Section 1274(d) of the Code as of the date on which a Change of Control occurs.

(f)     "Market Capitalization" means total market capitalization of the Company upon the occurrence of a Change of Control, as reflected by the amount of cash and the fair market value of any property received by the Company or its shareholders in the transaction that constitutes the Change of Control.

(g)     "Net Aggregate Change of Control Payments" means the Gross Aggregate Change of Control Payments reduced by the estimated net present value of the amount, if any, by which the Company's federal, state and local income taxes are expected to be reduced due to the deductibility of the Change of Control Payments under Applicable Tax Laws. The amount by which the Company's taxes are expected to be reduced by reason of the tax deductibility of any Change of Control Payment for the taxable year in which the Change of Control occurs or any subsequent taxable year shall be determined based on the Applicable Tax Laws in effect for such taxable year. Net Aggregate Change of Control Payments shall be determined both with and without regard to the adjustments to Change of Control Payments required under this Section 6.8, as applicable. The discount rate used to determine the present value of any tax deduction under this Section 6.8(g) will be the applicable federal rate in effect under Section 1274(d) of the Code as of the date on which a Change of Control occurs.

6.10     Leased Automobile. During the Employment Period, Executive shall be entitled to a Company-provided leased automobile for personal use, the make and model of which be comparable to the Company-provided leased automobile in Executive's possession on the Agreement Date. Throughout the Employment Period, all expenses for routine maintenance, repair and insurance, Executive's rights and obligations regarding replacement leased automobiles and the tax treatment of the automobile as a fringe benefit to Executive shall be governed by the Company's standard practices, policies and procedures in effect from time to time.

# ARTICLE VII.
## TERMINATION BENEFITS

7.1    <u>Termination for Cause or Other Than for Good Reason, etc.</u>

(a)    If the Company terminates Executive's employment for Cause or Executive terminates his employment other than for Good Reason, death or Disability, the Company shall pay to Executive immediately after the Date of Termination an amount equal to the sum of Executive's Accrued Base Salary and Accrued Annual Bonus, and Executive shall not be entitled to receive any Severance Payment.

(b)    The Company may not terminate Executive's employment for Cause unless:

(i)    no fewer than 30 days prior to the Date of Termination, the Company provides Executive with written notice (the "<u>Notice of Consideration</u>") of its intent to consider termination of Executive's employment for Cause, including a detailed description of the specific reasons which form the basis for such consideration;

(ii)    for a period of not less than 30 days after the date Notice of Consideration is provided, Executive shall have the opportunity to appear before the Board, with or without legal representation, at Executive's election, to present arguments and evidence on his own behalf; and

(iii)    following the presentation to the Board as provided in (ii) above or Executive's failure to appear before the Board at a date and time specified in the Notice of Consideration (which date shall not be less than 30 days after the date the Notice of Consideration is provided), Executive may be terminated for Cause only if (x) the Board, by the affirmative vote of at least 75% of its members (excluding Executive if he is a member of the Board, and any other member of the Board reasonably believed by the Board to be involved in the events leading the Board to terminate Executive for Cause), determines that the actions or inactions of Executive specified in the Notice of Consideration occurred, that such actions or inactions constitute Cause, and that Executive's employment should accordingly be terminated for Cause; and (y) the Board provides Executive with a written determination (a "<u>Notice of Termination for Cause</u>") setting forth in specific detail the basis of such Termination of Employment, which Notice of Termination for Cause shall be consistent with the reasons set forth in the Notice of Consideration.

Unless the Company establishes both (i) its full compliance with the substantive and procedural requirements of this Section 7.1 prior to a Termination of Employment for Cause, and (ii) that Executive's action or inaction specified in the Notice of Termination for Cause did occur and constituted Cause, any Termination of Employment shall be deemed a Termination Without Cause for all purposes of this Agreement.

(c)    After providing a Notice of Consideration pursuant to the provisions of Section 7.1(b), the Board may, by the affirmative vote of at least 75% of its members (excluding for this purpose Executive if he is a member of the Board, and any other member of the Board reasonably believed by the Board to be involved in the events

leading the Board to issue the Notice of Consideration), suspend Executive with pay until a final determination pursuant to such Section 7.1(b) has been made and any such suspension of Executive's employment with pay shall not, in and of itself constitute a Good Reason.

7.2   Termination for Death or Disability.  Subject to Section 7.6, if Executive's employment terminates during the Employment Period due to his death or if the Company terminates Executive's employment during the Employment Period due to Disability, the Company shall pay to Executive or his Beneficiaries, as the case may be, immediately after the Date of Termination an amount which is equal to the sum of Executive's Accrued Base Salary, Accrued Annual Bonus and Prorata Annual Bonus.

7.3   Termination Without Cause or for Good Reason.  In the event of a Termination Without Cause or a Termination for Good Reason, Executive shall receive the following:

(a)   immediately after the Date of Termination, a lump-sum amount in immediately available funds equal to the sum of Executive's Accrued Base Salary and Accrued Annual Bonus;

(b)   a Prorata Annual Bonus, payable as scheduled under the Annual Incentive Plan;

(c)   subject to Section 7.6, continued payment of the Base Salary through the end of the Severance Period, payable in accordance with the Company's normal payroll practices in effect from time to time.

7.4   Other Termination Benefits.  In addition to any amounts or benefits payable upon a Termination of Employment hereunder, Executive shall, except as otherwise specifically provided herein, be entitled to any payments or benefits under the terms of any plan, policy or program of the Company (other than any such plan, policy or program providing for severance, separation pay or salary continuation payments or benefits) or as otherwise required by applicable law.

7.5   Deferral of Payments Necessary to Avoid Taxation Under Code Section 409A.  The parties acknowledge that Section 409A of the Code ("Section 409A") imposes excise taxes and other penalties ("Section 409A Penalties") on deferred compensation (as defined in Section 409A) that does not meet certain requirements.  The parties agree that it is not intended that Section 409A Penalties apply to any payment or the provision of any benefit under this Agreement, and accordingly, the provisions of this Agreement shall be interpreted in a manner consistent with the requirements of Section 409A and the final regulations promulgated thereunder.

Without limiting the generality of the foregoing, if at the time of Executive's Termination of Employment, which shall be construed for purposes of this Agreement to mean separation from service within the meaning of Section 409A, (i) the equity securities of the Company (or any other corporation required to be aggregated with the Company pursuant to Section 414(b) or (c) of the Code) are publicly traded on an established securities market (within the meaning of Section 409A(a)(2)(B)(i) of the Code and the final regulations promulgated thereunder) and (ii) Executive is a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code and the final regulations promulgated thereunder), any payment or benefit that is considered to be deferred compensation for purposes of Section 409A and the regulations promulgated thereunder

that is payable or provided to or on behalf of Executive on account of Executive's Termination of Employment for reasons other than death shall be delayed or postponed until the date that is six months after Executive's Date of Termination.

7.6     Execution of Release.  As a condition of receiving the compensation and benefits (other than Accrued Base Salary and Accrued Annual Bonus) described in Sections 6.2, 7.2, 7.3 or 7.4, Executive (or in the event of Executive's death, the executor of Executive's estate or her personal representative) shall execute, no later than sixty (60) days after the event that gives rise to the right to receive the compensation and benefits described in Sections 6.2, 7.2, 7.3 or 7.4, as applicable, a release of any and all claims against the Company arising out of Executive's employment with the Company or, if such release is executed in connection with Executive's separation from such employment, such separation (including, without limitation, claims relating to age, disability, sex or race discrimination to the extent permitted by law), excepting (i) claims for benefits under any employee benefit plan in accordance with the terms of such employee benefit plan, (ii) claims based on breach of the Company's obligations to pay the compensation and benefits described in Sections 6.2, 7.2, 7.3 or 7.4 of this Employment Agreement, (iii) claims arising under the Age Discrimination in Employment Act after the date Executive signs such release, and (iv) any right to indemnification by the Company or to coverage under directors and officers liability insurance to which Executive is otherwise entitled in accordance with the Company's articles of incorporation or by-laws or other agreement between Executive and the Company.  Such release shall be in a form tendered by the Company which shall comply with any applicable legislation or judicial requirements, including, but not limited to, the Older Workers Benefit Protection Act, and shall be substantially in the form of release attached as Attachment A.

ARTICLE VIII.
RESTRICTIVE COVENANTS

8.1     Non-Solicitation of Employees; Confidentiality.

(a)     Executive covenants and agrees that, at no time during the Employment Period through the date of Termination of Employment nor during the one-year period immediately following a Termination of Employment for any reason, shall Executive: (i) directly or indirectly employ or seek to employ any person employed at that time by the Company or any of its Subsidiaries or otherwise encourage or entice any such person to leave such employment or (ii) solicit any customers or vendors of the Company on behalf of or for the benefit of any Person which owns and operates any television broadcast properties in any television broadcast market in which the Company or any Subsidiary owns television broadcast properties as of the time in question and as of the Date of Termination.

(b)     Executive covenants and agrees that at no time during the Employment Period nor at any time following any Termination of Employment will Executive use, communicate, furnish, divulge or disclose in any manner to any Person any Confidential Information (as defined in Section 8.1(d)) without the prior express written consent of the Company.  After a Termination of Employment, Executive shall not, without the prior written consent of the Company, or as may otherwise be required by law or legal process, communicate or divulge such Confidential Information to anyone other than the Company and its designees.

(c)     For purposes of this Section, "<u>Confidential Information</u>" shall mean financial information about the Company, contract terms with vendors and suppliers, customer and supplier lists and data, trade secrets and such other competitively-sensitive information to which Executive has access as a result of his positions with the Company, except that Confidential Information shall not include any information which was or becomes generally available to the public (i) other than as a result of a wrongful disclosure by Executive, (ii) as a result of disclosure by Executive during the Employment Period which he reasonably and in good faith believes is required by the performance of his duties under this Agreement, or (iii) any information compelled to be disclosed by applicable law or administrative regulation; provided that Executive, to the extent not prohibited from doing so by applicable law or administrative regulation, shall give the Company written notice of the information to be so disclosed pursuant to clause (iii) of this sentence as far in advance of its disclosure as is practicable.

8.2     <u>Injunction</u>. Executive acknowledges that monetary damages will not be an adequate remedy for the Company in the event of a breach of this Article VIII, and that it would be impossible for the Company to measure damages in the event of such a breach. Therefore, Executive agrees that, in addition to other rights that the Company may have, the Company is entitled to an injunction preventing Executive from any breach of this Article VIII.

## ARTICLE IX.
## MISCELLANEOUS

9.1     <u>Entire Agreement; Supersedure of Old Agreement</u>. This Agreement contains the entire agreement between the parties with respect to the subject matter hereof, and expressly terminates, rescinds, replaces, and supersedes all prior and contemporaneous agreements and understandings, oral or written, between the parties with respect to the subject matter hereof including without limitations, the Old Agreement.

9.2     <u>Full Settlement</u>. The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any circumstances, including set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against Executive or others. In no event shall Executive be obligated to seek other employment or take any other action to mitigate the amounts payable to Executive under any of the provisions of this Agreement, nor shall the amount of any payment hereunder be reduced by any compensation earned as result of Executive's employment by another employer, except that any continued welfare benefits provided for by Section 6.3 shall not duplicate any benefits that are provided to Executive and his family by such other employer and shall be secondary to any coverage provided by such other employer.

9.3     <u>Legal Fees</u>. If Executive incurs legal or other fees and expenses in an effort to secure, preserve or establish entitlement to compensation and benefits under this Agreement and substantially prevails in respect of such a claim before a court of competent jurisdiction, the Company shall thereafter reimburse Executive for all such reasonable fees and expenses within 30 days after Executive's request for reimbursement accompanied by evidence that the fees and expenses were incurred is received by the Company.

9.4     <u>Beneficiary</u>. If Executive dies prior to receiving all of the amounts payable to him in accordance with the terms of this Agreement, such amounts shall be paid to one or more beneficiaries (each, a "<u>Beneficiary</u>") designated by Executive in writing to the Company during his lifetime, or if no such Beneficiary is designated, to Executive's estate. Such payments shall

be made in a lump-sum to the extent so payable and, to the extent not payable in a lump-sum, in accordance with the terms of this Agreement. Executive, without the consent of any prior Beneficiary, may change his designation of Beneficiary or Beneficiaries at any time or from time to time by a submitting to the Company a new designation in writing.

9.5    Assignment; Successors. The Company may not assign its rights and obligations under this Agreement without the prior written consent of Executive except to a successor of the Company's business which expressly assumes the Company's obligations hereunder in writing. This Agreement shall be binding upon and inure to the benefit of Executive, his estate and Beneficiaries, the Company and the successors and permitted assigns of the Company.

9.6    Nonalienation. Benefits payable under this Agreement shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution or levy of any kind, either voluntary or involuntary, prior to actually being received by Executive or a Beneficiary, as applicable, and any such attempt to dispose of any right to benefits payable hereunder shall be void.

9.7    Severability. If one or more parts of this Agreement are declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity shall not invalidate any part of this Agreement not declared to be unlawful or invalid. Any part so declared to be unlawful or invalid shall, if possible, be construed in a manner which will give effect to the terms of such part to the fullest extent possible while remaining lawful and valid.

9.8    Captions. The names of the Articles and Sections of this Agreement are for convenience of reference only and do not constitute a part hereof.

9.9    Amendment; Waiver. This Agreement shall not be amended or modified except by written instrument executed by the Company and Executive. A waiver of any term, covenant or condition contained in this Agreement shall not be deemed a waiver of any other term, covenant or condition, and any waiver of any default in any such term, covenant or condition shall not be deemed a waiver of any later default thereof.

9.10    Notices. All notices hereunder shall be in writing and delivered by hand, by nationally-recognized delivery service that guarantees overnight delivery, or by first-class, registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

|  |  |
|---|---|
| If to the Company, to: | Young Broadcasting Inc.<br>599 Lexington Avenue<br>New York, New York 10022 |
| with a copy to: | Robert L. Winikoff, Esquire<br>Sonnenschein Nath & Rosenthal<br>1221 Avenue of the Americas, 24th Floor<br>New York, New York, 10020 |
| If to Executive, to: | Vincent J Young<br>2 Meadowbrook Road<br>Katonah, New York 10536 |

Either party may from time to time designate a new address by notice given in accordance with this Section. Notice shall be effective when actually received by the addressee.

9.11 <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

9.12 <u>Applicable Law</u>. This Agreement shall be interpreted and construed in accordance with the laws of the State of New York, without regard to its choice of law principles.

9.13 <u>Survival of Executive's Rights, Obligations and Acknowledgments</u>. All of Executive's rights under Article 5, Section 6.8 and Article 7 hereof and his obligations under and acknowledgments with respect to the provisions of Section 7.6 and Article 8 hereof and the acknowledgments and obligations in Article 9 of this Agreement, shall survive the termination of Executive's employment hereunder and the termination of this Agreement to the extent necessary to give effect thereto.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

YOUNG BROADCASTING INC.


By: _____
　　　Its:


EXECUTIVE:


By: _____
　　　Vincent J. Young

ATTACHMENT A

WAIVER AND RELEASE

This is a Waiver and Release ("Release") between Vincent J. Young ("Executive") and Young Broadcasting Inc. (the "Company"). The Company and Executive agree that they have entered into this Release voluntarily, and that it is intended to be a legally binding commitment between them.

In consideration for and contingent upon Executive's right to receive the benefits described in the Employment Agreement between the Company and Executive (the "Employment Agreement") and this Release, Executive hereby agrees as follows:

(a)     General Waiver and Release.  Except as provided in Paragraph (e) below, Executive and any person acting through or under Executive hereby release, waive and forever discharge the Company, its past and present subsidiaries and affiliates, and their respective successors and assigns, and their respective past and present officers, trustees, directors, shareholders, executives and agents of each of them, from any and all claims, demands, actions, liabilities and other claims for relief and remuneration whatsoever (including without limitation attorneys' fees and expenses), whether known or unknown, absolute, contingent or otherwise (each, a "Claim"), arising or which could have arisen up to and including the date of his execution of this Release, including without limitation those arising out of or relating to Executive's employment or cessation and termination of employment, or any other written or oral agreement, any change in Executive's employment status, any benefits or compensation, any tortious injury, breach of contract, wrongful discharge (including any Claim for constructive discharge), infliction of emotional distress, slander, libel or defamation of character, and any Claims arising under Title VII of the Civil Rights Act of 1964 (as amended by the Civil Rights Act of 1991), the Americans With Disabilities Act, the Rehabilitation Act of 1973, the Equal Pay Act, the Older Workers Benefits Protection Act, the Age Discrimination in Employment Act, the Employee Retirement Income Security Act of 1974, or any other federal, state or local statute, law, ordinance, regulation, rule or executive order, any tort or contract claims, and any of the claims, matters and issues which could have been asserted by Executive against the Company or its subsidiaries and affiliates in any legal, administrative or other proceeding. Executive agrees that if any action is brought in his name before any court or administrative body, Executive will not accept any payment of monies in connection therewith.

(b)     Miscellaneous.  Executive agrees that Sections 6.2, 7.2, 7.3 or 7.4 of the Employment Agreement (which Sections are specifically incorporated herein by reference) specifies payment from the Company to himself, the total of which meets or exceeds any and all funds due him or her by the Company, and that he will not seek to obtain any additional funds from the Company with the exception of nonreimbursed business expenses. (This covenant does not preclude Executive from seeking workers compensation, unemployment compensation, or benefit payments from Company's insurance carriers that could be due him.)

(c)     No-Hire, Non-Solicit and Confidentiality Covenants.  Executive warrants that Executive has, and will continue to comply fully with Section 8.1 of the Employment Agreement.

(d)     THE COMPANY AND EXECUTIVE AGREE THAT THE BENEFITS DESCRIBED IN THE EMPLOYMENT AGREEMENT AS SUBJECT TO EXECUTIVE'S (OR HIS ESTATE'S) COMPLIANCE WITH SECTION 7.6 THEREOF ARE CONTINGENT UPON EXECUTIVE SIGNING THIS RELEASE. EXECUTIVE FURTHER UNDERSTANDS AND

A-1

AGREES THAT IN SIGNING THIS RELEASE, EXECUTIVE IS RELEASING POTENTIAL LEGAL CLAIMS AGAINST THE COMPANY. EXECUTIVE UNDERSTANDS AND AGREES THAT IF HE DECIDES NOT TO SIGN THIS RELEASE, OR IF HE REVOKES THIS RELEASE, THAT HE WILL IMMEDIATELY REFUND TO THE COMPANY ANY AND ALL SEVERANCE PAYMENTS AND OTHER BENEFITS HE MAY HAVE ALREADY RECEIVED.

(e)     The waiver contained in Paragraph (a) and (b) above does not apply to:

(i)     Any claims for benefits under employee benefit plans in accordance with the terms of the applicable employee benefit plan,

(ii)     Any Claim under or based on a breach of the Company's obligations to pay the compensation and benefits described in Sections 6.2, 7.2, 7.3 or 7.4 of this Employment Agreement,[2]

(iii)     Rights or Claims that may arise under the Age Discrimination in Employment Act after the date that Executive signs this Release,

(iv)     Any right to indemnification by the Company or to coverage under directors and officers liability insurance to which Executive is otherwise entitled in accordance with the Company's articles of incorporation or by-laws or other agreement between Executive and the Company.

(f)     EXECUTIVE ACKNOWLEDGES THAT HE HAS READ AND IS VOLUNTARILY SIGNING THIS RELEASE. EXECUTIVE ALSO ACKNOWLEDGES THAT HE IS HEREBY ADVISED TO CONSULT WITH AN ATTORNEY, HE HAS BEEN GIVEN AT LEAST 21 DAYS TO CONSIDER THIS RELEASE BEFORE THE DEADLINE FOR SIGNING IT, AND HE UNDERSTANDS THAT HE MAY REVOKE THE RELEASE WITHIN SEVEN (7) DAYS AFTER SIGNING IT. IF NOT REVOKED WITHIN SUCH PERIOD, THIS RELEASE WILL BECOME EFFECTIVE ON THE EIGHTH (8) DAY AFTER IT IS SIGNED BY EXECUTIVE.

BY SIGNING BELOW, BOTH THE COMPANY AND EXECUTIVE AGREE THAT THEY UNDERSTAND AND ACCEPT EACH PART OF THIS RELEASE.

By: _____

Vincent J. Young                              DATE

YOUNG BROADCASTING INC.

By: _____

DATE

---

[2]     Customize when Executive signs release based on circumstance triggering right to compensation and benefits.

# EXHIBIT 5

**YOUNG BROADCASTING INC.**

**2009 MANAGEMENT INCENTIVE PLAN**

**EFFECTIVE AS OF _____, 2009**

# YOUNG BROADCASTING INC.
## 2009 MANAGEMENT INCENTIVE PLAN

Section 1.   <u>General</u>

   <u>Establishment</u>.  Young Broadcasting Inc., a Delaware corporation, or any successor thereto, by merger, consolidation or otherwise (the "<u>Company</u>"), has adopted the Plan as set forth in this document in connection with the confirmation of its Chapter 11 Plan of Reorganization dated _____, 2009, as confirmed by the United States Bankruptcy Court for the Southern District of New York (the "<u>Plan of Reorganization</u>").

   <u>Purpose of the Plan</u>.  The purpose of this Plan is to attract, retain, incentivize and motivate officers and employees of, consultants to, and non-employee directors providing services to, the Company and its Subsidiaries and Affiliates and to promote the success of the Company's business by providing such participating individuals with a proprietary interest in the performance of the Company.  The Company believes that this incentive program will cause participating officers, employees, consultants and non-employee directors to increase their interest in the welfare of the Company, its Subsidiaries and Affiliates and to align those interests with those of the stockholders of the Company, its Subsidiaries and Affiliates.

Section 2.   <u>Definitions</u>

   Whenever capitalized in the Plan, the following terms shall have the meanings set forth below.

   (a)   "<u>Affiliate</u>" shall mean with respect to any entity, any entity that the Company, either directly or indirectly through one or more intermediaries, is in common control with, is controlled by or controls, each within the meaning of the Securities Act.

   (b)   "<u>Award</u>" shall mean, individually or collectively, the grant of an Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit or Other Stock-Based Award under the Plan as evidenced by an Award Agreement relating thereto.

   (c)   "<u>Award Agreement</u>" shall mean the agreement between the Company and a Participant who has been granted an Award pursuant to this Plan, which defines the rights and obligations of the parties in respect of the Award, as required by Section 6(b) of the Plan.

   (d)   "<u>Board</u>" shall mean the Board of Directors of the Company, as constituted from time to time.

   (e)   "<u>Cause</u>" shall mean, except as otherwise set forth in the applicable Award Agreement (and for the purposes set forth in such Agreement), "cause," "just cause" or any term of like import, as defined in any employment, consulting or similar agreement between the Company and the Participant governing the provision of Services by the Participant to the Company, any Subsidiary or Affiliate and shall be interpreted in accordance with the procedures set forth therein, or, in the absence of such an agreement, that, upon determination by the

Company, the Participant: (i) has been negligent in the discharge of his or her duties to the Company or any Subsidiary or Affiliate, has refused to perform stated or assigned duties or is incompetent in or incapable of performing those duties (other than by reason of his or her incapacity due to physical or mental illness or injury); (ii) has been dishonest or committed or engaged in an act of theft, embezzlement or fraud, a breach of confidentiality, an unauthorized disclosure or use of inside information, customer lists, trade secrets or other confidential information with respect to the Company or any Subsidiary or Affiliate, or has otherwise engaged in conduct materially injurious to the Company, a Subsidiary or any Affiliate; (iii) has breached a fiduciary duty or violated any other duty, law, rule, regulation or policy of the Company or any Subsidiary or Affiliate or has been convicted of, or pled not guilty or nolo contendere to, a felony or misdemeanor (other than minor traffic violations or similar offenses); (iv) has breached any of the provisions of any agreement with the Company or any Subsidiary or Affiliate or (v) has engaged in unfair competition with, or otherwise acted intentionally in a manner injurious to the reputation, business or assets of the Company or any Subsidiary or Affiliate, has improperly induced a vendor or customer to break or terminate any contract with the Company or any Subsidiary or Affiliate or has induced a principal for whom the Company or any Subsidiary or Affiliate acts as agent to terminate such agency relationship.

(g)     "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(h)     "Committee" shall mean a committee of the Board described in Section 4(a) of the Plan or, if none has been appointed, the Board.

(i)     "Common Stock" shall mean the Class A New Common Stock, par value $0.01 per share, of the Company and any stock or other security into which such common stock may be converted or into which it may be exchanged.

(j)     "Company" has the meaning ascribed to it in Section 1(a) of the Plan.

(k)     "Consultant" shall mean a person who performs bona fide services for the Company or an Affiliate or Subsidiary as a consultant or advisor but who is not an Employee or Director.

(l)     "Director" shall mean a member of the Board, or of the board of directors, or body performing similar functions, of an Affiliate or Subsidiary, who is not an Employee.

(m)     "Dividend Equivalent" shall mean a right that entitles the holder to receive, for each Restricted Stock Unit that is subject to (or referenced by) an underlying Award, an amount equal to the dividends paid on one Share at such time as determined by the Committee in accordance with Section 9(b)(ii) of the Plan.

(n)     "Employee" shall mean an employee of the Company, a Subsidiary or an Affiliate.

(o)     "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

(p)     "Fair Market Value" shall mean, as of any date, the per Share value determined as follows:

(i)     if the Common Stock is listed on a national securities exchange, the closing sale price reported as having occurred on the primary exchange with which the Common Stock is listed and traded on such date, or, if there is no such sale on that date, then on the last preceding date on which such a sale was reported;

(ii)     if the Common Stock is not listed on any national securities exchange but is quoted in an inter-dealer quotation system on a last sale basis, the average between the closing bid price and ask price reported on such date, or, if there is no such sale on that date, then on the last preceding date on which a sale was reported; or

(iii)     if the Committee determines in its sole discretion that the shares of Common Stock are too thinly traded for Fair Market Value to be determined pursuant to clause (i) or (ii) above or if the Common Stock is not listed on a national securities exchange nor quoted in an inter-dealer quotation system on a last sale basis, the fair market value as determined in good faith by the Committee in its sole discretion.

(q)     "Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

(r)     "Liquidity Event," except as otherwise set forth in the applicable Award Agreement (and for the purposes set forth in such agreement), shall mean the occurrence of any one of the following events other than in connection with implementation of the Plan of Reorganization: (i) any person (as such term is used in Rule 13d-5 under the Exchange Act and defined in Section 3(a)(9) of the Exchange Act) or group (as such term is defined in Section 13(d)(3) of the Exchange Act), other than a Subsidiary, any employee benefit plan (or any related trust) of the Company or a Subsidiary, Vincent Young, any member of Vincent Young's family, or any trust or business principally owned by Vincent Young, any member of his family or any affiliate of Vincent Young or his family, becomes the beneficial owner of 50% or more of the New Common Stock or of securities of the Company that are entitled to vote generally in the election of directors of the Company ("Voting Securities") representing 50% or more of the combined voting power of all Voting Securities of the Company; (ii) individuals who, as of the effective date of the Plan of Reorganization, constitute the Board (the "Incumbent Directors") cease for any reason to constitute 75% of the members of the Board; *provided* that any individual who becomes a director after the Agreement Date whose election or nomination for election by the Company's shareholders was approved by 75% of the members of the Incumbent Board (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened "election contest" relating to the election of the directors of the Company (as such terms are used in Rule 14a-11 under the Exchange Act), "tender offer" (as such term is used in Section 14(d) of the Exchange Act) or a proposed Merger (as defined below)) shall be deemed to be members of the Incumbent Board; (iii) consummation by the Company of a merger, reorganization, consolidation or similar transaction (any of the foregoing,

a "Merger") as a result of which the Persons who were the respective beneficial owners of the outstanding New Common Stock and Voting Securities of the Company immediately before such Merger are not expected to beneficially own, immediately after such Merger, directly or indirectly, more than 60% of, respectively, the New Common Stock and the combined voting power of the Voting Securities of the corporation resulting from such Merger in substantially the same proportions as immediately before such Merger; or (iv) approval by the shareholders of the Company of a plan of liquidation or dissolution of the Company or a plan or agreement for the sale or other disposition of all or substantially all of the assets of the Company (any of the foregoing, a "Sale or Disposition") as a result of which the Persons who were the respective beneficial owners of the outstanding New Common Stock and Voting Securities of the Company immediately before such Sale or Disposition are not expected to beneficially own, immediately after such Sale or Disposition, directly or indirectly, more than 60% of, respectively, the New Common Stock and the combined voting power of the Voting Securities of the corporation acquiring substantially all of the assets of the Company in such Sale or Disposition in substantially the same proportions as immediately before such Sale or Disposition.

(s)     "New Common Stock" means Class A and Class B New Common Stock as such terms are defined in the Plan of Reorganization.

(t)     "Non-qualified Stock Option" shall mean an Option that does not meet the requirements of an incentive stock option under Section 422 of the Code.

(u)     "Option" shall mean an option to purchase Common Stock issued under and subject to the Plan.

(v)     "Other Stock-Based Award" shall mean any right granted under Section 10 of the Plan.

(w)     "Participant" shall mean any eligible person as set forth in Section 3 of the Plan to whom an Award is granted.

(x)     "Person" shall mean any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

(y)     "Plan" shall mean this Young Broadcasting Inc. 2009 Management Incentive Plan, as it may be amended from time to time.

(z)     "Restricted Period" shall mean, with respect to any Award of Restricted Stock or Restricted Stock Units, the period of time determined by the Committee during which such Award is subject to the restrictions set forth in Section 9 of the Plan and the applicable Award Agreement, as specified in the applicable Restricted Stock Award Agreement or Restricted Stock Unit Award Agreement.

(aa)     "Restricted Stock" shall have the meaning described in Section 9(a) of the Plan.

(bb)     "Restricted Stock Unit" shall have the meaning described in Section 9(b) of the Plan.

(cc)     "Securities Act" shall mean the Securities Act of 1933, as amended.

(dd)     "Service" shall mean the Participant's service as an Employee, Director or Consultant.  For any purpose under this Plan, Service shall be deemed to continue while the Participant is on a bona fide leave of absence, if such leave was approved by the Company in writing or if continued crediting of Service for such purpose is expressly required by the terms of such leave or by applicable law (as determined by the Company).

(ee)     "Share" shall mean a share of either Common Stock or such other class or kind of shares or other securities, which results from the application of Section 11(a) of the Plan.

(ff)     "Stock" shall mean the Common Stock or such other authorized shares of stock of the Company as the Committee may from time to time authorize for use under the Plan.

(gg)     "Stock Appreciation Right" shall have the meaning described in Section 8(a) of the Plan.

(hh)     "Stockholders Agreement" shall mean the Stockholders Agreement, dated on or about _____ __, 2009, by and among the Company and the stockholders named therein, as amended from time to time.

(ii)     "Subsidiary" shall mean any corporation (other than the Company), partnership, joint venture, Person or other legal entity of which the Company owns, directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

Section 3.     Eligibility

Participants will consist of such Employees, Directors and Consultants as the Committee in its sole discretion designates from time to time to receive an Award under the Plan and who have entered into an Award Agreement and, following the death of any such individual, his or her successors, heirs, executors, administrators and assigns, as the case may be.

Section 4.     Administration

(a)     Committees.  The Plan shall be administered by the Board or, at its election, by one or more Committees consisting of one or more members of the Board who have been appointed by the Board.  The Committee shall have such authority and be responsible for such functions as may be delegated to it by the Board, and any reference to the Board in the Plan shall be construed as a reference to the Committee with respect to functions delegated to it by the Board.  If no Committee has been appointed, the entire Board shall administer the Plan.

(b)     Authority of the Board.  Subject to the provisions of this Plan and applicable law, the Committee shall have full authority and sole discretion to take all actions it deems necessary

or advisable for the administration and operation of the Plan, including, without limitation, the authority and discretion to (i) designate Participants; (ii) determine the type or types of Awards to be granted to a Participant; (iii) determine the number of Shares to be covered by, or with respect to which payments, rights or other matters are to be calculated in connection with Awards; (iv) determine the terms and conditions of any Award, including, without limitation, and as applicable, the exercise price, vesting schedules, conditions relating to exercise and termination of the right to exercise; (v) determine whether, to what extent, and under what circumstances Awards may be settled or exercised in cash, Shares, other securities, other Awards or other property, or canceled, forfeited or suspended and the method or methods by which Awards may be settled, exercised, canceled, forfeited or suspended; (vi) determine whether, to what extent, and under what circumstances the delivery of cash, Stock, other securities, other Awards, other property and other amounts payable with respect to an Award shall be deferred, either automatically or at the election of the holder thereof or the Committee; (vii) interpret, construe, administer, reconcile any inconsistency, resolve any ambiguity, correct any defect and/or supply any omission in the provisions of the Plan, any Award Agreement or any Award or any instrument or agreement relating to the Plan; (viii) review any decisions or actions made or taken by any Committee in connection with any Award or the operation, administration or interpretation of the Plan; (ix) accelerate vesting or exercisability of, or otherwise waive any requirements or conditions applicable to, any Award; (x) extend the term or any period of exercisability of any Award; (xi) modify the purchase price or exercise price under any Award; and (xii) otherwise amend an Award in whole or in part from time-to-time as the Committee determines, in its sole and absolute discretion, to be necessary or appropriate to conform such Award to, or required to satisfy, any legal requirement (including without limitation the provisions of Section 409A of the Code), which amendment may be made retroactively or prospectively. The Committee shall have full discretionary authority to adopt and amend from time to time such rules and regulations for the administration of the Plan as the Committee may deem necessary or appropriate and to adopt, amend, suspend or waive such rules, forms, instruments and guidelines, and appoint such agents, as it deems necessary, desirable or appropriate for the proper administration of the Plan. Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations and other actions or decisions of the Committee or, in the absence of any action by the Committee, the Board, shall be final, conclusive and binding upon all parties, including, without limitation, the Company, any Affiliate, any shareholder, any Participant and their estate and any holder or beneficiary of any Award.

Section 5.    Stock Subject to Plan

(a)    Basic Limitation. Subject to the following provisions of this Section and Section 11(a) of the Plan, the maximum aggregate number of Shares that may be issued pursuant to Awards made under the Plan is 500,000. Shares may be treasury shares, authorized but unissued shares or shares purchased on the open market or by private purchase, or a combination of the foregoing, in the discretion of the Committee.

(b)    Additional Shares. If any outstanding Award or portion thereof expires or is cancelled or otherwise terminated for any reason whatsoever, any Shares covered by such expired, cancelled or terminated Award or portion thereof shall again be available for future Awards under the Plan. If Shares issued under the Plan in connection with the grant of any

Award are reacquired by the Company pursuant to any forfeiture provision, right of repurchase, call right, put right, right of first offer or withholding requirements, such Shares shall again be available for future Awards under the Plan. If a Participant pays for any Award through the delivery of previously held or acquired Shares, the number of Shares available under the Plan shall be increased by the number of Shares delivered by the Participant.

Section 6.    Awards

(a)    Types of Awards. The Committee may, in its sole discretion, make Awards of one or more of the following: Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units and Other Stock-Based Awards.

(b)    Award Agreements. Each Award made under the Plan shall be evidenced by a written Award Agreement between the Participant and the Company, and no Award shall be valid without any such Award Agreement. The terms and conditions of an Award and Award Agreement may vary among Participants and among different Awards granted to the same Participant. An Award shall be subject to all applicable terms and conditions of the Plan and to any other terms and conditions that the Committee in its sole discretion deems appropriate for inclusion in the Award Agreement (including, without limitation, provisions for the forfeiture of or restrictions on resale or other disposition of Shares acquired under any Award; provisions giving the Company the right to repurchase Shares acquired under any Award in the event the Participant elects to dispose of such shares; subject to Section 409A of the Code, provisions allowing the Participant to elect to defer the receipt of payment in respect of Awards for a specified period or until a specified event; provisions requiring the Participant to become a party to the Stockholders Agreement as a condition of the Award; and provisions to comply with Federal and state securities laws and Federal and state tax withholding requirements); provided, however, that such terms and conditions shall not be inconsistent with the Plan. Unless an Award Agreement specifically states otherwise, in the event of any conflict between the provisions of the Plan and any Award Agreement, the provisions of the Plan shall prevail. Each Award Agreement shall provide, in addition to any terms and conditions required to be provided in such Award Agreement pursuant to any other provision of this Plan, the following terms:

(i)    the number of Shares subject to the Award, if any, which number shall be subject to adjustment in accordance with Section 11(a) of the Plan or as provided in the Award Agreement;

(ii)    the consequences of the Participant's termination of Service with the Company or any Subsidiary or Affiliate; and

(iii)    the dates and events on which all or any installment of the Award shall be vested and nonforfeitable.

(c)    No Rights as a Shareholder. Except as otherwise provided in an Award Agreement, a Participant, or a transferee of a Participant, shall have no rights as a shareholder with respect to any Shares covered by an Award until the Participant becomes the record holder of such Shares.

(d)     Awards Subject to Stockholders Agreement. As a condition of the grant, exercise or settlement of an Award, the Committee may require a Participant to execute and deliver to the Company a joinder to the Stockholders Agreement in a form provided by the Company. If the Committee exercises its authority under this Section 6(d) and determines that a Participant is required to execute and deliver to the Company a joinder to the Stockholders Agreement and if such Participant fails to execute or to deliver to the Company such Stockholders Agreement, the Award shall, in the sole discretion of the Committee, be null and void or paid in a form other than Shares.

Section 7.    Options

(a)     Option Agreement. The Committee may, in its sole discretion, grant Options. All Options will be Nonqualified Stock Options. Each Award Agreement evidencing an Award of Options shall contain the following information, which, except as otherwise provided below, shall be determined by the Committee, in its sole discretion:

(i)     the exercise price of an Option, as determined by the Committee at the time of grant, provided, however, that the exercise price shall not be less than 100% of the Fair Market Value of a Share subject to such Option on the date of grant;

(ii)     the dates and events when all or any installment of the Option becomes exercisable; and

(iii)     the term of each Option (including the circumstances under which such Option will expire prior to the stated term thereof and the effect of termination of a Participant's Service), which shall not exceed 10 years from the date of grant, subject to the Committee's authority to extend the term of any Award, as provided in Section 4(b) of the Plan.

(b)     Method of Exercise.

(i)     General Rule. Except as otherwise provided in the Plan or any Award Agreement, an Option may be exercised for all or any part of the Shares for which such Option is then exercisable by such methods and procedures as the Committee determines from time to time. Except as otherwise provided in this Section 7(b), a Participant shall exercise an Option by delivery of written notice to the Company setting forth the number of Shares with respect to which the Option is to be exercised, together with cash or a personal check or bank draft in the amount equal to the sum of the exercise price for such Shares. The partial exercise of an Option shall not cause the expiration, termination or cancellation of the remaining portion thereof.

(ii)     Surrender of Shares. Notwithstanding Section 7(b)(i) of the Plan, in the sole discretion of the Committee, all or any part of the exercise price may be paid by surrendering Shares that are already owned by the Participant. Such Shares shall be surrendered to the Company in good form for transfer and shall be valued at their Fair Market Value on the date when the Option is exercised. The Participant shall not surrender Shares in payment of any portion of the purchase price if such Shares have been held by the Participant for less than six months or such action would cause the Company or any Subsidiary to recognize a compensation expense or additional compensation expense with respect to the applicable Option for financial reporting purposes, unless the Committee consents thereto.

(iii) <u>Net Exercise</u>. Notwithstanding Section 7(b)(i) or Section 7(b)(ii) of the Plan, in the sole discretion of the Committee, payment of all or any portion of the exercise price may be made by reducing the number of Shares otherwise deliverable pursuant to the Option by the number of such Shares having a Fair Market Value equal to the exercise price or by some other form of net physical settlement or method of cashless exercise as determined by the Committee.

(iv) <u>Exercise of Discretion</u>. Should the Committee exercise its discretion to permit the Participant to pay the purchase price under an Award in whole or in part in accordance with Section 7(b)(ii) or Section 7(b)(iii) above, it shall not be bound to permit such method of payment for the remainder of any such Option (unless otherwise provided in the Option Award Agreement) or with respect to any other Award or Participant under the Plan.

Section 8.    <u>Stock Appreciation Rights</u>

(a) <u>Generally</u>. The Committee may, in its sole discretion, grant Stock Appreciation Rights, including a grant of Stock Appreciation Rights in tandem with any Option. A Stock Appreciation Right is a right to receive, upon exercise, a payment in cash, Shares, other property or a combination thereof of an amount equal to the excess of (i) the Fair Market Value of a number of Shares subject to the Stock Appreciation Right on the date the right is exercised over (ii) the Fair Market Value of such Shares on the date the right is granted. If a Stock Appreciation Right is granted in tandem with an Option, such tandem Stock Appreciation Right shall be exercisable only to the extent the related Option is exercisable and shall expire no later than the expiration of the related Option. Upon the exercise of all or a portion of such tandem Stock Appreciation Right, a Participant shall be required to forfeit the right to purchase an equivalent portion of the related Option and upon the exercise of all or a portion of the related Option, a Participant shall be required to forfeit the right to receive payment with respect to an equivalent portion of the tandem Stock Appreciation Right.

(b) <u>Stock Appreciation Rights Award Agreement</u>. Each Award Agreement evidencing an Award of Stock Appreciation Rights shall contain the following information, which shall be determined by the Committee, in its sole discretion:

(i) the grant price of the Shares above which a Participant shall be entitled to share in the appreciation in the value of such Shares, provided that such grant price shall not be less than 100% of the Fair Market Value of such Shares on the date of grant;

(ii) the dates and events when all or any installment of the Stock Appreciation Rights become exercisable;

(iii) the term of each Stock Appreciation Right (including the circumstances under which such Stock Appreciation Right will expire prior to the stated term thereof and the effect of termination of a Participant's Service), provided that the term shall not exceed 10 years from the date of grant, subject to the Committee's authority to extend the term of any Award, as provided in Section 4(b) of the Plan.

(c) <u>Method of Exercise</u>. A Participant may exercise a Stock Appreciation Right by filing an irrevocable written notice with the Committee or its designee, specifying the number of Shares subject to the Stock Appreciation Right to be exercised.

Section 9. <u>Restricted Stock and Restricted Stock Units</u>

(a) <u>Restricted Stock</u>. An Award of Restricted Stock is a grant by the Company of a specified number of Shares to the Participant, which are subject to forfeiture until the expiration of the Restricted Period set forth in the applicable Award Agreement, and other restrictions on transfer, set forth therein.

(i) <u>Stock Certificate</u>. Upon the grant of Restricted Stock, the Committee shall cause a stock certificate registered in the name of the Participant to be issued and, if it so determines, deposited together with stock powers with an escrow agent designated by the Committee, which may be the Company, pending the release of the applicable restrictions. If an escrow arrangement is used, the Committee may cause the escrow agent to issue to the Participant a receipt evidencing any stock certificate held by it registered in the name of the Participant. Until the lapse of all restrictions with respect to Restricted Stock, each stock certificate representing Restricted Stock awarded under the Plan shall bear a legend substantially in the form of the following as well as any other information the Company deems appropriate:

[THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE OFFERED AND SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT AND SUCH LAWS OR PURSUANT TO A WRITTEN OPINION OF COUNSEL FOR THE COMPANY (OR SUCH OTHER EVIDENCE AS IS REASONABLY ACCEPTABLE TO THE COMPANY) THAT SUCH REGISTRATION IS NOT REQUIRED.

THE SALE, ASSIGNMENT, HYPOTHECATION, PLEDGE, ENCUMBRANCE OR OTHER DISPOSITION (EACH A "<u>TRANSFER</u>") AND VOTING OF ANY OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE RESTRICTED BY THE TERMS OF THE STOCKHOLDERS AGREEMENT, DATED ON OR ABOUT _____, 2009, BY AND AMONG YOUNG BROADCASTING INC. AND THE STOCKHOLDERS NAMED THEREIN, A COPY OF WHICH MAY BE INSPECTED AT THE COMPANY'S PRINCIPAL OFFICE. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE STOCKHOLDERS AGREEMENT.]

(ii)    <u>Restricted Stock Held in Escrow</u>. The Committee may require the Participant to execute and deliver to the Company an escrow agreement satisfactory to the Committee and the appropriate blank stock powers with respect to the Restricted Stock covered by such agreement. In such case, if a Participant fails to execute an agreement evidencing an Award of Restricted Stock and, if applicable, an escrow agreement and stock powers, the Award shall be null and void.

(iii)    <u>Rights as a Shareholder</u>. A Participant shall have no rights as a shareholder in respect of any Restricted Stock during the Restricted Period unless specifically provided in the applicable Award Agreement. Notwithstanding the foregoing, if permitted by governing corporate documents, the Committee, in its sole discretion, may, but is not required to, grant to a Participant in an Award Agreement the right to vote and/or collect or be credited with dividends in respect of such Restricted Stock during the Restricted Period and the terms and conditions of such rights shall be set forth in the applicable Award Agreement.

(iv)    <u>Delivery of Restricted Stock</u>. Upon the expiration of the Restricted Period with respect to any Shares of Restricted Stock, the restrictions set forth in this Section 9 and in the applicable Award agreement shall be of no further force or effect with respect to such Shares, except as set forth in the applicable Award Agreement. If an escrow arrangement is used, upon such expiration, the Company shall deliver to the Participant, or his beneficiary, without charge, the stock certificate evidencing the Shares of Restricted Stock which have not then been forfeited and with respect to which the Restricted Period has expired (to the nearest full share).

(v)    <u>Section 83(b) Elections on Restricted Stock.</u> A Participant shall indicate to the Company whether the Participant intends to make an election under Section 83(b) of the Code with respect to any Shares of Restricted Stock.

(b)    <u>Restricted Stock Units</u>. An Award of Restricted Stock Units is a grant by the Company of a specified number of units, which shall each represent one Share credited to a notional account maintained by the Company, with no Shares actually awarded to the Participant in respect of such units until the Restricted Period expires. Restricted Stock Units awarded to any Participant shall be subject to forfeiture until the expiration of the Restricted Period, as provided in the applicable Award Agreement. To the extent such Restricted Stock Units are forfeited for any reason, all rights of the Participant to such Restricted Stock Units shall terminate without further obligation on the part of the Company, including in connection with the termination of the Participant's Service.

(i)    <u>Rights as a Shareholder</u>. A Participant shall have no rights as a shareholder in respect of any Restricted Stock Units during the Restricted Period unless specifically provided in the applicable Award Agreement. Notwithstanding the foregoing, if permitted by governing corporate documents, the Committee, in its sole discretion, may, but is not required to, grant to a Participant the right to vote Shares corresponding to the Restricted Stock Unit.

(ii)    <u>Dividend Equivalent Rights</u>. At the discretion of the Committee, each Restricted Stock Unit (representing one share of Stock) may be credited with cash and stock

dividends paid by the Company in respect of one share of Stock. The terms of any such credit will be set forth in the applicable Award Agreement.

(iii) <u>Settlement of Restricted Stock Units</u>. Upon the expiration of the Restricted Period with respect to any outstanding Restricted Stock Units, the Company shall deliver to the Participant, or his beneficiary, without charge, one share of Stock for each such outstanding Restricted Stock Unit, provided, however, that the Committee retains the discretion to determine whether the Restricted Stock Units shall be settled in Shares, in cash equal to the value of the Shares that would otherwise be distributed in settlement of such units, other property or any combination of the foregoing. The Committee may, in its discretion, permit Participants to defer settlement of Restricted Stock Units, provided that any such deferral shall comply with the requirements of, and shall not result in the imposition of any excise or penalty tax under, Section 409A of the Code.

(c) <u>Terms of Restricted Stock Awards and Restricted Stock Units</u>. Each Award Agreement evidencing an Award of Restricted Stock or Restricted Stock Units shall contain the following information, which shall be determined by the Committee, in its sole discretion:

(i) the Restricted Period;

(ii) the number of Shares of Restricted Stock or the number of Restricted Stock Units; and

(iii) such other provisions as the Committee shall determine.

(d) <u>Termination of Service</u>. Unless otherwise provided in the applicable Award Agreement, unvested Restricted Stock and Restricted Stock Units shall be forfeited upon a Participant's termination of Service.

(e) <u>Removal of Restrictions</u>. The Committee shall have the authority to, at any time, remove any or all of the restrictions on the Restricted Stock and Restricted Stock Units, including, without limitation, whenever it may determine that, by reason of changes in applicable laws or other changes in circumstances arising after the date of the Restricted Stock or Restricted Stock Units are granted, such action is appropriate.

Section 10. <u>Other Stock-Based Awards</u>

The Committee, in its sole discretion, may grant Awards of Shares and Awards that are valued, in whole or in part, by reference to, or are otherwise based on, the Fair Market Value of Shares ("Other Stock-Based Awards"). Such Other Stock-Based Awards shall be in such form, and dependent on such conditions, as the Committee shall determine, including, without limitation, (i) the right to receive one or more Shares (or the equivalent cash value of such Shares) upon the completion of a specified period of Service, (ii) the occurrence of an event and/or (iii) the attainment of performance objectives. Subject to the provisions of the Plan, the Committee shall determine (i) to whom and when Other Stock-Based Awards will be granted, (ii) the number of Shares to be awarded under (or otherwise related to) such Other Stock-Based Awards, (iii) whether such Other Stock-Based Awards shall be settled in cash, Shares or a combination of cash and Shares, and (iv) all other terms and conditions of such Awards

(including, without limitation, the vesting provisions thereof, provisions ensuring that all Shares so awarded and issued shall be fully paid and non-assessable and provisions addressing whether any voting or dividend rights shall attach to such Awards).

Section 11.    Adjustment of Shares

(a)    General.  In the event that there shall be any extraordinary distribution (whether in the form of cash, Common Stock, securities or other property), stock dividend, extraordinary cash dividend, recapitalization, reclassification stock split, reverse stock split, reorganization, merger, consolidation, spin-off, combination, repurchase, Common Stock exchange or other similar transaction or event, the number and kind of Shares, in the aggregate, reserved for issuance or with respect to which Awards may be made under this Plan shall be adjusted to reflect such event, and the Committee shall make appropriate and equitable adjustments to Awards under the Plan that are affected by such event, including, without limitation, as to the number, exercise price, class and kind of Shares subject to Awards, the Award price per share or other consideration subject to the Awards.  The Committee is authorized to make adjustments in the terms and conditions of, and the criteria included in, Awards in recognition of unusual or nonrecurring events (including, without limitation, the events described in the preceding sentence) affecting the Company or its financial statements or those of any Subsidiary or of changes in applicable laws, regulations or accounting principles, whenever the Committee determines that such adjustments are appropriate to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan.  The determination of the Committee regarding any adjustment will be final and conclusive.

(b)    Other Corporate Transactions.  Upon a Liquidity Event, unless otherwise specifically prohibited under applicable laws or by the rules and regulations of any governing governmental agencies, or unless the Committee shall determine otherwise in the Award Agreement, the Committee is authorized (but not obligated) to make adjustments in the terms and conditions of outstanding Awards, including without limitation the following (or any combination thereof):

(i)    the continuation or assumption of such outstanding Awards under the Plan by the Company (if it is the surviving corporation) or by the surviving corporation or its parent;

(ii)    the substitution by the surviving corporation or its parent of stock awards with substantially the same terms for such outstanding Awards;

(iii)    the acceleration of the vesting of or right to exercise such outstanding Awards immediately prior to or as of the date of the Liquidity Event, and the expiration of such outstanding Awards to the extent not timely exercised or purchased by the date of the Liquidity Event or other date thereafter designated by the Committee; or

(iv)    the cancellation of all or any portion of such outstanding Awards by a cash payment, (A) in the case of Awards other than Options and Stock Appreciation Rights, equal to the Fair Market Value of the Shares subject to such outstanding Awards or portion thereof being canceled and, (B) in the case of Options and Stock Appreciation Rights, the cancellation of all or any portion of such outstanding Options and Stock Appreciation Rights by a cash payment equal

to the excess, if any, of the Fair Market Value of the Shares subject to such outstanding Awards or portion thereof being canceled over the exercise price or grant price, as applicable, with respect to such Options and Stock Appreciation Rights or portion thereof being canceled (and, for the avoidance of doubt, if there is no such excess, such Options and Stock Appreciation Rights shall be cancelled without any payment therefor).

(c) <u>No Other Rights</u>. Except as expressly provided in the Plan or an Award Agreement, no Participant shall have any rights by reason of any subdivision or consolidation of shares of stock of any class, the payment of any dividend, any increase or decrease in the number of shares of stock of any class or any dissolution, liquidation, merger or consolidation of the Company or any other corporation. Except as expressly provided in the Plan, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number of shares or amount of other property subject to any Award.

(d) <u>Savings Clause</u>. No provision of this Section 11 shall be given effect to the extent that such provision would cause any tax to become due under Section 409A of the Code.

Section 12. <u>Securities Law Requirements</u>

(a) Shares and Awards shall not be issued under the Plan unless the issuance and delivery of such Shares and any Awards comply with (or are exempt from) all applicable requirements of law, including (without limitation) the Exchange Act, the Securities Act, the rules and regulations promulgated thereunder, state securities laws and regulations and the regulations of any stock exchange or other securities market on which the Company's securities may then be traded. Except as set forth in an Award Agreement, the Company shall not be obligated to file any registration statement under any applicable securities laws to permit the purchase or issuance of any Shares or any Awards under the Plan, and, accordingly, any certificates for Shares or documents granting Awards may have an appropriate legend or statement of applicable restrictions endorsed thereon. If the Company deems it necessary to ensure that the issuance of securities under the Plan is not required to be registered under any applicable securities laws, each Participant to whom such security would be purchased or issued shall deliver to the Company an agreement or certificate containing such representations, warranties and covenants as the Company determines necessary or appropriate to satisfy such requirements.

(b) The exercise of any Option granted hereunder shall only be effective at such time as counsel to the Company shall have determined that the issuance and delivery of Shares pursuant to such exercise is in compliance with all applicable laws, regulations of governmental authority and the requirements of any securities exchange on which Shares are traded. The Company may, in its discretion, defer the effectiveness of an exercise of an Option hereunder or the issuance or transfer of Shares pursuant to any Award pending or to ensure compliance under federal or state securities laws or the rules or regulations of any exchange on which the shares are then listed for trading. The Company shall inform the Participant in writing of its decision to defer the effectiveness of the exercise of an Option or the issuance or transfer of Shares pursuant to any Award. During the period that the effectiveness of the exercise of an Option has been

deferred, the Participant may, by written notice, withdraw such exercise and obtain the refund of any amount paid with respect thereto.

Section 13.    <u>Compliance with Section 409A of the Code</u>

To the extent applicable, notwithstanding anything herein to the contrary, this Plan and Awards issued hereunder are intended not to be governed by or to be in compliance with Section 409A of the Code. To the extent applicable, the Plan and the Awards granted under the Plan shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretative guidance issued thereunder, including, without limitation, any such regulations or other guidance that may be issued after the effective date of the Plan. Notwithstanding any provision of the Plan to the contrary, in the event that the Committee determines that any Shares issued or amounts payable hereunder will be taxable to a Participant under Section 409A of the Code and related Department of Treasury guidance, prior to delivery to such Participant of such Shares or payment to such Participant of such amount, the Company may (a) adopt such amendments to the Plan and Awards and appropriate policies and procedures, including amendments and policies with retroactive effect, that the Committee determines necessary or appropriate to preserve the intended tax treatment of the benefits provided by the Plan and Awards hereunder and/or (b) take such other actions as the Committee determines necessary or appropriate to avoid or limit the imposition of an additional tax under Section 409A of the Code.

Section 14.    <u>Duration and Amendments</u>

(a)    <u>Term of the Plan</u>.   The Plan, as set forth herein, shall become effective on the effective date of the Plan of Reorganization. The Plan shall terminate automatically on the day preceding the tenth anniversary of its adoption by the Board unless earlier terminated pursuant to subsection (b) below.

(b)    <u>Amendment, Modification, Suspension, and Termination of Plan</u>.   The Board may amend, alter, modify, suspend, discontinue or terminate the Plan or any portion thereof or any Award thereunder at any time; provided that no such amendment, alteration, modification, suspension, discontinuation or termination shall be made (i) without shareholder approval if such approval is necessary to comply with any tax or regulatory requirement applicable to the Plan and (ii) without the consent of the Participant, if such action would materially diminish any of the rights of any Participant under any Award theretofore granted to such Participant under the Plan; provided, however, the Committee may amend the Plan, any Award or any Award Agreement in such manner as it deems necessary to comply with applicable laws and as set forth in Section 13 of the Plan. The termination of the Plan shall not affect any Awards outstanding on the termination date and shall stay in effect to the extent necessary to administer any remaining obligations in respect of outstanding Awards under the Plan.

Section 15.    <u>General Terms</u>

(a)    <u>Termination for Cause</u>.   Unless otherwise set forth in the applicable Award Agreement, all Awards, whether vested or unvested, shall be forfeited upon a Participant's termination for Cause. Unless otherwise set forth in the applicable Award Agreement or the

Stockholders Agreement, Shares issued with respect to any Award granted under the Plan shall be forfeited for no consideration upon a Participant's termination of Service for Cause. In the case of Restricted Stock, if some or all of the Shares of Restricted Stock are forfeited under this Section 15(a) or under the applicable Award Agreement, then, to the extent such Shares are forfeited, the stock certificates shall be returned to the Company, and rights, if any, of the Participant to such Shares and as a shareholder shall terminate without further obligation on the part of the Company.

(b) No Retention Rights; No Right to Incentive Award. Nothing in the Plan, any Award Agreement or in any Award granted under the Plan shall confer upon a Participant any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company (or any Subsidiary or Affiliate employing or retaining the Participant) or of the Participant, which rights are hereby expressly reserved by each, to terminate his or her Service at any time and for any reason, with or without cause. No person shall have any claim or right to receive an Award hereunder. The Committee's granting of an Award to a Participant at any time shall neither require the Committee to grant an Award to such Participant or any other Participant or other person at any time nor preclude the Committee from making subsequent grants to such Participant or any other Participant or other person.

(c) Termination of Employment. Unless an applicable Award Agreement provides otherwise, for purposes of the Plan, a person who transfers from employment or Service with the Company to employment or Service with a Subsidiary or an Affiliate or vice versa shall not be deemed to have terminated employment or Service with the Company, Subsidiary or Affiliate.

(d) Settlement of Awards; Fractional Shares. Each Award Agreement shall set forth the form in which the Award shall be settled. The Committee shall determine whether fractional Shares shall be issued under the Plan, whether cash, Awards, other securities or other property shall be issued or paid in lieu of fractional Shares or whether such fractional Shares or any rights thereto shall be rounded, forfeited or otherwise eliminated.

(e) Nontransferability of Awards. Unless otherwise determined by the Committee, an Award shall not be sold, pledged, assigned, hypothecated, transferred or disposed of in any manner by the Participant except in the event of the Participant's death (subject to the applicable laws of descent and distribution) and any purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance in violation of this Section 15(e) shall be void and unenforceable against the Company or any Subsidiary or Affiliate. An Award may be exercised, during the lifetime of a Participant, only by a Participant and an Award exercisable after the death of a Participant may be exercised by the legatees, personal representatives or distributees of the Participant. Any permitted transfer of the Awards to heirs or legatees of the Participant shall not be effective to bind the Company unless the Committee shall have been furnished with written notice thereof and a copy of such evidence as the Committee may deem necessary to establish the validity of the transfer, the acceptance by the transferee or transferees of the terms and conditions of the Plan and the Award and agreement to be bound by the acknowledgments made by the Participant in connection with the grant of the Award.

(f) Conditions and Restrictions on Shares. Any Shares issued under the Plan shall be subject to such vesting and special forfeiture conditions, repurchase rights, call rights, put rights,

rights of first offer and other transfer restrictions as the Committee may determine. Such restrictions shall be set forth in the applicable Award Agreement and shall apply in addition to any restrictions that may apply to holders of Shares generally.

(g) Withholding Requirements. The Company shall have the power and the right to deduct or withhold, or require a Participant to remit to the Company, the minimum statutory amount to satisfy federal, state and local taxes, whether domestic or foreign, required by law or regulation to be withheld with respect to any taxable event arising as a result of the Plan. If a Participant does not remit a required payment to the Company, the Company may offset any payments due to the Participant with any amounts owed to the Company. The Committee may, in its sole discretion, (unless otherwise set forth in the applicable Award Agreement), permit a Participant to satisfy the withholding requirement, in whole or in part, by (i) electing that the Company withhold from the Shares otherwise issuable to a Participant under an Award, a number of Shares that have a Fair Market Value equal to the required withholding amount or (ii) surrendering shares that are owned by the Participant and that have been held by the Participant for at least six months, that are in good form for transfer and that have an aggregate Fair Market Value equal to the required tax withholding amount. Notwithstanding the foregoing, the Participant shall not be permitted to surrender shares in payment of any portion of the tax withholding amount if such action would cause the Company or any Subsidiary to recognize a compensation expense, or additional compensations expense, with respect to the applicable Award for financial reporting purposes, unless the Committee consents thereto.

(h) Unfunded Plan. Participants shall have no right, title or interest whatsoever in or to any investments which the Company may make to aid it in meeting its obligations under the Plan. Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind, nor a fiduciary relationship between the Company and any Participant, beneficiary, legal representative or any other person. To the extent that any person acquires a right to receive payments from the Company under the Plan, such right shall be no greater than the rights of an unsecured general creditor of the Company. All payments to be made hereunder shall be paid from the general funds of the Company, and no special or separate fund shall be established and no segregation of assets shall be made to assure payment of such amounts. The Plan is not intended to be subject to the Employee Retirement Income Security Act of 1974, as amended.

(i) No Liability of Committee Members. No member of the Committee shall be personally liable by reason of any contract or other instrument executed by such member or on his behalf in his capacity as a member of the Committee nor for any mistake of judgment made in good faith, and the Company shall indemnify and hold harmless each member of the Committee and each other employee, officer, director or consultant of the Company to whom any duty or power relating to the administration or interpretation of the Plan may be allocated or delegated, against any cost or expense (including counsel fees) or liability (including any sum paid in settlement of a claim) arising out of any act or omission to act or determination in connection with the Plan unless arising out of such person's own fraud or willful bad faith; provided, however, that approval of the Board shall be required for the payment of any amount in settlement of a claim against any such person. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled

under the Company's Articles or Certificate of Incorporation or By-Laws, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

(j)     Reliance on Reports. Each member of the Committee and each member of the Board shall be fully justified in acting or failing to act, as the case may be, and shall not be liable for having so relied, acted or failed to act in good faith, in reliance upon any report made by the independent public accountant of the Company and its Affiliates and/or any other information furnished in connection with the Plan by any person or persons other than himself.

(k)     Relationship to Other Benefits. No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, profit sharing, group insurance or other benefit plan of the Company or any Subsidiary except as otherwise specifically provided in such other plan.

(l)     Expenses. The expenses of administering the Plan shall be borne by the Company and Subsidiaries or Affiliates.

(m)     Nonexclusivity of the Plan. The adoption of this Plan by the Board shall not be construed as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including, without limitation, the granting of stock options otherwise than under this Plan, and such arrangements may be either applicable generally or only in specific cases.

(n)     Severability. If any provision of the Plan or any Award agreement is or becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction or as to any person or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be stricken as to such jurisdiction, person or Award, and the remainder of the Plan and any such Award shall remain in full force and effect.

(o)     Choice of Law. The Plan shall be governed by, and construed in accordance with, the laws of the state of Delaware without regard to the principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction, in each case, which could cause the application of the laws of any jurisdiction other than such state.

(p)     Pronouns. Masculine pronouns and other words of masculine gender shall refer to both men and women.

(q)     Titles and Headings. The titles and headings of the sections in the Plan are for convenience of reference only, and, in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]