**MILBANK, TWEED, HADLEY & McCLOY** LLP
Linda Dakin-Grimm (LD 5669)
Daniel M. Perry (DP 6966)
601 S. Figueroa St., 31st Floor
Los Angeles, CA 90017
Telephone: (213) 892-4000

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| YOUNG BROADCASTING INC., *et al.*, | : | Case No. 09-10645 (AJG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

## OBJECTION TO THE PLAN OF REORGANIZATION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND PRE-TRIAL BRIEF OF WACHOVIA BANK, N.A., AGENT FOR SENIOR SECURED LENDERS

Wachovia Bank, N.A. ("Wachovia"), the administrative agent for the senior secured lenders (the "Lenders") under the Credit Agreement dated as of May 3, 2005, with Young Broadcasting, Inc. ("YBI" or the "Company") and its subsidiaries (collectively, the "Debtors"), hereby submits its pre-trial brief in support of its objection to the confirmation of the Official Committee of Unsecured Creditors' (the "Committee") Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Committee's Plan") and in support of the Debtors' Joint Plan Under Chapter 11 of the Bankruptcy Code (the "Debtors' Plan").

## PRELIMINARY STATEMENT

The Court is confronted with a choice between two plans of reorganization. The Debtors' Plan completely deleverages the Company and provides it with a $20 million working capital facility going forward. It is clear that the Debtors' Plan is feasible and positions the Company for success in the current economic climate. The Committee's Plan, on the other hand, proposes to reinstate all $357 million of the Lenders' secured debt ($338 million pre-petition principle and interest and $19 million (as of today) post-petition interest). The result will be a Company that is over 10x levered upon emergence from bankruptcy with a maturity of the reinstated debt looming in November of 2012. And while the Committee Plan includes an initial $45.6 million equity investment, that money will do nothing more than pay the Debtors' exit costs from bankruptcy and attempt to maintain the $10 million cash cushion required by the Credit Agreement, leaving little to fund growth and investment going forward ; or more importantly, to provide working capital in the event the revenue projections that are admitted to be "aspirational" are off by a little. Even the Committee's own representative admitted at deposition that the Committee Plan was "speculative." Indeed, it is difficult to image how the Debtors that recently generated cash bids of only $120 million at auction could be in a position to pay off over $350 million in debt in less than three years. Not surprisingly, the Committee's Plan suffers from a number of case dispositive deficiencies that require confirmation of the Debtors' Plan.

*First*, the Committee Plan seeks to give *control* of the reorganized Company to the noteholders committing the $45.6 million in equity called for under the Committee Plan. The Committee Plan does so notwithstanding a comprehensive series of

protections that trigger an "event of default" under the Credit Agreement in the event that Vincent Young loses *control* of YBI. The Committee Plan has created a veritable Rube Goldberg device to circumvent both the intent and meaning of these change of control provisions. The Committee Plan, among other things, creates two classes of stock (one for Vincent Young and one for everyone else) and allocate hundreds of millions of votes to Vincent Young so that he can elect himself to the Board, but otherwise gives him only nominal voting power for the rest of the board of directors. Elsewhere, the Committee Plan actually seeks to effect a change of control in the reorganized YBI board of directors by requiring the current board to "nominate" directors for election that have already been nominated by the parties contributing new equity. This complicated scheme, which the Committee admits it specifically designed to circumvent the Change of Control provisions in the credit agreement, violates the plain language of the Credit Agreement. In attempting to strip the change of control provisions of all force and effect, the Committee's scheme violates the fundamental precept of New York law that all contracts must be interpreted in a manner that gives full force and effect to each and every clause contained in the contract.

*Second*, the testimony at trial will demonstrate that the Committee Plan is not feasible. Analyzing the Debtors' "base case" budget, the Lenders' expert, Blackstone, concluded that even with flawless execution of the "aspirational" business plan attached to the Debtors' Plan, the Debtors will be unable to refinance or otherwise extinguish the reinstated debt upon maturity in November 2012. The Allen & Company ("Allen & Co.") report submitted by the Committee reaches a contrary conclusion under the "base case" but expresses some uncertainty under a "stress case." Wachovia will file, prior to

trial a *Daubert* motion seeking to have the Committee's expert report and testimony excluded at trial. But even if the Court chooses to hear testimony from the Committee's expert, the Committee's expert report is hopelessly flawed. The Committee has proffered an unqualified expert. He did not attend business school or even obtain an undergraduate degree in any relevant field. The proffered expert is a lawyer, not a finance professional. Neither he nor his team has any experience in the type of finance transaction that will be required to extinguish the reinstated debt. Nor is the report reliable. In order to generate higher valuations, Allen & Co. used a method of valuation (which they call a "Levered DCF analysis") that has never been used in any recorded case that we were able to identify. The witness was unable to identify any textbook that teaches the "Levered DCF analysis." The rules surrounding the types of expert valuation testimony in court proceedings are well-established, and the Committee simply chose to ignore established practice in order to generate the inflated valuation necessary to justify their Plan. The Committee's expert has a strong incentive to use an untested methodology to "gin up" the numbers necessary to support the Committee Plan: Allen & Co. will collect a $3.6 million "success fee" in the event that the Committee Plan is approved.

*Finally*, even assuming *arguendo* that the Plan is technically feasible (it is not), the Bankruptcy Code Section 1129 factors strongly favor the Lenders. The only factor that cuts decisively in favor of either party is the relative feasibility of the proposed Plans. It cannot be credibly disputed that the Debtors' Plan is the far more feasible than the Committee Plan. This is likely why the trade creditors, who are a constituent member of the Committee, voted $7 million to $1 million *against* the Committee Plan. The largest

and most significant trade creditors do not want to do business with a reorganized YBI that is overleveraged with an uncertain and "speculative" future.

*     *     *

This is simply not a case where the Committee has proposed a feasible plan. Indeed, we are aware of no case where a Court has reinstated an objecting senior secured lender where, as here, the enterprise value of the Debtor on the plan effective date is actually *less* than the amount of the secured obligation reinstated under the plan.

## FACTUAL BACKGROUND

**A.      Deterioration of the Debtors' Business Leading to the Chapter 11 Filing**

**1.            Company Overview**

YBI, the direct or indirect parent of each of the other Debtors, was founded in 1986 by Vincent Young and his father, Adam Young.  Vincent Young is the current chairman of the Company.  The Debtors own and operate ten television stations, which are located in:  Lansing, Michigan (WLNS- a CBS network affiliate), Green Bay, Wisconsin (WBAY - an ABC network affiliate), Lafayette, Louisiana (KLFY - a CBS network affiliate), Nashville, Tennessee (WKRN - an ABC network affiliate), Knoxville, Tennessee (WATE - an ABC network affiliate), Albany, New York (WTEN - an ABC network affiliate), Richmond, Virginia (WRIC - an ABC network affiliate), Davenport, Iowa (KWQC - an NBC network affiliate), Sioux Falls, South Dakota (KELO – a CBS network affiliate), and San Francisco, California (KRON - a MyNetworkTV network affiliate).  The Debtors also operate satellite stations that rebroadcast programming from primary stations.  In addition, the Debtors own and operate a television advertising sales representation firm, Adam Young, Inc.

The Debtors focus on local news, local sports, and community affairs programming. The Debtors' primary means of income generation is the sale of advertising on Company stations. Each of the stations relies on an affiliated network for programming. Each of the stations (other than KRON) has an affiliation agreement with one of the major networks.

##### 2. Declining Revenues and Repeated Failures to Meet Budget Projections and Wall Street Analyst Expectations

During the period leading up to bankruptcy, YBI management demonstrated an awful record of performance relative to the company's budget and Wall Street expectations. In each of the three years before filing these cases, YBI suffered a steep decline in revenue and significantly underperformed its *budgeted* net operating revenue and broadcast cash flow. In 2006, the Company realized $225.2 million in net operating revenue (as against a budgeted $240.6 million) and $64.8 million in broadcast cash flow (as against a budgeted $80 million). (*See* Declaration of Daniel M. Perry in Support of Objection of Wachovia Bank to Committee Plan ("Perry Decl."), Ex. 1, Expert Report of Blackstone Advisory Partners, dated December 2009 (the "Blackstone Report") at 20.) In 2007, the Company's net operating revenue decreased to $201.2 million (as against a budgeted $223.6 million) and its broadcast cash flow decreased to $45.1 million (as against a budgeted $65.1 million). (*Id.*) In 2008, the Company's net operating revenue decreased again to $190.8 million (as against a budgeted $229.6 million) and its broadcast cash flow further decreased to $39.3 million (as against a budgeted $82.1 million). (*Id.*)

Similarly, from 2005 to 2008, YBI routinely failed to meet the quarterly expectations of the research analysts following the Company. Specifically, during that

timeframe, YBI missed the Quarterly Consensus Revenue Estimates 53% of the time, missed the Quarterly Consensus EBITDA Estimates 77% of the time, and missed the Quarterly Consensus EPS Estimates 60% of the time.  (*Id*. at 22.)

### 3. Decline in Broadcast Television Share of Advertising Revenues

In addition to poor management and other unsuccessful investment decisions, YBI has suffered as a result of fundamental changes in the media landscape—most significantly, the rise of cable and satellite television, the internet, and other alternatives to broadcast television.  Broadcast television viewership has been declining for decades and is projected by Wall Street analysts to continue to lose market share to cable and satellite channels for the foreseeable future.  (Perry Decl., Ex. 1 (Blackstone Report) at 12.)  The rise of internet programming choices such as Hulu, technological challenges including DVRs, and prior reductions of fixed costs have placed additional pressure on the revenue capability of the television broadcast sector.  (*Id*. at 11.)  As set forth in the Blackstone Report, between 2003 and 2013, broadcast television's share of advertising spending in the United States is projected to decline from 24% to 20%.  (*Id*. at 13.)

### B. The Debtors' Obligations Under the Credit Agreement

### 1. Overview of Obligations

YBI is the Borrower under a Fourth Amended and Restated Credit Agreement, dated as of May 3, 2005, among YBI, the Lenders from time to time party thereto, Wachovia (as administrative agent, collateral agent and issuing bank), Lehman Commercial Paper Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated (as syndication agents), BNP Paribas (as documentation agent), and Wachovia Capital Markets, LLC, Lehman Brothers Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated (as joint lead arrangers and joint lead book-runners) (the "<u>Credit</u>

Agreement") (Perry Decl., Ex. 2). As described more fully below, the Committee proposes to reinstate the Credit Agreement as part of its Plan.

The Credit Agreement originally provided for a $300 million term loan. Critically, that loan matures in November 2012. The Company borrowed the full $300 million under the term loan on May 3, 2005. Subsequent amendments increased the term loan to $350 million. The Secured Obligations under the Credit Agreement, as amended, bear a LIBOR-based floating interest rate: LIBOR plus 2.5%.

YBI's obligations under the Credit Agreement are secured by interests in and liens upon substantially all of the Debtors' assets. As of the Petition Date in this matter, February 13, 2009, the allowed amount of the Secured Obligations owing to the Prepetition Lenders was $338,451,923.85 (comprising outstanding principal of $338,125,000.00, plus unpaid prepetition fees, costs, and expenses as of the Petition Date). As of December 15, 2009, the amount owing to the Prepetition Lenders is no less than $357,522,093.04, which amount is increasing on a daily basis in an amount no less than $62,529.96 (as of December 15, 2009).

### 2. The Credit Agreement Provisions Implicated by the Proposed Reinstatement

The Committee Plan is a reinstatement plan. In order to prevail, the Committee must (i) cure all defaults under the Credit Agreement, and (ii) avoid triggering any new defaults following implementation of that plan.

#### a. The Default Interest Provision

There exist both pre- and post-petition monetary defaults under the Credit Agreement. In order to cure all existing defaults, the Debtors would be required, *inter alia*, to pay default interest as required under Section 2.04(f) of the Credit Agreement,

which provides that interest is payable at the default rate (2% above the non-default rate), "after as well as before judgment," once there has been an event of default. Due to certain pre-petition payment defaults of the Debtors, interest at the default rate started to accrue on or about February 14, 2009. As a result, accumulated interest and principal amortization payments will be due in varying amounts based on the plan effective date as follows: effective date of December 31, 2009 in the amount of $23.9 million, March 31, 2010 in the amount of $30.4 million, and June 30, 2010 in the amount of $36.9 million. (*See* Bentien Declaration attached to Wachovia's Objection to the Committee's Disclosure Statement (Docket No. 628 at ¶ 5)).

### b. Change of Control Provisions

The Credit Agreement also includes three different change of control provisions, each designed to ensure that Vincent Young—the individual with whom the Lenders chose to do business—continues to control YBI while the Company's obligations under the Credit Agreement remained outstanding. The Lenders bargained for these provisions to avoid a situation in which third parties (including junior creditors) took over the management and control of YBI. These provisions provide that upon occurrence of a defined change of control event, the obligations of the Lenders may be terminated and YBI's obligations may be declared immediately due and payable.

### C. The Auction for the Debtors' Assets

On March 4, 2009, in connection with authorizing the Debtors to use the Lenders' cash collateral, the Court authorized the Debtors to commence a process to market and

sell their assets.[1]  On April 2, 2009, the Court approved the Debtors' proposed bidding

procedures and scheduled an auction for the Debtors' assets.[2]  The auction was held, and

three qualified bids were submitted:  two cash bids of $120 million and the Lenders'

credit bid of $200 million.  (*See* Sale Order at 2.)  At the hearing where the Debtors asked

the Court to approve a sale of the Debtors' assets to the Lenders, the court found that the

Debtors and their financial advisor UBS Securities LLC diligently marketed the Debtors'

businesses over a six-month period, that the marketing and sale process resulted in a

market test and fair valuation of the Debtors' assets, and that the bids represented the best

price that could be obtained for the Debtors' businesses at that time.  (*See* Sale Order at 6,

¶¶ F, G.)  The Court's finding in this regard was consistent with well-established

precedent that a market test is a particularly reliable indicator of a company's value.[3]

Following the auction process, the Court authorized and directed the Debtors to

perform under the Asset Purchase Agreement they had entered into with the Lenders, but

---

[1]      *See* Final Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate
Protection to Certain Pre-Petition Secured Parties, and (III) Granting Related Relief, entered
March 4, 2009 (Docket No. 65).

[2]      *See* Order (I) Approving Bidding Procedures in Connection With an Investment or Sale
Transaction; (II) Authorizing the Debtors to Enter into a Stalking Horse Agreement in
Connection With an Investment or Sale Transaction; (III) Approving the Payment of Termination
Fee in Connection Therewith; (IV) Setting Auction and Hearing Dates; and (V) Approving
Procedures for the Assumption and Assignment Of Executory Contracts, entered April 2, 2009
(the "Sale Order") (Docket No. 207).

[3]      *See, e.g., In re Granite Broad. Corp*., 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007) ("there
is no dispute that in many circumstances the best evidence of value is what a third party is willing
to pay in an arm's length transaction. . . . [A] third party offer typically trumps all other
indications of value") (internal quotation marks omitted); *cf. Bank of America Nat'l Trust & Sav.
Ass'n. v. 203 N. LaSalle St. P'ship.*, 526 U.S. 434, 458 (1999) ("plans providing junior interest
holders with exclusive opportunities free from competition and without benefit of market
valuation" violate absolute priority rule).

to consummate the transaction only pursuant to a Chapter 11 plan or further order of the Court. (*See* Sale Order at 14.)

### D. The Competing Plans of Reorganization

#### 1. The Debtors' Budget

Each of the Plans at issue is based on the Debtors' Budget. Performance relative to the budget is not particularly critical for the Debtors' Plan, given that the Plan effects a complete deleveraging of the Company. But the Committee's Plan calls for substantial leverage, which will serve to magnify even a small shortfall relative to budget. And as the Debtors acknowledge, YBI has had a historic tendency to release overly optimistic budgets that the Company never meets. (*See* Perry Decl., Ex. 3 (Presentation to the Board of Directors, December 2009) at 50) (acknowledging that past budgets were "aspirational.") The projected budgets for 2010-2014, relied on by both the Debtors' and the Committee's Plan,[4] continue this practice of "aspirational" budgeting.

##### a. The Debtors Improperly Rely on Industry Average Statistics

The Debtors' business plan is unreliable, insofar as it is based on industry average forecasting, even though the Company has historically underperformed the industry average. The Committee Disclosure Statement notes that the Debtors' projections "reflect numerous assumptions, including . . . industry performance, certain assumptions with respect to the competitors of the Debtors, [and] general business and economic conditions." Committee Discl. Stmt. Supp. (Docket No. 645) at 81. Indeed, James Morgan, YBI's Chief Financial Officer testified in deposition that as of April 2009, the

---

[4]     The Debtors' financial projections, as adjusted by the Committee to reflect the proposed reinstatement of the Credit Agreement, as well as the stress case projections, are attached to the Committee's disclosure statement as Exhibit 4.

Company's "business plan model revenue"—referred to internally as "Case 3"—was actually set at a level *more* optimistic than the industry average. (*See* Perry Decl., Ex. 4 (Depo. Tr. of James Morgan, 11/30/09 ("Morgan Tr.")) at 165:9-167:3.)

Yet the Blackstone Report makes clear that (i) YBI has failed to achieve its projected budget numbers in the past three years, and (ii) the Company's "projections for a recovery in broadcast cash flow and EBITDA seems aggressive relative to its public peers." (Perry Decl., Ex. 1 at 20, 23-24.) In other words, the Debtors are projecting **better** than industry average performance in the coming three years, even though the Company has failed to meet industry average projections in the past three years. Moreover, the Debtors' projections do not account for particular factors affecting the Company's performance, especially the fact that, under the Committee Plan, YBI (fresh out of Chapter 11) would be highly leveraged, and in a weak negotiating position with potential lenders, networks, service providers, and other third parties with whom it will need to do business.

### b. The Debtors' Budget Does Not Reflect Accurate Capital Expenditure Needs

For the last several years, the Debtors have deferred significant amounts of capital expenses, which adds another degree of uncertainty to their forecasted budget.[5] As a

---

[5]      *See* Perry Decl., Ex. 5 (September 26, 2009 email from Bob Peterson to James Morgan and others, marked as Deposition Exhibit ("Depo. Ex.") 54, stating that for the several years YBI has only had capital funds for emergency replacement); Perry Decl., Ex. 6 (September 11, 2009, 9:46 a.m. email from Erik Graber to James Morgan and others asking to discuss "when/whether the company will stop deferring so much CAPEX," marked as Depo. Ex. 11); Perry Decl., Ex. 7 (Depo. Ex. 53, September 24, 2009 email from Bob Peterson to James Morgan and others, stating that "it was very clear that we were only to consider emergency needs so I no longer tried to develop a plan to implement a [capital expenditure] budget for 2009", marked as Depo. Ex. 53); *see also* Perry Decl., Exs. 8-9 (Depo. Exhs. 48, 49) (discussing outstanding capital expenditure projects that have been waiting for months for approval); Perry Decl., Ex. 10 (Depo. Tr. of Bob Peterson, 11/30/09 ("Peterson Tr.") at 15:12-19.)

result, the Debtors' infrastructure has severely deteriorated.[6]  But despite this deterioration, which in some cases has resulted in problems as extreme as stations going dark when switching from network to local programming (*see* Perry Decl., Ex. 14 (Depo. Ex. 50); Ex. 10 (Peterson Tr.) at 59:24-62:10), the Debtors have not allocated adequate resources to address these issues or even contemplated making any significant improvement to the Debtors' infrastructure.

The Debtors' budget forecast allocates approximately $8 million in capital expenditure each year for the next five years.  (Ex. B of the Debtors' Plan (Docket No. 644).)  But this number does not reflect the actual needs of the stations.  Rather, senior management picked this number out of thin air and then directed Company staff to create a capital expenditure plan based on this number.  (Perry Decl., Ex 10 (Peterson Tr.) at 43:18-46:7; *see also* Perry Decl., Ex. 15 (Depo. Ex. 44).)  In fact, the estimated "priority needs" for the stations is approximately $10.745 million and the stations' "wish list" is $23 million.  (*See* Perry Decl., Exs. 16-17 (Depo. Exs. 32, 51).)  The Debtors' methodology of first picking a number and then creating a capital expenditure budget that "backs into" that number is inherently problematic, especially because capital expenditures are so crucial to YBI's business operations.  Not only does the $8 million clearly not address the needs of the stations, but it does not provide adequately for unknown expenses that may arise in the next few years, especially in the rapidly

---

[6]    *See* Perry Decl., Ex. 11 (Depo. Ex. 45, May 4, 2009 email from Bob Peterson stating that continuing to operate with current unreliable 10+ year-old field and editing equipment would be "flirting with disaster"); Perry Decl., Ex. 12 (Depo. Ex. 43, Mar. 20, 2009 YBI Capital Status Report stating that "[d]igital audio problems plague all of our stations"); Perry Decl., Ex. 13 (Depo. Ex. 46, May 6, 2009 email from Bob Peterson stating that YBI cannot install available upgrades because of "hardware limitations" that would be solved by purchase of an approximately $4500 server for each station).

changing area of broadcast technology, to which YBI will need to adapt in order to remain competitive.[7]

### 2. The Debtors' Plan

On September 24, 2009, the Debtors filed their Plan. The Debtors' Plan flows directly from the auction sale approved by the Court, and thus reflects a truly market tested approach to reorganizing the Debtors and their business. ***The Debtors' Plan effects a complete deleveraging of the Debtors***—all $357 million (as of 12/15/09) of the Lenders' secured debt, and all $484 million of the Noteholders' subordinated notes, are extinguished. Under the Debtors' Plan, a new holding company owned by the Lenders will own the stock of the reorganized Debtors, and will issue **$75 million** of notes with a five-year maturity. The reorganized Debtors will not be borrowers or guarantors under this debt issuance by the new holding company, and the new notes will not be secured by the assets of the reorganized Debtors. In addition to deleveraging the Company, under the Debtors' Plan the Lenders have committed $20 million to an Exit Facility providing credit to the Company as it emerges from Chapter 11.

The Debtors' Plan thus accomplishes two goals critical to the Company's success post-reorganization: (i) it deleverages the Company and (ii) it provides an additional $20 million in working capital to the Company going forward. In the context of a slowing economy, shrinking revenues in the television broadcasting industry, tight credit markets, and the various challenges confronting YBI in particular, this conservative approach is the only sensible approach to achieving long-term stability.

---

[7] Notably, the Debtors projected capital expenditure budget for 2008-2010 is well below almost all of its competitors, at approximately 3.3% of its revenues. (Perry Decl., Ex. 1 (Blackstone Report) at 24.)

### 3.    The Committee's Plan

On October 9, 2009, the Committee filed its plan.  The Committee Plan provides for reinstatement[8] of the Prepetition Lender Claims under the Credit Agreement under Bankruptcy Code Section 1124, with a commitment by certain "Backstop Parties" to invest $45.6 million in new equity capital in the form of New Preferred Stock and New Common Stock.  The Backstop Parties are primarily a series of funds affiliated with the Capital Research Group, and none of the Backstop Parties are strategic investors with a long-term investment horizon.

Indeed, the $45.6 million investment promised under the Committee Plan represents nothing more than a short-term cash infusion that will barely cover the Debtors' exit from bankruptcy.  As set forth in the Bentien Declaration attached to Wachovia's Objection to the Committee's Disclosure Statement (Docket No. 628 at ¶ 5), an interest and principal amortization payment will be due under the Credit Agreement on March 31, 2010 in the amount of $30.4 million.  When the Debtors' other bankruptcy exit costs are considered, along with the required $10 million cushion, it is clear that the $45.6 million will only bring the Company back to "square one" and provide *no* working capital going forward.

Under the Committee Plan, 10% of the New Common Stock would be distributed to Noteholders, who would also have the opportunity to participate in a Rights Offering

---

[8]       Section IV.B. of the Committee Plan provides that "[o]n the Plan Effective Date . . . the maturity of the Prepetition Lender Claims shall be reinstated as such maturity existed prior to any such default and the legal, equitable and contractual rights of Holders of Class 2 Claims will not otherwise be altered."  Committee Plan § IV.B.1.  As such, the Committee Plan treats Class 2 as unimpaired and the "Holders of Allowed Prepetition Lender Claims are presumed to accept the [Committee] Plan and are not entitled to vote to accept or reject the [Committee] Plan." Committee Plan § IV.B.2.

to purchase up to their *pro rata* share of the New Preferred Stock and New Common Stock.  The Committee Plan proposes to retain members of management with rich new employment contracts and to create a new Management and Director Equity Incentive Plan.  With respect to Mr. Young, in particular, the Committee Plan provides, *inter alia*, for a two-year term at an annual salary of $840,000, an annual bonus of up to $1.68 million, termination payments, stock grants of Class B New Common Stock representing 10% of the New Common Stock upon confirmation, an unspecified payment under a deferred compensation plan payable at the end of 2010, and a company-provided leased automobile for personal use.  (*See* Ex. 4 of Committee Plan, Employment Agreement Between Young Broadcasting Inc., and Vincent J. Young, filed Dec. 12, 2009, Docket No. 706.)

### 4.     The Results of the Voting on the Plan

With one important exception, the result of the voting on the Debtors' Plan and the Committee's Plan was relatively unexceptional—the Lenders voted for the Debtors' Plan and the noteholders voted for the Committee Plan.  But even though one would expect general unsecured creditors to prefer a plan proposed by an official creditors committee over one proposed by a debtor, here the general unsecured creditors have expressed a clear preference for the Debtors' Plan.  Based upon the results of the voting tallied by the Voting Agent, general unsecured creditors holding $7.5 million in claims voted to accept the Debtor's Plan, and only $0.95 million voted to reject the Debtors' Plan.  In startling contrast, general unsecured creditors holding only $2.66 million in claims voted to accept the Committee Plan, while $5.79 million voted to reject the Committee Plan.  By more than 7 to 1, the general unsecured creditor claims voted to

accept the Debtors' Plan, while by more than a 2 to 1 margin the general unsecured creditors voted to reject the Committee Plan.

The result is even more startling when the preference vote is counted. Almost $6.7 million in general unsecured claims voted to prefer the Debtors' plan, and only $1 million voted to prefer the Committee Plan, almost a 7 to 1 margin preferring the Debtors' Plan. Notwithstanding that 88% in dollar amount of general unsecured creditors voted for the Debtors Plan, only 43% of the general unsecured creditors voting voted for the Debtors' Plan, so the general unsecured class is not deemed as a legal matter to have accepted the Debtors' Plan. As a result, both plans will be required to pass the cram down test of Bankruptcy Code Section 1129(b).

Given that the Senior Lenders' claims exceed the going concern value of the Debtors, the consideration being paid to general unsecured creditors is greater than they are entitled to under the fair and equitable test of Section 1129(b) and the best interests of creditors test of Section 1129(a)(7), and the Debtors' Plan should have no problem satisfying the tests of Section 1129(b). The noteholders claims are contractually subordinated under the applicable Indentures to the Senior Lenders, therefore, cramdown of their claims under the Debtors' plan is appropriate.

The general unsecured creditors' overwhelming preference for the Debtors' Plan makes good business sense. Unlike the noteholders that controlled the votes on the Creditors Committee, these creditors do business with the Debtors on a daily basis, know the Company at the ground level, and need a company that will best be able to survive the current difficult economic times. Only the Debtors' Plan, which effects a complete

deleveraging of the Debtors, can provide the general unsecured creditors with a stable and continuing source of business for creditors.

**ARGUMENT**

**I.    THE COMMITTEE PLAN VIOLATES THE CHANGE OF CONTROL PROTECTIONS IN THE CREDIT AGREEMENT**

The Credit Agreement provides the Lenders with substantial protection against a "change of control" whereby Young Broadcasting is operated and controlled by a person or an entity other than the person the Lenders agreed to do business with (*i.e.*, Vincent Young). Specifically, three provisions of the Credit Agreement work together to require that Mr. Young (and not junior creditors) maintain control over the Company. *First*, the Credit Agreement requires that Mr. Young (and persons he controls) maintain at least 40% of the Company's Voting Stock. (Perry Decl., Ex. 2 at § 6.01(j).) *Second*, the Credit Agreement forbids any other person or group from owning more than 30% of the Voting Stock (unless Mr. Young and his affiliates own more Voting Stock than that person or group or have the ability to elect a majority of the board of directors). (*Id*. at § 6.01(k)(i).) *Third*, the Credit Agreement bars any change in the majority of the board of directors over a two-year period. (*Id*. at § 6.01(k)(ii).) When read together and giving full effect to each clause—as required under New York law, which governs the Credit Agreement —these provisions evince a clear intent among the parties to the Credit Agreement to ensure that Vincent Young maintain control of the Company.[9]

---

[9] *See, e.g., Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003) (contract should be read as a "harmonious and integrated whole" with "every part . . . interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose"); *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996) ("When interpreting a written contract, the court should give effect to the intent of the parties as revealed by the language and structure of the contract and should ascertain such intent by examining the

As set forth below, the Committee's voting rights scheme, if implemented, would trigger immediate change of control defaults. These defaults would render reinstatement impossible and require denial of the Committee Plan.[10]

### A. The Committee Plan Impermissibly Provides Vincent Young With Less Than 40% of the Voting Stock of the Debtors

The Credit Agreement provides for an event of default if Vincent Young, his affiliates, and members of management of Young Broadcasting "shall fail to hold, in the aggregate for all such individuals and other Persons, record and beneficial title to at least 40% (by number of votes) of the Voting Stock of the Borrower." (Perry Decl., Ex. 2 at § 6.01(j).) Voting Stock is defined as "Capital Stock . . . of the class or classes pursuant to which the holders thereof have the *general voting power under ordinary circumstances* to elect the board of directors, managers (irrespective of whether or not at the time stock of any class or classes shall have or might have voting power by reason of the happening of any contingency)." (*Id*. at § 1.01 (emphasis added).) Capital Stock is, in turn, defined as "an and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) corporate stock or other equity participations, including partnership interests, whether general or limited, . . . including any Preferred Stock." (*Id*. at § 1.01.)

The Committee attempts to circumvent the protections negotiated by the Lenders by manipulating the votes allocated to the Voting Stock provided under the Plan so as to

---

document as a whole. Effect and meaning must be given to every term of the contract and reasonable effort must be made to harmonize all of its terms.").

[10] *See In re Charter Commc'ns.*, No. 09-11435 (JMP), 2009 WL 3841971, at *9 (Bankr. S.D.N.Y. Nov. 17, 2009) (where proposed plan of reorganization is premised on reinstatement of loan agreement that includes prohibitions on change of control events, "[f]inding a change in control would defeat reinstatement and result in denial of confirmation.").

give themselves a lawyer's argument that the Committee Plan complies with Section 6.01(j).  (*See* Committee Plan at 30-31.)  The Committee admits that it has distributed only 10% of the beneficial equity ownership in reorganized YBI to Vincent Young, but contrives to provide Mr. Young with at least 40% of the "votes" through the issuance of an entirely new (Class B) stock owned exclusively by Mr. Young.  (*See id.*)

Under the Committee's scheme, which the Committee Disclosure Statement admits was established "[t]o comply with the Credit Agreement" (Committee Discl. Stmt. at 26), there would be seven directors, six of whom would be "Class A" directors and one of whom would be a "Class B" director.  The Class A directors would be appointed by the Backstop Parties and the Committee, while the Class B director would be Vincent Young.  The Committee assigns different multipliers to the stock holdings of Class A and Class B holders, in order to achieve, as a purely numerical matter, a situation in which Vincent Young holds more than 40% of the "votes."  Each share of Class A stock (out of a total of 5 million Class A shares) would entitle the holder to cast 20 votes in the election of Class A directors, and one vote in the election of Class B director (*i.e.*, Vincent Young).  Each share of Class B stock (out of a total of 500,000 Class B shares) would entitle the holder (*i.e.*, Vincent Young) to cast one vote per share in the election of Class A directors, and 1000 votes per share in the election of the Class B Director.  This

proposed voting mechanism is reflected in the following table:

|  | **Votes for Class A Directors** | **Votes for Class B Directors (Vince Young)** |
|---|---|---|
| **Class A Holders** *(5 million shares)* | **100 million** *(5m\*20)* | **5 million** *(5m\*1)* |
| **Class B Holder** *(500,000 shares)* | **500,000** *(500,000\*1)* | **500 million** *(500,000\*1000)* |

Thus, the Committee artificially pads the Class B votes total by giving the holder of the Class B shares (*i.e.*, Vincent Young) an inordinate number of votes (500 million) with respect to the election of the single Class B director (*i.e.*, Vincent Young). At the same time, the Class B shares hold only a nominal number of votes with respect to the selection of the six Class A directors (500,000 as compared to the Class A shares' 100 million).[11]

This scheme—openly designed to circumvent the change of control protection negotiated by the Lenders—fails, on its face, to satisfy the terms of Section 6.01(j). That Section requires that Mr. Young hold 40% (by number of votes) of the "Voting Stock" of Young Broadcasting. The definition of Voting Stock does not include all classes of the

---

[11] Moreover, while the Class A shares are entitled to one vote per share on (i) "matters affecting the rights, powers and preferences" of Class A stock and (ii) "all other matters," the Class B shares are entitled to one vote per share on matters affecting the rights, power and preferences of Class B stock, but "will have no other voting rights." *See* Committee Discl. Stmt. at 28. Given the totals of Class A and Class B shares (5 million as opposed to 500,000), these provisions mean that even on matters directly affecting the rights of Class B stock, the Class B shares would have only a trace amount of voting power relative to the Class A shares, and on any other matters (other than the election of directors), the Class B shares would have no vote at all.

Capital Stock of the company or even all classes of the Capital Stock of the Company with voting power. Rather, the Voting Stock is the stock "pursuant to which the holders thereof have the ***general voting power under ordinary circumstances*** to elect the board of directors." Only the Class A Stock created under the Committee Plan affords its holders "general voting power" that may be exercised "under ordinary circumstances" to elect the "board of directors." The Capital Stock granted to Mr. Young under the Committee Plan only gives him the right to elect himself as a member of the Board of Directors. The power to elect and control the board of directors lies with the Class A Stock. *See Charter Commc'ns.*, 2009 WL 3841971, at *9 (defining "ordinary voting power" as power to influence composition of board of directors).

The interpretation that the Committee urges would render meaningless the protections negotiated by the Lenders. An entity acquiring control of YBI from Mr. Young and his affiliates could always manipulate the voting rights accorded to the shareholders so that Mr. Young had 40% of the number of votes, while at the same time exercising no control over the Board of Directors. This result is contrary to well-established New York law governing contract interpretation, which requires that a Court give each and every provision of a contact meaning, force, and effect.[12]

---

[12]    *See Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007) ("A reading of the contract should not render any portion meaningless") (internal citations omitted); *Acme Supply Co., Ltd. v. City of New York*, 834 N.Y.S.2d 142, 143 (N.Y. App. Div. 2007) ("A court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect.") (internal citations omitted); *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect.") (internal citations omitted).

**B.    The Committee Plan Impermissibly Cedes Control of Over 30% of the Voting Stock of Young Broadcasting to a Group Other than Mr. Young and His Affiliates**

Section 6.01(k)(i) provides for an event of default if "any 'person' or 'group' (as such terms are used in Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended) . . . is or becomes the 'beneficial owner' . . . directly or indirectly, of more than 30% (by number of votes) of the total outstanding Voting Stock of the Borrower . . . ." As set forth above, the Backstop Investors will own more than 30% of the Voting Stock (as that term is defined under the Credit Agreement) of Young Broadcasting upon consummation of the Plan.  Investment funds controlled by the Capital Research Group constitute approximately 80% (approximately $36.62 million) of the $45.6 million in committed funds for the newly issued Voting Stock.  It is black letter law that an investment advisor such as Capital Research, together with funds it administers, constitute a "group" as that term is defined under Section 13(d) of the Securities and Exchange Act.[13]

Each of the Capital Research Funds is a signatory to the Plan Support Agreement under which the Backstop Parties memorialized their respective commitments toward the $45.6 million initial capitalization of the Company.  The fact that the same individual, Michael J. Downer, signed the letters on behalf of each fund, identifying himself on each signature page as "Sr. VP" signing as a representative for "Capital Research and

---

[13]    *See In re Montagu Inv. Mgmt. Ltd.*, No. 3-6223, 1983 SEC LEXIS 2235 (SEC Mar. 10, 1983) (investment advisor and client trust accounts constitute a "group" where investment advisor has discretion to make voting and investment decisions on behalf of the trusts); Matthew Bender & Co., 1-12 Investment Advisers: Law & Compliance § 12.02 (2009); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 124 (2d Cir. 2001) ("group" is formed where members combine to further a common objective regarding acquiring, holding, voting, or disposing of equity securities on certain specified terms); *see also In re Joslyn*, No. 3-11718, 2004 SEC LEXIS 2441 (SEC Oct. 26, 2004) ("group" activity may be demonstrated by communications between and among group members relating to coordinated securities acquisition).

Management Company, for an [sic] on behalf of [fund]" constitutes further evidence that these affiliated funds operate as a Section 13(d) group under established law. (*See* Perry Decl. Ex. 22.)

Section 6.01(k)(i) provides a safe harbor for an investment where (i) Mr. Young and his affiliates own more Voting Stock than the acquiring group or (ii) where Mr. Young and his affiliates have "the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the board of directors."  Neither safe harbor provision is available here.  As described above, Capital Research will own, as the Committee Plan is currently drafted, far more "Voting Stock" than Mr. Young and his affiliates.  Moreover, the Committee Plan, on its face, does not provide Mr. Young or his affiliates with the power to elect or nominate for election a majority of the board of directors.

### C.    The Committee Plan Impermissibly Requires the Wholesale Replacement of the Existing Board of Directors

Section 6.01(k)(ii) provides further protection from a change of control by providing for an event of default where "during any period of two consecutive years, individuals who at the beginning of such period constituted the board of directors of the Borrower . . . shall cease for any reason to constitute a majority of the board of directors of the Borrower then in office."  Here, the Committee Plan contemplates the wholesale replacement of the five members of the current board of directors (except for Mr. Young) with a new seven-member board of directors appointed by the Backstop Parties and the Committee.

The Committee claims that the provision is not triggered because the existing board of directors will "nominate for election" the slate of directors already "designated"

for election by the Committee and the Backstop Parties.  In doing so, the Committee attempts to twist a parenthetical contained in 6.01(k)(ii) aimed at protecting YBI from triggering an event of default through the normal course rotation of new directors.  That parenthetical provides, in relevant part, that "any new directors whose election to such board of directors, or whose nomination for election by the stockholders of the Borrower, was approved by a vote of 66 2/3% of the directors then still in office . . . ."  (Perry Decl., Ex. 2 (Credit Agreement) at § 6.01(k)(ii).)  The Committee attempts to comply with this provision, while retaining control of the board of directors of reorganized YBI, by purporting to have the Backstop Parties and the Committee "designate" the Class A Directors for election to the Board.  The Committee Plan then purports to have the existing board of directors "nominate" the previously "designated" directors for election.

The Committee's device to accomplish the change of control does not comport with the plain meaning of 6.01(k)(ii).  *First*, the entire structure of the proposed action is at odds with the purpose of Section 6.01(k)(ii).  New York law requires that a contract be interpreted to give effect to the intention of the parties as reflected by the plain language of an agreement.[14]  But the device here, on its face, seeks to accomplish a change of control through a wholesale change in the composition of the Young Broadcasting board

---

[14]  *See Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003) (contract should be read as a "harmonious and integrated whole" with "every part . . . interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose") (internal citations omitted); *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996) ("When interpreting a written contract, the court should give effect to the intent of the parties as revealed by the language and structure of the contract and should ascertain such intent by examining the document as a whole.  Effect and meaning must be given to every term of the contract and reasonable effort must be made to harmonize all of its terms.") (internal citations omitted); *Tantleff v. Truscelli*, 493 N.Y.S.2d 979, 983 (N.Y. App. Div. 1985) ("[T]he proper aim of the court is to arrive at a construction which will give fair meaning to all of the language employed by the parties, and to reach a practical interpretation of the expressions of the parties to the end that there will be a realization of their reasonable expectations.") (emphasis in the original) (internal citations omitted).

of directors—precisely what the parties to Credit Agreement agreed would constitute an event of default.

*Second*, even if the Court were willing to permit this sort of mischief, the Credit Agreement requires that the existing board of directors do the nominating—not the party seeking to assume control of the company. The Committee attempts to draw a distinction by having the Backstop Parties "designate" the new board members and then having the board "nominate" the "designated" parties. But, in this context, the two terms are synonymous. Indeed, Black's Law Dictionary defines "nominate" as "to name or ***designate*** (a person) for a position." BLACK'S LAW DICTIONARY 1148 (9th ed. 2009) (emphasis added). Similarly, the Oxford Dictionary defines the word "designate" as (*inter alia*) to "appoint, set apart, select, nominate for duty or office," while it defines the word "nominate" as (*inter alia*) to "appoint (a person) by name to hold an office or discharge a duty." OXFORD ENGLISH DICTIONARY (2nd ed. 1989). Here, it is the Committee and the Backstop Parties that have nominated and will vote on each of the new directors that will sit on the Board of reorganized Young Broadcasting. That constitutes a change of control under Section 6.01(k)(ii).

Again, were the Court to read the provision otherwise, the change of control protection negotiated by the Lenders in the Credit Agreement would be rendered meaningless, which is not permitted under New York law. (*See supra* at note 12.) A party seeking to take control of YBI could simply arrange to have their hand-picked directors "nominated" by the existing board, thereby rendering the protections negotiated in Section 6.01(k)(ii) completely without force and effect.

*Third*, even if the Court accepts the Committee's "designate/nominate" scheme, the Committee Plan fails to account for the minority fiduciary blocking mechanism contained in Section 6.01(k)(ii). Under the Committee's interpretation, 66 2/3% of the current board of directors (*i.e.*, four of its five current members) must vote to "nominate" the Committee's new board of directors. The Committee simply fails to address the possibility that two of the five board members could, in the sound exercise of their business judgment, vote against or make clear their intention to vote against the "nomination" of the Committee's new board of directors, thereby blocking the implementation of the "speculative" and highly leveraged Committee Plan.

## II.    THE COMMITTEE'S PLAN IS NOT FEASIBLE

To confirm a Chapter 11 plan, Section 1129(a)(11) requires that the Court determine that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization." 11 U.S.C. 1129(a). "The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan is workable and has a reasonable likelihood of success." *In re WorldCom, Inc*., No. 02-13533, 2003 Bankr. LEXIS 1401, 169-171 (Bankr. S.D.N.Y. Oct. 31, 2003). "The purpose of the feasibility test is to protect against speculative plans [and] to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Id*. Factors considered in determining whether a plan proponent has met its burden of showing feasibility include "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which will determine the prospects of a sufficiently successful operation to enable

performance of the provisions of the plan." *Id*. at 170; *see also In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

The Committee Plan is premised on the reinstatement of the Credit Agreement. Because the Committee concedes that the Debtors will not be able to repay the outstanding principal at maturity, the Committee Plan requires that the Debtor sell the company for value or refinance the debt *prior to November 2012*. In order to carry their burden on feasibility, the Committee offers the expert opinion of Allen & Co. Allen & Co. seeks to testify that (i) the value of the Debtors upon a sale in November 2012 will exceed their debt and (ii) alternatively, the Debtors would be able to refinance the debt at that time. Blackstone, on the other hand, will testify that (i) the total enterprise value of the Debtors is less than the value of the reinstated debt, and (ii) no reasonable third party would provide financing at the levels proposed in the Committee Plan.

### A. The Committee's Own Representative Witness Admitted at Deposition that the Committee Plan Was "Speculative"

Section 1129(a)(11) is designed to protect creditors against speculative and unrealistic plans that have little to no chance of success, and courts have repeatedly denied confirmation when the financial realities do not support the plan's promises of payment.[15] Here, the Committee's own representative conceded at deposition that the

---

[15]   *In re 8315 Fourth Avenue Corp.*, 172 B.R. 725, 734-35 (Bankr. E.D.N.Y. 1994) (plan premised on sale or refinancing that required value of debtor's assets to double or triple in five years deemed not practical as it was "relying on a veritable pot of gold at the end of the rainbow"); *In re Prudential Energy Co.*, 58 B.R. 857, 863-64 (Bankr. S.D.N.Y. 1986) (plan proponent's feasibility analysis (i) based upon expectation of "an overnight reversal of fortune," and (ii) not consistent with debtor's actual past performance; confirmation denied); *In re Investment Co. of the Southwest, Inc.*, 341 B.R. 298, 316-17 (B.A.P. 10th Cir. 2006) (plan proponent fails to explain how balloon payments are to be reasonably funded; explanation proffered is inconsistent with debtors' past performance).

Committee Plan was "speculative":

> Q. [D]o you have a belief as to whether or not Young, if it goes through the unsecured creditors plan, whether Young will be able to pay off that credit facility in 2012 when it matures?
>
> A. I think it's dependent on the condition of the high yield market in 2012. My belief is that the company will be able to refinance and then pay it off. However, you know, it's speculative in that I don't know what the condition of the credit markets will be.

(Perry Decl., Ex. 18 (Depo. Tr. of Tara Torrens, 12/8/09 ("Torrens Tr.")) at 15:15-16:2.)

A plan is simply not confirmable where even the plan proponent admits that the plan is "speculative." Numerous bankruptcy and appellate courts have rejected Chapter 11 plans on feasibility grounds where, as here, a large obligation comes due in the short term and the plan proponent relies on dramatic short-term improvements in credit market conditions and the debtor's performance to prove feasibility.[16]

---

[16] See, e.g., *In re Investment Co. of the Southwest, Inc.*, 341 B.R. 298 (B.A.P. 10th Cir. 2006) (confirmation denied where balloon payment to secured lender in seven years not supported by predictions based upon objective fact); *In re Smitty Investment Group, LLC*, No. 07-00020-TLM, 2008 WL 2095523 (Bankr. D. Idaho May 16, 2008) (confirmation denied where evidence that market conditions would rebound in time for balloon payment in four to five years fails to meet reliability standards for feasibility determination); *In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760 (Bankr. N.D. Fla. 1994) (plan proponent's optimism about future market conditions insufficient to show feasibility of making balloon payment to secured creditor in three years); *In re Lakeside Global II, Ltd.*, 116 B.R. 499 (Bankr. S.D. Tex. 1989) (confirmation denied where collateral value is half of secured debt and plan proponent proposes balloon payment in two years; debtor's prediction of "significant increase in the value and marketability" of debtor's assets not sufficient); *In re M& S Associates, Ltd.*, 138 B.R. 845 (Bankr. W.D. Tex. 1992) (confirmation denied where ability to make balloon payment in four years was a "long shot possibility"); *In re Parke Imperial Canton, Ltd.*, No. 93-61004, 1994 WL 842777 (Bankr. N.D. Ohio Nov. 14, 1994) (confirmation denied where balloon payment in seven years to secured lender based upon "possibility . . . [of] sufficient financing at some time in the future" is nothing more than visionary scheme); *In re Pelham Street Associates*, 134 B.R. 700 (Bankr. D.R.I. 1991) (confirmation denied where proposed balloon payment to secured lender in five years, paid through refinancing or sale, is "pure pie in the sky"); *In re 625 Corp.*, 228 B.R. 758 (Bankr. M.D. Fla. 1998) (confirmation denied where plan proponent would not be able to make balloon payment in ten years); *In re Stuart Motel, Inc.*, 8 B.R. 48 (Bankr. S.D. Fla. 1980) (confirmation denied where balloon payment to secured creditor contingent on speculative sales of property).

**B.    The Blackstone Report Credibly Concludes that the Debtors
Will Not Be Able to Sell the Company or Refinance when the
Reinstated Debt Matures in November 2012**

The opinion submitted by the Lenders' expert, Blackstone, establishes that the

Committee Plan is not feasible.  Assuming the "aspirational" projections set forth in the

Debtors' Disclosure Statement are correct, and applying well-established valuation

methodologies—particularly the discounted cash flow ("DCF") method, a review of

current market trading levels, and the recent auction process resulting in two cash bids of

$120 million and the Lenders' credit bid of $200 million—the Blackstone Report

concludes that the total enterprise value of the Company is $250 - $300 million.  (Perry

Decl., Ex. 2 at 8.)  Blackstone performed the same valuation exercise using the numbers

presented by the Committee under its so called "Delayed Recovery Case," and concluded

that based on these "stress case" numbers, the Company's intrinsic value lies in a range

of $200-$250 million.  Even at the highest end of the range ($300 million), the value of

the Debtors is more than $57 million short of what the Company currently owes under

the Credit Agreement.

There are several important caveats that suggest that the actual market value of

the Debtors is much lower.  Blackstone cautioned that its valuation represents an estimate

of the Company's "intrinsic" value "and may be higher than what a potential buyer is

willing to pay" through an auction process, "due to higher return hurdles required by new

buyers, or their disbelief in the Company's projections, or both," as well as the fact that a

potential buyer would not likely pay for long-term future tax attributes (which Blackstone

credited to the Company in its DCF analysis).  (*Id*. at 8, 27.)  Blackstone cautioned that

the Debtors' projections are highly optimistic, and "the Debtor Case valuation represents

a result that would only be achieved with flawless execution and ideal market

conditions." (*Id*.) In particular, Blackstone found that "Young's projections for a recovery in broadcast cash flow and EBITDA seem aggressive relative to its public peers" and "its projections for corporate expenses are significantly below historical levels." (*Id*.) Summaries of the Company's historical financials versus the Debtors' projected numbers support this finding, as they show a virtual doubling in projected broadcast cash flow from $28.9 million in 2009 to $57.4 million in 2012 (the year the Credit Agreement matures), along with a precipitous decline in corporate expense from $20.9 million in 2009 to only $4.8 million in 2012. (*Id*. at 17-18.) The Company's projections are particularly dubious given that YBI has failed to meet budget projections each year between 2006 and 2008. (*See id*. at 23.)

Blackstone concluded, based on its review of Company financials, industry trends, and the overall market, "***that Young will be unable to refinance its bank debt under the Creditor Committee Plan when it matures in November 2012***." (*Id*. at 36.) (emphasis added). Even under the optimistic "base case," "the Company will continue to be excessively levered with average 2010/2011 net debt to EBITDA of 6.9x," which is "at the high end of current and precedent leverage multiples for total debt on a television broadcaster." (*Id*.) Indeed, "[d]espite the current rebound in the financing markets, recent transactions for Sinclair Broadcast Co. and Belo Corp. indicate that current markets will finance TV broadcasters with senior leverage below 5.0x and total debt ***below 6.3x***." (*Id*.) (emphasis added). In addition, because the Company will need to refinance the Credit Agreement "by March 2012 at the latest" in order to avoid receiving a "going concern" opinion from its auditors, "a late 2011 refinancing may make it difficult for financing sources to 'look forward' to year-end 2012 projections and [those

sources] may be more comfortable financing YBI at a 'look back' average of 2010/2011 EBITDA," effectively requiring that the Company qualify for refinancing of its current debt based on ***next year's performance***.  (*Id.*)

In sum, even assuming flawless performance by the Company, the highest end of the valuation range is still more than $57 million ***less*** than the current outstanding debt, which matures in less than three years.

> **C.     The Committee Has Not Submitted Credible or Reliable
>            Expert Testimony Necessary to Meet Their Burden in Proving
>            Feasibility**

The Committee's expert, Allen & Co., has offered its own valuation of the Company, opining that the Company will be able to satisfy the reinstated debt upon maturity in November 2012.  (Perry Decl., Ex. 19, Young Broadcasting, Inc.:  Report on Behalf of the Official Committee of Unsecured Creditors, December 4, 2009 ("Allen & Co. Report").)  But the Committee's proffered expert, Thomas Kuhn, is not qualified to offer expert testimony on either subject.  Moreover, the methodologies used in the Allen & Co. Report are not standard methodologies.  They are untested, have not been subjected to peer review, error reporting, or maintained standards, and are not generally accepted in this field.  The  Lenders will be filing a *Daubert* motion seeking the exclusion of this testimony.

> **1.     Allen & Co. Failed to a Provide an Admissible Expert Opinion
>            on Valuation**

> **a.     Allen & Co. Is Neither Qualified Nor Credible**

The Committee's designated expert, Thomas Khun of Allen & Co., is not qualified to offer an expert opinion on valuation.  As he admitted during his deposition, has no banking expertise, knowledge, skill, experience, training, or education.  (*See* Perry

Decl., Ex. 20 (Deposition Transcript of Thomas Kuhn, 12/14/09 ("Kuhn Tr.") at 14:8-13).)  He never attended business school and is not an economist.  (*Id*. at 143:20-23, 144:2-3.)  His primary work experience is as an attorney, not as a banker analyzing the credit risk of companies similar to YBI.  (*Id*. at 11:13-13:9.)

Discovery has also confirmed that Mr. Kuhn and Allen & Co. lack credibility. During his deposition, Mr. Kuhn asserted that Allen & Co. had only considered a "base" and "delayed recovery" cases in rendering his opinion.  Only after being confronted with documents did Mr. Kuhn admit (after first dissembling) that, as of July 2009, Allen & Co. had considered not two but ***three*** projection scenarios for the Company:  (1) the Debtors' projections, (2) the more conservative "stress case" presented in the Committee's Disclosure Statement and Allen & Co. Report, and (3) a "downside" case. (*See* Perry Decl., Ex. 19 at 4; *cf*. Ex. 20 (Kuhn Tr.) at 115:20-117:21).  By October 2009, Allen & Co. had abandoned its "downside" case and was presenting only the more optimistic base and stress cases.  Mr. Kuhn's decision to excise entirely the "downside" case from his analysis is troubling and telling.  If Allen & Co. anticipated an economic scenario in which the Committee's Plan would fail, they should have apprised the Court and the Lenders of its existence.  They could have explained why they believed that the "downside" case was unlikely.  The Committee ought not proffer an expert who simply conceals the information that is harmful and presents the purportedly helpful information as his full and complete conclusions.

This behavior is not surprising.  Allen & Co. has negotiated a $3.6 million success fee here.  A substantial portion of Allen & Co.'s compensation is directly tied to its ability to get the Committee Plan confirmed.  (Perry Decl., Ex. 20 (Kuhn Tr.) at 101:13-

19.)  It is well-established that a success fee for an expert casts considerable doubt on the credibility of the testimony offered by the expert.  *Tagatz v. Marquette Univ., 861 F.2d 1040, 1042* (7th Cir. 1988) (finding that a "trier of fact should be able to discount [a witness' testimony] for so obvious a conflict of interest").

**b.      Allen & Co.'s "Levered DCF" Analysis Is Not Based on a Proper Method of Valuation and Is Not Reliable**

Allen & Co. also failed to conduct an appropriate valuation analysis, particularly a standard DCF analysis.  Instead, Allen & Co. relied entirely on what they have termed a "Levered DCF" analysis.  (Perry Decl., Ex. 19 (Allen & Co. Report) at 26-29.)  We are aware of no case in which a Court accepted the "Levered DCF" analysis used here by Allen & Co.  Indeed, Mr. Kuhn could not identify a single text book in which the "Levered DCF" is taught.  (Perry Decl., Ex. 20 (Kuhn Tr.) at 193:20-194:2.)

The caselaw is clear that there are three established ways to value a company.  Although the terms used to describe the methodologies vary, the methodologies themselves are standard.  They are: (i) a discounted cash flow analysis or "DCF"; (ii) a precedent transaction or comparable transaction analysis; and (iii) a publicly traded company or comparable company analysis."  *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 370 (Bankr. D. Del. 2006).  An expert will normally conduct all three analyses, then assign an appropriate weight to each methodology based on the circumstances of the case.  *Id*. at 371.

Both experts here did not rely on their precedent transactions analyses because little weight can be given to any precedential transactions given the change in the economic landscape over the last year and a half.  (Perry Decl., Ex. 19 (Allen & Co Report) at 25; Ex. 1 (Blackstone Report) at 26.)  A DCF analysis "derives the value of a

company by calculating the company's future cash flows multiplied by a discount factor to determine a present value of those future cash flows." *In re Nellson Nutraceutical,* 356 B.R. at 370. The main components of a DCF analysis are as follows:

> (a) an estimation of net cash flows that the firm will generate and when, over some period;

> (b) a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and

> (c) a cost of capital with which to discount to a present value of both the projected net cash flows and the estimated terminal or residual value.

*Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117, 1130 (D. Nev. 1998) (internal citation omitted). Valuation experts commonly determine the future cash flows of a company based on various projections. *Id.* This calculation takes the projections of what the company expects to earn and deducts expenses to determine cash flows in the future, then discounts them to determine a present value. *Id.* Next, experts generally calculate a terminal value of the company as of the end of the projections period based on an appropriate metric and application of an appropriate multiple based on a variety of factors. *Id.* The most commonly used metric for calculating terminal value is EBITDA. Experts generally apply a multiple using their expert judgment to determine the implied "terminal value" of the company. *Id.* This implied terminal value is designed to assess the value of the company as a going concern beyond its projections. *Id.* The appropriate multiple is derived from a variety of factors, including company- and industry-specific information. "The expert analysis is required, among other things, to select the appropriate source material and to perform the actual calculation." *In re Nellson Nutraceutical,* 356 B.R. at 370. Then, using their judgment, experts apply a discount rate

to determine a present value of the implied terminal value.  *Steiner*, 5 F. Supp. 2d at 1130.  Experts commonly use a weighted cost of capital ("WACC") as the discount rate to determine the present value of cash flows and the terminal value.  *Id.*  Together, the present value of the future cash flows plus the present value of the terminal value determines the "total enterprise value" or "TEV" of the company.  *Id.*

As the Lenders will show in a *Daubert* motion filed prior to trial, the "Levered DCF" analysis does not even approximate a traditional DCF analysis.   Indeed, when asked about the Allen & Co. "Levered DCF" analysis, the Lenders' expert, Peter Cohen, testified that he did not consider Allen & Co.'s methodology to be a DCF, but instead "would characterize it as a highly simplified way to look at valuation relative to a true discounted cash flow analysis."  (Perry Decl., Ex. 21 (Depo. Tr. of Peter Cohen, 12/14/09 at 86:5-24.)

> **2.      Allen & Co. Failed to a Provide an Admissible Expert Opinion to Establish that the Company Would Be Able to Refinance Its Debt Prior to Maturity**

Allen & Co.'s conclusion that the finance markets will recover and the reorganized Company will be able to raise sufficient funds through either a sale or a refinancing is similarly flawed.  The Committee's Plan is based on an unrealistic and speculative determination that the Debtors will be able to refinance their outstanding debt based on an unreliable opinion from Allen & Co.

> **a.      Allen & Co. Is Not Qualified to Submit an Expert Opinion on a 2012 Refinancing**

In addition to not being qualified to render an expert opinion on valuation, Mr. Kuhn's testimony reveals that he is not qualified to opine on the credit markets or lending trends.  (Perry Decl., Ex. 20 at 67:12-16, 141:7-144:3.)  Neither Mr. Kuhn nor any of his

colleagues working under his supervision has any experience in the business of making loans nor have they conducted or reviewed valuations or other considerations from the perspective of a lender on a financing transaction.  (Perry Decl., Ex. 20 at 14:20-22, 144:12-16.)  Instead, Allen & Co. purports to have expertise in the broadcast television market, based on various transactions in which Mr. Kuhn testified that he had no involvement.  (Perry Decl., Ex. 20 at 20:14-22:3.)  Notably, Mr. Kuhn is not a banker and he has no experience working with banks on the types of financing transactions that could be used to attempt to refinance the reinstated debt in 2012.  (Perry Decl., Ex. 20 at 14:8-13, 20-22.)  Mr. Kuhn testified that he had experience in "investment banking" at Allen & Co., but admitted that Allen & Co. does not make loans or analyze finance transactions from the perspective of the party actually making the loans.  (Perry Decl., Ex. 20 at 14:20-22; 144:12-16.)

> **b.  Allen & Co.'s Opinion on the Ability of the Debtors to Refinance Is Not Reliable**

Not surprisingly, given that he and his team have no relevant expertise, Mr. Kuhn also fails to provide a reliable expert opinion on the ability of the Debtors to refinance the reinstated debt in 2012.  Mr. Kuhn intends to opine that the credit markets will return to "somewhat normal" levels by November 2012 (*i.e.*, the maturity date of the senior secured debt), and, so the argument goes, the Debtors will be able to obtain a replacement loan facility *at terms that are not available in today's market*.  (Perry Decl., Ex. 20 at 143:12-144:3.)  In addition to not being qualified to render this opinion, Mr. Kuhn sets forth no factual basis upon which this opinion is based.  Similarly, Mr. Kuhn intends to opine that the Debtors will be able to be sold for more than the amount of the senior secured debt in November 2012 because "in approximately three years, the overall

economic environment will have improved to provide more liquidity and appetite for acquisitions in the broadcasting sector." (*See* Perry Decl., Ex 19 at 29.) In addition to not being qualified to opine about the state of the economy in 2012, Mr. Kuhn has failed to identify any reliable factual basis upon which his bald statements are based. If anything, Mr. Kuhn's opinion is at odds with his own assumption. Under both the Debtors' projections and Allen & Co.'s own purportedly conservative "stress case" numbers, Mr. Kuhn believes that LIBOR will stay flat and the company's interest expense will be based on today's rates. (Perry Decl., Ex. 20 (Kuhn Tr.) at 84: 13-17.)

*    *    *

In considering all of this expert testimony, the court should not ignore the results of the sale process, and the significance of the refusal of the investment funds that hold the Noteholder debt to participate in that process. In that regard, this case is similar to *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009), *aff'd*, 576 F.3d 108 (2d Cir. 2009), *judgment vacated*, No. 09-285, 2009 WL 2844364 (U.S. Dec 14, 2009), where the Court observed:

> Further the true test of value is the sale process itself. In that regard, no bidder other than Fiat came forward. The First-Lien Lenders had numerous options under the Bankruptcy Code: they could have refused to consent to the sale or, having consented, they could have chosen to credit bid instead of agreeing to take cash.

*Id*. at 98. Here, the Noteholders had the full opportunity to participate in the sale process and bid at the auction. If the Noteholders truly believed that the going concern value of the Debtors exceeded the Lenders' secured debt, they would have bid at an auction where the highest cash bid was $120 million and the highest credit bid was $200 million. The Noteholders failure to bid is more telling than any expert report.

### III. EVEN IF THE COURT FINDS THAT THE COMMITTEE'S PLAN IS "FEASIBLE," THE SECTION 1129(C) BALANCING TEST DICTATES THAT THE COURT CONFIRM THE DEBTORS' PLAN

The Bankruptcy Code provides that a "court may confirm only one plan." 11 U.S.C. § 1129(c). Assuming *arguendo* that the Court finds that the Debtors' Plan and Committee's Plan are both feasible, the Court will have to choose which one of them to confirm. Section 1129(c) of the Bankruptcy Code provides that when two plans meet the requirements for confirmation, "the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c).[17] Courts have developed four main factors to determine which plan should be confirmed: "(1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security holders."[18] Here, each of the factors is either neutral or favors confirming the Debtors' Plan.

*The Type of Plan*: A "reorganization plan is usually preferable to a liquidation plan." *Holley Garden*, 238 B.R. at 495. Both Plans here are plans of reorganization.

*The Treatment of Creditors and Equity Security Holders*: "The Court must make the choice that is most beneficial to all creditors and equity security holders." *River Valley*, 2003 WL 22298573, at *9 (citing *In re Sound Radio, Inc.*, 93 B.R. 849, 859 (Bankr. D.N.J. 1988)). Here, the treatment of all claims and interests under each the

---

[17] In this regard, Bankruptcy Rule 3018 provides that, when creditors and equity holders vote to accept more than one plan, they "may indicate a preference or preferences among the plans so accepted." FED. R. BANKR. P. 3018(c).

[18] *In re River Valley Fitness One L.P.*, No. 01-12829-JMD, 2003 WL 22298573, at *9 (Bankr. D.N.H. Sept. 19, 2003) (citing *In re Internet Navigator Inc.*, 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003)). *See also In re ASARCO LLC*, Nos. 09-CV-177, 05-21207, 2009 WL 4639113 at *8 (S.D. Tex. Nov. 13, 2009); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 245 (Bankr. D.N.J. 2000); *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999).

Debtors' Plan and the Committee's Plan is substantially the same, with the exception of the Lenders' and Noteholders' respective claims. Thus, creditors and equity security holders holding such claims or interests should be indifferent as to their treatment under the competing plans. As may be expected, the Lenders prefer their treatment under the Debtors' Plan because the treatment of their claims under the Committee's Plan is unfair, unreasonable and infeasible, while the Noteholders prefer the treatment of their claims under the Committee's Plan. Accordingly, the second factor is also neutral.

*The Preferences of Creditors and Equity Security Holders*: In this case, the treatment of all claims and interests under each the Debtors' Plan and the Committee's Plan is substantially the same, with the exception of the Lenders' and Noteholders' respective claims. While trade creditors should be indifferent as to their treatment under the competing plans, trade creditors holding approximately 88% of the dollar amount of the trade claims voted to *accept the Debtors' Plan* and trade creditors holding approximately 68% of the dollar amount of the trade claims voted to *reject the Committee's Plan*. (*See* Tabulation Affidavit to be filed with the Court.)

The trade creditors' preference of the Debtors' Plan over the Committee's Plan is critical here. It is the trade creditors that conduct business with the Company on a daily basis and, therefore, have a unique perspective and understanding of the Company's businesses. This perspective apparently drove the most substantial trade creditors to support the Debtors' Plan, which will result in a viable entity with which the trade may conduct future business. Trade creditors should not, and do not, want to support a plan where the Company will be inadequately capitalized and where there is a potential risk of the Company filing for bankruptcy protection again. The vote of the trade creditors is all

the more shocking considering that trade creditor representatives sit on the Committee and the Committee is bound to protect their interests. While the preferences of the Lenders' and Noteholders may cancel each other out, the preferences of the trade creditors to confirm a feasible plan that will result in a viable entity with which to conduct future business should sway this factor in favor of the Debtors' Plan.

*The Feasibility of the Plan*: This "factor dictates that the Court 'should give preference to the plan that is ***more feasible than the other proposed plans***.'" *ASARCO*, 2009 WL 4639113 at *15 (emphasis added) (quoting *Holley Garden*, 238 B.R. at 496). As described above, the Debtors' Plan is indisputably more feasible than the Committee's Plan. The Debtors' Plan will result in a substantial deleveraging of the Debtors' capital structure while the Committee's Plan calls for the Company to remain highly leveraged and offers the Company no realistic opportunity to refinance or otherwise retire the reinstated debt upon the impending November 2012 maturity. Given the substantial risks associated with the Committee's Plan, the feasibility factor overwhelmingly favors confirmation of the Debtors' Plan.

*    *    *

Under the four-factor analysis, the only factor that is overwhelmingly in favor of either competing plan is the feasibility of the Debtors' Plan and/or the infeasibility of the Committee's Plan. Every other factor is either neutral or favors the Debtors' Plan. Bankruptcy proceedings are designed to allow the debtor to emerge as a viable entity able to carry out its business. Given that the Committee's Plan will leave the Debtors' businesses undercapitalized and at substantial risk of a second bankruptcy, the Court should confirm the Debtors' Plan based upon a weighing of the section 1129(c) factors.

## IV.  MISCELLANEOUS OBJECTIONS THAT MAY BE RAISED BY THE DEBTORS OR THE COMMITTEE AT TRIAL

### A.  Reinstatement Under the Committee Plan Requires Payment of Default Rate Interest

In order to reinstate the Lenders' claims pursuant to the Committee Plan, section 1124 of the Bankruptcy Code requires, *inter alia*, that the Committee Plan provide for the cure of any and all defaults (irrespective of whether such defaults occurred before or after commencement of the case) that are not *ipso facto* or financial condition defaults.  *See* 11 U.S.C. § 1124(2)(A).  Section 1123 of the Bankruptcy Code further requires that the amount necessary to cure a default "shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law."  11 U.S.C. § 1123(d).

Pursuant to Section 2.04(f) of the Credit Agreement, interest is payable at the default rate (2% above the non-default rate) once there has been an event of default.  The following events of default occurred:  (a) the Debtors failed to pay all of the accrued prepetition interest under the Credit Agreement (*i.e.*, approximately $314,976.36 remains unpaid); and (b) the Debtors have not paid any of the scheduled postpetition interest due under the Credit Agreement.  As a result of these payment defaults, interest at the default rate started to accrue on or about February 14, 2009.  (See Bentien Declaration at ¶ 4.) Accumulated interest and principal amortization payments due upon emergence will vary based on the plan effective date as follows:  effective date of December 31, 2009 in the amount of $23.9 million, March 31, 2010 in the amount of  $30.4 million, and June 30, 2010 in the amount of $36.9 million.  (See Bentien Declaration, at ¶ 5 and Exhibit 2.)Interest and principal amortization payments will be due on December 31, 2009 in the amount of $23.9 million, on March 31, 2010 in the amount of  $30.4 million, and on June 30, 2010 in the amount of $36.9 million.  (*See* Bentien Declaration, at ¶ 5 and Exhibit 2.)

The law is clear that Lenders are entitled to interest at the default rate.  In *In re 139-41 Owners Corp.*, 306 B.R. 3763 (Bankr. S.D.N.Y. 2004), *aff'd*, 313 B.R. 364 (S.D.N.Y. 2004), the bankruptcy court held, and the district court affirmed, that cure and reinstatement of a secured creditor's claim under sections 1123(d) and 1124(2) of the Bankruptcy Code mandates the payment of default interest if required pursuant to the underlying contract.  As the district court determined:

> Subsection (2) [of Section 1124] on its face is concerned only with a contract provision requiring 'accelerated payment' upon a default, and the statute permits the debtor to de-accelerate and reinstate the pre-default maturity of the loan only if the plan (D) 'does not otherwise alter' the secured creditor's contractual rights.  Because the denial of a mortgagee's contractual right to interest at a default rate does 'alter' the secured creditor's contractual rights within the meaning of subsection (D) of Section 1124(2) . . . Section 1124(2) . . . does not provide a statutory basis for judicial nullification of a contract right to default rate interest."

*139-141 Owners Corp.*, 313 B.R. at 368 (internal citations omitted).

Here, the 2% incremental default interest rate is mandated under the Credit Agreement and is consistent with New York law (which governs the Credit Agreement).  Accordingly, the amount of cure required to reinstate the Lender's claims is governed by the Credit Agreement, which obligates the payment of default interest from February 14, 2009 to the effective date of the Committee Plan.

**B.      Reinstatement Under the Committee Plan Requires Payment of the Blackstone Fee and Expenses Associated Therewith**

In connection with the contested confirmation proceedings, Wachovia authorized Agent's counsel, Milbank, Tweed, Hadley & McCloy LLP ("Milbank") to engage Blackstone to prepare the above-discussed expert witness report and provide expert witness testimony.  (Perry Decl., Ex. 23 (Engagement Letter from Blackstone Advisory Partners L.P. to Gregory Bray, Milbank, Tweed, Hadley & McCloy LLP, dated Nov. 23,

2009).) The Agent so directed Milbank after obtaining the consent of the Majority

Lenders under the Credit Agreement pursuant to the Consent Letter from Wachovia, as

Agent, to the Lenders, dated Nov. 23, 2009. (Perry Decl., Ex. 24). The Agent borrowed

a portion of the funds necessary to pay Blackstone's fees, pursuant to a Letter Agreement

by and between Wachovia, as Agent, and the Lenders, dated Nov. 23, 2009. (Perry

Decl., Ex. 25.) The Agent was required to borrow such funds because the Debtors

refused to pay for the retention of an independent expert witness and instead argued that

the Agents' financial advisor during the case should be designated as an expert. We now

know the pitfalls with such an approach and that the Agent was justified in retaining a

separate testifying expert witness. Under the reinstatement provisions of the code and the

applicable loan documents (*see* articles 6 and 7 of the Credit Agreement), the Agent is

entitled to reimbursement from the Debtors and payment from the realization on any

Collateral (as defined in the Credit Agreement) of all amounts paid to Blackstone.

Blackstone's fee is $1.5 million plus out of pocket expenses, of which $250,000 was

borrowed by the Agent pursuant to the Letter Agreement and advanced to Blackstone; the

remainder is payable no later than one day after the effective date of a plan of

reorganization for the Debtors. The borrowed amount is accruing interest at 9% per

annum.

## <u>CONCLUSION</u>

For each of the foregoing reasons, Wachovia respectfully urges the Court to reject

the Committee's Plan, and confirm the Debtors' Plan

Dated: December 16, 2009     Respectfully submitted,

             Milbank, Tweed, Hadley & McCloy, LLP

             By: /s/ Daniel M. Perry
                Linda Dakin-Grimm (LD 5669)
                Daniel M. Perry (DP 6966)
                1 Chase Manhattan Plaza
                New York, N.Y. 10005
                Telephone: (212) 530-5000
                Facsimile: (212) 530-0158

                *-and-*

                Gregory A. Bray
                Fred Neufeld
                601 S. Figueroa St.
                Suite 3000
                Los Angeles, CA 90017
                Telephone: (213) 892-4000
                Facsimile: (213) 629-5063