**MILBANK, TWEED, HADLEY & McCLOY LLP**
Linda Dakin-Grimm (LD 5669)
Daniel M. Perry (DP 6966)
601 S. Figueroa St., 31st Floor
Los Angeles, CA 90017
Telephone:  (213) 892-4000

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                              :
In re:                                        :
                                              :    Chapter 11
                                              :
Young Broadcasting Inc., *et al.*,            :    Case No. 09-10645 (AJG)
                                              :
                                              :    (Jointly Administered)
                         Debtors.[1]          :
                                              :    Trial Date: Jan. 19, 2009
-----------------------------------------------------------x


**MOTION *IN LIMINE* OF WACHOVIA BANK, N.A., AGENT FOR SENIOR
SECURED LENDERS, TO EXCLUDE UNDER FEDERAL RULE OF EVIDENCE 702,
TESTIMONY AND REPORT OF TOM KUHN, OFFERED BY
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Wachovia Bank, N.A., as administrative agent for the senior secured lenders (the

"Lenders") under the Credit Agreement, dated May 3, 2005, files this motion *in limine* (the

"Motion") requesting an order excluding purported expert testimony and the report of Mr.

Tom Kuhn of Allen & Company, offered by the Official Committee of Unsecured Creditors

(the "Committee").

---

[1] The Debtors are Young Broadcasting, Inc. and its direct and indirect subsidiaries: Young
Broadcasting of Lansing, Inc., Young Broadcasting of Louisiana, Inc.; Young Broadcasting of
Nashville, LLC; Young Broadcasting of Albany, Inc.; Young Broadcasting of Richmond, Inc.; Young
Broadcasting of Knoxville, Inc.; Young Broadcasting of Green Bay, Inc.; Young Broadcasting of
Davenport, Inc.; Young Broadcasting of Sioux Falls, Inc.; Young Broadcasting of Rapid City, Inc.;
Young Broadcasting of San Francisco, Inc.; Young Broadcasting of Nashville, Inc.; Young
Broadcasting of Los Angeles, Inc.; Young Broadcasting Shared Services, Inc.; Adam Young, Inc.;
WKRN, G.P.; WATE, G.P.; KLFY, L.P.; YBT, Inc.; YBK, Inc.; LAT, Inc.; Winnebago Television
Corporation; Fidelity Television, Inc.; and Honey Bucket Films, Inc.

## TABLE OF CONTENTS

I.    MR. KUHN IS NOT QUALIFIED TO PROVIDE EXPERT OPINIONS ON THE
      SUBJECTS PROPOSED ................................................................................................. 3

II.   THE *DAUBERT/KUMHO* STANDARD MANDATES THE EXCLUSION OF
      MR. KUHN'S EXPERT TESTIMONY AND REPORT ON VALUATION ................. 5

      A.    A Proper Expert Valuation Analysis Requires A Discounted Cash Flow
            Analysis ....................................................................................................... 7

      B.    Mr. Kuhn's "Levered Dcf" Is Not A Valuation Methodology Accepted By
            The Courts Or Financial Analysts ........................................................... 8

      C.    Mr. Kuhn's Discount Rate Is Not A Weighted Average Cost Of Capital
            Capital (Or "Wacc") As Is Ordinarily Used In A Dcf Analysis .................... 12

      D.    A "Levered Dcf" Analysis Has Not Been Tested Or Subjected To Peer
            Review, Error Reporting, Or Maintained Standards, And Has Not Gained
            General Acceptance In The Relevant Scientific Community As Required
            By Law ....................................................................................................... 15

III.  *THE DAUBERT/KUMHO* STANDARD MANDATES THE EXCLUSION OF
      MR. KUHN'S EXPERT TESTIMONY AND REPORT ON THE DEBTORS'
      ABILITY TO SELL OR REFINANCE IN NOVEMBER 2012.................................... 17

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.,*
    514 F. Supp. 2d 571 (S.D.N.Y. 2007) ................................................................ 6

*Adelphia Comm'ns Corp. vs. Motorola, Inc., (In re Adelphia Comm'ns Corp.),*
    Case No. 02-41729 (REG) (S.D.N.Y. filed Jun. 25, 2002)............................ 4, 5

*Amorgianos v. Amtrak,*
    303 F.3d 256 (2d Cir. 2002) ........................................................................... 6

*Boucher v. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996) ............................................................................. 17

*Chartwell Lit. Trust v. Addus Healthcare, Inc., (In re Med Diversified Inc.),*
    334 B.R. 89 (Bankr. E.D.N.Y. 2005) ..............................................3, 4, 6, 8, 15

*Daubert v. Merrell Dow Pharmaceuticals,*
    509 U.S. 579 (1993) ....................................................................5, 6, 7, 15, 17

*Dora Homes, Inc. v. Epperson,*
    344 F.Supp.2d 875 (E.D.N.Y. 2004) ............................................................ 17

*Fleming v. Merck & Co., Inc., (In re Fosamax Products Liability Litigation),*
    No. 1:06-cv-7631, 2009 WL 4042769 at *5 (S.D.N.Y. Nov. 23, 2009) ............................ 3

*General Electric Co. v. Joiner,*
    522 U.S. 136 (1997).................................................................................... 17

*In re Bush Indus., Inc.,*
    315 B.R. 292 (Bankr. W.D.N.Y. 2004) ...................................................... 9, 10

*In re Nellson Nutraceutical, Inc., et al.,*
    356 B.R. 364 (D. Del. 2006) .......................................................7, 8, 9, 10, 15

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999).....................................................................5, 6, 7, 15, 17

*Lippe v. Bairnco Corp.,*
    288 B.R. 678 (Bankr. S.D.N.Y. 2003).................................................. 8, 15, 17

*MTX Communications Corp. v. LDDS/WorldCom, Inc.,*
    132 F.Supp.2d 289 (S.D.N.Y. 2001) ............................................................ 17

*Prohaska v. Sofamor, S.N.C.,*
    138 F.Supp.2d 422 (W.D.N.Y. 2001) ............................................................ 3

*Shubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.),*
    348 B.R. 234 (Bankr. D. Del. 2005) ....................................................... 15. 16

*Steiner Corp. v. Benninghoff,*
    5 F. Supp. 2d 1117 (D. Nev. 1998)........................................................... 9, 10

**RULES**

Fed. Rules of Evidence 702 ...............................................................1, 2, 3, 5, 6

## PRELIMINARY STATEMENT

The Lenders respectfully request that the Court exclude Mr. Kuhn's testimony and report under Rule 702 of the Federal Rules of Evidence, because: (i) Mr. Kuhn is not qualified to offer expert testimony on the subjects proposed based on "knowledge, skill, experience, training, or education;" and (ii) the proposed report and testimony is not reliable under Rule 702 because it is not based on appropriate facts or data, is not the product of reliable principles and methods, and Mr. Kuhn has not applied reliable principles and methods to the facts of the case.

Mr. Kuhn intends to opine in this case on the enterprise value of the Debtors, but he has neither the qualifications to do so nor has he applied generally accepted valuation methodologies recognized as standard by valuation professionals and courts. Mr. Kuhn is a lawyer, with a bachelor's degree in history. He does not have an M.B.A., nor any other designation or credential customarily held by valuation professionals. He has no training in valuation methodologies.

Mr. Kuhn further intends to opine that the credit markets will return to "somewhat normal conditions" by November 2012 (*i.e.*, the maturity date of the senior secured debt), and thus, the Debtors will be able to obtain a replacement loan facility for that debt *at terms that are not available in today's market*. And Mr. Kuhn intends to opine that the Debtors will be able to be sold for more than the amount of the senior secured debt in November 2012 because "in approximately three years, the overall economic environment will have improved to provide more liquidity and appetite for acquisitions in the broadcasting sector." Mr. Kuhn has no qualifications to render these opinions nor has he identified any factual basis whatsoever upon which his bald statements are based. He is not an economist. He has never

-1-

been employed in any capacity at a commercial bank engaged in lending.  He has no training, formal or informal, in forecasting the economy, the future state of the credit markets, or available loan interest rates and terms.  His proffered testimony on these points is nothing more than self-interested speculation.[2]

Well-established legal authority mandates that a proposed expert be excluded when he is not qualified to testify on the proposed topics by "knowledge, skill, experience, training, or education."  Fed. R.Evid. 702.  Mr. Kuhn does not possess the required qualifications to testify on valuation in this case, and he certainly is not qualified to provide speculative testimony about what the state of the U.S. economy will be in three years.

Moreover, even if Mr. Kuhn were qualified to testify on these subjects, the law is plain that when the expert employs methodologies that are untested, not subject to peer review, error reporting, or maintained standards, and not generally accepted by the relevant scientific community, his conclusions and opinions must be excluded from evidence.  The purported valuation methodology Mr. Kuhn used in this case is not accepted by the professional valuation community or courts in this country.  Mr. Kuhn himself has never used it in any valuation offered in court, and was unable to identify a single other professional who has done so.  Mr. Kuhn could not identify any textbook or article on valuation that discusses his proposed methodology.  Nor does there exist a single reported case from any court in the country mentioning this novel methodology.  Further, Mr. Kuhn applied no methodology at all arrive at his opinions regarding the possibility of a sale or refinancing of Debtors in 2012,

---

[2] Mr. Kuhn's firm stands to collect $3.6 million as a "success fee," if the Creditors' Plan is approved by this Court.  That amount was increased from $3 million when Mr. Kuhn agreed to provide this expert testimony. (Declaration of Daniel M. Perry In Support of Motion *in Limine* ("Perry Decl."), Ex. A, Depo. Tr. of Tom Kuhn, 12/14/09 ("Kuhn Tr.") at 102:16-104:4.)

other than a layperson's speculation that the economic environment will have improved by

2012.  Thus, Mr. Kuhn's opinions fail to meet the standards of reliability for expert testimony.

## ARGUMENT

### I.    MR. KUHN IS NOT QUALIFIED TO PROVIDE EXPERT OPINIONS ON THE SUBJECTS PROPOSED

Mr. Kuhn intends to testify on (i) the future value of equity in the Debtors in

November 2012; (ii) the state of the economy and the lending markets in 2012; and (iii) the

Debtors' ability either to be sold or to obtain replacement financing—*at rates better than*

*those available today*—in November 2012.  But Rule 702 of the Federal Rules of Evidence,

made applicable to these proceedings through Bankruptcy Rule of Procedure 9017, requires

that expert opinion testimony can only be provided by a person who is qualified "by

knowledge, skill, experience, training or education."  Fed. R. Evid. 702.  The expert must

have "relevant experience and qualifications such that whatever opinion he will ultimately

express would not be speculative."  *Fleming v. Merck & Co., Inc.*, (*In re Fosamax Products*

*Liability Litigation*), No. 1:06-cv-7631,  2009 WL 4042769 at *5 (S.D.N.Y. Nov. 23, 2009)

(holding that physician's testimony on medical issue was nevertheless inadmissible where he

lacked knowledge of the particular issue in question); *Prohaska v. Sofamor*, S.N.C., 138

F.Supp.2d 422, 437 (W.D.N.Y. 2001) (finding a medical doctor unqualified to render an

expert opinion on causation of an injury "[b]ecause of his dearth of knowledge" in the topic at

issue).  If a proposed expert is not qualified, that person *cannot* present an opinion to the

court.  *Prohaska*, 138 F.Supp.2d at 437.

General experience in an industry is insufficient to render an individual qualified to be

an expert on a specific topic.  *See, e.g.*, *Chartwell Lit. Trust v. Addus Healthcare, Inc.*, (*In re*

*Med Diversified Inc.*), 334 B.R. 89, 95 (Bankr. E.D.N.Y. 2005) (refusing to qualify as a

valuation expert an accountant with twenty-plus years of experience in the financial industry, because that experience did not substitute for formal education and training in business valuation.) Rather, courts require specific expertise in the relevant sub-branch of the field at issue. *In re Med Diversified Inc.*, 334 B.R. at 97.    Moreover, to qualify as an expert, a court must find that the testifying expert *himself* has the relevant expertise; expertise held by the entity for whom the expert works or by others who may have assisted the expert in drafting the export report cannot be the basis for the testifying expert's qualification. *Id.* at 96.

Mr. Kuhn simply does not have the relevant expertise required under the law to provide expert opinion testimony on valuation, on the financial markets, the prospects for a sale or the availability of financing in 2012—critical issues in these proceedings.  Mr. Kuhn does not hold an M.B.A. or any other business education credentials.  (Ex. A, Kuhn Tr. at 144:2-3.)  He is not an economist. (*Id.* at 15:6-11; 143:20-23.)  He has no commercial banking experience and has never underwritten or evaluated commercial loans.  (*Id.* at 14:18-22.)  He has no investment banking experience other than his recent consulting work at Allen & Co. (*Id.* at 14:8-13.)  In fact, Mr. Kuhn holds a bachelor's degree in history and a law degree, and has spent most of his career as a practicing attorney outside of the financial world.  (*Id.* at 11:13-13:9.)

In addition to his glaring lack of credentials, Mr. Kuhn does not have any experience that makes him qualified to offer an opinion on the subjects he seeks to testify.  He has testified in only one court proceeding, and in that case Mr. Kuhn did not conduct the analysis normally accepted by the courts.[3]  (*Id.* at 44:25-46:22.)  Furthermore, he has not published

---

[3] Mr. Kuhn falsely testified in deposition in this case that he performed a Discounted Cash Flow analysis in the only other case in which he has testified as an expert (*i.e.*, *Adelphia Comm'ns Corp. vs. Motorola, Inc.*, *(In re Adelphia Comm'ns Corp.)*, Case No. 02-41729 (REG) (S.D.N.Y. filed Jun. 25,

any articles on any topic at issue in this case.  (Kuhn Tr. at 172:2-6.)  Mr. Kuhn has no

commercial lending experience (*Id*. at 14:18-22) and acknowledges that he has no greater

ability to predict the credit markets than any other layperson.  (*Id*. at 68:2-9.)  Thus, Mr. Kuhn

lacks the requisite knowledge and expertise necessary to testify on any issue in this case.

## II.    THE *DAUBERT/KUMHO* STANDARD MANDATES THE EXCLUSION OF MR. KUHN'S EXPERT TESTIMONY AND REPORT ON VALUATION

Mr. Kuhn is simply not qualified to provide an expert opinion in this case.  Even if he

were, his "methodology" is so unreliable as to render his opinion inadmissible.  Rule 702 of

the Federal Rules of Evidence requires the exclusion of all expert testimony, no matter how

qualified the expert, unless "(1) the testimony is based on sufficient facts or data, (2) the

testimony is the product of reliable principles and methods, and (3) the witness has applied

the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the United States

Supreme Court first charged trial courts with the duty of acting as "gatekeepers" to ensure that

expert testimony satisfies Rule 702.  Six years later in *Kumho Tire Co. v. Carmichael*, 526

U.S. 137 (1999), the Supreme Court extended this gate-keeping function to apply to non-

scientific testimony.  *Kumho* stated that "where [expert] testimony's factual basis, data,

principles, methods, or their application are called sufficiently into question, the trial judge

must determine whether the testimony has 'a reliable basis in the knowledge and experience

of [the relevant] discipline.'"  *Kumho Tire Co.,* 526 U.S. at 148 (1999).

---

2002)). (Kuhn Tr. at 44:25-45:10.)  But, a sworn declaration he executed in that case states that he did
not, in fact, conduct a Discounted Cash Flow analysis.  Mr. Kuhn declared "Allen did not perform a
Discounted Cash Flow analysis '**DCF**' for purposes of the current valuation."  The declaration of Mr.
Kuhn is attached to the Perry Decl. as Ex. B at ¶ 12.

Under the *Daubert/Kumho* gate-keeping standard, trial courts are thus required to act as gatekeepers to ensure the reliability of an expert's testimony. *Id.* at 152. Among the factors that *Daubert/Kumho* encourages courts to examine in determining whether to admit proposed expert testimony are: (1) whether a theory or technique had been and could be tested; (2) whether it had been subjected to peer review; (3) what its error rate was; (4) the existence and maintenance of scientific standards to govern the theory or technique's application or operation; and (5) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *Kumho Tire Co.*, 526 U.S. at 149. Courts in the Second Circuit have adopted the *Daubert/Kumho* factors. *See, e.g.*, *In re Med Diversified Inc.*, 334 B.R. at 95 (*citing Daubert*, 509 U.S. at 593-94 and *Kumho Tire Co.*, 526 U.S. at 149).

Under *Daubert* and Rule 702, the court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the court's belief as to the correctness of those conclusions. *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002). Nothing in *Daubert* or the Federal Rules of Evidence requires a court to admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert." *Id.* Indeed, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 *mandate* the exclusion of that unreliable opinion testimony." *Id.* (emphasis added). Courts in the Second Circuit have routinely applied the *Daubert/Kumho* factors to hold that expert testimony based on untested, unaccepted methodologies, as is the case here, is unreliable and should be excluded. *See, e.g.*, *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) (rejecting expert valuation testimony where the expert did not use the most

reliable "discounted cash flow" ("DCF") method, but instead used an untested method with no known rate of error and which was not subject to any particular standards or controls).

The Committee, as the proponent of Mr. Kuhn's testimony, bears the burden of demonstrating admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592, n.10. The Committee cannot satisfy this burden because the valuation analysis actually employed by Mr. Kuhn fails when tested against every *Daubert/Kumho* factor. Mr. Kuhn did not perform a discounted cash flow analysis in this case. Instead, *he purported to estimate the value of equity in the Debtors in three years*—and then he named his novel exercise a "Levered DCF," *to make it sound like he had performed a discounted cash flow analysis.* Mr. Kuhn's approach to future equity valuation (1) has not been tested; (2) has not been subjected to peer review or publication; (3) has an unknown error rate; (4) is not known to be governed or maintained by scientific standards; and (5) plainly has not been generally accepted by experts in the field (as demonstrated by the fact that *it does not appear in a single reported case in the country*). Accordingly, all portions of Mr. Kuhn's report and testimony that rely upon or relate to the so-called "Levered DCF" fail to meet the *Daubert/Kumho* standards of reliability and should be excluded by the Court.

**A.  A Proper Expert Valuation Analysis Requires a Discounted Cash Flow Analysis**

Courts have set forth clear rules for admissibility of expert testimony on the determination of enterprise value of a company. To be admissible, experts use three methods: (1) precedent transaction, (2) comparable company, and (3) discounted cash flow analysis. *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 370 (D. Del. 2006). Typically, experts consider all three methods, and then assign an appropriate weight to each, using their expert judgment,

to determine a range of values for the enterprise.  *Id*. at 371.  Courts do not look favorably

upon experts who forgo use of a DCF, the most commonly accepted methodology in a field,

particularly when they offer no explanation for why they chose not to use a DCF.  *In re Med*

*Diversified, Inc.*, 334 B.R. at 99 (excluding expert testimony where the expert did not do a

DCF analysis and offered no adequate explanation for why he did not do so); *see also Lippe v.*

*Bairnco Corp.*, 288 B.R. 678, 689-690 (Bankr. S.D.N.Y. 2003) (Chin, J.) (excluding expert

testimony where expert did not use DCF and had no justification for why he did not except, "I

didn't try.")  In such situations, courts have concluded that the methodology actually chosen

was *result-driven*, as opposed to driven by the science.  *Lippe*, 288 B.R. at 701 (rejecting an

expert report where the court became convinced that the experts' only goal was to come up

with conclusions that would support the plaintiffs' positions in the case).

        In deposition, Mr. Kuhn offered no explanation for why he failed to conduct a DCF

analysis.  In fact, although many textbooks and even court decisions have explained how a

DCF analysis is conducted, Mr. Kuhn refused to characterize the DCF analysis as a

"standard" methodology.  (Kuhn Tr. at 157:10-20.)  Instead of conducting a DCF to determine

the enterprise value of the Debtors, Mr. Kuhn did an analysis to estimate the value of equity

*three years from now*.  His approach has never been subject to peer review or publication nor

accepted by any court as a proper valuation methodology.

**B.**    **Mr. Kuhn's "Levered DCF" Is Not a Valuation Methodology Accepted by
        the Courts or Financial Analysts**

        Evidencing that he actually understood that there are three methodologies

appropriately used in a valuation analysis, Mr. Kuhn performed the first two—the precedent

transactions analysis and the comparable companies analysis.  But he dismissed their

importance (at the weighing stage), stating that they did not "attribute significant weight" to

either method.  (Kuhn Report on Behalf of the Official Committee of Unsecured Creditors

("Kuhn Report"), dated December 4, 2009 at 23, 25, attached to the Perry Decl. as Ex. C.)

But instead of using the DCF analysis as his third methodology, Mr. Kuhn's opinion

"primarily relied on a Levered Discounted Cash Flow Analysis to determine a range of

valuations for the Debtors."  (Kuhn Report at 27.)  Mr. Kuhn misleadingly labeled his

approach a "Levered DCF" to create the appearance of having done a DCF.  But the so-called

"Levered DCF" is simply not a discounted cash flow analysis as that term is understood in the

professional community and case law.

      The DCF analysis accepted by courts in this country "derives the value of a company

by calculating the company's future cash flows multiplied by a discount factor to determine a

present value of those future cash flows."  *Nellson Nutraceutical, Inc.*, 356 B.R. at 370.  The

components of a DCF analysis are as follows:

> (a) an estimation/projection of unlevered cash flows that the company is
> expected to generate over a selected number of years in the future;
>
> (b) determination of a "terminal" or residual value equal to the future value,
> at the end of the projection period, of the firm's unlevered cash flows beyond
> the projection period; and
>
> (c) determination of the appropriate "cost of capital" with which to discount
> to a present value, both the projected cash flows and the estimated terminal
> or residual value.

*In re Bush Indus., Inc.*, 315 B.R. 292, 299 (Bankr. W.D.N.Y. 2004); *see also Steiner Corp. v.*

*Benninghoff*, 5 F. Supp. 2d 1117, 1129-36 (D. Nev. 1998) (internal citation omitted).

      To conduct a DCF, starting with step (a), valuation experts commonly determine the

unlevered future cash flows of a company based on projections created by the company's

management.  *In re Bush Industries*, 315 B.R. at 299.  "Unlevered free cash flow represents the cash flow that a company is projected to generate during a specified period of time if it were to have no debt in its capital structure."  *Id*.  Next, for step (b), experts generally calculate a terminal value of the company as of the end of the projection period, based on an selected metric and a selected multiple.  *Id*.  The most commonly used metric for calculating both projections and the terminal value is EBITDA.  Using their expert judgment, experts generally apply a "multiple" to EBITDA to determine the implied "terminal value" of the company.  *Id*.  This implied terminal value is designed to assess the value of the company as a going concern beyond its projections.  *Id*.  The appropriate multiple is derived from a variety of factors, including company-specific and industry-specific information.  "The expert analysis is required, among other things, to select the appropriate source material and to perform the actual calculation."  *In re Nellson Nutraceutical*, 356 B.R. at 370.

Then, for step (c), experts use their judgment to apply a "discount rate" to determine a present value of the implied terminal value.  *Steiner*, 5 F. Supp. 2d at 1130.  Experts commonly use a weighted average cost of capital ("WACC") as the discount rate to determine both the present value of cash flows in step (a) and the terminal value in step (c).  *Id*.  The determination of the appropriate WACC itself is a process involving a number of steps (described in valuation literature and case law), including determining the appropriate "beta" (or measure of volatility), size premium, risk premium and other factors requiring expert judgment.  *Id*. at 1132-36.  The expert is expected to show all these steps in his expert report and work product.  Together, the present value of the future cash flows, plus the present value of the terminal value determines the enterprise value of the company going forward in perpetuity.  *Id*.

Although Mr. Kuhn's analysis deceptively used terms similar to those used in a DCF analysis, even a cursory review of Mr. Kuhn's work reveals that he did not follow any of the steps of a DCF, but instead tried to present his results-driven "future equity valuation" using the DCF words but not the DCF methodology to make it seem like he had done a real DCF. Unlike a DCF analysis accepted by courts, which determines the intrinsic value of a company as an ongoing business in perpetuity, Mr. Kuhn instead estimated the future value of equity in the Debtors upon an assumed sale in November 2012. (Kuhn Report at 13.) By doing so, Mr. Kuhn improperly assumed away a critical issue in the case—whether the highly-leveraged restructured Debtors would be able to effectuate a sale in 2012 and obtain equity value in the range of historical precedent transactions (taken from a period in history *before* recent catastrophic market events). Mr. Kuhn's failure to conduct a DCF analysis to determine enterprise value illustrates his failure to properly consider crucial issues in a valuation analysis, and he has therefore not presented any reliable opinion on the value of the Debtors.

Mr. Kuhn's misleadingly labeled "Levered DCF" is simply not an accepted method of determining the enterprise value of a company. Mr. Kuhn made no attempt to determine a present value of future cash flows of the ongoing business, which is the essence of a DCF analysis. Instead Mr. Kuhn's exercise purported to value the company *three years from now* based on an approximation of the supposed *value of equity* at that time. Although the Kuhn Report provides little description of this analysis, or the considerations underlying the multiples and discount rates used, Mr. Kuhn actually applied a multiple to the projected end-of-period cash flows, estimated this future value (misleadingly labeled "implied enterprise value"), deducted the net debt, and then discounted this estimate of future equity value to present-day at a random rate he chose (which he misleadingly labeled as a "WACC"). (Kuhn

-11-

Report at 28.)  After applying this discount, Mr. Kuhn determined a so-called "equity value
[of the Debtors] upon a sale"—purportedly a measure of the present value of the equity
should the Debtors sell the company in November 2012 and pay off the outstanding balance
on the debt.  (*Id.* at 4; Kuhn Tr. at 160:6-13.)  This is not a DCF accepted by the courts.

###### C.    Mr. Kuhn's Discount Rate Is Not a Weighted Average Cost of Capital Capital (or "WACC") as Is Ordinarily Used in a DCF Analysis

Mr. Kuhn further attempted to conceal his novel approach by claiming to have
calculated a weighted average cost of capital or "WACC."  The Kuhn Report misleadingly
labeled its 20-30% discount rate (which, as described below, is a rate that was simply plucked
out of thin air) a "WACC."  (Kuhn Report at 28.)  And in his deposition, Mr. Kuhn claimed to
have calculated a WACC.  (Kuhn Tr. at 160:22-161:4.)  But a WACC takes into account the
*cost of all capital*—debt and equity—and is "weighted" to reflect the relative amounts of the
debt and equity in the company's capital structure.  Mr. Kuhn did not do this.  Nor did he
determine a weighted average cost of capital through any standard methodology, which would
involve determining a "beta" to account for the company's volatility, tax rates, risk-free rates,
costs of debt, risk and size premiums, and the capital structure of the company (including
considerations of the market rate of debt financing and what the market would be willing to
accept as relative amounts of debt in the capital structure).  Instead, as described by Mr.
Kuhn, the discount rate he determined to be relevant to his analysis of equity value is "an
equity discount rate as opposed to the blended rate that is included in some other analyses,
including the one . . . in the Blackstone report."  (Kuhn Tr. at 160:9-13.)  This "equity
discount rate" is not a WACC (which analyzes the cost of debt and equity), but is actually a
*levered cost of equity*.  When asked directly whether the discount rate he applied was "more

accurately called a levered cost of equity," Mr. Kuhn essentially conceded his loose (and

incorrect) labeling of his discount rate as a WACC, and responded:  "You can call it what you

would like, but it is the cost of equity."  (Kuhn Tr. at 191:20-192:2.)

       In an attempt to make his 20-30% equity discount rate appear to have some semblance

of scientific rigor, Mr. Kuhn claimed to have done an analysis supporting the 20-30% equity

discount rate (although no such analysis was contained either in his report or in the work

papers he produced in discovery).  When asked where his back up work justifying his

selection of the 20-30% rate could be found, Mr. Kuhn acknowledged that "the calculation of

it is not contained in the report."  (*Id*. at 159:7-12).  Rather he testified that the equity discount

rate "calculations" were "embedded in our range of discount rates" (whatever that means) and

could be found in underlying spreadsheets contained in his work papers.  (*Id*. at 160:22-161:3,

192:8-193:2.)  (It turns out this testimony was not true.)  Mr. Kuhn went on to claim to have

calculated his equity discount rate using (as is customary in calculating a WACC) an

appropriate beta (*Id*. at 162:19-24), tax rate (*Id*. 164:8-16), risk-free rate (*Id*. at 164:17-

165:24), pretax cost of debt (*Id*. at 167:7-12), and size premium (*Id*. at 167:13-22).  But Mr.

Kuhn could not remember the sources he looked at to determine these components (such

sources are typically identified in the expert's report).  (*Id.* 169:13-170:5; *see* Expert Report

of Blackstone Advisory Partners, December 2009 (the "<u>Blackstone Report</u>")) at 44, attached

to the Perry Decl. as Ex. D.)  Notwithstanding his sworn testimony that he conducted this type

of extensive analysis, and that his sources could be found in spreadsheets underlying his

work, there were no such documents in the Committee's production of approximately 1550

documents or spreadsheets from Allen & Co. files.

       The Committee has now, in effect, acknowledged this deception.  On December 28,

2009, *two weeks after* Mr. Kuhn's deposition and *more than three weeks* after Mr. Kuhn submitted his report, Committee counsel emailed Lenders' counsel four undated spreadsheets that the Committee's counsel said reflected "the calculations underlying the expert report of Allen & Co." (December 28, 2009 email from Anouck Giovanola at Paul Weiss to counsel for the Lenders and the Debtors, attaching four spreadsheets, attached to the Perry Decl. as Ex. E.) Only after specific questions from the Lenders' counsel concerning the provenance of these documents did counsel for the Committee admit that *the spreadsheets did not exist at the time Mr. Kuhn submitted his report or when he was subsequently deposed*. Instead, they were created *after* Mr. Kuhn testified at deposition. (December 29, 2009 email from Anouck Giovanola at Paul Weiss attached to Perry Decl. as Ex. F.) These documents were created after Mr. Kuhn's deposition in an effort to (i) make it appear as if Mr. Kuhn performed work that he did not perform prior to submitting his expert report and (ii) conceal Mr. Kuhn's false and misleading testimony that he had performed such work and that it was reflected in his work papers produced in the litigation. Accordingly, the Court should exclude these documents from the case.

In sum, Mr. Kuhn's statements about his purported "WACC" calculation reflect that he either (i) does not know and/or misstated what steps he took, or (ii) fundamentally misunderstood his own analysis. In either case, Mr. Kuhn's opinions should be rejected. Mr. Kuhn's improper (and misleading) use of valuation terminology, failure to apply basic valuation principles, apparent failure to understand his supposed expert opinion, and belated attempt to create supporting documents that did not exist at the time he rendered his "expert" opinions render Mr. Kuhn unreliable and his opinions inadmissible in these proceedings.

**D.    A "Levered DCF" Analysis Has Not Been Tested or Subjected to Peer Review, Error Reporting, or Maintained Standards, and Has Not Gained General Acceptance in the Relevant Scientific Community as Required by Law**

Because Mr. Kuhn's so-called "Levered DCF" is not a methodology accepted by the courts, it must be tested against the *Daubert/Kumho* factors to determine if it is a reliable methodology.  It is not.  The "Levered DCF" fails to satisfy any factor.  First, where *no* other experts in the valuation field rely on a methodology and where the methodology is not the subject of any peer review or publication, that methodology cannot be considered to have been "tested" or subject to peer review or publication under *Daubert/Kumho*.  *See, e.g., In re Nellson Nutraceutical,* 356 B.R. at 374, 377 (holding that an atypical analysis offered by the expert that was "unprecedented both in the legal context and in the relevant scientific community" had not been "tested" under *Daubert/Kumho*).  Moreover, the DCF analysis, as described above, is the only DCF methodology that has general acceptance in the relevant scientific community.  Indeed, the leading authorities on business valuation and most courts "recognize that the most reliable method for determining the value of a business is the Discounted Cash Flow ("DCF") Method." *Lippe*, 288 B.R. 678, 689 (S.D.N.Y. 2003) (citing the seminal valuation textbook *Shannon P. Pratt et. al., Valuing A Business: The Analysis and Appraisal of Closely Held Companies* 154 (4th ed. 2000) ("Regardless of what valuation approach is used, in order for it to make rational economic sense from a financial point of view, the results should be compatible with what would result if a well-supported discounted economic income analysis were carried out.")); *see also In re Med Diversified, Inc.*, 334 B.R. at 99  (finding that the "failure to use the DCF method amount[ed] to a material flaw in [the expert's] methodology"); *Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns., Inc.),* 348

B.R. 234, 276 (Bankr. D. Del. 2005), aff'd, No. 06-cv-0147 (JFF), 2007 U.S. Dist. LEXIS 31137, 2007 WL 1232185 (D. Del. Apr. 26, 2007) (stating that DCF is the preferred method of valuing a company as a going concern).

By Mr. Kuhn's own admission, his "Levered DCF" analysis has never been used by any expert before any court in the United States, let alone been accepted by a court as an appropriate and reliable methodology of computing valuation. (Kuhn Tr. at 170:14-171:16.) Mr. Kuhn cannot point to any publications, treatises, articles, or peer reviews that validate or even mention the use of this methodology. (Kuhn Tr. at 171:21-172:6; 175:13-176:7; 193:14-194:2.) Indeed, broad searches for legal authority supporting the use of a "Levered DCF" analysis have revealed no cases that have ever accepted an expert valuation opinion based on a Levered DCF analysis. Nor have we discovered any case or literature concluding it reasonable or proper to value a company based on purported future value of its equity at a future date certain. Because Mr. Kuhn's methodology has not been tested nor subject to peer review or publication, there is no way to know whether the methodology leads to erroneous results and there are no established, maintained standards controlling its application.

In short, instead of performing the usual and customary industry-standard DCF, as Lenders' expert did, and as experts around the country regularly do, Mr. Kuhn created a results-driven, unvetted, and unreliable approach that has never been tested and can only be explained by a desire to support the Committee's argument that the company will be able to be sold or have its debt refinanced in an amount in excess of the Lenders' debt in 2012. *Daubert/Kumho* and their progeny mandate that Mr. Kuhn's opinion on valuation be excluded.

III.    **THE *DAUBERT/KUMHO* STANDARD MANDATES THE EXCLUSION OF
MR. KUHN'S EXPERT TESTIMONY AND REPORT ON THE DEBTORS'
ABILITY TO SELL OR REFINANCE IN NOVEMBER 2012**

Expert testimony "must be excluded [under *Daubert/Kumho*] if it is speculative,

conjectural, or based on unrealistic assumptions." *Lippe v. Bairnco Corp.,* 288 B.R. at 698

(quoting *Boucher v. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (excluding expert

testimony where the expert relied not on facts or data but instead engaged in rank

speculation); *see also MTX Communications Corp. v. LDDS/WorldCom*, Inc., 132 F.Supp.2d

289, 293 (S.D.N.Y. 2001) (excluding expert testimony regarding the value of a

telecommunications reseller as unreliable where it was "too speculative and lacking in

probative force"); *Dora Homes, Inc. v. Epperson*, 344 F.Supp.2d 875, 888 (E.D.N.Y. 2004)

(excluding expert opinions of licensed engineer because the opinions were based on

speculation and methodology inadequate to support his conclusions).  In *Lippe v. Bairnco

Corp.*, for example, the court excluded unreliable expert testimony under *Daubert/Kumho*

where the experts had relied mainly on their own "say-so" and had not taken into account the

major variables that one would expect to have had an impact on their conclusions.  *Lippe*, 288

B.R. at 701; *see also MTX Communications Corp. v. LDDS/WorldCom*, Inc., 132 F.Supp.2d

289, 291 (S.D.N.Y. 2001) ("Nothing in either *Daubert* or the Federal Rules of Evidence

requires a district court to admit opinion evidence which is connected to existing data only by

the *ipse dixit* of the expert.")  Thus, where the "analytical gap between the data and the

opinion proffered" is so great and connected only by speculative facts and pure conjectures,

the testimony is inherently unreliable and must be excluded.  *General Electric Co. v. Joiner*,

522 U.S. 136, 146 (1997).

Having no qualification to assess the state of the financial markets in three years, much less what a potential buyer or lender would consider in assessing a possible purchase of the Debtors or a refinancing of the Debtors' outstanding debt, Mr. Kuhn's opinion that the Debtors will be able to obtain either a sale or refinancing in November 2012 is unreliable and inadmissible.  His opinion is pure speculation and conjecture (as acknowledged in the plain language of the report) in that the Kuhn Report states little more than that it "*assumes* that in approximately three years, the overall economic environment will have improved to provide more liquidity and appetite for acquisitions in the broadcasting sector" and that it "*believes* the Reorganized Company could likely refinance the debt assuming a return to somewhat normal credit markets."  (Kuhn Report at 17, 29) (emphasis added).

By basing his opinion on an assumption of an improved "overall economic environment" and a "return to somewhat normal credit markets," Mr. Kuhn takes an enormous and unsupported leap.  Having no experience in commercial lending himself, Mr. Kuhn specifically acknowledged that he did not confer with commercial lenders about what they believe lenders will do in the next two years.  (Kuhn Tr. at 144:12-16.)  In fact, Mr. Kuhn conceded his own lack of knowledge and qualification to opine on economic forecasts for November 2012 when he stated, "I have no greater predictive ability than any other human being." (*Id*. at 68:7-9.)  Given that Mr. Kuhn relied on pure speculation and a layperson's prediction when making his refinancing opinion, his testimony on this topic must be excluded because it is so speculative as to render it unreliable.

## CONCLUSION

**WHEREFORE**, the Lenders respectfully request that this Court enter an order, substantially in the form attached hereto, determining that Mr. Kuhn lacks qualifications to

provide expert testimony on the subjects presented in the Kuhn Report, excluding Mr. Kuhn's

proffered testimony, and granting the Lenders such other and further relief as the Court may

deem just and proper.

Dated: December 30, 2009                     Respectfully submitted,

                                             Milbank, Tweed, Hadley & McCloy, LLP

                                             By:    /s/ Linda Dakin-Grimm
                                                    Linda Dakin-Grimm (LD 5669)
                                                    Daniel Perry (DP 6966)
                                                    1 Chase Manhattan Plaza
                                                    New York, N.Y. 10005
                                                    Telephone: (212) 530-5000
                                                    Facsimile:  (212) 530-0158

                                                    Gregory A. Bray
                                                    Fred Neufeld
                                                    601 S. Figueroa St.
                                                    Suite 3000
                                                    Los Angeles, CA 90017
                                                    Telephone: (213) 892-4000
                                                    Facsimile:  (213) 629-5063

                                                    *Attorneys for Wachovia Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                 :
In re:                              :
                               :     Chapter 11
                               :
Young Broadcasting Inc., *et al.*,     :     Case No. 09-10645 (AJG)
                               :
                               :     (Jointly Administered)
                Debtors.      :
                               :
-------------------------------------------------------------x

**ORDER GRANTING MOTION *IN LIMINE* OF WACHOVIA BANK, N.A., AGENT FOR
SENIOR SECURED LENDERS, TO EXCLUDE UNDER FEDERAL RULE OF
EVIDENCE 702, TESTIMONY AND REPORT OF TOM KUHN,
OFFERED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Upon the motion, dated December 30, 2009, it is

     **ORDERED** that the Motion is granted; and it is further

     **ORDERED** that Tom Kuhn is not qualified to provide expert testimony on the subjects

presented in the Allen & Co. Report;

     **ORDERED** that the expert testimony and report of Mr. Kuhn is excluded to the extent

that it offers an opinion regarding valuation; and

     **ORDERED** that the expert testimony and report of Mr. Kuhn is excluded to the extent

that it offers an opinion regarding the Debtors' ability to sell or refinance in 2012.

     Dated: _____, 2009
     New York, New York

                                    _____
                                    HONORABLE ARTHUR J. GONZALEZ
                                    UNITED STATES BANKRUPTCY JUDGE