**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew J. Ehrlich
Andrew N. Rosenberg
Jeffrey D. Saferstein
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re

   YOUNG BROADCASTING INC., et al.,

Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Chapter 11

Case No. 09-10645  (AJG)

Jointly Administered

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MEMORANDUM**
**OF LAW IN OPPOSITION TO THE SENIOR SECURED LENDERS' MOTION IN**
**LIMINE TO EXCLUDE THE TESTIMONY AND REPORT OF TOM KUHN**

Dated:    New York, New York
          January 11, 2010

## TABLE OF CONTENTS

**Page**

Table of Authorities ..................................................................................................

I.     MR. KUHN'S TESTIMONY AND REPORT ARE ADMISSIBLE ...................... 5

 A.   Mr. Kuhn Possesses The Necessary Knowledge, Skill, and Experience To
      Be Qualified as an Expert .................................................................................. 6

 B.   Mr. Kuhn's Expert Report and Proffered Testimony Possess Sufficient
      Indicia of Reliability and Accordingly Should Not Be Excluded ....................... 12

 C.   Mr. Kuhn's Report and Testimony Are Relevant to Understanding or
      Determining the Facts at Issue .......................................................................... 26

II.    MR. KUHN'S OPINIONS WERE NOT INFLUENCED BY A SUCCESS
       FEE .................................................................................................................... 27

 Conclusion .................................................................................................................. 28

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

24/7 Records, Inc. v. Sony Music Entm't, Inc.,
   514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) ...................................................... 25

In re Adelphia Commc'ns Corp.,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007)............................................................... 10

Alfa Corp. v. OAO Alfa Bank,
   475 F. Supp. 2d 357 (S.D.N.Y. 2007) ................................................................. 5

Bah v. Nordson Corp.,
   No. 00 Civ. 9060 (DAB), 2005 WL 1813023 (S.D.N.Y. Aug. 1,
   2005) ............................................................................................................ 15, 17

Daubert v. Merrell Dow Pharms., Inc.,
   509 U.S. 579 (1993) ...............................................................................passim

Disability Advocates, Inc. v. Paterson,
   No. 03 Civ. 3209 (NGG) (MDG), 2008 WL 5378365 (E.D.N.Y.
   Dec. 22, 2008)..................................................................................................... 5

EMIG v. Electrolux Home Prods. Inc.,
   No. 06 Civ. 4791 (KMK), 2008 WL 4200988 (S.D.N.Y. Sept. 11,
   2008)..................................................................................................................... 5

Equal Employment Opportunity Comm'n v. Morgan Stanley,
   324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004) ...................................................... 28

In re Fosamax Prods. Liab. Litig.,
   645 F. Supp. 2d 164 (S.D.N.Y. 2009) .......................................................... 7, 26

In re Hayes Lemmerz Intern., Inc.,
   340 B.R. 461 (Bankr. D. Del. 2006).................................................................. 21

Indu Craft, Inc. v. Bank of Baroda,
   47 F.3d 490 (2d Cir. 1995)................................................................................. 26

Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,
   No. 04 Civ. 7369 (LTS), 2006 WL 2128785 (S.D.N.Y. July 28,
   2006) .................................................................................................................... 1

**Page(s)**

Keenan v. Mine Safety Appliances Co.,
No. 03 Civ. 710 (TCP) (ARL), 2006 WL 2546551 (E.D.N.Y. Aug.
31, 2006) ...................................................................................................... 1

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) ...................................................................................6, 7, 13

Lippe v. Bairnco,
288 B.R. 678 (S.D.N.Y. 2003)....................................................................20, 25

Madison Ave. Inv. Partners, LLC v. Am. First Real Estate Inv. Partners,
L.P.,
806 A.2d 165 (Del. Ch. 2002)................................................................... 21

Malletier v. Dooney & Bourke, Inc.,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) .................................................... 11

McCullock v. H.B. Fuller Co.,
61 F.3d 1038 (2d Cir. 1995).............................................................. 2, 9

In re Med Diversified, Inc.,
334 B.R. 89 (Bankr. E.D.N.Y. 2005) .......................................................12, 25

In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,
No 00 Civ. 1898 (SAS), 2008 WL 1971538 (S.D.N.Y. May 7,
2008) ...................................................................................................... 1, 7

In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,
643 F. Supp. 2d 482 (S.D.N.Y. 2009) .................................................... 5

In re Nellson Neutraceuticals, Inc.,
356 B.R. 364 (Bankr. D. Del. 2006).......................................................17, 18, 21

Nimely v. City of New York,
414 F.3d 381 (2d Cir. 2005).......................................................................5, 6, 13

Norwest Financial, Inc. v. Fernandez,
86 F. Supp. 2d 212 (S.D.N.Y. 2000) .................................................... 28

Tiffany (NJ) Inc. v. eBay, Inc.,
576 F. Supp. 2d 457 (S.D.N.Y. 2007) .............................................. 13

In re Winstar Commc'ns, Inc.,
348 B.R. 234 (Bankr. D. Del. 2005).................................................... 21

Wright v. Stern,
450 F. Supp. 2d 335 (S.D.N.Y. 2006) .............................................. 6

**Page(s)**

In re Zenith Elecs. Corp.,
    241 B.R. 92 (Bankr. D. Del. 1999)....................................................................... 27

**RULES**

Federal Rule of Evidence 702 ................................................................................passim

**OTHER AUTHORITIES**

JAMES R. HITCHNER, FINANCIAL VALUATION: APPLICATIONS AND MODELS
    (2d ed. 2006) ..................................................................................................... 21

SHANNON P. PRATT, ROBERT F. REILLY, & ROBERT P. SCHWEIHS, VALUING
    A BUSINESS (4th ed. 2000).................................................................................. 21

Summary of Economic Projections, Addendum to the Minutes of the
    Federal Open Markets Committee, November 3-4, 2009,
    http://www.federalreserve.gov/
    monetarypolicy/fomcminutes20091104ep.htm.................................................... 16

TOM COPELAND, TIM KOLLER, JACK MURRIN, VALUATION (4th ed. 2005) ..................... 24

The Official Committee of Unsecured Creditors (the "Committee")
respectfully submits this memorandum of law in opposition to the Senior Secured Lenders'
(the "Lenders") motion in limine to exclude the expert report and proffered testimony of
Tom Kuhn (the "Motion").

### PRELIMINARY STATEMENT

The Lenders' Motion to disqualify the Committee's expert is an exercise in
both overreaching and distraction that the Court should swiftly reject.

Faced with a Committee Plan that has now won unanimous support from the
Debtor's Board of Directors (including the two directors installed by the Lenders), the
Lenders have resorted to attempting to disqualify the Committee's expert, an investment
banker with two decades of experience in law, banking, and the media industry. As we
demonstrate herein, this gambit is predicated on a fundamental distortion of the law of the
admissibility of expert testimony, as well as a series of baseless and unwarranted attacks on
the Committee's expert and its counsel.

With respect to Mr. Kuhn's qualifications, the Lenders overreach as to both
the law and the facts. Notwithstanding the Lenders' suggestion that disqualification of an
expert is commonplace, the law in this Circuit is clear that rejection of expert testimony is
the rare exception rather than the rule. Courts in the Second Circuit have consistently
construed expert qualification requirements liberally.[1] Disputes as to the strength of an

---

[1]    See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., No 00 Civ. 1898 (SAS), 2008 WL
1971538, at *5 (S.D.N.Y. May 7, 2008) (noting that "[c]ourts within the Second Circuit have
liberally construed expert qualification requirements" (internal quotations and citations omitted));
Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04 Civ. 7369 (LTS), 2006 WL
2128785, at *5 (S.D.N.Y. July 28, 2006) ("In assessing whether a witness can testify as an
expert, courts have liberally construed the expert qualification requirement."); Keenan v. Mine

expert's credentials go to the <u>weight</u> of an expert's testimony, and are not grounds for wholesale exclusion.[2] The Lenders cite no case in this Circuit where a proffered expert with credentials as vast as Mr. Kuhn's is not accepted by a Court.

And in any event, it requires no liberal construction of the law to qualify Mr. Kuhn as an expert. The Lenders simply ignore that he has nine years of experience as a partner at Allen & Company, one of the nation's most prominent media investment banking firms, and previously served as general counsel to USA Networks, which owned and operated a dozen television stations similar to those operated by the Debtors. Through this experience, Mr. Kuhn has arranged financing for dozens of media clients, engaged in valuation analyses, and gained broad experience concerning the markets about which his opinion is proffered. Indeed, notwithstanding the Lenders' ridicule of Mr. Kuhn's qualifications, Mr. Kuhn was qualified as an expert by Judge Gerber in the <u>Adelphia</u> chapter 11 cases, where he testified at trial and Judge Gerber found that Mr. Kuhn testified "competently and credibly" on valuation issues.

In the face of this expertise, the Lenders stubbornly insist that Mr. Kuhn cannot be qualified as an expert because he is not an economist and "[h]e does not have an M.B.A., nor any other designation or credential customarily held by valuation professionals." (Lenders' Brief at 2.) However, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience rather than formal education. Given his 20 years of relevant professional experience, Mr. Kuhn is undoubtedly qualified to

---

Safety Appliances Co., No. 03 Civ. 710 (TCP) (ARL), 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006) ("The qualifications necessary to testify as an expert are minimal.").

[2] See <u>McCullock</u> v. <u>H.B. Fuller Co.</u>, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.").

2

offer expert testimony on the subjects contained in his report. The Lenders cite no law, nor are we aware of any, holding that an M.B.A. is the *sine qua non* of admissible expert testimony. Indeed, countless leading valuation experts who do not hold M.B.A. degrees (including Jim Milstein, formerly of Lazard Frères & Co., and now Chief Restructuring Officer of the United States Treasury, among others) testify before this Court on a regular basis, and such testimony is routinely accepted by the Court.[3] And Mr. Kuhn not only has banking expertise, his experience (unlike that of the Lenders' expert) is grounded in industry operating experience.

The Lenders' attack on Mr. Kuhn's methodology is equally overreaching. The Lenders contend that Mr. Kuhn's opinion as to the reorganized company's ability to sell itself or refinance its debts at maturity is "speculative" because Mr. Kuhn is allegedly unqualified to opine on the economy or credit markets. (Lenders' Brief at 18.) But, Mr. Kuhn is in fact eminently qualified by virtue of his experience and rests his opinions on a reliable basis—a survey of historic valuation multiples, precedent transactions, and the application of his informed judgment as to developments in the financing markets. Indeed, the Lenders' expert offers an opinion contrary to that of Mr. Kuhn—but it is based on precisely the same set of historic facts, using the same methodology.

The lengthy attack on Mr. Kuhn's valuation analysis, to which the Lenders devote the overwhelming bulk of their motion, is, frankly, a sideshow. This case is not a valuation fight. There is no dispute between the parties as to the Debtors' valuation. Nor is

---

[3]    Other well-known valuation experts who testify in this Court on a regular basis who also do not have M.B.A. degrees, include: David S. Kurtz, Managing Director at Lazard Frères & Co; Bradley A. Robins, Managing Director at Greenhill & Co.; and William H. Hardie III, Managing Director, Irwin Gold, Senior Managing Director, and Jeffrey I. Werbalowsky, Co-Chief Executive Officer, all of Houlihan Lokey Howard & Zukin Inc.

there a dispute as to whether the reorganized Debtors can service their debt obligations upon confirmation, under either plan.  To be clear, the Lenders' expert has conceded that the Debtors could service their debt obligations under the Committee Plan.  The only disputed issue in the case involving expert analysis is the question of whether the Committee Plan is feasible, insofar as the Debtors could sell the company or refinance to satisfy the Credit Agreement at its maturity in November 2012.

Finally, in all events, the Lenders' attack on Mr. Kuhn's valuation methodology, present value as calculated by a discounted cash flow ("DCF") analysis, is without merit.  The Lenders concede that DCF is a well-recognized valuation methodology, widely accepted by courts.  That should be the beginning and end of the analysis for purposes of this motion to exclude.  Mr. Kuhn has used assumptions and inputs to the DCF methodology—which is also widely recognized as necessarily involving subjective professional judgments—that he believes appropriate to this very unusual case.  It is far from the ordinary case that involves the potential reinstatement of a senior secured credit facility featuring a sub-market interest rate; accordingly, Mr. Kuhn used assumptions and inputs tailored to this case, which is exactly what an expert witness should do.  The Lenders are free to attack those assumptions on cross-examination, but the assumptions are reasonable, logical, developed for these specific circumstances, and thus fall well within the range of reasonable professional judgments that the Court may consider in deciding this matter.

For all of these reasons, the Court should not take the radical step of excluding Mr. Kuhn's report and testimony.  Given Mr. Kuhn's broad qualifications, and the established nature of his methodology, the Lenders' arguments to exclude are in fact all

4

points that go to the weight of his testimony, and should properly be raised on cross-examination.

## ARGUMENT

## I.

## MR. KUHN'S TESTIMONY AND REPORT ARE ADMISSIBLE

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702, which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the Second Circuit has explained, "Federal Rule of Evidence 702 . . . 'embodies a liberal standard of admissibility for expert opinions.'" EMIG v. Electrolux Home Prods. Inc., No. 06 Civ. 4791 (KMK), 2008 WL 4200988, at *3 (S.D.N.Y. Sept. 11, 2008) (quoting Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005)). Thus, "[a]lthough expert testimony should be excluded if it is speculative or conjectural—or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison—other contentions that are unfounded go to the weight—not the admissibility—of the testimony." In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 643 F. Supp. 2d 482, 493 (S.D.N.Y. 2009) (internal citations omitted).

Moreover, courts in the Second Circuit have consistently held that "the rejection of expert testimony is the exception rather than the rule." Alfa Corp. v. OAO Alfa Bank, 475 F. Supp. 2d 357, 360 (S.D.N.Y. 2007) (quoting Fed. R. Evid. 702 Advisory

Committee Notes); see also Disability Advocates, Inc. v. Paterson, No. 03 Civ. 3209 (NGG)

(MDG), 2008 WL 5378365, at *2 (E.D.N.Y. Dec. 22, 2008) (noting that "[t]he Second

Circuit's standard for admissibility of expert testimony is 'especially broad'" and that "[t]he

rejection of expert testimony is 'the exception rather than the rule'" (citation omitted));

Wright v. Stern, 450 F. Supp. 2d 335, 359-60 (S.D.N.Y. 2006) ("Rejection of expert

testimony, however, is still 'the exception rather than the rule. . . .'" (citation omitted)).

The Supreme Court set forth the analytical framework for applying Rule 702

in the seminal case of Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  Under

Rule 702 and Daubert, trial courts serve a "gatekeeper" function in evaluating the

admissibility of proffered expert testimony, ensuring as required by Rule 702 that: (i) an

expert is qualified to opine on the matter at issue, and that the proffered testimony is (ii)

reliable and (iii) relevant.  Id. at 589, 597; see also Kumho Tire Co. v. Carmichael, 526 U.S.

137, 147 (1999).  Applying these standards, we demonstrate below that Mr. Kuhn is

extremely qualified to opine on the matters at issue, and that his testimony and report are

both reliable and relevant.

**A.      Mr. Kuhn Possesses The Necessary Knowledge, Skill, and Experience To Be Qualified as an Expert**

**1.      Mr. Kuhn's Qualifications**

As to the first requirement of Rule 702 and Daubert—qualification—an

expert must possess the requisite "knowledge, skill, experience, training, or education," Fed.

R. Evid. 702, with respect to the matters he intends to address.  See, e.g., Nimely, 414 F.3d at

399 n.13 (noting that "because a witness qualifies as an expert with respect to certain matters

or areas of knowledge, it by no means follows that he or she is qualified to express expert

opinions as to other fields").

6

"Qualification as an expert is viewed liberally and may be based on 'a broad range of knowledge, skills, and training.'" In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (internal quotations and citations omitted). Moreover, "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience rather than formal education." In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 2008 WL 1971538, at *5 (internal quotations and citations omitted). Indeed, the Supreme Court has noted that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Kumho Tire, 526 U.S. at 150; see also Fed. R. Evid. 702 Advisory Committee Notes ("[T]he relevant reliability concerns may focus upon personal knowledge or experience.").

Here, given his extensive professional experience, Mr. Kuhn is clearly qualified to offer expert testimony on the subjects contained in his report and testimony.

For the last nine years, Mr. Kuhn has been a Managing Director at Allen & Co., an investment banking firm. (See id. at 34; Transcript of the Deposition of Tom Kuhn ("Kuhn Dep. Tr."), Ehrlich Decl. Ex. B, at 14:7-13; Declaration of Tom Kuhn "Kuhn Declaration" ¶ 1.) Allen & Co. is widely recognized as one of the most active firms in the

7

media and entertainment industry and has significant transactional experience across all forms of media and entertainment.  (See Kuhn Decl. ¶ 2; Kuhn Report at 31.)  At Allen & Co., Mr. Kuhn has had substantial experience advising companies on mergers, acquisitions, asset sales, and financings; he has completed approximately 28 transactions, of which 18 have been in the media and communications fields.  (See Kuhn Decl. ¶ 3.)  During the course of his professional career, he has managed or been involved in more than 150 transactions.  (See id. ¶ 3.)  A majority of the buy-side assignments on which Mr. Kuhn has worked at Allen & Co. have included substantial financing components.  (See id. ¶ 10(f).)  Though Allen & Co. does not act as a lender, Mr. Kuhn and the company are regularly involved in every detail of its clients' financings, including, securing loans for clients and evaluating competing financing proposals from various sources of debt financing, such as the type presented in this case.  (See id.)

Contrary to the Lenders' illogical assertions, simply because Mr. Kuhn has never worked as a lending officer at a commercial bank does not mean that Mr. Kuhn cannot be qualified to offer opinion testimony as to the markets for financing.  Indeed, given that Mr. Kuhn regularly arranges financing for media clients, it is entirely appropriate opinion testimony.  The Lenders cite no law—nor can they—asserting that only one type of market participant can be deemed an expert in the market overall; such a proposition complies neither with the law of opinion testimony, nor with common sense.

What is more, Mr. Kuhn—unlike the Lenders' own expert—has experience with respect to the operation of broadcast television stations and media companies.  From 1997 through 2000, Mr. Kuhn was Senior Vice President and General Counsel of USA Networks, Inc., where he was primarily responsible for the company's mergers and

acquisitions, as well as its general legal affairs. (See id. ¶ 4; Kuhn Dep. Tr. at 22:13-14;

Kuhn Report at 34.) The USA Networks group of companies included 12 television stations

which are substantially similar to the composition of the station group owned by the Debtors,

with many of the stations operating in the same or similar markets. (See Kuhn Decl. ¶ 5;

Kuhn Dep. Tr. at 22:23-23:1; Kuhn Report at 34.) Mr. Kuhn was one of three corporate

executives responsible for the oversight of the USA Broadcasting station group and was

personally involved in licensing, budgeting, financing and operations of the stations. (See

Kuhn Decl. ¶ 5.) Mr. Kuhn was personally involved in negotiating financings at USA

Networks, including the terms of the company's bank debt and bond issuances. (See id.¶

10(g))[4]

Given this professional experience—set forth in even more detail in the

accompanying declaration filed by Mr. Kuhn—it defies logic to contend, as the Lenders do,

that Mr. Kuhn cannot be qualified to render opinion testimony. Just as the Committee may

argue that the Court should accord little weight to the Lenders' expert, Mr. Cohen, because,

unlike Mr. Kuhn, he has no first-hand experience operating a broadcast company, the

Lenders may argue that because Mr. Kuhn has never been a commercial banker or does not

have an M.B.A. degree, his testimony is less persuasive. But all these considerations go to

the weight afforded the testimony in the Court's ultimate analysis, and none are the stuff of

exclusion under Daubert and Rule 702. See McCullock, 61 F.3d at 1044.

---

[4]    Additionally, prior to his work at USA Networks, Mr. Kuhn was a partner in the law firm of
       Howard, Darby & Levin LLP, where he advised clients concerning financing transactions. (See
       Kuhn Decl. ¶ 7; Kuhn Dep. Tr. at 12:23-25; Kuhn Report at 35.) During his time as a practicing
       lawyer, Mr. Kuhn participated in 31 completed transactions; seventeen of which involved
       substantial bank borrowings and/or subordinated debt issuances. (See Kuhn Decl. ¶ 7.) Mr.
       Kuhn was personally involved in the negotiation and structuring of the economic and non-
       economic terms of each of those financings. (See id.)

Indeed, the overreaching of the Lenders' motion is made plain by the fact that based on his more than 20 years of professional experience, Mr. Kuhn was qualified by Judge Gerber as a testifying expert in another chapter 11 proceeding (in contrast to the Lenders' proffered expert, Peter Cohen, who has never been qualified as an expert by any court). Specifically, in 2007, Mr. Kuhn served as a co-advisor to Adelphia Communications in the sale of the company to Time Warner and Comcast. (See Kuhn Decl. ¶ 10(a); Kuhn Dep. Tr. at 19:2-3; Kuhn Report at 35.) Adelphia was sold during its chapter 11 proceedings for $17.6 billion. (See Kuhn Decl. ¶ 10(a).) In Adelphia's chapter 11 proceedings, Mr. Kuhn was qualified as an expert on valuation and testified as such before Judge Gerber. (See id.¶ 10(a); Kuhn Dep. Tr. at 19:2-3, Kuhn Report at 35); In re Adelphia Commc'ns Corp., Case No. 02-41729 (S.D.N.Y. 2002).

The Lenders attempt to minimize this fact—which is so damning to their motion—by hurling invective. The Lenders state that Mr. Kuhn "falsely testified" that he had performed a Discounted Cash Flow analysis ("DCF") in the Adelphia case. (Lenders' Brief at 4). In fact, Mr. Kuhn did perform several DCF analyses in connection with his role as an advisor and expert in that proceeding. (See Kuhn Decl. ¶ 10(a)); see also In re Adelphia Commc'ns Corp., 368 B.R. 140, 178 (Bankr. S.D.N.Y. 2007) (stating that DCF was "taken into account as a factor in earlier valuations" though it was not a factor in Mr. Kuhn's final valuation, and noting that "the Adelphia Valuation Expert testified very competently and credibly").

## 2. The Allen & Co. Team's Qualifications

Mr. Kuhn's professional experience alone would qualify him as an expert, but in this case his experience is buttressed by that of three additional members of a team at Allen & Company that assisted him in preparing his analysis. Courts have widely

10

recognized that an expert witness is permitted to use assistants in formulating his or her expert opinion, and normally the assistants need not themselves testify. <u>See, e.g.</u>, <u>Malletier</u> v. <u>Dooney & Bourke, Inc.</u>, 525 F. Supp. 2d 558, 665 (S.D.N.Y. 2007).

In preparing for his testimony and expert report in this matter, Mr. Kuhn worked closely with a highly qualified team of colleagues at Allen & Co., each of whom has significant professional experience, academic qualifications, and more than 35 years of combined experience in the investment banking field. (<u>See</u> Kuhn Decl. ¶ 11.) Mr. Kuhn worked closely with Richard Fields, a Managing Director at Allen & Co. (<u>See id.</u> ¶ 11(a); Kuhn Dep. Tr. 16:10-12.) Mr. Fields has been an investment banker for over 23 years, with an active practice in mergers and acquisitions, principal investments, and public and private financings. (<u>See id.</u>) Prior to joining Allen & Co., Mr. Fields served for four years as the CEO involved in the restructuring and successful sale of a financially troubled family business. (<u>See id.</u>¶ 11(a).) Mr. Fields received his J.D. from Harvard Law School and an M.B.A. from the Stanford Graduate School of Business, with a concentration in finance and accounting. (<u>See id.</u>) Previously, he received his Bachelor of Science in Economics from the Massachusetts Institute of Technology, with a specialization and graduate level work in applied microeconomics and industrial organization. (<u>See id.</u>) Mr. Kuhn also worked with Kemp Webber Steib, a Vice President of Allen & Co., and Andre Fankhauser, an analyst, both of whom have substantial investment banking experience, including working on a number of valuations and financings for media and entertainment companies.[5] (<u>See id.</u> ¶

---

[5]   The Lenders argue that a court must find that a testifying expert himself has the relevant expertise, and that the expertise held by the entity for whom the expert works or by others who may have assisted the expert in drafting the expert report cannot be the basis for the testifying expert's qualifications. To support this argument, the Lenders cite to <u>In re Med Diversified, Inc.</u>, 334 B.R. 89 (Bankr. E.D.N.Y. 2005), a case wholly distinguishable from the facts in the current

11

11(b)-(c); Kuhn Dep. Tr. 16:10-12.) Indeed, both Ms. Steib and Mr. Fankhauser advised Fox on the sale of eight television stations to Oak Hill Capital, which had an approximately $1.1 billion valuation, the largest broadcast transaction in the last two years. (Kuhn Decl. ¶¶ 11(b)(ii), 11(c)(iii).)

                                        *        *        *

        Based on Mr. Kuhn's and his team's vast experience in the television broadcasting industry, and their experience in having to secure financing for media companies, Mr. Kuhn certainly has the knowledge, skill, and experience to be qualified as an expert here. Mr. Kuhn has a wealth of knowledge and experience in securing financing for media and entertainment companies, the precise subject of his proffered expertise.

**B.      Mr. Kuhn's Expert Report and Proffered Testimony Possess Sufficient Indicia of Reliability and Accordingly Should Not Be Excluded**

        Concerning the second part of the Daubert/Rule 702 analysis—reliability— course have identified a range of relevant factors. The Court in Daubert identified a non-exhaustive list, including: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Daubert, 509 U.S. at 593-94. These factors

---

matter. There, the Court granted a motion to exclude the testimony of a purported valuation expert after he admitted: "I'm not a certified valuation expert, and I don't issue valuation reports . . . . [The expert] also admitted repeatedly that he personally does not issue business valuation reports, although he relies upon members of his support staff who are certified business valuators for their input." Id. at 96. Relying solely on support staff to formulate an expert opinion is entirely different than drafting an expert report with the assistance of a highly experienced group of colleagues.

do not constitute, however, a "definitive checklist or test; rather, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," id.; see also Nimely, 414 F.3d at 397, and thus the "gatekeeping inquiry must be tied to the facts of a particular case." Kumho Tire, 526 U.S. at 150.

Aside from invective and character assassination,[6] the Lenders have asserted two principal substantive challenges to the reliability of the Kuhn Report and Mr. Kuhn's proffered testimony. Specifically, the Lenders argue that Mr. Kuhn's opinion as to the Debtors' ability to sell or refinance the company in 2012 is "pure speculation," (Lenders' Brief at 18), and that the valuation methodology used in the Kuhn Report is deficient. These challenges, much like the Lenders' attack on Mr. Kuhn's qualifications, are without merit and both are in fact attacks on credibility, rather than admissibility. As set forth below, Mr. Kuhn's expert opinion possesses sufficient indicia of reliability to satisfy Rule 702's "liberal" admissibility standard, Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007), and accordingly, should not be excluded.

### 1.    Mr. Kuhn's Expert Opinion As to the Ability of the Debtors to Sell or Refinance is Reliable

Significantly, although the principal disputed issue in the case is the Debtors' ability to sell the company or refinance its debt upon maturing, the Lenders' motion to exclude Mr. Kuhn's opinion on this topic is essentially an afterthought. The Lenders devote a scant two pages to this topic, and the contents of those two pages appear to be largely a regurgitation of the argument, addressed at length above, that Mr. Kuhn is unqualified.

---

[6]    In an attempt to muddy the waters, the Lenders repeatedly throw about terms such as "deception" and "false and misleading testimony," (e.g., Lenders' Brief at 13-14), on the part of Mr. Kuhn and the Committee. Such characterizations are a gross distortion of the record and the events that transpired, and, moreover, are wholly irrelevant to this motion.

13

Specifically, the Lenders contend that because Mr. Kuhn has no commercial lending experience, he is not qualified to opine that there will be a "'return to somewhat normal credit markets'" by 2012 and an "improved 'overall economic environment'" at the time the Debtors will seek to sell or refinance, two of the assumptions the Lenders claim underlie Allen & Co.'s ultimate opinion as to the Debtors' ability to sale or refinance. (Lenders' Brief at 18.) This, the Lenders argue, renders the ultimate opinion "so speculative as to make it unreliable," and thus it must be excluded. (Id.) This argument as to his lack of lending experience, however, fares no better when disguised as an attack on the reliability of the opinion than it does when couched as an attack on Mr. Kuhn's qualifications. Indeed, while the Lenders correctly point out that the "ipse dixit" of an expert is insufficient to render an expert opinion reliable, it is equally true that the Lenders' own "say-so" does not make Mr. Kuhn unqualified or his expert opinion "pure speculation." (See id. at 17-18.) Moreover, Mr. Kuhn does not rely on these assumptions in forming his opinion that the reorganized company will be able to sell or refinance in 2012.

Far from being the product of speculation or conjecture, Mr. Kuhn's expert opinion rests on an entirely reliable basis: a thorough consideration of relevant comparable companies, as well as precedent sale and financing transactions, viewed in light of the same extensive experience that makes him fully qualified to serve as an expert. [7] It is beyond any

---

[7]

dispute that "'[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony'" and that experienced-based testimony is admissible so long as the expert explains how the experience "leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Bah v. Nordson Corp., No. 00 Civ. 9060 (DAB), 2005 WL 1813023, at *7, 9 (S.D.N.Y. Aug. 1, 2005) (quoting Fed. R. Evid. 702 Advisory Committee Notes). That standard is satisfied here.

Mr. Kuhn considered a number of comparable public companies and performed an analysis of historical precedent transactions to arrive at his contemplated exit multiple range for a sale of the reorganized company. (See Kuhn Report at 13, 38-40.) Similarly, in arriving at his opinion as to the viability of a refinancing of the reorganized company's debt in 2012, Mr. Kuhn considered the leverage ratios at which recent broadcast transactions have been financed. (Id. at 14.) ███████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████ Mr. Kuhn's sale/refinancing opinion and the challenged

---

8   The Lenders assert in passing and without elaboration that Allen & Co. has not "identified any factual basis whatsoever" upon which the challenged opinions are based. (Lenders' Brief at 1.) ██████████████████████████████████████████████████████████████████████

15

assumptions are thus the product of a multitude of data considered in light of Mr. Kuhn's

broad experience, including in the television broadcasting financing industry.



In addition to the assumption just cited above, the report and proffered

testimony of the Lenders' expert are replete with further instances of the same sort of "bald

statements" of which the Lenders are so critical in the Kuhn Report. By way of example, the

Lenders criticize the Kuhn Report because it "'assumes'" on the basis of Mr. Kuhn's

experience and relevant data a better economic environment and improved credit markets in

three years.[9] (Lenders' Brief at 18 (citing Kuhn Report at 17) (emphasis added by Lenders).)

---

[9]   Notably, Mr. Kuhn's conclusions as to the state of the economy and the credit markets in 2012 are consistent with the predictions of economists. See, e.g., Summary of Economic Projections, Addendum to the Minutes of the Federal Open Markets Committee, November 3-4, 2009, http://www.federalreserve.gov/monetarypolicy/fomcminutes20091104ep.htm (last visited Jan. 6, 2010) (noting that "[meeting] participants anticipated that the recovery [in real GDP growth] would gather steam in 2011 and 2012 as a consequence of further improvements in consumer and business confidence and in the condition of financial markets and institutions").

 Such

statements are just as deficient and arguably even more so than the two statements in the Kuhn Report on which the Lenders have focused their attention, and, thus, under the Lenders' standard, would also mandate exclusion of the Cohen Report.

Finally, to the extent the Lenders contend Mr. Kuhn's expert opinion rests on improper or "unfounded assumptions," like the Lenders' other arguments, "such contentions go to the weight, not the admissibility, of the testimony," and are properly addressed by cross-examination at trial.  Bah, 2005 WL 1813023, at *9.

### 2. Mr. Kuhn's Valuation Methodology Is Not Relevant Here, But, In Any Event, Is Reliable

The Lenders also challenge various aspects of the valuation methodology used by Mr. Kuhn.  In fact, the Lenders devote no fewer than twelve pages of their nineteen-page motion in limine to attacking the Committee's expert on an issue which is, ultimately, beside the point. Notwithstanding the irrelevance of the Lenders' arguments to the ultimate

17

issues, Mr. Kuhn's valuation methodology is reliable under the standards set forth in <u>Daubert</u> and Rule 702, and thus should not be excluded.

As a preliminary matter, regardless of the critiques the Lenders make of Mr. Kuhn's valuation methodology, the Lenders ignore that whatever the disputes between the Lenders and the Committee, this is simply not a valuation fight. It remains inescapably true that a DCF calculation of the present value of the Company <u>is not relevant</u> to the feasibility of the Committee's plan or to the reorganized company's ability to sell or refinance in 2012.[10]   In fact, as set forth below, strikingly, the Committee and the Lenders are in agreement as to the values underlying the relevant considerations—they differ only as to the conclusions to draw from those values.

As to the feasibility of the Committee's plan, the relevant inquiry is not the reorganized company's value upon emergence as calculated by a DCF analysis, but rather whether the reorganized company can service its debt obligations and meet its other operating expenses.



---

[10]   The immateriality of Mr. Kuhn's DCF analysis to the issues at hand here is in stark contrast to <u>In re Nellson Neutraceuticals, Inc.</u>, upon which the Lenders rely. 356 B.R. 364, 370 (Bankr. D. Del. 2006). There, the court held that because the portion of an expert's testimony that was found to be unreliable was "in fact, inseparable from his ultimate conclusion," the entirety of the expert's testimony must be excluded. <u>Id.</u> at 376; <u>see also id.</u> at 375 (noting that the expert's "DCF analysis has a material impact on his ultimate conclusion"). Here, in contrast, Mr. Kuhn's DCF analysis, far from being "inseparable" from his ultimate conclusions about the reorganized company's ability to service its debt and refinance or sell itself in 2012, is in fact irrelevant to them.



███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████

Leaving aside the relative irrelevance of the Lenders' argument, however, Mr. Kuhn's valuation methodology is sufficiently reliable to satisfy the <u>Daubert</u> standard.  As the Lenders point out, a DCF analysis is a commonly-used and accepted method of valuing an enterprise.  (Lenders' Brief at 7-8); <u>see</u> <u>also</u> <u>Lippe</u> v. <u>Bairnco</u>, 288 B.R. 678, 689 (S.D.N.Y. 2003) (noting that "[m]any authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ("DCF") method" and citing cases). ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████  The Lenders thus attempt to

---

[11] ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

20

portray the valuation methodology used by Mr. Kuhn, because it differs from the Lenders' purported "standard" DCF, as non-standard and therefore unreliable.

It is well settled, however, that "valuation, although employing broad principles of economics, is as much an art as it is a science. Each approach may yield a different result and which approach offers the best or better framework is a determination made in light of the facts of a case." In re Winstar Commc'ns, Inc., 348 B.R. 234, 274 (Bankr. D. Del. 2005); see also In re Hayes Lemmerz Intern., Inc., 340 B.R. 461, 486 (Bankr. D. Del. 2006) (noting, in the context of discussion of valuation of certain leased property, that "[t]his process, like any appraisal, is more art than science"); Madison Ave. Inv. Partners, LLC v. Am. First Real Estate Inv. Partners, L.P., 806 A.2d 165, 176 (Del. Ch. 2002) (noting that "as one of the leading treatises on valuation techniques states, 'valuation is as much an art as a science and is inherently imprecise'" (quoting TOM COPELAND, TIM KOLLER, JACK MURRIN, VALUATION 293-4 (3rd ed. 2000)). Indeed, it is recognized that "[f]inancial valuations are very much affected by specific facts and circumstances." JAMES R. HITCHNER, FINANCIAL VALUATION: APPLICATIONS AND MODELS xxxii (2d ed. 2006). "Every situation is unique, and differing facts and circumstances may result in variations of the applied methodologies." Id.; see also SHANNON P. PRATT, ROBERT F. REILLY, & ROBERT P. SCHWEIHS, VALUING A BUSINESS 53-54 (4th ed. 2000) (noting that "[t]he specific methods and procedures for valuing a business or a business interest vary from one situation to

another" and that "[w]ithin the scope of . . . business valuation principles, different standards and premises of value and different ownership characteristics apply for different valuation purposes and within different legal contexts"); In re Nellson Neutraceuticals, 356 B.R. at 370 (noting that "[a]t the heart of any valuation methodology is a simple task: the expert determines an appropriate metric of value and applies a multiple to that metric to determine the enterprise value of the company. Different methodologies use different sources of material to determine the appropriate metric of value and the multiple.").

Contrary to the Lenders' contentions, the methodology used by Mr. Kuhn is a reliable variation on a DCF analysis, adjusted in light of the specific facts and circumstances of this case. Mr. Kuhn used that analysis to calculate, for inclusion in the Committee's Disclosure Statement, the values relevant to an informed evaluation of the Committee's Plan: the equity value available to the noteholders under the competing plans. (Kuhn Decl. ¶ 12.) The analysis sought to provide a comparison of the relative values of the equity offered under the Committee Plan, with the reinstated debt at a low interest rate, against the value of the warrants offered under the Debtors' Plan, with a reduced amount of debt at a higher interest rate. (Id. ¶ 13.)

Mr. Kuhn and his team believed that the substantially below-market terms of the reinstated debt would be a key asset of the estate and that, accordingly, taking account of that cheap debt was essential to an accurate analysis of equity values under the two plans, and that thus a central element of the analysis was incorporating a mechanism to take full account of the varying cost and amount of the leverage under each plan. (Id. ¶¶ 14-15 ; see also Kuhn Dep. Tr. at 154:24-155:4, 192:2-7.) Mr. Kuhn and his team thus determined, based on their experience, that the most appropriate way to take this below-market debt into

22

account and to value the equity received under either plan on a present value basis was to perform what was termed in the Disclosure Statement as a levered DCF. (Kuhn Decl. ¶ 15.) This modified DCF analysis calculated the implied value of an equity position under a levered capital structure, much like an LBO analysis calculates the return to equity in a levered situation. (Id. ¶ 16; see also Kuhn Dep. Tr. at 193:18-19.)

A "standard" DCF analysis, as characterized by the Lenders (Lenders' Brief at  9), analyzes the stream of cash flows and a terminal value for a company, and then discounts these cash flows back to the present using a discount rate, taking into account the capital structure of the company to obtain a value to common equity holders. (Kuhn Decl. ¶ 17.) In the modified or levered DCF model that Mr. Kuhn determined was appropriate to the particular facts and circumstances of this case, he assumed that the reorganized company's cash flow each year would be utilized to pay interest expense, and that the remaining cash flow would be put onto the balance sheet, and thus would not be available for distribution. (Id. ¶ 18.) The analysis performed by Mr. Kuhn and his team also assumed the reorganized company would be sold in 2012. (Id. ¶ 19.) Assuming a sale event in 2012, Mr. Kuhn and his team analyzed how much cash flow would be expected to be available to common equity holders based on the net debt to be paid off and the preferred stock outstanding at that time. (Id. ¶ 20.) Mr. Kuhn and his team then discounted the value of this cash flow back to the present, using an equity weighted average cost of capital ("WACC"),[12] as the future capital

---

[12]   The Lenders also contend that Mr. Kuhn's valuation analysis is unreliable because it uses a weighted average cost of equity that the Kuhn Report "misleadingly" terms a WACC, which, used in a "standard" DCF analysis, incorporates the cost of both debt and equity. (Lenders' Brief at 12-13.) This contention misses the mark in both its invective and its substance. Because Mr. Kuhn and his team had already taken into account the debt in the capital structure when determining the value of the common equity in 2012, the weighting of debt in the levered DCF's WACC calculation is zero, and thus the cost of debt in the WACC calculation is zero. (Kuhn

23

structure of the company already factored in the net debt and preferred stock at that time. (Id. ¶ 21.) That equity WACC was not, as the Lenders contend, "plucked out of thin air." (Lenders' Brief at 12.)  Rather, Mr. Kuhn and his team calculated the equity WACC using the Capital Asset Pricing Model ("CAPM"), a widely-used method of calculating cost of equity. (Id. ¶ 23); see also TOM COPELAND, TIM KOLLER, JACK MURRIN, VALUATION 293-4 (4th ed. 2005) (calculating WACC using the CAPM model).

Therefore, in the levered DCF analysis, just as in a "standard" DCF analysis, Mr. Kuhn and his team valued the cash flows available for distribution on an annual basis (here, none), calculated a terminal value (sale value minus the net debt and preferred stock in 2012), and then discounted these values back to the present to determine the present value of the common equity.  (Id. ¶ 24.)  This analysis was a reliable modification of the DCF analysis as described by the Lenders that was precisely tailored to the facts at hand and, in the opinion of Mr. Kuhn and his team, gave noteholders a relevant and consistent basis upon which to weight the value of the recovery they would receive on a present value basis. (Id. ¶ 25.)  Accordingly, there is no basis on which to exclude Mr. Kuhn's Report and proffered testimony.

The cases on which the Lenders rely do not counsel a different result.  In Lippe v. Bairnco, for example, the testimony of the plaintiffs' first valuation expert was excluded as unreliable where the expert failed to conduct a DCF analysis and was unable to otherwise explain how he reached his conclusions. 288 B.R. 678.  Thus, when questioned as to his failure to conduct a DCF analysis, the expert responded, "I can't tell you.  I didn't try." 288 B.R. at 689.  When questioned about other aspects of his methodology, the expert

Decl. ¶ 22.) The WACC in Mr. Kuhn's modified DCF is thus solely comprised of the cost of equity.  (Id.)

24

replied variously that he had "no idea" why a certain multiple was chosen, did not know what his "thought process" was in not considering certain companies as comparable companies, and had "no idea" why he decreased a control premium by over 5%. Id. at 690-94 (internal quotations and citations omitted). Similarly, the testimony of the plaintiffs' second valuation expert was excluded where the "valuations, on their face, [made] no sense," the expert was unable to explain her use of particular growth rates or respond to questions about her methodology, and the expert repeatedly acknowledged that her valuation was wrong, that she needed to "reanalyze" it, and that she had "not done enough analysis." Id. at 695-97. The Lenders also cite In re Med Diversified, in which, as in Lippe, expert testimony was excluded where the expert in question "never determined that the DCF method was inappropriate as a valuation method under the circumstances," and indeed conceded the method was "appropriate," but nonetheless "did not use the DCF method and . . . failed to offer an adequate explanation why he did not do so." 334 B.R. at 99 (internal citations and quotations omitted). Finally, in 24/7 Records, Inc. v. Sony Music Entm't, Inc., another case on which the Lenders rely, expert testimony was excluded where one expert calculated an "intrinsic value" of the business being valued, based on certain factors such as the company's "financial solvency, successful exploitation of artists and music, industry notoriety, and relationship with [other companies]," but could not explain how he "translated" those factors "into dollar figures" and further conceded "that he did not ascribe independent values to any of these factors," and where the other expert similarly could not explain "how he valued [the factors he considered] nor how he assessed their relative significance, but rather "appear[ed] to rely on his instinct" in reaching a valuation. 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007). Unlike the experts in Lippe, In re Med Diversified, and

25

24/7, Mr. Kuhn has used a methodology, DCF, that Lenders concede is reliable, and has adequately explained his rationale for adjusting that methodology when he did so.

The Lenders do not contend that Mr. Kuhn's testimony is unreliable because his methodology is applied to insufficient facts or data—nor could they, as they rely on largely the same facts and data. Nor do the Lenders contend that Mr. Kuhn applied his methodology to the facts or data in an unreliable manner. The Lenders argue only that Mr. Kuhn's methodology itself is unreliable, and, as discussed above, that is simply not the case. In any event, "to the extent [Mr. Kuhn] departed from general valuation practices or adopted procedures subject to criticism," such criticisms go to the weight, not the admissibility, of the proffered testimony. Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 496 (2d Cir. 1995) ("The expert's training and background and the procedures he followed in arriving at a valuation presented the jury with the question of whether or not to accept the expert's opinion and what weight to give it.").

## C.      Mr. Kuhn's Report and Testimony Are Relevant to Understanding or Determining the Facts at Issue

Mr. Kuhn's report and testimony also satisfy Daubert's relevancy requirement—that the testimony assist the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or to determine a fact in issue, which is satisfied where the testimony "usurp[s] [n]either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," and the testimony pertains to matters within the witness's specialized scientific, technical, or specialized knowledge, and not to "lay matters which the jury is capable of understanding and deciding without the expert's help." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d at 173 (internal quotations and citations omitted). It is beyond

26

dispute that Mr. Kuhn's report and testimony satisfy <u>Daubert</u>'s relevancy requirement. Specifically, Mr. Kuhn's report and testimony include opinions on the enterprise value of the Debtors and the availability of replacement financing for the Debtors in November 2012, which are relevant issues in this proceeding.  Moreover, Mr. Kuhn's report and testimony include detailed opinions on valuation and financing, specifically within the television broadcasting industry, areas where an expert's specialized knowledge is helpful.

**II.**

**<u>MR. KUHN'S OPINIONS WERE NOT INFLUENCED BY A SUCCESS FEE</u>**

 The Lenders ignore the fact that success fees are common: "many retention agreements with investment bankers, financial advisors (and even counsel) contain such contingent fee arrangements. That does not, per se, disqualify such firm from testifying as an expert witness." <u>In re Zenith Elecs. Corp.</u>, 241 B.R. 92, 102 (Bankr. D. Del. 1999).  Moreover, Allen & Co.'s compensation was not a mere "success fee," but rather was for a substantial array of services: investment banking advice, financial analysis, operational restructuring, as well as valuation analysis.[13] Allen & Co. served as the Committee's financial advisor since its formation, long before it

---

[13]   The Lenders also allege that Allen & Co.'s success fee was increased "when Mr. Kuhn agreed to provide . . . expert testimony."  (Lenders' Brief at 2 n.2.)  This is just another example of demonstrably wrong personal attacks on the part of the Lenders.  The Lenders once again have mischaracterized the record and ignored testimony directly refuting their allegations.

was even contemplated that there might be expert testimony in a contested confirmation

hearing. ███████████████████████████████████████████████████

████████████████████████████████████████████     In fact, Mr.

Kuhn's reputation has never been challenged in litigation or any other official proceeding.

(See Kuhn Decl. ¶ 9.)

Moreover, the Lenders will have the opportunity to cross-examine Mr. Kuhn

at the Confirmation Hearing, where they will have ability to probe his alleged bias.  See

Norwest Financial, Inc. v. Fernandez, 86 F. Supp. 2d 212, 228 n 15 (S.D.N.Y. 2000) ("'An

expert witness's bias goes to the weight, not the admissibility, of the testimony, and should

be brought out on cross-examination.'") (quoting 4 WEINSTEIN'S FEDERAL EVIDENCE §

702.06[8], at 702-59 (2d ed.1999)); Equal Employment Opportunity Comm'n v. Morgan

Stanley, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004) (quoting Daubert, 509 U.S. at 596) (the

"rigors of '[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof,' which provide the 'traditional and appropriate means of

attacking shaky but admissible evidence'").

In sum, the Lenders' contention that Mr. Kuhn is biased is unfounded and

should have no effect on the admissibility of his testimony or expert report.

### Conclusion

For the foregoing reasons, the Committee respectfully submits that the

Lenders' motion to exclude the testimony and expert report of Tom Kuhn should be denied.


Dated:  New York, New York
January 11, 2010

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By:   /s/   Andrew J. Ehrlich
Andrew J. Ehrlich
Andrew N. Rosenberg
Jeffrey D. Saferstein
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Fax:  (212) 757-3890

*Attorneys for the Official Committee of Unsecured Debtors*