SONNENSCHEIN NATH & ROSENTHAL LLP
Peter D. Wolfson
Jo Christine Reed
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

*Counsel for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------- x
In re                                            :        Chapter 11
                                                 :
YOUNG BROADCASTING INC., et al.,                 :        Case No. 09-10645(AJG)
                                                 :
                          Debtors.¹              :
                                                 :        (Jointly Administered)
-------------------------------------------------------------- x
```

**[CORRECTED] DEBTORS' RESPONSE TO OBJECTION AND PRE-TRIAL BRIEF OF
WACHOVIA BANK, N.A., AGENT FOR SENIOR SECURED LENDERS
AND MEMORANDUM OF LAW IN SUPPORT OF THE AMENDED JOINT
PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES
BANKRUPTCY CODE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Young Broadcasting Inc. ("Young") and its direct and indirect subsidiaries, the debtors

and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

hereby submit their response (the "Debtors' Response") to the objection and pre-trial brief of

Wachovia Bank, N.A. (the "Objection"), agent for Senior Secured Lenders, and memorandum of

support of the Official Committee of Unsecured Creditors' (the "Creditors' Committee")

---

[1]      The Debtors in these cases are Young Broadcasting of Lansing, Inc., Young Broadcasting of Louisiana, Inc.; Young Broadcasting of Nashville, LLC; Young Broadcasting of Albany, Inc.; Young Broadcasting of Richmond, Inc.; Young Broadcasting of Knoxville, Inc.; Young Broadcasting of Green Bay, Inc.; Young Broadcasting of Davenport, Inc.; Young Broadcasting of Sioux Falls, Inc.; Young Broadcasting of Rapid City, Inc.; Young Broadcasting of San Francisco, Inc.; Young Broadcasting of Nashville, Inc.; Young Broadcasting of Los Angeles, Inc.; Young Broadcasting Shared Services, Inc.; Adam Young Inc.; WKRN, G.P.; WATE, G.P.; KLFY, L.P.; YBT, Inc.; YBK, Inc.; LAT, Inc.; Winnebago Television Corporation; Fidelity Television, Inc.; and Honey Bucket Films, Inc.; Young Broadcasting Capital Corp.; and Young Communications Inc.

Amended Joint Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code

(the "UCC Plan").  The Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

In August, the Debtors sought a second extension of their exclusivity periods to file and

solicit votes for a plan of reorganization.  The Official Committee of Unsecured Creditors

opposed the Debtors' motion arguing that it wanted to have an opportunity to file a competing

plan that would reinstate the Prepetition Lenders' debt and infuse fresh capital into the

reorganized company.  The Court sustained the Creditors Committee's objection, granting the

Debtors an extension of exclusivity, but carving out an exception for the Creditors' Committee to

file a reinstatement plan.  Consistent with the authority granted to it under this Court's order, the

Creditors' Committee ultimately filed such a reinstatement plan.  Following solicitation of votes

on the UCC Plan and being presented with analysis of the UCC Plan, the Debtors' Board of

Directors have determined that the UCC Plan provides a better recovery to all creditors and has

instructed the Debtors to support the UCC Plan and, in the event such plan is deemed

unconfirmable, to seek confirmation of the Debtors Plan.  Thus, the Debtors file this response in

support of the UCC Plan and to correct various misstatements made about the Debtors' Business

Plan.

The UCC Plan proposes to infuse over $45 million into the reorganized Young, to

reinstate the Credit Agreement, and thus give the Prepetition Lenders all that they are legally

entitled to -- the full benefit of their prepetition bargain.  Hoping to get out of that bargain, which

has favorable interest rates and terms for the Debtor, the  Prepetition Lenders have decided to

reject the UCC Plan and wage a war to defeat it.  Armed with no fact or law to support their

position, the Prepetition Lenders have opted to hurl misguided assertions of law and misleading

representations of fact in the hope of defeating the UCC Plan.  However, the law provides that

the Prepetition Lenders are only entitled to their prepetition bargain.  The fact is that the UCC

Plan proposes to give them that bargain.  The law requires that a plan have a likelihood of

succeeding.  The fact is that the Debtors' Business Plan establishes that such a likelihood exists.

The law requires, and fairness compels, this Court to chose the plan that affords the better

treatment to creditors.  The fact is that the UCC Plan does just that by providing a greater

distribution to a greater number of creditors.

Because the UCC Plan is predicated upon the Debtors' Business Plan, the Prepetition

Lenders try to spin a story, with no support, that the Debtors' Business Plan is unreliable and

therefore cannot support a finding that the UCC Plan is feasible.  Additionally, the Prepetition

Lenders assert that the voting creditors have expressed an "overwhelming preference for the

Debtors Plan."  Each of these arguments are without merit and the Prepetition Lenders'

objections should be denied and the UCC Plan confirmed.

<u>RESPONSE</u>

**A.      <u>The Debtors' Business Plan Is Both Reasonable and Reliable</u>**

The Prepetition Lenders go to great lengths to cast doubt on the Debtors' Business Plan.

However, aside from proffering misleading statements and unfounded conclusions, they offer no

support for their assertion.

The Prepetition Lenders assert that the Business Plan is unreliable because it is based

upon industry averages.  That is not true.  The Debtors employed a "bottom-up" process to

develop the Business Plan.  This process was driven by station managers and sales teams who

are intimately familiar with the specifics of their local markets.  The Debtors' revenues are

derived primarily from advertising sales.  As a leading station in the majority of their markets,

the Debtors are able to command a larger piece of the local advertising market.  Station

managers and regional sales teams are, therefore, in the best position to assess the trends in their

local markets and estimate advertising expenditures in their area.  Management requested

projections from the stations, compared them to and tested them against industry average

statistics and after analyzing this material and exercising their business judgment, set the revenue

projections for the Business Plan.

At trial, the Debtors will show that management's "bottom-up" approach has proven to

be both accurate and conservative.  Following the commencement of these chapter 11 cases,

management used a bottom-up approach to forecast revenues for the remainder of 2009.  The

Debtors 2009 ***actual*** results exceeded management's projections by approximately 4%.  (*See*

Declaration of Jo Christine Reed in of the Debtors' Response to Objection and Pre-Trial Brief of

Wachovia Bank, N.A., Agent for Senior Secured Lenders and Memorandum of Law in Support

of the Amended Joint Plan of Reorganization Under Chapter 11 of the United States Bankruptcy

Code of the Official Committee of Unsecured Creditors ("Reed Dec."), Exh. A, 2009 Final 2009

Pacing Report, *see also* Expert Report of Blackstone Advisory Partners, December 2009

("Blackstone Report") at p. 21, attached as Exhibit 1 to Declaration Daniel M. Perry, dated

December 16, 2009).[2]

The Prepetition Lenders also argue that the Business Plan projects a higher cash flow

growth rate than the Debtors' peers.  To the extent it does, it is because the Debtors have

aggressively exploited the restructuring opportunity that operating in chapter 11 provides thereby

achieving cost savings unattainable outside of bankruptcy.  As of the petition date, the Debtors'

largest expenses, aside from headcount related expenses, were syndicated programming and

ratings fees.  The Debtors will establish at trial that since February 2009, the Debtors have

significantly reduced their syndicate programming costs and have reduced ratings fees.  Every

---

[2]    Further, recent forecasts by leading industry research specialists support the Debtors' views, as set forth in their
projections, that the recent broadcast decline was in fact cyclical as opposed to secular, and that broadcasters
will enjoy moderate increases in advertising spending, particularly during political years.  (*See* Reed Dec., Exh.
B, MAGNA Global 2010 Advertising Forecast, December 2009).

dollar the Debtors have saved through the strategic use of the bankruptcy tools available to them is, effectively, a dollar towards future revenue and cash flow.  Better still, these costs will remain at or near current levels until 2013 because management has contractually locked in these lower rates.  None of the Debtors' peers are in chapter 11 and therefore cannot avail themselves of these same cost-cutting techniques.

The Prepetition Lenders also try to disparage the Debtors' cash flow growth rate by criticizing the Debtors' projected decline in corporate expenses, characterizing it as "aggressive." They assert that the Debtors' indicate a precipitous decline in corporate expense from $20.9 million in 2009 to only $4.8 million in 2010.  (Objection at p. 31).  However, that is blatantly incorrect.  The Debtors' actual projection is that corporate expense will drop from $7.9 million in 2009 to $4.8 million in 2010.  (Blackstone Report at pp. 17-18).  The vast majority of the reduction, which will occur immediately upon the effective date of a plan, will result from the elimination of restructuring expenses that the Debtors now bear operating in chapter 11, and because the company will no longer have the added costs associated with being a public company.

In a last ditch effort, the Prepetition Lenders paint a picture of doom and gloom with respect to the Debtors capital expenditure plan.  They allege that the more than $8 million per year the Debtors have budgeted to spend on capital expenditures is insufficient and/or a number picked out of thin air.  As proof of this assertion, the Prepetition Lenders assert that "the Debtors['] projected capital expenditure budget for 2008-2010 is well below almost all of its competitors, at approximately 3.3% of it revenues."  (Objection at p. 14; Blackstone Report, p. 24).  This figure is misleading.  The average for the Debtors' peer group is 4.4% of revenues, the Debtors historically spent 3.3% and will spend 4.3% under the new capital plan.

- 5 -

The Debtors will establish at trial that the Debtors' new capital plan adequately provides for the company's needs.  Management requested and reviewed capital spending requests from the stations, the information technology department and engineering staff.  In an exercise of business judgment management prioritized the requested capital expenses with an eye towards maintaining their lead positions and competitiveness in their respective markets and to increase operational efficiency.  The result is a capital plan that will generate additional costs-savings -- on top of that already achieved through the bankruptcy process, described above -- which are ***not*** incorporated into the Business Plan.  The new capital plan also provides for any capital expense emergencies that the Debtors may face by establishing a12.5% -- or $1 million -- annual reserve.

## B.    The Committee's Plan is Feasible

As explained above, the Debtors' Business Plan is reasonable, achievable and conservative.  All agree that there are sufficient funds to meet all of the obligations due upon the effective date, and to meet all of the reorganized company's obligations through maturity of the Credit Agreement about three years hence, November 2012.  While no one has a crystal ball, the company is confident that it will be able to refinance the balance due on the loan at that time, whether through new bank debt, high yield debt, equity or a combination thereof.  Further, with over $70 million of cash projected to be on the balance sheet in 2012, there is no doubt that the company will be more valuable at the time the bank debt matures than it is worth today coming out of one of the most difficult time the broadcast industry has ever faced.  This level of assurance is all that need be established to meet the feasibility standard.

"The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds."  *In re Worldcom,* 2003 WL 23861928, *58 (Oct. 31, 2003).  Moreover, "the feasibility standard is whether the plan offers a reasonable assurance of success" and "[s]uccess need not be guaranteed."  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).  Rather, all that is

required is that there be reasonable assurance of success. *In re Texaco, Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) (citing *In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986)); *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421-22 (S.D.N.Y. 2003) (in determining feasibility, the court only needs to know "is that the plan has a reasonable likelihood of success").

At trial, the Debtors will establish that the Business Plan provides the "reasonable likelihood of success" that the law requires.  Upon the effective date, there will be cash sufficient to satisfy administrative and other bankruptcy related expenses along with interest and amortization catch-up payments under the Credit Facility.  Additionally, the reorganized company will have sufficient cash to service its debt going forward, satisfy operating expenses and meet capital expenditure requirements.  (Young Broadcasting Inc. - Presentation to the Board of Directors, December 2009, at pp. 39 - 41, attached as Exhibit 3 to Declaration Daniel M. Perry, dated December 16, 2009).  The Prepetition Lenders do not and cannot provide any evidence that discredits the Debtors' projections.

Instead, they assert that a plan is "not feasible" where "a large obligation comes due in the short term and the plan proponent relies on dramatic short-term improvements in credit market conditions and the debtor's performance to prove feasibility."  (Objection at p. 29, fn. 16).  Of course, as evident from the Business Plan, the Debtor here is not relying upon dramatic short-term improvements in credit market conditions or its performance.  Nor is that assertion really a rule of law.  Upon examination none of the cases cited by the Prepetition Lenders for that proposition create or even insinuate such a rule.  In each case, the courts rejected the plans on feasibility grounds because the plan proponents were basing their plans' success on a "pot of gold at the end of the rainbow" theory, *In re Investor Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 706, 765 (Bankr. N.D. Fla. 1994) as opposed to "identifiable factors indicating the

likelihood of probable future performance." *In re Investment Company of the Southwest, Inc.*,

341 B.R. 298, 315 (B.A.P. 10th Cir. 2006).  For example, some of the cases involved plans

founded upon the plan proponent's mere hopes that the subject ***real estate*** would eventually sell

at a higher price.  *See, e.g., In re Smitty Inv. Group, LLC*, 2008 WL 2095523 (Bankr. D. Idaho

May 16, 2008); *In re Lakeside Global II, Ltd.*, 116 B.R. 499 (Bankr. S.D. Tex. 1989).  Other

cases involved plan proponents who offered absolutely no ***evidence*** for the projections.  *See, e.g.,*

*In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760 (Bankr. N.D. Fla. 1994); *In*

*re M & S Associates, Ltd.*, 138 B.R. 845 (Bankr. W.D. Tex. 1992); *In re Parke Imperial Canton,*

*Ltd.*, 1994 WL 842777 (Bankr. N.D. Ohio Nov. 14, 1994); *In re Stuart Motel, Inc.*, 8 B.R. 48

(Bankr. S.D. Fla. 1980); *In re 625 Corp.*, 228 B.R. 758 (Bankr. M.D. Fla. 1998).  These cases

have no import on and bear no relationship to the instant confirmation proceedings.

At trial, the Debtors will establish that the Business Plan is based upon the sound

business judgment of a proven management team, tested against and tempered by respected

industry reports.  Additionally, no less than four financial firms -- the Prepetition Lenders' two

financial advisors, the Creditors Committee's financial advisor and the Debtors' financial advisor

-- have vetted, reviewed and tested the Debtors' Business Plan.  None of them have determined it

to be unreasonable, highly speculative or lacking "identifiable factors indicating the likelihood of

probable future performance."

### C.    The Debtors Plan is Not Confirmable

The Court only needs to perform the 1129(c) balancing test upon finding that both the

UCC Plan and Debtors Plan are confirmable.  Here, if the Court determines that the UCC Plan is

confirmable, the Debtors Plan is not confirmable because it does not satisfy the cram down

requirements of the Bankruptcy Code.

1.    Two Classes Rejected the Debtors Plan

The holders of Class D Noteholder Claims and the holders of Class E General Unsecured Claims voted to reject the Debtors Plan.  Thus, under section 1129(b) of the Bankruptcy Code, the Debtors Plan may only be "crammed down" and confirmed over the dissenting vote of these impaired classes as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes.  11 U.S.C. § 1129(b).

2.    The Debtors' Cannot Satisfy the "Fair and Equitable" Provisions of 1129(b)(2)

It is axiomatic that "creditors cannot be elevated to a better position than their pre-petition legal entitlements." *JPMorgan Chase Bank, N.A. v. Charter Communs. Operating, LLC (In re Charter Communs.)*, 2009 Bankr. LEXIS 3609, *48 (Bankr. S.D.N.Y. Nov. 17, 2009). Thus the Bankruptcy Code provides that a chapter 11 plan of reorganization may, in appropriate circumstances treat certain obligations as unimpaired and reinstate the terms of a prepetition debt obligation.  11 U.S.C. 1123, 1124 and 1129(a)(1).  The UCC Plan provides for the reinstatement of the Prepetition Lenders' debt.  The excess -- the equity of the reorganized company -- will be distributed to the noteholders.  If this Court determines that the UCC Plan is confirmable, it will have also determined, as a matter of law, that the Prepetition Lenders are receiving all that they are legally entitled to -- the full benefit of their original bargain. *In re Gillette Assocs., Ltd.*, 101 B.R. 866, 875 (Bankr. N.D. Ohio 1989).  Thus, the Prepetition Lenders would not be entitled to any thing more and the excess should be distributed to others.

In a cram down, section 1129(b)(2) prohibits a senior class from receiving more than it is legally entitled. *See In re Granite Broadcasting Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. Del. 2003) ("a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its

claims."); *In re MCorp. Financial Inc.*, 137 B.R. 219, 235 (Bank. S.D. Tex. 1992) ("creditors must not be provided for more than in full").  If confirmed, the UCC Plan would establish that the Prepetition Lenders are receiving all that they are entitled to with the excess going to other claimants.  Thus, in a scenario, such as the Debtors Plan, where the Prepetition Lenders take everything, the Prepetition Lenders would capture that excess and thus receive more than they are legally entitled to in contravention of 1129(b)(2).  Accordingly, the confirmability of the UCC Plan establishes, by definition, the failure to meet the conditions for a cram down, and thus the non-confirmability of the Debtors' Plan.

Alternatively, the value indicated by a confirmable UCC Plan establishes the non-confirmability of the Debtors Plan because the UCC Plan provides a market test for the value of the reorganized company that indicates that there is excess value for distribution to others.  Specifically, the investors financing the UCC Plan had the information necessary to make an informed offer and the ready ability to pay the price.  Ultimately, they have committed to pumping $45.6 million into the reorganized debtor and have therefore set the value with their purses and established that there is value in excess of the debt.  "[T]here is no dispute that in many circumstances the best evidence of value is what a third party is willing to pay in an arm's length transaction…[A] third party offer typically trumps all other indication of value.  *In re Granite Broad. Corp.*, 369 B.R. at 140-143.  *See also Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship.*, 526 U.S. 434, 458 (1999) (leaving open possibility that market test could be established by a competing plan as well as an auction); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 432 (S.D.N.Y. 2007) (market tested when any party in interest files a competing plan); *In re G-1 Holdings, Inc.*, --- B.R. ---, No. 09-CV-05031, 2009 WL 3785953, at *40 (D.N.J. Nov. 12, 2009) (holding plan proposed by a non-debtor provided a market test of the reasonableness of the new value contribution from the old equity).

**D.** **The UCC Plan Clearly Provides Better Treatment to More Creditors**

Assuming the Court finds both the UCC Plan and the Debtors Plan confirmable, the Court will have to choose which plan to confirm. Section 1129(c) provides, in pertinent part: "the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). The parties do not dispute which 1129(c) factors apply; however, the Debtors submit that the relevant factors overwhelmingly favor the UCC Plan.

Under the Debtors Plan, noteholders get no recovery. Under the UCC Plan, the Prepetition Lenders get all that they are legally entitled to and the noteholders get a recovery in the form of equity in the reorganized company and the right to participate in the rights offering (which many noteholders have opted to do). The vast majority of unsecured creditors indicated an overwhelming preference for the UCC Plan.

The Prepetition Lenders attempt to cloud this fact by highlighting the voting results of the general unsecured (trade) class only, ignoring the hundreds of million of dollars worth of preferences in favor of the UCC Plan. Specifically, noteholders, holding nearly 84% of more than $300 million in notes, representing 87% in number, preferred the UCC Plan. The Prepetition Lenders' asks this Court to overlook those numbers to focus instead on the roughly 110 ballots, representing only $8,456,882,30 of claims to conclude that general unsecured creditors have an "overwhelming preference for the Debtors Plan." (Objection at p. 17). The Prepetition Lenders' approach is both misguided and misleading.

The general unsecured creditors will receive the exact same treatment under both plans. At least one court facing a similar scenario has found that the preference of creditors who will receive the same treatment under competing plans unpersuasive. *In re Asarco LLC*, 09-CV-177, 2009 U.S. Dist. LEXIS 121615, *65-66 (S.D. Tex. November 13, 2009). This Court should

- 11 -

similarly disregard the preference of the general unsecured creditors. This is particularly true here. When numerosity alone is considered, more than 60% of the voting general unsecured creditors preferred the UCC Plan. However, a single trade creditor, holding claims totaling $5,726,543, effectively skewed the outcome as its preference for the Debtors Plan dominated the $7,716,851 claims that indicated a preference. When that creditors' amount is excluded from the tally, the preferences in favor of the UCC Plan exceeds 50%.

The existence of one trade creditor with a particularly large claim has led the Prepetition Lenders to reach hypothetical conclusions about who trade creditors want to do business with going forward. The Prepetition Lenders' argument amounts to no more than rank speculation. The Prepetition Lenders cannot divine the thinking of an entire class of creditors from the vote of one creditor, particularly where a larger number of individual creditors overwhelmingly favored the UCC Plan.

### Conclusion

As demonstrated above, the UCC Plan is feasible and is superior to the Debtors Plan. The Prepetition Lenders' objections should be denied and, the Debtors' respectfully submit, that the UCC Plan should be confirmed.

Dated: January 13, 2009  
      New York, New York

Respectfully Submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

By:    */s/ Peter D. Wolfson*  
     Peter D. Wolfson  
     Jo Christine Reed  
     1221 Avenue of the Americas  
     New York, New York 10020  
     Telephone: (212) 768-6700  
     Facsimile: (212) 768-6800

*Counsel for the Debtors*  
*and Debtors in Possession*