UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| Young Broadcasting Inc., et al., | : | Case No. 09-10645 (AJG) |
| Debtors. | : | (Jointly Administered) |

-----------------------------------------------------------

## CONFIRMATION OPINION

APPEARANCES:

SONNENSCHEIN NATH & ROSENTHAL LLP
Counsel for the Debtors
New York, New York

By:     Peter D. Wolfson, Esq.
        Jo Christine Reed, Esq.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Counsel for the Official Committee of Unsecured Creditors
New York, New York

By:     Andrew J. Ehrlich, Esq.
        Andrew N. Rosenberg, Esq.

MILBANK, TWEED, HADLEY & McCLOY LLP
Counsel for Wachovia Bank, N.A., Agent for Senior Secured Lenders
New York, New York

By:     Linda Dakim-Grimm, Esq.
        Daniel M. Perry, Esq.
        Gregory A. Bray, Esq.
        Mark C. Scarsi, Esq.

ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUTPCY JUDGE


Before this Court are two proposed plans of reorganization.  The Official Committee of

Unsecured Creditors (the "Committee") of Young Broadcasting, Inc. ("YBI" or the "Debtor")

and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") move before this Court seeking confirmation of the Committee's Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated November 4, 2009 (the "Committee Plan") pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code"). In the event that the Court denies confirmation of the Committee Plan, the Debtors[1] move for confirmation of the joint plan of Young Broadcasting, Inc. and its subsidiaries under chapter 11 of the Bankruptcy Code (as the same may be subsequently amended or supplemented and including all exhibits and supplements thereto, the "Debtors Plan"). For the reasons set forth below, the Court denies confirmation of the Committee Plan and grants confirmation of the Debtors Plan.

**Background**

On February 13, 2009 (the "Commencement Date"), the Debtors filed before this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On September 16, 2009, Young Broadcasting Capital Corp. and Young Communications, Inc., two of the original Debtors' affiliates, each filed before this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Pursuant to the Orders dated February 17, 2009 and October 29, 2009, these cases were jointly administered.[2]

*The Debtors' Business*

---

[1] The Debtors in these cases are Young Broadcasting, Inc.; Young Broadcasting of Lansing, Inc.; Young Broadcasting of Louisiana, Inc.; Young Broadcasting of Nashville, LLC; Young Broadcasting of Albany, Inc.; Young Broadcasting of Richmond, Inc; Young Broadcasting of Knoxville, Inc.; Young Broadcasting of Green Bay, Inc.; Young Broadcasting of Davenport, Inc.; Young Broadcasting of Sioux Falls, Inc.; Young Broadcasting of Rapid City, Inc.; Young Broadcasting of San Francisco, Inc.; Young Broadcasting of Nashville, Inc.; Young Broadcasting of Los Angeles, Inc.; Young Broadcasting Shared Services, Inc.; Adam Young, Inc.; WKRN, G.P.; WATE, G.P.; KLFY, L.P.; YBT, Inc.; YBK, Inc.; LAT, Inc.; Winnebago Television Corporation; Fidelity Television, Inc.; and Honey Bucket Films, Inc.; Young Broadcasting Capital Corp.; and Young Communications, Inc.

[2] Since the Commencement Date, the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession ("DIP") pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

YBI, a Delaware corporation that is currently headquartered in New York, was founded in 1986 by Vincent Young ("Young") and his father, Adam Young. Thereafter, affiliated entities were formed and acquired. The Debtors own and operate ten television stations in geographically diverse markets[3] and a national television sales representation firm, Adam Young, Inc.[4]

YBI is the borrower under a Fourth Amended and Restated Credit Agreement, dated as of May 3, 2005 (as subsequently amended and supplemented, and together with related loan and security documents, the "Credit Agreement"), among YBI, the Lenders (the "Lenders") from time to time party thereto, Wachovia (as administrative agent, collateral agent and issuing bank), Lehman Commercial Paper Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated (as syndication agents), BNP Paribas (as documentation agent), and Wachovia Capital Markets, LLC, Lehman Brothers Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated (as joint lead arrangers and joint lead book-runners). The Credit Agreement originally provided for a $300 million term loan that matures in November 2012. Subsequent amendments increased the term loan to $350 million.[5] The YBI's obligations under the Credit Agreement are secured by a

---

[3] The stations are: Lansing, Michigan (WLNS – a CBS network affiliate); Green Bay, Wisconsin (WBAY – an ABC network affiliate); Lafayette, Louisiana (KLFY – a CBS network affiliate); Nashville, Tennessee (WKRN – an ABC network affiliate); Knoxville, Tennessee (WATE – an ABC network affiliate); Albany, New York (WTEN – an ABC network affiliate); Richmond, Virginia (WRIC – an ABC network affiliate); Davenport, Iowa (KWQC – an NBC network affiliate); Sioux Falls, South Dakota (KELO – a CBS network affiliate); and San Francisco, California (KRON – a MyNetworkTV network affiliate). The Debtors also operate satellite stations that rebroadcast programming from primary stations.

[4] The Debtors' television broadcasting stations reach 6% of the total U.S. television households and are ranked first in news broadcasting in a majority of their geographic markets. The Debtors employ approximately 1,107 employees nationwide and their primary customers are local, regional, and national advertisers. The broadcasting industry is cyclical. Revenue of the Debtors' business generally is higher during even-numbered election years due to spending by political candidates and supporters of ballot initiatives, with spending usually the highest in the fourth quarter. Revenue from political advertising spending is particularly higher during presidential election years (i.e., years divisible by four).

[5] Under the Credit Agreement, the secured obligation as amended bears a floating interest rate of LIBOR plus 2.5%. The Credit Agreement also requires that, so long as any amounts remain outstanding under Credit Agreement, the Debtor must maintain at least $10 million in cash reserve.

first priority security interest in and liens upon substantially all of the Debtors' assets.  As of the Commencement Date, the allowed amount of secured obligations owed to the Lenders was $338,451,923.85.[6]

On March 1, 2001, YBI completed a private offering of $500 million of 10% senior subordinated notes due 2001.  On December 23, 2003, YBI completed another private offering of $140 million of 8¾ % senior subordinated notes due 2014.  These two series of notes are collectively referred to as the "Senior Subordinated Notes" and have an aggregate face amount of $640 million.  The Senior Subordinated Notes are general unsecured obligations of the YBI, subordinated in right of payment to all senior debt, including all of the YBI's indebtedness under the Credit Agreement.  The Senior Subordinated Notes are guaranteed by each of the Debtors.  As of December 31, 2008, the principal amount outstanding under the Senior Subordinated Notes was approximately $484.3 million.

*Events Leading Up to the Debtors' Chapter 11 Filing*

During the years leading up to the Commencement Date, the Debtors were burdened with debt and suffered a decline in revenue as a result of the general decrease in advertising budgets in the current recession.  The Debtors also encountered increased competition from other television stations as well as alternate advertising vehicles such as newspapers, radio stations, magazines, cable networks, and internet portals.  In particular, the Debtors' largest station, KRON-TV ("KRON"), suffered severe cash flow losses.  The Debtors explored various options prior to filing Chapter 11, including cost savings initiatives, attempts to sell KRON, and discussions of out-of-court restructuring with the holders of the Senior Subordinated Notes (the "Noteholders").  These efforts were unsuccessful at solving the Debtors' dire financial problems.

---

[6] This amount consists of outstanding principal in the amount of $338,125,000, plus unpaid prepetition fees, costs, and expenses as of the Commencement Date.

In February 2009, the Debtors' board of directors appointed David Pauker of Goldin Associates, LLC as the Debtors' Chief Restructuring Officer ("CRO") to effect a recapitalization and deleveraging through a Chapter 11 plan or a section 363 sale.

*The Auction, the Credit Bid, and the Competing Plans*

When the cases were first filed, the Debtors pursued a dual track process, exploring a sale of substantially all of their assets while attempting to reach a consensual "stand alone" plan with their major constituents. At the time, the Debtors believed that a section 363 sale would best suit the Debtors' situation and maximize value for the estate. In April 2009, this Court approved the Debtors' bidding procedures for the sale of substantially all of their assets, and after an extensive marketing process, the Debtors received three qualified bids, all seeking to purchase substantially all of the Debtors' assets, and an expression of interest from a potential purchaser who had not participated in the sale process or conducted due diligence.[7] The Lenders were selected as the stalking horse bidder and offered to credit bid $200 million of their secured debt towards the purchase of the Debtors' assets and to cause the purchasing entity to assume all allowed administrative costs and cure claims, resulting in a bid value of approximately $219.9 million (the "Credit Bid").[8] After consultation with the Committee and the Lenders, the Debtors deemed the Credit Bid as the prevailing bid and the auction was canceled.[9]

---

[7] During the Debtors' marketing process, sixty-nine potential bidders were contacted, twenty-nine of which negotiated confidentiality agreements entitling them access to due diligence information. The potential purchaser, who set forth a bid of $215 million, did not qualify to participate in the auction because the bid was not accompanied by a deposit and it was subject to additional due diligence that the bidder estimated would take two to three weeks to complete.

[8] The other two qualified bids offered to purchase the assets for $120 million.

[9] The other two qualified bidders indicated that they would not raise their bids to the level of the Credit Bid, did not intend to attend the auction, and demanded prompt return of their deposits. Both the Lenders and the Committee declined to give more time to the non-qualified bidder to conduct due diligence. The Debtors' financial advisor believes that the bids at the auction accurately reflect the market perception that the then current value of the Debtors' assets was less than the Credit Bid.

By this time, however, the Debtors' business had improved and had produced sufficient cash flow to operate until at least the end of 2009. Consequently, this Court found that the emergency conditions required to authorize a sale of substantially all of the Debtors' assets outside the plan process were not satisfied and ruled that it would only consider approval of a sale as part of a plan. The Court then entered an order authorizing the Debtors to execute the Asset Purchase Agreement (the "APA") with the Lenders, subject to a further order confirming a plan of reorganization. Meanwhile, the Debtors began negotiating with the Committee to develop an alternative plan of reorganization.

Further, after the Court denied the Debtors' request to approve the sale, the Debtors moved to extend exclusivity, at which time the Committee objected and sought a lifting of exclusivity to file the Committee Plan.[10] The Debtors, with the consent of the Lenders, agreed to a lifting of exclusivity to permit the Committee to propose a plan, provided that the Committee Plan remained on the same timeline towards confirmation as the Debtors Plan. On August 12, 2009, this Court entered an order extending exclusivity with a carve-out to allow the Committee to file a competing plan. The Debtors filed the joint plan of the Debtor and its debtor subsidiaries on September 24, 2009, an amended joint plan on November 4, 2009, and their Disclosure Statement for that plan on October 9, 2009. On October 9, 2009, the Committee filed its Disclosure Statement Supplement. On November 5, 2009, the Court approved both the Committee's Disclosure Statement Supplement for the Committee Plan and the Debtors' Disclosure Statement for the Debtors Plan. On November 6, 2009, the Court entered an order approving solicitation and voting procedures (the "Solicitation Order"). According to the

---

[10] At this time, the Committee also committed to make a cash infusion of $38 million to fund the Committee Plan. That commitment was later increased to $45.6 million in order to provide an additional working capital cushion to the Company.

Solicitation Order, the Debtors would solicit votes for the Debtors Plan and the Committee Plan on a single ballot. Creditors entitled to vote would receive a single ballot. On the ballot, creditors could vote for or against either plan and, if voting in favor of both plans, indicate a preference for one plan over the other. In November 2009, pursuant to the Solicitation Order, the Solicitation Package was mailed to creditors.

In December 2009, after a presentation of both plans to the Debtors' board of directors, it decided, exercising its fiduciary duties and business judgment, that it preferred the Committee Plan over the Debtors Plan. As a result, it seeks confirmation of the Debtors Plan only if the Court does not confirm the Committee Plan.

*The Debtors Plan*

The Debtors Plan, (1) fully compensates allowed administrative expenses, allowed priority claims, and secured claims other than the Lenders' claims; (2) creates a new company, New Young Broadcasting Holding Co., Inc. ("NewCo"), which would receive all of the common stock of the Reorganized Debtors (the "Company"), and in which the Lenders would receive all of the equity interests in complete satisfaction of their secured claims totaling $338 million as of the Commencement Date; (3) provides general unsecured creditors with their pro rata share of $1 million in the aggregate; (4) provides equity warrants in NewCo to the Noteholders if they voted to accept the Debtors Plan; and (5) provides no distribution to holders of equity interests in the Debtors. The Debtors Plan completely deleverages the Debtors as both the Senior Subordinated Notes and the Lenders' claim under the Credit Agreement are discharged and extinguished.

*The Committee Plan*

The treatment of allowed administrative expenses, allowed priority claims, secured claims, and general unsecured claims are the same under the Committee Plan as they are under the Debtors Plan. Likewise, holders of equity interests will also receive no distribution.[11]

However, under the Committee Plan, all $338 million of the debt owed to the Lenders under the Credit Agreement as of the Commencement Date, including accrued post petition interest and principal amortization payments, will be reinstated.[12] If the Credit Agreement is reinstated under the Committee Plan, at the time of the loan's maturity in November 2012, assuming timely payment of interest and quarterly principal amortization payments, a principal balance of $325,000,000 (the "Debt") will become due. The Committee Plan further provides the Noteholders with a pro rata share of 10% of the Company's common stock and the opportunity to participate in a rights offering under which the Noteholders can purchase a pro rata share of $45.6 million of preferred stock plus 80% of the common stock in the Company. A Plan Support Agreement filed by certain backstop parties (the "Backstop Parties") in support of the Committee Plan provides for a cash investment in the amount of $45.6 million, which will pay all monetary defaults under the Credit Agreement, fund payments under the Committee Plan, and meet the working capital and general corporate needs of the Debtors. In addition, Young will receive all of the Class B shares of common stock of the Company, which converts to 10% of the Class A common stock upon full repayment of the Debt in November 2012.

*Balloting Results*

---

[11] In an effort to address certain change of control provisions in the Credit Agreement, the Committee Plan provides that Mr. Young will receive all of the Class B shares of common stock of the Company, which converts to 10% of the Class A common stock upon full repayment of the Debt. The Court will subsequently address whether this provision adequately addresses the change of control provisions.

[12] The Lenders' other rights under the Credit Agreement remain the same as required by sections 1123(d) and 1124 of the Bankruptcy Code.

On January 18, 2010, the Declaration of Jane Sullivan Regarding Voting on, and Tabulation of, Ballots Accepting and Rejecting (I) The Debtors' Joint Plan Under Chapter 11 of the Bankruptcy Code and (II) the Official Committee of Unsecured Creditors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ("Ballot Declaration"), containing balloting results, was filed.  Below are the balloting results for both plans:

| Vote on Debtors Plan | Amount Accepting (% of Amount Voted) | Amount Rejecting (% of Amount Voted) | Number Accepting (% of Amount Voted) | Number Rejecting (% of Amount Voted) |
|---|---|---|---|---|
| Lender Claims (Class B/Class 2) | $295,448,513.35 (95.21%) | $14,871,077.94 (4.79%) | 57 (81.43%) | 13 (18.57%) |
| Noteholder Claims (Class D/Class 6) | $197,281,000.00 (58.29%) | $141,163,000.00 (41.71%) | 26 (27.96%) | 67 (72.04%) |
| General Unsecured Claims (Class E/Class 7) | $7,499,225.45 (88.68%) | $957,656.85 (11.32%) | 33 (43.42%) | 43 (56.58%) |

| Vote on Committee Plan | Amount Accepting (% of Amount Voted) | Amount Rejecting (% of Amount Voted) | Number Accepting (% of Amount Voted) | Number Rejecting (% of Amount Voted) |
|---|---|---|---|---|
| Lender Claims (Class B/Class 2) | N/A (deemed accept) | N/A (deemed accept) | N/A (deemed accept) | N/A (deemed accept) |
| Noteholder Claims (Class D/Class 6) | $338,291,000.00 (99.95%) | $153,000.00 (0.05%) | 90 (96.77%) | 3 (3.23%) |
| General Unsecured Claims (Class E/Class 7) | $2,663,436.08 (31.49%) | $5,793,446.22 (68.51%) | 52 (68.42%) | 24 (31.58%) |

| Preference Election | Amount Preferring Debtors Plan (% of Amount Voted) | Amount Preferring Committee Plan (% of Amount Voted) | Number Preferring Debtors Plan (% of Amount Voted) | Number Preferring Committee Plan (% of Amount Voted) |
|---|---|---|---|---|
| Lender Claims (Class B/Class 2) | $222,808,122.34 (78.26%) | $61,908,799.41 (21.74%) | 22 (39.29%) | 34 (60.71%) |
| Noteholder Claims (Class D/Class 6)[13] | $58,123,000.00 (31.47%) | $126,551,000.00 (68.53%) | 8 (38.10%) | 13 (61.90%) |
| General Unsecured Claims (Class E/Class 7) | $918,422.90 (92.73%) | $72,018.52 (7.27%) | 6 (60.00%) | 4 (40.00%) |

*See JX-56, Ex. A.*

---

[13] These calculations only include the preference elections of those holders that voted to accept both plans.

On December 30, 2009, the Lenders filed a motion *in limine* (the "Daubert Motion") seeking an order from the Court to exclude (1) the expert report and testimony of Tom Kuhn ("Kuhn") of Allen & Company ("A&C") on the issues of the Company's ability to sell or refinance in November 2012, and (2) Kuhn's expert report and testimony on the Debtors' valuation. On January 11, 2010, the Committee filed an opposition to the Daubert Motion.

On January 19, 2010, a hearing (the "Confirmation Hearing") commenced on the issues of whether the Debtors Plan and the Committee Plan can be confirmed pursuant to Bankruptcy Rule 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code.[14] The Confirmation Hearing continued on January 20, 2010, January 21, 2010, and concluded on January 25, 2010. As instructed by the Court, the parties filed post-hearing briefs, proposed findings of fact and conclusions of law, and post-trial reply briefs. The record of these proceedings was closed as of February 16, 2010.[15]

## Discussion

---

[14] The parties also made oral arguments with respect to the Daubert Motion at the Confirmation Hearing on January 19, 2010.

[15] The Lenders filed an Evidentiary Objections and Motion to Strike numerous statements in Kuhn's Declaration on the basis that they violate Federal Rules of Civil Procedure 26(a)(2)(B) and 37(c)(1) as containing statements of purported fact and opinion that were not included in Kuhn's expert report. Courts have held that where an expert affidavit "'expound[ed] a wholly new and complex approach,'" as opposed to "'merely support[ing] an initial position,'" the expert's affidavit should be stricken. *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ 4001, 2004 U.S. Dist. LEXIS 2676, at *32 (S.D.N.Y. 2004)). However, where an expert's affidavit provides evidentiary details for an opinion expressed in his expert report, those portions of his or her affidavit can be considered. *Id.* Kuhn's statements in ¶¶ 3, 6, 10, 22, 25, 26, 27, 30, 32, 33, and 34 are not new opinions; they consist of details and explanations of statements he made in his expert report that are entirely consistent with and substantially similar to opinions expressed in his expert report. Thus, the Lenders' Evidentiary Objections and Motion to Strike with respect to ¶¶ 3, 6, 10, 22, 25, 26, 27, 30, 32, 33, and 34 are OVERRULED. Lenders' objection to ¶ 12 of Kuhn's Declaration is SUSTAINED because Kuhn cannot rely on the qualifications of his colleagues at A&C to buttress the reliability of his expert opinion. *See Chartwell Litig. Trust v. Addus Healthcare, Inc., (In re Med Diversified, Inc.),* 334 B.R. 89, 96 (Bankr. E.D.N.Y. 2005). To rule otherwise would deprive the Lenders of their ability to cross-examine witnesses who are not testifying before the Court. The Lenders' also object to ¶ 24 of Kuhn's Declaration that "Based on current closing prices, public company comparables are trading at 6.6x-9.2x average 2009/2010 BCF, excluding any control premium." The Lenders' objection to ¶ 24 is SUSTAINED because Kuhn was making a statement about current trading prices of public company comparables, information that he did not possess at the time he submitted his expert report. This statement constitutes new opinion and new information and is, therefore, excluded from the record.

*Reinstatement of the Credit Agreement*

The Lenders argue that the Committee Plan cannot be confirmed because it is premised upon an impermissible reinstatement of the Debt. In that regard, the Lenders contend that the Committee's proposed allocation of voting rights would trigger an immediate change of control default under the Credit Agreement. The Lenders further argue that because that default is not being cured, the loan cannot be reinstated pursuant to section 1124(2).

The Committee contends that its proposed plan, as structured, complies with the Credit Agreement in all respects, including the provision that no event triggering a change of control occur. Alternatively, the Committee argues that if the Court determines that the primary structure for selecting directors for the board as set forth in the Committee Plan, contravenes the Credit Agreement, the secondary proposed structure, set forth in a footnote in the Supplemental Disclosure Statement, conforms to the Lenders' interpretation of the terms of the Credit Agreement. The Committee maintains that the alternative board structure is a technical fix and would not require re-solicitation under Bankruptcy Code section 1125 or Bankruptcy Rule 3019 because it does not alter any economic interest as it is neither material nor adverse to the only class (i.e., Noteholders) that had previously accepted Plan.

With respect to the alternate proposed board structure, the Lenders argue that the description of that proposal in the footnote of the Supplemental Disclosure Statement provides insufficient information to determine whether Mr. Young would retain the requisite percentage of Voting Stock or otherwise conform to the requirements of the Credit Agreement. The Lenders further argue that, to the extent the Committee seeks to further supplement its description of the structure, such modification would constitute a material change in the Committee Plan

concerning the Backstop Parties' control of the board. Thus, it would require re-solicitation of the Committee Plan.

Of the provisions describing circumstances of default under the Credit Agreement, several describe the default that results from a transaction that precipitates a change of control. To avoid triggering the change of control provisions, section 6.01(j) of the Credit Agreement requires that Mr. Young, his immediate family members and certain persons controlled by Young (the "Affiliates" and together with Young and his immediate family members, the "Young group"), as well as members of management, have more than 40% of the Voting Stock by number of votes. Section 6.01(k)(i) of the Credit Agreement requires that if any person or group owns more than 30% of the total outstanding Voting Stock of the Debtors, then the Young group must own more than 30% or alternatively, the Young group must have the right or ability by voting power, contract, or otherwise to elect or designate for election a majority of the Debtors' board of directors. Section 6.01(k)(ii) requires that during any two-year period, those individuals who were directors at the beginning of such period constitute the majority of directors at the end of such period. To meet the "continuing" director requirement, it is sufficient if such director was elected (or was a shareholder-nominated director who was approved) by the majority of the directors or any earlier elected "continuing" director.

In the Credit Agreement, Voting Stock of a Person[16] is defined as the

Capital Stock[17] of such Person of the class or classes pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect the board of

---

[16] Person is defined in the Credit Agreement as any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization or government or any agency or political subdivision thereof. Credit Agreement § 1.01.
[17] Capital Stock of any Person is defined as any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) corporate stock or other equity participations, including partnership interests, whether general or limited, of such Person, including any preferred stock. Credit Agreement § 1.01.

directors, managers or trustee of such Person (irrespective of whether or not at the time stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

Credit Agreement, §1.01.

Under the Committee Plan, the board of directors is divided into two classes (A and B), and the Voting Stock to be issued is divided into two classes. There are a total of 5 million shares of New Common Stock in Class A and 500,000 shares of New Common Stock in Class B. The Class A stock represents 90% of the equity interests and the Class B stock represents 10% of the equity interests. Class A and Class B stockholders can vote for directors in both Class A and Class B in certain amounts. The Class A shareholders have a combined total of 105,000,000 director votes - with each of the 5 million shares entitled to 20 votes for Class A directors (100,000,000 votes) and 1 vote (5,000,000 votes) for class B directors. There are six Class A directors. There is only one Class B shareholder - Mr. Young, who can cast 500,500,000 director votes, as each of his 500,000 shares entitles him to 1000 votes (500,000,000 votes) for the Class B director and 1 vote (500,000 votes) for Class A directors.

The combined total of director votes for both Class A and B is 605,500,000 and Mr. Young can cast 500,500,000 of those votes. The Committee argues that this calculation gives Mr. Young over 82% of the vote, substantially in excess of the 40% required by the Credit Agreement. The Committee contends that the allocation of votes to Mr. Young technically complies with the requirement that he have at least 40% of the votes "by number of votes."

The Lenders argue that the change of control provisions in the Credit Agreement are intended to ensure that Mr. Young[18] maintain control of the Company. The Lenders contend that

---

[18] Technically, under the terms of the Credit Agreement it is the Young group and members of management that should maintain control of the Company, however, because of that group only Mr. Young receives stock under the Committee Plan, that structure effectively would require Mr. Young to maintain that control.

the Committee's manipulation of the votes allocated to the Voting Stock is an effort to circumvent the protections negotiated by the Lenders. The Lenders note that the Committee Plan clearly indicates that Mr. Young only has a 10% equity interest in the Company. Through the issuance of the Class B stock, owned exclusively by Mr. Young, he is allocated more than 40% of the "votes" for the directors. However, Mr. Young only has a nominal number of votes in connection with the election of the Class A directors and the overwhelming number of votes for the one Class B director. As such, Mr. Young cannot elect the 40% of the directors. Instead, he can only control the election of one of the seven directors, the one director - himself - elected as the Class B director.

The Lenders argue that the interpretation advanced by the Committee would eliminate the protections negotiated by the Lenders to ensure that Mr. Young exert control over the board of directors. The Lenders contend that an entity acquiring control of the Company could always manipulate the voting rights of shareholders to provide that certain shareholders had the requisite votes while actually exerting no control, thereby eliminating the protection intended by a change of control provision.

The Lenders also maintain that the allocation does not even technically comply with the requirements set forth in the Credit Agreement to avoid triggering a change of control because the Credit Agreement specifically defines Voting Stock as "Capital Stock . . . of the class or classes pursuant to which the holders thereof have *the general voting power under ordinary circumstances* to elect the board of directors." (emphasis added). The Lenders argue that, pursuant to the Committee Plan, only Class A stock has general voting power that may be exercised under ordinary circumstances to elect the board of directors. The Lenders maintain

that the capital stock granted to Mr. Young only grants him the right to elect himself as a member of the board of directors. Therefore, the Lenders contend that only the holders of Class A stock have the power to elect and control the board of directors. The Lenders note that "ordinary voting power" has been interpreted as the power to influence the composition of a board of directors. *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns*, 419 B.R. 221, 238, 248 (Bankr. S.D.N.Y. 2009) (noting "that the ordinary voting power for the management of [a company] is exercised by means of shareholder votes for directors who in turn govern the management").

Each side cites to *Charter* to support their position. The Committee contends that it is sufficient if a plan allows for a "formalistic retention of control" notwithstanding a shift in the economic ownership. *Charter*, 419 B.R. at 248. The Lenders argue that, apart from the shift in economic ownership, the voting structure set forth in the Committee Plan does not allow for the Young group and members of management to retain the 40% control required by the Credit Agreement. The Lenders note that the structure set forth in the *Charter* plan complied with the specific terms of the credit agreement at issue there, which required that the relevant group retain the ability to control 35% of the board of directors. In *Charter*, because the structure set forth in the plan allowed the relevant group to elect 4 of the 11 directors, that group retained the power to elect over 36% of the directors and the condition requiring at least 35% control was met. *Id*. In the Committee Plan, by contrast, despite allocating all of the votes for the Class B shares to Mr. Young, he can only control the election of one director in Class B out of a total of seven directors in the combined Class A and B board of directors. Thus, for the combined board of directors, Mr. Young has less than 15% control while the terms of the Credit Agreement require that he, his family, the Affiliates, and the members of management retain 40%.

The Lenders also argue that the Committee Plan violates section 6.01(k)(i) of the Credit Agreement by ceding control of over 30% of the Voting Stock of the Company to a group other than the Young group.  The Lenders note that, under the Committee Plan, the Backstop Parties will own more than 30% of the Voting Stock.  Capital Research Group is an investment advisor that administers certain funds and together with those funds it constitutes a "group" under Section 13(d) of the Securities and Exchange Act.of 1934, which is the relevant definition for group under the Credit Agreement.  The Lenders contend that Capital Research funds will control approximately 80% of the Voting Stock.  The Lenders argue that the Committee Plan will also replace the board of directors in violation of section 6.01(k)(ii) of the Credit Agreement as the Backstop Parties and the Committee would control the election of the board of directors.

In disputing that the Young group would cede control of the board of directors to another group, the Committee again premises its argument on its interpretation of how the votes are calculated by number.  Therefore, the Committee contends that because Mr. Young will have over 80% of the Voting Stock by number of votes, no other group can have more than 30%. With respect to the Lenders' argument concerning the replacement of the existing directors, the Committee notes that the terms of the Credit Agreement recognize that directors elected or approved by the current board of directors qualify towards the count of continuing directors.  The Committee maintains that the requirement of the Credit Agreement is met because, although the Backstop Parties and the Committee would designate most of the directors, the board of directors has the discretion to nominate the directors.

Pursuant to section 1124(2) of the Bankruptcy Code, even if a holder of a claim or interest is entitled to accelerated payments of its claim after the occurrence of a default, a plan of reorganization can provide (with certain exceptions) that the default be cured, 11 U.S.C.

16

§ 1124(2)(A), and for reinstatement of the pre-default maturity, 11 U.S.C. § 1124(2)(B).  This is all subject to the plan not altering any legal, equitable, or contractual rights to which the claim or interest is entitled.  11 U.S.C. § 1124(2)(E).[19]

Therefore, if the Debtors seek to reinstate the maturity of the loan, the Committee Plan must cure any defaults.  The Lenders argue that the new corporate governance provisions under the Committee Plan will result in a change of control that constitutes a default under the terms of the Credit Agreement that has not been cured, precluding the reinstatement of its loan.

---

[19] Section 1124 of the Bankruptcy Code provides as follows:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests, is impaired under a plan unless, with respect to each claim or interest of such class, the plan –

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default –

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law:

(D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Thus, it is necessary to analyze the change of control provisions of the Credit Agreement. Section 8.06 of the Credit Agreement provides that it is to be governed by, and construed, in accordance with the laws of the State of New York. Pursuant to New York law, in construing a contract, the plain meaning of the language controls. *City of Hartford v. Chase*, 942 F.2d 130, 134-35 (2d Cir. 1991) (quoting *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985). When interpreting the contract, the court's role is to "give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Assocs. Inc. v. ANC Holdings, Inc.*, 959 F.2d at 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt*, 477 N.E.2d 1099 (1985)). The terms employed are given their ordinarily-attributed meanings unless that procedure would lead to an absurd result. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) (citations omitted). Thus, "deference is to be paid to the plain meaning of the language ... and the normal usage of the terms selected." *City of Hartford*, 942 F.2d at 134 (omission in original) (quoting *Berger*, 771 F.2d at 1568. The Court's objective is to "give effect to the expressed intentions of the parties." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989). In addition, there is a presumption that every clause was intended to have an effect. *City of Hartford*, 942 F.2d at 135.

Where the language has a "definite and precise meaning," which cannot be misconstrued, and where a reasonable person could only draw one conclusion as to its meaning, the contract is unambiguous. *Hunt*, 889 F.2d at 1277. Under New York law, whether the language employed in a contract is ambiguous is a question of law. *Seiden Assocs.*, 959 F.2d at 429. The court determines whether a contract is ambiguous by reference to the contract alone. *See Goodheart Clothing Co. v. Laura Goodman Enters*, 962 F.2d 268, 272 (2d Cir. 1992). If it is determined that the contract is unambiguous, its meaning is determined from the contract without resorting

to any type of extrinsic evidence. *Goldman v. Comm'r of Internal Revenue*, 39 F.3d 402, 406 (2d Cir. 1994) (citing *Goodheart*, 962 F.2d at 268); *see also Hunt*, 889 F.2d at 1277 (citations omitted). "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990). Extrinsic evidence is not admissible to create an ambiguity in a written agreement that is complete and clear and unambiguous on its face. *W.W.W. Assocs.*, 77 N.Y.2d at 163, 565 N.Y.S.2d at 443, 566 N.E.2d at 642.

In determining whether a contract is ambiguous, a court examines the entire contract and the circumstances surrounding its implementation, including the relationship of the parties. *Kass v Kass*, 91 N.Y.2d 554, 566 696 N.E.2d 174, 180-81(1998). Moreover, words are not viewed in isolation but in context. *Id.* Thus, the terms of the contract are considered in the context of the obligation as a whole and the intention of the parties as shown by the words selected. *Id.* A court must discern "a sensible meaning" for the words selected. *Id.* (quoting *Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927)).

Therefore, although it has been observed that where a contract is unambiguous, a contract is formed, regardless of whether the parties had any "unexpressed intention," *Hunt*, 889 F.2d at 1277, nevertheless, "where the document makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]." *Kass*, 91 N.Y.2d at 567, 696 N.E.2d at 181 (alteration in original) (citations and internal quotations omitted).

Where the language in the contract is plain, it does "not become ambiguous merely because the parties urge different interpretations." *Hunt*, 889 F.2d at 1277. If the parties do not

agree on the interpretation of contract clauses, the court must decide if the contract clauses are ambiguous when analyzed in "the context of the entire integrated agreement and . . . cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *JA Apparel Corp. v. Abboud*, 568 F3d 390, 396-97 (2d Cir. 2009) (citations and internal quotations omitted).

The Credit Agreement defines Voting Stock as "general voting power under ordinary circumstances to elect the board of directors . . . ." As noted by the *Charter* court, "ordinary voting power for the management of [a company] is exercised by means of shareholder votes for directors who in turn govern the management." *Charter*, 419 B.R. at 238. As such, general voting power must involve the power to influence the composition of the board of directors. Thus, if section 6.01(j) of the Credit Agreement requires that the Young group, together with members of management have 40% of the Voting Stock, the plain meaning of the provision requires that this group have the power to influence 40% of the composition of the entire board. Under the proposed plan, Mr. Young only retains the power to control less than 15% of the entire board.

The Committee relies on *Charter* to argue that the voting can be manipulated to technically conform to the requirements of the agreement. However, in *Charter*, the credit agreement at issue required that the incumbent group have 35% of the voting power for the management of the relevant company in that case. In accordance with that contractual requirement, even after the "manipulation" of the voting stock, the group was entitled to appoint 4 of the 11 directors of its board and therefore retained more than 35% of the voting power for the management. Thus, the relevant Charter group retained the minimum amount of control to

comply with the credit agreement.  As previously noted, the Young group only retains the power to control less than 15% of the entire board.

Thus, the Charter case is distinguishable because that court was addressing the separation of economic interests from voting power.  Although the relevant control person in *Charter* only retained 10% of the economic interest, he continued to exert the requisite 35% general voting power.  In the instant matter, however, the proposed structure will utilize two classes to dilute the general voting power of the current control group.

The Committee asserts that the only general voting power that the Voting Stock must have is the "general voting power to elect the board of directors" and that the Young group has power to elect members of the board of directors.  The Committee contends that the structure complies with the 40% requirement because the Young group has 40% of the votes to elect directors even though those votes only allow them to elect one director in class B.  The Committee further asserts that there is no control requirement because where the election of a majority of the board of directors is required elsewhere in the Credit Agreement, the terms of the agreement expressly provide for it.  The Committee also argues that the *Charter* case noted that a credit agreement should be construed narrowly to enable a borrower to engage in permissible corporate engineering.

The Lenders, however, are not arguing that the Young group should be empowered to control a majority of the board of directors.  Rather, the Lenders maintain that, to comply with the Credit Agreement, the Young group and members of management have to control the election for 40% of the board of directors.  Further, the Lenders argue that such an interpretation would accord with the purpose of the change of control provisions.  According to the Lenders, those provisions are intended to protect the Lenders from a situation in which an outside party

takes over the Company and holds the ability to dividend-out value from the Company and otherwise squeeze out value for the short term gain, leaving the Lenders with security worth less than the outstanding debt. The Lenders argue that the Committee Plan will allow such conduct because it does not bar the issuance of dividends. According to the Lenders, the Backstop Parties are financial institutions with a short-term investment plan.

In interpreting the Credit Agreement, all of the provisions must be read as part of an integrated agreement and each clause must be intended to have some effect. In analyzing all of the change of control provisions, the Court finds that their purpose is to preclude another group from gaining more control than the Young group and current management. Section 6.01(j) requires that 40% of the voting power be retained by the Young group and management. Section 6.01(k)(i) of the Credit Agreement provides that if another group acquires more than 30% of the Voting Stock, then the Young group is required to own at least that percentage. In a public company, a block acquiring 30% of the voting power could influence management. Reading sections 6.01(j) and 6.01(k)(i) together, it is clear that the intent of the change of control provisions was to insure that no one person or group would have more control than the Young group and management. Thus, by allowing Mr. Young to control a large number of votes that have no power to influence the composition of the entire board of directors, the proposed structure would not accord with the purpose of precluding another group from gaining more control than the Young group. The purpose of section 6.01(j) of the Credit Agreement is to provide the Young group and members of management with power to influence the composition of the board of directors and the voting structure proposed by the Committee Plan would not accord with that purpose. By creating the different classes of directors and only allowing Mr.

Young to elect one director of the total of 7-directors board, the Committee's interpretation undermines the intent of those two sections.

As the proposed corporate governance structure precludes compliance with section 6.01 of the Credit Agreement, which requires retention of 40% of the Voting Power by the Young group and management, the loan cannot be reinstated under that structure.[20] The Committee, however, has also proposed an alternate structure that it maintains complies with the Lenders' interpretation of the change of control provisions.

The alternate board of directors structure proposed by the Committee provides for two classes of new common stock (A and B) but only one class of directors. The Class A New Common Stock still represents 90% of the equity of the Company and the Class B New Common Stock represents 10% of the equity of the Company. Mr. Young will hold all of the class B common stock. The new class A and Class B common stock would vote together as a single class in all matters (other than certain class specific matters), including the election of directors. The class A shares would have 60% (by number of votes) and the class B shares would have 40% (by number of votes).

There would be seven directors on the board of directors and Mr. Young would be one of the directors as the Company's Chief Executive Officer. All of the directors would be nominated by the existing board of directors. Five of the new directors on the board would be designated by the Backstop Parties holding a majority of the equity commitment, three of which would be independent. An additional independent board member would be approved by the Committee.

_____

[20] Inasmuch as the Court has determined that reinstatement of the loan is precluded because the Committee's main proposed board structure would violate section 6.01(j) of the Credit Agreement, the Court does not address the parties' dispute concerning the proper application of the two subsections of section 6.01(k).

The board will be staggered with three classes of directors. The first of which would include the CEO. Upon the Class B conversion described in the Plan or the expiration of the two year employment term set forth in Mr. Young's employment Agreement, whichever occurs later, at the director's option, Mr. Young would be required to resign. Thereafter, the first class would have a one-year term. The second class would include the Committee board nominee and have a two-year term. The third class would include the remaining board members and have a three year term. The Amended and Restate By-laws or Amended and Restated Certificate of Incorporation or any Stockholders' Agreement would provide that Permitted Holders (as defined in the Credit Agreement) would have the right or ability by voting power, contract, or otherwise to elect or designate for election a majority of the board of directors.

The Committee maintains that there would be no default of the change of control provisions of the Credit Agreement because Mr. Young would continue to hold record and beneficial title to at least 40% (by number of votes) of the Voting Stock. In addition, the Committee asserts that no person, other than Mr. Young, would beneficially own more than 30% (by number of votes) of the Voting Stock.

The Lenders contend that the disclosure statement did not provide sufficient information concerning the alternative board structure to determine whether it complies with the change of control provisions of the Credit Agreement. The Lenders also argue that even if the proposed structure does comply, it is a material change to the Committee Plan and would require re-solicitation.

Pursuant to section 1127(a) of the Bankruptcy Code, with certain limitations, a proponent of a plan may modify its plan prior to confirmation and such modified plan then becomes its proposed plan. However, the disclosure requirements of section 1125 must be met, 11 U.S.C.

§ 1127(c).  Moreover, Federal Rule of Bankruptcy Procedure 3019 provides, in relevant part that in a chapter 11 case,

> after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing . . . that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

The Lenders argue that the proposed alternate structure would be a material change in the Committee Plan as it pertains to the Backstop Parties' control of the board.

The Committee argues that its proposal to implement the alternate plan structure complies with the disclosure requirements of 1125 of the Bankruptcy Code because it was described in a footnote in the Supplement to the Disclosure Statement.  The Committee further argues that the proposal is not a modification to the proposed Committee Plan but that even if it is deemed a modification, it does not require re-solicitation under either Bankruptcy Code section 1125 or Federal Rule of Bankruptcy Procedure 3019 because it is a technical fix that does not alter any economic interest and, therefore, is not material or adverse to the Noteholder class, which was the only class that accepted the Committee's proposed Plan.

The description of the alternate board structure is contained in a footnote to the Supplemental Disclosure Statement, dated November 9, 2009.  The information contained in that footnote is as follows:

> Alternatively, the board of directors of the Reorganized Company may consist of seven (7) board members (one of whom would be Vincent Young as the Reorganized Company's Chief Executive Officer). Five (5) members of the New Board shall be designated by the existing board, subject to the approval of the Backstop Parties. At least three of these board members would be independent, and one (1) member of the New Board would be independent and approved by the Creditors' Committee.  The organizational documents will provide for a staggered board under §141(d) of the Delaware General Corporation Law whereby there

will be three classes of directors. The first class would include the Chief
Executive Officer and have a one year term; the second class would include the
Creditors' Committee board nominee and have a two year term; and the third
class would include the five remaining board members and have a three year term.

This description does not provide sufficient information to determine if it complies with
the change of control provisions of the Credit Agreement. For example, there is no indication
whether the Young group and management get 40% of the Voting Stock or whether the Young
group would have more than any other person or group that might acquire 30% of the Voting
Stock. Nor does the Committee provide enough information concerning the proposed
amendment to the By-laws and Certificate of Incorporation and requirement that any
Stockholder's Agreements would provide that Permitted Holders (as defined in the Credit
Agreement) would have the right or ability by voting power, contract, or otherwise to elect or
designate for election a majority of the board of directors.

The proposed modification is a modification to the corporate governance of the
Company. Under the Committee Plan, in addition to the rights afforded to certain of the
Noteholders to participate in the Rights Offering, the Noteholders will receive 10% of the Class
A New Common Stock. Thus, all of the Noteholders will be stockholders and the provisions
concerning corporate governance will impact the voting rights of the stock that they receive
under the Committee's Plan. As such, it is a material modification. *See In re Am Solar King
Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (noting that a plan modification is material if a
creditor would be motivated to reconsider its prior acceptance if it knew of it, even if the creditor
did not ultimately alter its acceptance). A material modification requires sufficient disclosure to
comply with section 1125 of the Bankruptcy Code. Therefore, the material modification to the
corporate governance requires re-solicitation. Moreover, the Committee has not indicated that

the Noteholder class has accepted the modification to the plan in writing, as permitted by Federal Rule of Bankruptcy Procedure 3019.

Under other circumstances, the Court might have allowed the Committee to re-solicit and more fully describe the suggested alternative proposed board structure. In addition to providing the required disclosure, permitting the Committee to elaborate concerning the proposed structure would have provided a basis upon which to determine whether that structure complied with the change of control provisions. In the context of these cases, however, and for the reasons that will be discussed in this Opinion, the Court does not reach the issue of whether the Committee should be afforded an opportunity to re-solicit its plan.

**Motion in Limine**

The Court now turns to the admissibility of Kuhn's expert report and testimony regarding the Company's ability to sell or refinance in November 2012 and his expert report and testimony regarding the Debtors' valuation.

*Legal Standard for Admissibility of Expert Testimony*

The admissibility of expert testimony is analyzed under Rule 702, which as amended in 2000, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> FED. R. EVID. 702.

The proponent of the expert testimony at issue must establish its admissibility by a preponderance of evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592, n. 10, (1993); *Lippe v. Bairnco, Corp.,* 288 B.R. 678, 685 (S.D.N.Y. 2003). The Supreme Court stated that trial courts are to serve as gatekeepers, which "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592-93; *United States v. Williams*, 506 F.3d 151, 160-61 (2d Cir. 2007). This "gatekeeping" obligation applies to scientific testimony as well as to "testimony based on 'technical' and 'other specialized knowledge.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238, (1999).

As courts have explained, Rule 702 requires a court to make three determinations: (1) whether a witness is qualified as an expert to testify as to a particular matter; (2) whether that opinion is based upon reliable data and methodology; and (3) whether the expert's testimony is relevant. *See Nimely v. City of New York,* 414 F.3d 381, 396-97 (2d Cir. 2005) (citation omitted); *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)("Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." (citing *In re Paoli R.R. Yard PCB Litig. (Paoli, II)*, 35 F.3d 717, 741-3 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190, 115 S. Ct. 1253, 131 L. Ed. 2d 123 (1995))).

*Qualification Standards*

First, the witness proffered to testify as to specialized knowledge must be qualified as an expert. *See Zaremba v. General Motors Corp.,* 360 F.3d 355, 360 (2d Cir. 2004)(noting that, where the witness lacked qualification, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Courts have liberally construed this requirement, holding that an expert's

28

qualification can be based on a broad range of knowledge, skill, experience, training, or education. *See United States v. Brown,* 776 F.2d 397, 400 (2d Cir. 1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the Rule"); *In re Paoli R. Yard PCB Litig. (Paoli I),* 916 F.2d 829, 855 (3d Cir. 1990)("[V]arious kinds of 'knowledge, skill, experience, training, or education' qualify an expert as such." (quoting FED. R. EVID. 702)); *In re Foxamax,* 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009); *TC Systems, Inc. v. Town of Colonie, N.Y.,* 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2003);

These bases for qualification are disjunctive such that practical experience may be crucial for one type of expert opinion while academic training may be essential for another. *See e.g., Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A.,* 785 F.2d 1154, 1159-60 (4th Cir. 1986) (an expert was not unqualified merely because she lacked practical experience where she was qualified on the basis of her education); *Berry v. City of Detroit,* 25 F.3d 1342, 1349-52 (6th Cir. 1994) (noting that an expert could testify to the principles on the basis of either formal training or experience alone, but rejecting the testimony of the instant witness for lacking both). Further, it is not required that an expert cite to publications that support his/her expert opinion. *Heller v. Shaw Indus.,* 167 F.3d 146,155 (3d Cir. 1999) (finding no requirement "that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness").

Essentially, a court is to consider the totality of a witness's qualifications in its analysis. *See Atl. Specialty Ins. Co. v. Gold Coast Devs., Inc.,* No. 05-CV-4863, 2008 U.S. Dist. LEXIS 28744, 2008 WL 974411, at *6 (E.D.N.Y. Apr. 8, 2008).

Disputes regarding matters such as an expert's credentials go to the weight, not admissibility, of an expert's testimony. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d

Cir. 1995); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC,* 467 F.3d 107, 134 ("To the extent that there are gaps or inconsistencies in [the expert]'s testimony, those issues 'go to the weight of the evidence, not to its admissibility.'" (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d, 179, 186 (2d Cir. 2001))).

*Kuhn's Qualifications*

The Lenders argue that Kuhn is not qualified because, *inter alia*, he has no M.B.A. or business education credentials, he is not an economist, he has no commercial banking experience, and he has published no articles on the subject matter of his expert testimony.

The Court finds that Kuhn is qualified to testify as an expert under the *Daubert* standard; his background and practical experience in media-related transactions and the broadcast television industry qualify as expertise through "experience, training, or education" under Rule 702. Specifically, Kuhn has been a Managing Director at A&C for the last nine year, advising media/entertainment clients in mergers and acquisitions, financings, asset sales, and restructurings[21] (Kuhn Decl. ¶¶ 2-3; Kuhn Dep. at 22). Prior to his employment at A&C, Kuhn was a Senior Vice President and General Counsel of USA Networks, Inc., where he worked on that company's financings, mergers and acquisitions, and general legal issues[22] (Kuhn Decl. ¶ 4). As a result of his experience at USA Networks, through actively participating in various aspects of the company's business, such as the budgeting and planning process (1/19/10 Hrg. Trans. at 230-31), Kuhn believes he has gained significance expertise in the economics and operations of television stations in general (Kuhn Dep. at 24).

---

[21] During his tenure at Allen & Company, Kuhn advised approximately 28 transactions, 18 of which were in the media and communications industry (Kuhn Decl. ¶ 3; Kuhn Dep. 22-23).
[22] During Kuhn's tenure at USA Networks, the company owned and operated 12 stations similar to the stations operated by the Debtors (JX-5 at 34).

The fact that Kuhn does not have an M.B.A. or related business credentials does not necessarily exclude him as an expert. Courts have held that academic training is not necessary if an expert's practical experience is sufficient to qualify him. *See Friendship Heights Assocs.,* 785 F.2d at 1159-60; *Berry,* 25 F.3d 1342. In any event, with respect to opinions regarding financing and acquisitions of media companies, practical experience is likely more relevant than an academic degree in business and finance. Similarly, the fact that Kuhn has not published articles on the subject matter of which he is proffered to testify is also insufficient as grounds to exclude him as an expert in light of his professional expertise due to his work in numerous financings, restructurings, and mergers and acquisition transactions.

Further, although Kuhn was never a commercial banker who made lending decisions, he has had significant experience on the borrower side, as an advisor for substantial borrowers (1/19/10 Hrg. Trans. at 222), which left him with experience and knowledge of issues relating to media financing deals. To the extent that the Lenders challenge Kuhn's conclusions because he lacks experience as a commercial lender, such challenges were addressed on cross-examination and affect the weight, rather than the admissibility, of his testimony.

Upon considering the totality of Kuhn's background and qualifications in the context of the underlying goals and requirements of Rule 702, the Court finds that Kuhn qualifies as an expert in this case.

*Reliability Standard*

In addition to establishing the qualification of a proffered expert witness, the Committee must also prove, by a preponderance of evidence, that the proffered expert testimony is both

relevant and reliable.[23]  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert*, 509 U.S. 579, 597 (1993) (citing *Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987)).  In *Daubert*, the Supreme Court abandoned the bright-line rule articulated in *Frye v. United States*[24] and replaced it with a standard that it deemed was more consistent with the liberal thrust of the Federal Rules.  *See Daubert*, 509 U.S. at 588; *see also Zuchowicz v. United States*, 140 F.3d 381, 386 n. 5 (2d Cir. 1998) (discussing the Supreme Court's rejection of the *Frye* standard).  In evaluating the reliability of an expert testimony, the Supreme Court has provided a list of nondispositive and non-exclusive factors for trial judges to consider.  Among others, trial courts may consider: (1) whether a theory or method can be, and has been tested; (2) whether the theory or method has been subjected to peer review and publication; (3) a method's known or potential rate of error and the existence of standards controlling the method's operation; and (4) whether a particular theory or method has gained general acceptance in the relevant scientific or professional community.[25]  *Daubert*, 509 U.S. at 593; *Kumho Tire*, 526 U.S. at 151; *Lippe,* 288 B.R. at 687-688; *In re Med Diversified Inc.*, 334 B.R. at 95 (citing *Daubert*, 509 U.S. at 593-94; *Kumho Tire*, 526 U.S. at 149).

---

[23]  "Rule 702 [ ] requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Daubert,* 509 U.S. 579 at 591.  The Lenders do not object to the admissibility of Kuhn's testimony on the ground that it is irrelevant.  Rather, the entire focus of their objection here is to reliability of the expert opinion.  Therefore, the Court limits its analysis to the reliability factor under Rule 702.

[24]  *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), predates Rule 702 and stands for the proposition that expert opinions based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific community.  *Daubert v. Merrell Dow Pharms., Inc.,* 951 F.2d at 1128, 1129-30 (1991), *vacated,* 509 U.S. 579 (1993).  The *Frye* court further stated that expert opinion based on methodology that "diverge[s] significantly from the procedures accepted by recognized authorities in the field cannot be shown to be 'generally accepted as a reliable technique.'"  *Daubert*, 951 F.2d at 1130 (quoting *United States v. Solomon*, 753 F.2d at 1522, 1526 (9th Cir. 1985)).

[25]  In *United States v. Downing*, 753 F.2d 1124 (3d Cir. 1985), the Third Circuit delineated additional factors that courts may consider with respect to the reliability of an expert testimony; these factors are, "[1]the degree to which the expert testifying is qualified, [2] the relationship of a technique to 'more established modes of scientific analysis,' and [3] the 'non-judicial uses to which the scientific technique are put.'"  *Paoli II*, 35 F.3d at 742 (citing *Downing*, 753 F.2d at 1238-89).

These factors are not meant to be a definitive checklist as the reliability inquiry under Rule 702 is a flexible one.  *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)("[T]he *Daubert* inquiry is fluid and will necessarily vary from case to case.").[26]

As a general matter, the standard for determining reliability of an expert testimony is not high: "The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.  Rather the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'" *In re TMI Litigation*, 193 F.3d 613, 665 (3d Cir. 1999), *amended on other grounds*, 199 F.3d 158 (2000), *cert. denied*, 530 U.S. 1225, 120 S. Ct. 2238, 147 L. Ed. 2d 266 (2000) (quoting *Kannankeril v. Terminix Int'l Inc.,* 128 F.3d 802, 806 (3d Cir. 1997)).  In its analysis, a court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the [court]'s belief as to the correctness of those conclusions."  *Amorgianos*, 303 F.3d at 266 (citing *Daubert,* 509 U.S. at 595).

On the other hand, expert testimony should be excluded if it is speculative or conjectural. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citing *In re Air Disaster at Lockerbie Scotland,* 37 F.3d 804, 824 (2d Cir. 1994), *cert. denied*, 513 U.S. 1126 (1995)); *see also Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983) (expert testimony based on speculative assumptions should not be admitted).  Likewise, assumptions that are "'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples to oranges comparison'" should also be excluded.  *Boucher,* 73 F.3d at 21 (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)).  "Nothing in either *Daubert* or the Federal Rules of Evidence

---

[26] Depending on the facts of each case, the *Daubert* factors may or may not be pertinent in evaluating the reliability of an expert's testimony.  *See Kumho Tire*, 526 U.S. at 150.

requires a district court to admit opinion evidence that connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); *see Heller,* 167 F.3d at 163 (3d Cir. 1999) ("[A] district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used."). Critically, *Daubert* requires that an expert illustrate the reliability of his methodology and analysis at every step. *Paoli II,* 35 F.3d at 745 ("[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible."). In sum, the court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Lippe*, 288 B.R. at 686 (quoting *Kumho Tire,* 526 U.S. at 152).

*Kuhn's Testimony Regarding Sale and Refinancing*

The Lenders argue that Kuhn's report and testimony regarding the Company's ability to consummate a sale or refinance must be excluded under *Daubert* because his opinion is "pure speculation" and assumes improvement of the credit market and overall economic environment.

Contrary to the Lenders' assertion that Kuhn relied on a layperson's pure speculation when making his financing opinion, Kuhn reviewed and analyzed industry data, applied them to the Debtors' circumstances, and arrived at a conclusion based on his background and experience in media transactions. In arriving at the conclusion about a sale in November 2012, Kuhn selected an exit multiple range in broadcast cash flow ("BCF") based on his analysis of historical precedent transactions and current public comparable companies (JX-5 at 13, 38-40). With respect to the likelihood of refinancing, Kuhn considered the leverage ratios of recent broadcast

transactions (JX-5 at 14). Significantly, even though the two arrived at different conclusions on the same issue, the data that Kuhn considered are not dissimilar to those considered by Peter Cohen ("Cohen"), the expert retained by the Lenders, in forming his expert opinion.

Further, although Kuhn does assume an improvement of the economy, contrary to the Lenders' contention, this assumption is not the sole basis of Kuhn's opinion regarding a potential sale and refinance transaction. Without ruling on the propriety of this assumption, the Court does not find so wide of an "analytical gap between the data and the opinion proffered" to exclude Kuhn's opinion on this issue. Since exclusion of expert testimony is the exception rather than the rule, the Court finds that any weakness in this analysis goes to the weight rather than the admissibility of his opinion. Exclusion at this point would be an unwarranted expansion of the Court's "gatekeeper" function since the reasonableness of assumptions made by experts can be tested through rigorous cross-examination and rebutted by contrary evidence at trial.

Therefore, the Court finds that Kuhn's proffered testimony regarding a sale or a refinance transaction in 2012 is admissible as it contains sufficient indicia of reliability and satisfies the *Daubert* standard.

*Kuhn's Testimony Regarding Valuation*

The Lenders assert that Kuhn's testimony regarding valuation of the Debtors is inadmissible because Kuhn's levered discount cash flow (the "Levered DCF") analysis is not a reliable method for purposes of valuation. It is undisputed that many courts have found discount cash flow ("DCF") to be the most commonly-used and accepted method of valuing an enterprise. *Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117, 1129 (D. Nev. 1998) (DCF is "in theory the single best technique to estimate the value of an economic asset") (quoting *Cede & Co. v. Technicolor, Inc.*, Civ. A. No. 7129, 1990 Del. Ch. LEXIS 259, 1990 WL 161084, *7 (Del. Ch.

1990), *aff'd in part, rev'd in part on other grounds*, 634 A.2d 345 (Del. 1993))); *see Lippe*, 288 B.R. at 689; *In re Exide Techs.*, 303 B.R. 48, 63-65 (Bankr. D. Del. 2003); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 103-05 (Bankr D. Del. 1999); *In re Cellular Info. Sys. Inc.*, 171 B.R. 926, 930-37 (Bankr. S.D.N.Y. 1994).  In fact, although Kuhn performed both comparable company analysis and precedent transaction analysis, he attributed little weight to those two methods and relied primarily on the Levered DCF analysis to determine a range of valuations for the Debtors.

The Lenders argue that Kuhn misleadingly labeled his analysis a Levered DCF without having undertaken the necessary steps in a DCF analysis, which renders his valuation opinion unreliable and inadmissible.  The Committee, on the other hand, contends that Kuhn utilized a method that is a reliable variation of the DCF analysis and simply made adjustments to fit the Debtors' circumstances.  The question before the Court is twofold: (1) whether Kuhn conducted an acceptable variant of DCF analysis, and hence a DCF analysis, and (2) if Kuhn did not conduct a DCF analysis, whether the Levered DCF is a reliable method under the *Daubert* standard.

A DCF analysis arrives at a value, or a range of values, for a company by performing the following steps: (1) determine the projected distributable cash flow of a company within a forecast period of time; (2) determine the company's terminal value by the end of a forecast period, by applying a selected metric of value, which is usually a company's EBITDA, to an appropriate multiple; (3) determine the present value of both free cash flow and terminal value of the company by applying an appropriate discount rate; (4) calculate the sum of the present value of cash flow and present value of terminal value, which represents the total enterprise value of the company.  *See In re Exide Techs.*, 303 B.R. at 63; *Steiner Corp.* 5 F. Supp. 2d at 1130; *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 367 (Bankr. D. Del. 2006).

Kuhn, on the other hand, performed the following steps in his analysis: (1) determined zero projected distributable cash flow because the Committee assumes all cash will be accumulated to pay off the Debt upon maturity in November 2012; (2) determined the approximate value of equity in 2012 and assumed a sale of the Company at that value; (3) subtracts net debt and preferred stock outstanding from the projected sale value and labeled it "terminal value;" and (4) applied a discount rate, that accounts for only the cost of equity, to determine the present value of the common equity.[27]

The Court finds that, although Kuhn uses DCF terminologies, there are practically no substantive similarities between the generally accepted DCF method and the Levered DCF method. Kuhn has made multiple novel assumptions that do not exist in the DCF analysis, such as an assumed sale of the company and a discount rate that accounts for the cost of equity instead of both the cost of debt and equity.[28] Kuhn's analysis altered another key component of the DCF method, which is the way a company's terminal value should be calculated. By assuming a sale in 2012, Kuhn completely failed to calculate the terminal value of the Company by applying appropriate metrics to multiples. It is a court's duty, as the gatekeeper, to ensure that an expert establishes the reliability of his methodology at every step. In light of the significant missteps and speculative assumptions in Kuhn's novel valuation approach, the Court finds that he did not conduct an appropriate DCF analysis.

---

[27] The discount rate is the cost of capital, which consists of calculating the company's cost of equity, cost of debt, and determine the weighted average of the costs of equity and debt, according to the company's capital structure or ratio of debt to equity. *See Steiner Corp.*, 5 F. Supp. 2d at 1133.

[28] The Committee argues that the weighted cost of debt is zero in the Levered DCF analysis because Kuhn had already accounted the cost of debt in the capital structure when determining the value of common equity in 2012. However, Kuhn failed to explain how he derived a discount rate range of 20%- 30% in his expert report. More importantly, the assumption he made is yet another example of Kuhn's impermissible modification of the generally accepted DCF method.

The inquiry does not end here, however, because Kuhn's valuation analysis may still be admissible if the Court determines that the Levered DCF contains sufficient indicia of reliability under *Daubert*. It does not. The Levered DCF fails to meet any of the *Daubert* factors: it is not a method that has been tested or relied upon by other experts, it had never been subjected to peer review or discussed in any publication, the potential rate of error is unknown, and there is no evidence that this method was ever employed, discussed, and certainly not generally accepted in any academic or professional community.

The Committee attempts to distinguish the facts of this case by contending that, unlike experts who could not offer any explanation as to why they failed to utilized the DCF method,[29] Kuhn clearly stated that the Levered DCF is more appropriate to the facts of this case because it accounts for the value of the substantially below-market terms of the reinstated debt under the Committee Plan. Kuhn's explanation on the issue does not give him free rein to employ a brand new valuation method that he conceded has never been used by any valuation expert in court. In evaluating the reliability of an expert testimony, trial courts must focus on the methodology rather than the ultimate conclusions derived from the method. Methodologies that cannot be evaluated warrant exclusion. *24/7 Records, Inc. v. Sony Music Entm't, Inc*., 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) (excluding testimony when expert witness based calculations on "intrinsic value" without justifying how that value had been translated into dollars, a methodology the court found could not be evaluated). Here, Kuhn's application of facts to an untested method does not reflect the prerequisite level of "intellectual rigor that characterizes the practice of an expert" in the field of media valuation. *Lippe*, 288 B.R. at 686. Conclusions derived from the

---

[29] *Chartwell Litig.*, 334 B.R. at 99 (the expert never determined that the DCF method was inappropriate as a valuation method and failed to explain why he did not use it in his valuation analysis); *Lippe,* 288 B.R. at 695-97 (expert could not explain his failure to conduct a DCF analysis or why he chose certain multiples).

Levered DCF, therefore, are not products of reliable principles and methodologies, and the Court cannot simply rely on Kuhn's *ipse dixit* assertions about the reliability of such an analysis. Thus, the portion of Kuhn's expert report and testimony regarding valuation is inadmissible under Rule 702.

For the foregoing reasons, the Daubert Motion is granted, in part, and denied, in part.

**Feasibility of the Committee Plan**

In considering confirmation of a plan of reorganization, a court has an affirmative obligation to scrutinize the plan and determine whether it is feasible. *See In re Johns-Manville Bros.*, 68 B.R. 618, 635 (Bankr. S.D.N.Y. 1986), *aff'd*, Bankr. 407 (S.D.N.Y. 1987), *aff'd sub nom, Kaneve v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989); *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J. 1980).

Confirmation under section 1129(a)(11) requires that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

*11 U.S.C. § 1129(a)(11).*

The proponent of a proposed plan bears the burden of proving essential elements of confirmation by a preponderance of the evidence. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II (In re Briscoe Enters., Ltd., II),* 994 F.2d 1160 (5th Cir. 1993), *cert. denied*, 510 U.S. 92, 126 L. Ed. 2d 451, 114 S. Ct. 550 (1993); *see also In re Danny Thomas Props. II Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir. 2001).

The feasibility standard as set forth in section 1129(a)(11) requires a court to determine whether "a plan is workable and has a reasonable likelihood of success." *In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 1401, at *168 (Bankr. S.D.N.Y. 2003); *In re The Leslie Fay Cos.,* 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997); *see also Johns-Manville,* 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success."); *In re Waern Bldg. Corp.*, 145 F.2d 584, 588 (7th Cir. 1944) ("[T]he word feasible does not connote absolute insurance of success but only reasonable assurance of success."); *In re Woodmere Investors, L.P.,* 178 B.R. 346, 361 (Bankr. S.D.N.Y. 1995); *In re 8315 Fourth Ave. Corp.,* 172 B.R. 725, 734 (Bankr. E.D.N.Y. 1994); *In re Whittaker Mem'l Hosp. Ass'n, Inc.*, 149 B.R. 812, 816 (Bankr. E.D. Va. 1993) ("It is not a blanket guarantee which is required, but rather a reasonable likelihood of success."). As the Second Circuit explained, the key inquiry is whether, as a practical matter, provisions specified in the proposed plan of reorganization can be done post confirmation. *In re Bergman,* 585 F.2d 1171, 1179 (2d Cir. 1978); *In re Greene,* 57 Bankr. 272, 277-78 (Bankr. S.D.N.Y. 1986).

The purpose of the feasibility test is "'to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation….[W]here the financial realities do not support the proposed plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied." *In re Investors Fla. Aggressive Growth Fund, Ltd.,* 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994) (quoting *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989)); *see In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) (a plan based on impractical or visionary expectations cannot be confirmed); *Stapleton v. Archer Daniels Midland Co. (In re Stapleton)*, 55 Bankr. 716, 721 (S.D. Ga. 1985).

Courts have found that "the feasibility test is firmly rooted in predictions based on objective fact." *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985). While future projections are indicative of feasibility of a proposed plan, such projections must not be speculative, conjectural, or unrealistic. *In re Inv. Co. of the Sw., Inc.,* 341 B.R. 298, 311 (10th Cir. B.A.P. 2006) (citing *In re Trevarrow Lanes, Inc.,* 183 B.R. 475, 482 (Bankr. E.D. Mich. 1995)). For instance, "[a] glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the plan is not feasible." *Trevarrow Lanes,* 183 B.R. at 482.

On the other hand, just as speculative prospects of success cannot sustain feasibility, the mere prospect of financial uncertainty cannot defeat feasibility. *See In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985). Success need not be guaranteed, so long as the plan has a "reasonable likelihood of success." *In re Adelphia Bus. Solutions, Inc.,* 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003) (citing *Johns-Manville,* 843 F.2d at 650 (the feasibility standard is whether a plan of reorganization offers a reasonable assurance of success); *In re Texaco Inc.,* 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) (only a reasonable assurance of commercial viability is required); *Prudential,* 58 B.R. at 862 ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11).")); *In re Briscoe Enters., Ltd. II,* 994 F.2d 1160, 1166 (5th Cir. 1993) ("Only a reasonable assurance of commercial viability is required.") (quoting *In re Lakeside Global II,* 116 B.R. at 507)).

In assessing the feasibility of a proposed plan, courts have identified the following probative factors:

1. the adequacy of the capital structure;
2. the earning power of the business;
3. economic conditions;

4. the ability of management;
5. the probability of the continuation of the same management; and
6. any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[30]

However, the foregoing factors are neither exhaustive nor exclusive[31] as the analysis is fact intensive and merits a case by case analysis. *In re Eddington Thread Mfg. Co.,* 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995).

The key issue in determining feasibility of the Committee Plan is whether it is reasonably probable that the Debtors will be able to pay the Debt when it matures in November 2012, either through (1) a sale of the Company, or (2) refinancing of the Debt.

*Tom Kuhn's Expert Opinion*

In support of the feasibility of the Committee Plan, Kuhn of A&C was retained to perform extensive analysis of the Debtors' business and financial projections to determine: (1) adequacy of the capital structure of the Company;[32] (2) recovery analysis for the Debtors' creditors; and (3) potential valuation of the Company upon a sale or refinancing (JX-5 at 3). A&C performed the foregoing analysis based on projections[33] (the "Projections") prepared and

---

[30] *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, at 762-63 (Bankr. S.D.N.Y. 1992) (citing, *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984); *Prudential,* 58 Bankr. at 862-63); *see also In re Clarkson,* 767 F.2d at 420; *Leslie Fay,* 207 B.R. at 789; *In re Sound Radio, Inc.*, 93 B.R. 849, 856 (Bankr. D.N.J. 1988), *aff'd in part,* 103 B.R. 521 (D.N.J. 1989), *aff'd,* 908 F.2d 964 (3d Cir. 1990); *In re Adamson Co.*, 42 B.R. 169, 174 (Bankr. E.D. Va. 1984).
[31] *Drexel,* 138 B.R. at 763 *Cf In re U.S. Truck Co.,* 800 F.2d 581, 589 (6th Cir. 1986).
[32] In evaluating the adequacy of the Company's capital structure, Kuhn examined the Company's working capital, prospective availability of credit, its ability to meet debt service, and Capex (defined herein) requirements.
[33] A&C made the following adjustments to the Projections: assuming an effective date of February 28, 2010 (one month later than assumed in the Projections); investment of $45.6 million in new preferred equity with a 15% PIK coupon; reinstatement of $337 million existing debt based on the terms of the Credit Agreement excluding $2.2 million of annual management fees paid to Gray Consulting under the Debtors Plan and including $1.6 million of deferred compensation paid to senior management in 2010 (Kuhn Decl. at 8).

provided by the Debtors (the "Base Case") and a more conservative scenario for projections (the "Stress Case")[34] that it created.

Kuhn concludes that, under the Committee Plan, the Company will have sufficient financial resources to cover its Capital Expenditure ("Capex") requirements, service financial obligations, and pay the balance due when the Debt matures in November 2012. Kuhn formed his opinion based on analysis under three methodologies: (1) comparable company analysis; (2) precedent transaction analysis; and (3) Levered DCF (*Id.* at 22). He stated he primarily relied on the Levered DCF when forming his expert opinion.[35]

For purposes of valuation, Kuhn testified that he did not determine the total enterprise value ("TEV") of the Debtors upon emergence from Chapter 11 because he did not consider it relevant to the issue of the Company's ability to service the Debt through a sale or refinancing in November 2012 (1/20 Hrg. Trans. at 14-15). Instead, Kuhn relied primarily on the Levered DCF method in determining the Company's value to equity in 2012. First, based on historical precedent transactions that ranged from 8.1x – 16.1x projected Broadcast Cash Flow ("BCF") and current public comparable companies trading at 6.4x – 8.8x average 2009/2010 BCF, not including a control premium which would be expected in a sale transaction, Kuhn selected an exit multiple range of 7x – 11x BCF for a sale of the Company in November of 2012 (JX-5 at

---

[34] The Stress Case assumes no growth in advertising revenue until 2011, except cyclical political advertising revenue, and lower base revenue in each subsequent year. It also assumes an additional $2 million in annual operating expenses (*Id.*).

[35] A&C did not attribute significant weight to the Comparable Company Analysis because it asserts that (1) the television broadcasting sector has been highly volatile over the past year and using a valuation range based on a specific point in time is not meaningful; (2) the comparable companies are highly levered such that implied trading values may reflect assumptions regarding the leverage in their capital structure as opposed to the underlying business fundamentals; and (3) unlike other industries, trading multiples in the broadcasting sector have historically been lower in a period of reduced cash flow, which could result in disproportionately depressed valuation in the current economy (*Id.* at 23). Similarly, A&C did not attribute significant weight to its Precedent Transactions Analysis because it asserts that (1) nearly all transactions occurred during or before 2007, where the economic environment was significantly different from the current economic environment, and (2) financing has become more difficult to arrange since mid-2008, resulting in less capital available in today's market (*Id.* at 25).

13).  Given this selected range, the implied enterprise value (or value to equity) of the Company is $401.1 - $597.3 million under the Base Case (*Id.* at 13) and $353.7 - $522.7 million under the Stress Case (*Id.* at 17).  Kuhn opines that, under both the Base Case and the Stress Case, the sale of the Company in 2012 would not result in a value lower than the net debt outstanding at that time (*Id.* at 13, 17).  Significantly, Kuhn assumes the existence of at least one third-party purchaser in November 2012 and further assumes that a third-party purchaser will offer to buy the Company at a price that reflects what he opines as the implied enterprise value of the Company in November 2012.[36]

Kuhn further opines that, in the event that the Company chooses not to sell, it will still be well-positioned to obtain refinancing in November 2012 because the net debt balance implies a debt to 2012/2013 EBITDA ratio of 5.4x and 6.9x under the Base Case and the Stress Case, respectively, which are both leverage ratios below the multiples at which historical broadcast transactions have been financed (*Id.* at 14, 17, and 40).  Critically, Kuhn derived the leverage ratios by using an implied projected net debt balance of $239.5 million instead of the Debt's book value of $325 million and selected the 2012/2013 EBITDA even though the loan matures and must be refinanced by November 2012.

*Peter Cohen's Expert Opinion*

In evaluating the feasibility of the Committee Plan, Cohen of Blackstone Advisory Partners ("Blackstone") was retained by the Lenders to opine on (1) the overall value of the Debtor under its business plan, including how much a potential buyer would pay for the Company, and (2) the likelihood that the Debt will be refinanced at maturity in November 2012.

---

[36] To determine the implied present value of the Debtors based on a presumed sale in November 2012, A&C applied a discount rate range of 20%-30% to the equity value of the Debtors upon sale (JX-5 at 28).

In valuing the Debtors, Cohen considered comparable company analysis, precedent transactions analysis, DCF, as well as the result of the recent auction process under which the Credit Bid ultimately prevailed. Cohen concluded that the TEV of the Debtors, based on projections of the Base Case, is $250 - $300 million upon emerging from Chapter 11, a value range that is less than the value of the Debt (JX-4 at 8). Using the same methodologies and under the Stress Case projections, Cohen concluded the Debtors' TEV is $200 - $250 million (*Id.*). Further, if the Credit Agreement were reinstated, the Company's total debt ratio upon exiting bankruptcy is 10.1x average 2009/2010 EBITDA, which significantly exceeds the current market value multiples for TEV of broadcasters (*Id.*).

With respect to meeting their obligations under the reinstated Credit Agreement through the prospect of a sale, Cohen opines that the assumption of a sale of the Company in 2012 based on 9.0x 2012/2013 BCF is unreasonable in light of (1) the bids generated in the previous auction for the Debtors, which were significantly below 9.0x BCF, and (2) current trading levels of comparable companies at approximately 7.0x 2009/2012 BCF, which is also significantly lower than the Company's 9.0x multiple (*Id.* at 9).

Cohen further opines that the Company will be unable to refinance the Debt under the Committee Plan when it matures in November 2012 because the credit markets have significantly contracted and the Company will remain excessively levered with 2010/2011 net debt to EBITDA of 6.9x, which is at the high end of current and precedent leverage multiples for total debt of a television broadcaster (*Id.* at 36). Significantly, Cohen concludes that a "look back" average 2010/2011 EBITDA is the more appropriate figure to potential refinancers than a

"look forward" average 2012/2013 EBITDA.[37]   Further, Cohen observes that since the reinstated Credit Agreement has limited restrictions on dividends, in the event that the Company's equity owners distribute dividends prior to November 2012, the debt leverage will be even higher by the time the Debt reaches maturity (*Id.*).

*The Debtors' Business Plan Projections*

Since both Kuhn's and Cohen's expert opinions are based on the Projections, the Court will first turn to the issue of whether the Projections are reasonable and reliable in light of the evidence presented.[38]

*Revenue Growth*

Although the Debtors' management alleges that the Projections are conservative and reflect slow, consistent growth, the Court disagrees and finds the Company's projected growth to be aggressive and unrealistic.  For example, the Debtors projected their EBITDA (earnings before interest, taxes, depreciation and amortization) to grow from $20.9 million in 2009 to $43.9 million in 2010 and their BCF to grow from $28.9 million in 2009 to $48.4 million in 2010.  It is undisputed that the Company's projected EBITDA and BCF are significantly higher than what they were historically under both the Base Case and the Stress Case:

Historic Performance:

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| EBITDA | $32.3 million | $25.4 million | $20.9 million |
| BCF | $45.1 million | $39.3 million | $28.9 million |

*See* JX-4 at 17-18.

---

[37] Cohen stated that the "look-back" average of 2010/2011 EBITDA is more appropriate because the Company will likely need to refinance the Debt by March 2012 to avoid receiving a "going concern" opinion from its auditors.

[38] On March 31, 2010 and April 6, 2010, two separate hearings were held before the Court in the Debtors' chapter 11 cases on issues unrelated to the confirmation of the competing plans.  At these two hearings, the Debtors' counsel made various statements regarding recent developments in the Debtors' business operations.  The Court did not consider those statements in making its findings in this Opinion as the Debtors did not move to re-open the record on confirmation that was closed as of February 16, 2010.  It appears that had the record been re-opened and had the Court considered the statements made by the Debtors at these two hearings, they would not have materially altered the Court's analysis or determination on the issue before the Court.

Base Case Projections:

|  | 2010 | 2011 | 2012 |
|---|---|---|---|
| EBITDA | $43.9 million | $35.1 million | $52.7 million |
| BCF | $48.4 million | $39.8 million | $57.4 million |

*See* JX-5 at 15.

Stress Case Projections:

|  | 2010 | 2011 | 2012 |
|---|---|---|---|
| EBITDA | $37.3 million | $28.7 million | $45.5 million |
| BCF | $42 million | $33.3 million | $50.2 million |

*See* JX-5 at 18.

Further, the Debtors' BCF compound annual growth rate ("CAGR") and EBITDA CAGR also seems aggressive compared to those of their public peers during 2008 through 2010, which means that the Company's earnings are projected to grow at a much higher rate than that of their industry competitors during this period:

BCF CAGR 2008-2010

| Young | Average w/out Young | Nexstar | Gray | Sinclair | LIN TV | Entravision | Belo |
|---|---|---|---|---|---|---|---|
| 12.8% | -4.6% | 1.0% | -1.1% | -3.7% | -5.8% | -7.2% | -10.9% |

*See* JX-4 at 23

EBITDA CAGR 2008-2010

| Young | Average w/out Young | Nexstar | Gray | Sinclair | LIN TV | Entravision | Belo |
|---|---|---|---|---|---|---|---|
| 33.8% | -6.7% | -3.7% | 3.7% | -5% | -5.3% | -7.5% | -22.3% |

*See* JX-4 at 23.

The Court is particularly troubled by the aggressive EBITDA and BCF projections for 2012, which are approximately twice the EBITDA and BCF Projections for 2008, the last presidential election year.[39]  Benchmark analysis of comparable companies beyond 2009-2010 have not been presented to show that the extent of revenue growth projected for the Company with respect to 2011 and 2012 is reasonable as compared to the rest of the TV broadcasting industry.  The Court is also skeptical about the Debtors' ability to accurately make business

---

[39] *See supra* note 4.

projections and competently execute them as the same management group has historically failed at both tasks.[40]

Despite projecting aggressive growth in earnings with no change in their asset base, the Debtors estimate corporate expenses to be approximately one-third of what they were in past years and at a level considerably lower than corporate expenses of their public peers:[41]

Corporate Expense

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Corporate Expense | $12.8 million | $13.9 million | $4.5 million |

See JX-3 at 11.

|  | 2010 | 2011 | 2012 |
|---|---|---|---|
| Corporate Expense | $4.5 million | $4.7 million | $4.8 million |

See JX-3 at 11.

Corporate Expense % of Revenue 2010

| Young | Average w/out Young | Belo | Nexstar | Entravision | LIN TV | Sinclair | Gray |
|---|---|---|---|---|---|---|---|
| 2.7% | 6.0% | 9.6% | 9.0% | 6.7% | 4.6% | 4.3% | 1.5% |

*See* JX-4 at 24.

The Debtors assert that the Projections are conservative because the Company's BCF and EBITDA margins are conservative compared to those of their public peers (Morgan Decl. at ¶ 22; JX-3 at 13).[42]  Yet, the benchmarking analysis with respect to BCF and EBITDA margins is limited to 2008-2010 and does not address the aggressive projections for 2011 and 2012.  Even with respect to BCF and EBITDA margins for 2009-2010, the Projections reflect an increase nearly double those of the Company's peers: (1) the Company's BCF margin is projected to

---

[40] The Debtors attempt to justify their inability to meet historic performance projections by representing that business plans prior to the Debtors' chapter 11 cases were used internally and revenue projections were designed to be aggressive in order to motivate the Debtors' sales team to exceed their goals (Morgan Decl. ¶ 13).  However, the Court finds that this assertion is inconsistent with the fact that management made public statements on multiple occasions regarding the Debtor's revenue projections. (1/19 Hrg. Trans. at 155-160).  Thus, the Court is not persuaded by the Debtors' explanation and finds that there is significant evidence showing the Debtors' historic failure to accurately make and execute revenue projections.

[41] Even accounting for cost savings that the Debtors have achieved in chapter 11, their corporate expenses projections for 2010 through 2012 still appear to be low.

[42] The Debtors' projections show estimated BCF margins of approximately 21.2% in 2009, 29.3% in 2010, compared to projected margins of over 31.8% in 2009 and 37.3% in 2010 of comparable companies (Morgan Dec. at ¶ 22; JX-3 at 13).

increase by 38.2% while comparable companies' BCF margins are projected to increase by 17.29%; (2) the Company's EBITDA margins are projected to increase by 45.35% while comparable companies' EBITDA margins are projected to increase by 23.1% (1/19 Hrg. Trans. at 116-17). Further, conservative BCF and EBITDA margins do not automatically lead to conservative overall projections because margins reflect a company's profitability and not its overall revenue growth. Any perceived benefits from a conservative approach to projected margins would be offset by the extremely aggressive approach to projected revenue growth. For the reasons discussed, the Court finds the Company's projected EBITDA and BCF, particularly for 2011 and 2012, to be aggressive and overly optimistic.[43]

*Capex*

The Court also finds that the Debtors provided for inadequate Capex to support the rate of growth reflected in the Projections. First, the Debtors have deferred Capex over the last several years (JX-4 at 24; 1/19 Hrg. Trans. at 136). In fact, the Debtors' Capex has been lower than the Capex of their public peers from 2004 through 2009 (JX-3 at 15). In particular, the Debtors' Vice President of Business Development and Operations Manager of various stations, Robert Peterson ("Peterson") testified that in 2009 management was very conservative in Capex budgeting and replaced only broken items and items that needed to be replaced to meet the company's FCC (Federal Communications Commission) requirements (1/20 Hrg. Trans. at 143-144), even though a number of the stations' equipment has reached the end of their useful lives (1/20 Hrg. Trans. at 147-149; Lender Ex. 50). In one of Peterson's emails to the Debtors' Chief

---

[43] Without a definitive plan to improve KRON, it also is unreasonable to project that this station would produce even modest profits upon plan confirmation. KRON's alleged improvement has been mixed and inconsistent at best. With respect to KRON's performance in 2009, Morgan testified that "During the summer, KRON was soft. KRON rebounded in September. It came back and started approaching its budget numbers. Its fourth quarter, it was a little under budget but it was coming back at the end…." (1/19 Hrg. Trans. at 179).

Financial Officer, Executive Vice President, and Secretary, James A. Morgan ("Morgan"), which discusses Capex, Peterson stated that "it was very clear that we were to only consider emergency needs so I no longer tried to develop a plan to implement a budget for 2009." (Lender Ex. 53).

Though the Debtors assert that the projections were created using a bottom-up process, the Court finds that, although the opinions of Peterson and station managers were solicited and considered, Capex budgets were principally generated by upper management and did not necessarily reflect the Company's Capex needs. For instance, Peterson submitted Capex plans on multiple occasions in 2009, but even items that he identified as "key elements" were not approved by upper management. In one of his emails, Peterson expressed his frustration and stated, "We have never actually implemented any of the multitude of capx (sic) plans that have been submitted. I assume the next one will just be more of the same." (Lenders Ex. 52; 1/20 Hrg. Trans. at 161-162). In another email dated March 26, 2009, Morgan clearly instructed Peterson to create a Capex plan that would fit within an $8 million per year budget, an amount management previously deemed appropriate (Lender Ex. 44).[44] When asked whether he had understood his task to create a plan that would fit within the eight million dollar model, Peterson testified that he assumed his task was to let Morgan know whether it is acceptable to create a Capex plan by spending eight million dollars a year. However, the Court does not find Peterson's representation on this point to be credible because his email response to Morgan and his answer given in deposition on this point are inconsistent with his testimony. The Court finds that Peterson did, in fact, interpret Morgan's email instructions to mean that Peterson should create a Capex plan that would fit within the eight million dollar model. (1/20 Hrg. Trans. at

---

[44] In the email, Morgan wrote "…Our model assumes $8mm of capex per year starting now, 2009, forward (escalating at 1.5% per year) I need a "capex plan" for each year from now through 2013…." (Lender Ex. 44).

155).[45]  Unsurprisingly, the budgets in Debtors' Five-Year Capital Plan were also generated by upper management (1/20 Hrg. Trans. at 162-164 (Peterson testified that the budgets in the "Debtors' Five Year Capital Plan" were produced by someone in the corporate office, and the first time he saw the document was shortly before his deposition after Thanksgiving 2009)).

Further, the Debtors also failed to create a Capex budget for its biggest station, KRON. The Capex Projections for KRON included a small amount in 2011 and none in 2012 (1/19 Hrg. Trans. 122; JX-21) because it assumed that KRON would enter a shared-services agreement with another station.  The Debtors' President, Debra McDermott ("McDermott"), testified that she has been exploring opportunities for KRON since March 2009 but no agreement has been signed to date (1/21 Hrg. Trans. at 52-53,121).  Alternatively, McDermott mentioned the possibility of selling the building in which KRON is currently located, yet management has not even assessed the value of the building since eighteen months ago (Morgan Dep. at 66-68; 1/21 Hrg. Trans. at 52).  Given the lack of a definitive and viable plan for KRON, the Debtors should have included a Capex budget for KRON in the Projections.

Considering the amount of the Debtors' deferred Capex over the last several years, the inadequate Capex plan for KRON,[46] and the Debtors' management's unpersuasive testimony that, despite compelling evidence to the contrary, KRON's Capex was generated via a bottom-up process, the Court finds the Debtors' $8 million per year Capex budget is insufficient to keep the

---

[45] "Q.  And your response to Bob is that you'll go ahead and do this, correct?
   A.  That is correct.
   Q.  And he says his model assumes eight million of capex. Were you – did you understand your task to create a plan that would fit into this model?
   A.  Yes."
   (Lenders Ex. 76 (Peterson Dep. at 45-46)).

[46] The Court finds that the Capex budget in the Debtors' business plan is insufficient on the basis of the amount of deferred Capex over the last several years alone, regardless of whether KRON eventually enters a shared-services agreement or is sold.

Company competitive upon confirmation. By underestimating the amount of Capex, the Debtors have, in effect, inflated the EBITDA of the Company as reflected in the Projections.

The key deficiency in the Debtors' business plan is that the projected rate of growth in revenue necessarily presumes either a substantial improvement in the industry, increased industry market share within 2.5 years of emerging from bankruptcy, or both.[47] Although the Debtors may have reduced costs, made operational improvements, and cured some of the problems that led them into bankruptcy in the first place, there is simply not enough evidence on the record to suggest that cost reduction alone would necessarily give the Company sufficient advantages over its competitors to achieve the Projections. Even assuming that the Company will emerge from Chapter 11 as a leaner and more efficient entity, without adequate Capex and identifiable and unique competitive advantages, it is unreasonable to project that the Company could achieve substantially higher rate of growth than those of its competitors in an industry that shows no sign of dramatic turnaround within the next 2.5 years.

For the foregoing reasons, the Court finds that the Company would be unable to successfully execute its business plan and achieve the plan's optimistic projections.

*Assumed Sale of the Company*

Pursuant to the Court's holding in the Daubert Motion, any conclusions reached by Kuhn based upon the Levered DCF is excluded. Thus, Kuhn's opinion that the Debtors would be able

---

[47] There is no evidence that the broadcast television ("TV") industry would significantly improve over the next 2.5 years. To the contrary, broadcast TV has been losing market shares to cable and satellite TV (JX-4 at 12) as well as other forms of media (*Id.* at 13). According to Veronis Suhler Stevenson's Communications Industry Forecast 2009-2013, advertising spending will not begin to turn around from its recent dip until 2011 and will show no growth until 2012 (JX-1 at 21) ("The ad market will dip another 1.0 percent in 2010 before posting a modest turnaround in 2011. Growth will pick up in 2012 due to the influx of political and Olympics advertising. Overall, ad spending will post a CAGR of 0.4 percent during the 2008-2013 period...continuing to be the slowest growing of the four communications sectors."). Moreover, local advertising, which is important to the Debtors' business, will not rebound as quickly as national advertising (*Id.* at 22). For purposes of this case, the Court is only concerned about the forecast up to November 2012; thus, the Court will not reach the question of whether the decline in the TV industry is cyclical or secular.

to satisfy the Debt upon maturity through an assumed sale in November 2012 is excluded from the record. However, even if that portion of Kuhn's testimony were not excluded, the Court finds that the assumed sale of the Company in November 2012 at a price that is equivalent to its future common equity value is not supported by any reasonable analysis.

First, Kuhn assumes that in approximately three years, "the overall economic environment will have improved to provide more liquidity and appetite for acquisitions in the broadcasting sector." (JX-5 at 29). Kuhn provided no explanation as to why this assumption is appropriate, particularly when he does not have specific experience and background in making predictions about the overall health of the economy.

More importantly, Kuhn assumes that a potential buyer would purchase the Company at a price that is equivalent to the Company's implied future common equity. On this point, the Court agrees with Cohen's opinion that a potential buyer would likely bid below the intrinsic value to achieve a desired return on equity invested. (JX-4 at 27). It is unrealistic to assume that a potential purchase price would include the full extent of the Company's intrinsic value, particularly when a balloon payment under the reinstated Credit Agreement is looming.[48]

In sum, the Court finds that the prospect of the Company's assumed sale at a price equivalent to its future common equity value in November 2012 is both unsubstantiated and purely speculative.

*Refinancing*[49]

---

[48] Cohen also opines that a potential buyer would not pay for the intrinsic value of the Company because buyers (1) may not have full confidence in the Company's management and their projections, and (2) would also account for future tax attributes. (JX-4 at 27).

[49] The Credit Agreement does not require establishing a reserve account to satisfy the Debt in November 2012. Although the Lenders are not entitled to the protection afforded by a reserve account, the fact that the Committee would not commit to establishing such an account in its Plan is relevant in determining the amount that needs to be refinanced when the Debt matures in November 2012.

Aside from an assumed sale, the Committee argues that the Company will be able to refinance the Debt before it comes due. The Committee makes this assertion because the Company's net debt to EBITDA multiples in 2011 and 2012 fall within the range of market value debt to EBITDA ratios of two comparable companies in the broadcasting industry, Sinclair Broadcast Group ("Sinclair") and Belo Corporation ("Belo"), both of which refinanced in late 2009.[50] Based on the Projections, the Company's net debt to EBITDA ratio in 2011 is 6.9x and its net debt to EBITDA ratio in 2012 is 5.6x, while Sinclair and Belo's total book debt to EBITDA are 6.3x and 6.5x, respectively.[51] (JX-4 at 40-41; 1/25/10 Hrg. Tr. at 69). However, the Committee's argument, specifically its use of the net debt balance instead of the Debt balance that comes due in November 2012, is premised on faulty assumptions.

Using the Company's net debt balance of $239.5 million under the Base Case instead of the principal balance of the debt in the amount of $325 million due in November 2012, yields a substantially lower debt to EBITDA ratio, which appears in the Committee's analysis. The net debt amount is the principal balance of the debt, $325 million, minus the Company's annual cash accumulated based on the Projections.[52] Thus, the issues are: (1) the reasonableness of the assumption that the Company could, in fact, accumulate the projected cash accumulated under the Debtors' business plan; and (2) the probability that the Company's equity owners will

---

[50] Given that the Debt matures in November 2012, the Company would need to begin negotiations with potential lenders in the spring of 2012, particularly when there's evidence that the Company would otherwise receive a going concern opinion from its auditors. Potential lenders will definitely rely on the "look back" average of the Company's 2010/2011 EBITDA and will likely consider the Company's projected EBITDA for 2012. Any informed lender would also account for the fact that 2012 is a presidential election year with higher-than-average expected earnings. In addition, EBITDA projections of 2013 must incorporate higher debt service cost, as new financing almost certainly will require higher interest payment and more restrictive covenants than those present in the Credit Agreement.

[51] The market value of debt to EBITDA of Sinclair and Belo are 6.2x and 5.9x, respectively (JX-4 at 40)

[52] Under the Base Case, the Company's cash accumulation is $87.4 million and the net debt balance is $239.5 million. Under the Stress Case, the Company's cash accumulation is $67.2 million and the net debt balance is $259.7.

preserve and contribute all of the accumulated cash upon the Debtors' exiting chapter 11 through November 2012 towards paying the Debt when it comes due so that the Company would only need to refinance the net debt balance.

The amount of cash accumulated impliedly assumes the soundness of the Projections and the Debtors' ability to execute their business plan. But as the Court found it unlikely that the Company could achieve its Projections, it is therefore unlikely that the purported amount of cash could be accumulated to achieve the net debt balance upon which the net debt to EBITDA ratio is premised.

Second, achieving the net debt balance also assumes if the Company accumulates cash, it will not distribute dividends to equity holders prior to November 2012. The Committee asserts that the new equity holders do not intend to distribute dividends and such payment would require board approval. However, under the Committee Plan, the Backstop Parties will have control over the board to obtain approval of such payments and it is alleged by the Lenders, and unrebutted by the Committee, that the Committee has refused to restrict the ability of new equity holders to distribute dividends pending satisfaction of the reinstated Credit Agreement.

Given the (1) uncertainty as to the amount of accumulated cash under the Projections, and (2) lack of legal restrictions preventing the equity holders from both distributing dividends and requiring the Company to set aside the cash accumulation for the November 2012 balloon payment, the Court finds that it is unreasonable for the Committee to assume that the Company will only need to refinance the net debt balance of $239.5 million rather than the Debt of $325 million. By implication, the Committee's theory that the Company will be able to refinance based on its net debt to EBITDA ratio, rather than the Debt to EBITDA ratio, is purely

speculative. Therefore, the Committee has not met its burden in establishing that the Company will obtain refinancing when the Debt comes due in November 2012.

In conclusion, the Court finds that the Committee Plan is not feasible under section 1129(a)(11) because the Committee has failed to establish that the Company could satisfy the Debt upon maturity in November 2012 through either a sale or by refinancing.[53]

*Cramdown Requirements*

The Lenders object to confirmation of the Committee Plan on the basis that it violates section 1129(b)(2)(B)(ii) because the Committee has failed to establish that the plan does not "discriminate unfairly" and is "fair and equitable." The Committee responded by arguing that the Lenders waived such claims by not asserting them before the court-imposed deadline and that they have no standing to assert such claims. The Court need not reach the issues of waiver and standing because it has an independent duty to ensure that the requirements of 11 U.S.C. §1129 are satisfied, even if no objections to confirmation have been made. *See In re Mid-State Raceway, Inc.*, No. 04-65745, 2006 Bankr. LEXIS 3950, *42 (Bankr. N.D.N.Y. 2006) (citing *In re Lernout & Hauspie Speech Prods., N.V.,* 301 B.R. 651, 656 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)); *In re Valley Park Group, Inc.*, 96 B.R. 16, 21-22 (Bankr. N.D.N.Y.

---

[53] By way of urging the Court to find its plan feasible, the Committee analogizes the facts of this case to *In re DBSD N. Am., Inc.,* 419, B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd* No. 09 Civ. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. March 24, 2010), where a bankruptcy court confirmed a reinstatement plan over an objecting secured creditor and found that the debtor would be able to satisfy a balloon payment in four years by obtaining further financing or collaborating with a strategic partner. The facts of *DBSD*, however, are distinguishable from the facts of this case. At the time of its confirmation hearing, *DBSD* had already obtained three strategic transactions proposals, one of which came from the objecting secured creditor. By contrast, the Debtors have offered no evidence of any potential buyer of the Company. Further, *DBSD* had significant competitive advantages over comparable companies in the industry, both in terms of its superior technology and capital structure. The Debtors, on the other hand, offered no evidence of competitive advantages over comparable TV broadcasting companies, such as Sinclair and Belo, that would justify their aggressive revenue growth projections over the next 2.5 years. In fact, both Sinclair and Belo are larger companies with substantially lower senior debt to leverage ratio than that of the Debtors. Most importantly, the *DBSD* court found that the company's total enterprise value to be 6 to 8.44 times the amount of the objector's secured debt; the Debtors' total enterprise value upon exiting bankruptcy is less than the amount of debt owed to the Lenders.

1989)); *In re Bolton*, 188 B.R. 913, 915 (Bankr. D. Vt. 1995) (exercising its independent duty by examining whether plan is saved by "new value" exception to the absolute priority rule).

Section 1129(a)(8) requires that each class of claims or interests under a proposed plan either accept the plan or be unimpaired under the plan. *11 U.S.C. § 1129(a)(8)*. Section 1129(b) allows for "cramdown" of a proposed plan even where the plan has not been accepted by all impaired classes of claims. 11 U.S.C. §1129(b)(1) provides:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

*11 U.S.C. §1129(b)(1)*.

*Unfair Discrimination*

Under 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment. *See Johns-Manville*, 68 B.R. at 636; *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 929-30 (Bankr. S.D.N.Y. 1982). Where, however, a reasonable basis for the disparate treatment of two classes of similarly situated creditors exists, there is no unfair discrimination. *See In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003).[54]

The Lenders contend that the Committee Plan unfairly discriminates against the general unsecured creditors, who are receiving $1 million in the aggregate while the Noteholders are

---

[54] Courts have considered the following factors to determine whether a plan discriminates unfairly: (1) whether there is a reasonable basis for discriminating; (2) whether the debtor can consummate the plan without discriminating; (3) whether the discrimination is proposed in good faith; and (4) the degree of discrimination is in direct proportion to its rationale. *WorldCom*, 2003 WL 23861928, at *59.

receiving 10% of the equity in the Company and the opportunity to participate in a rights offering under which the they can purchase a pro rata share of $45.6 million of preferred stock plus 80% of the common stock in the Company.  The Committee argues that, based on Kuhn's valuation opinion, the Noteholders projected recovery of 10% of the Company's equity is approximately 2% of their claims which is less than the 5% cash recovery to trade creditors. Further, even if the plan is discriminatory, there is a reasonable basis for disparate treatment: the Noteholders and trade creditors bargained for different forms of recovery.

There is insufficient evidence on the record on this issue because the Committee has neither provided any evidence regarding the value of the subscription rights received by the Noteholders under the Committee Plan nor any evidence that the Noteholders and trade creditors bargained for different forms of recovery.  Therefore, the Committee has failed to meet its burden in establishing by a preponderance of the evidence that the Committee Plan does not unfairly discriminate against the general unsecured creditors.

*Fair and Equitable*

Section 1129(b)(2)(B)(ii), known as the absolute priority rule, provides in relevant part:

> For the purpose of this subsection, the condition that a plan
> be fair and equitable with respect to a class includes the
> following requirements:
> (B) with respect to a class of unsecured claims -
> (ii) the holder of any claim or interest that is
> junior to the claims of such class will not
> receive or retain under the plan on account
> of such junior claim or interest any property

*11 U.S.C. 1129(b)(2)(B)(ii).*

In *Bank of America Trust and Savings Association v. 203 North LaSalle Street Partnership*, the Supreme Court examined § 1129(b)(2)(B)(ii) and determined that the best

reading of the phrase "on account of" indicated that "a causal relationship between holding the prior claim or interest and receiving or retaining property is what activates the absolute priority rule." *Bank of Am. Nat'l Trust and Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 451 (1999). In *Charter*, as referenced and discussed previously, the bankruptcy court confirmed a debtor's plan of reorganization, which included in part, a large financial settlement to an old equity holder of the company, in order to satisfy a change of control provision in a reinstated credit agreement. *In re Charter Commc'ns*, 419 B.R. at 230-32. The *Charter* court found that, despite the significant financial gain to the old equity holder, the plan did not violate the absolute priority rule because the settlement provided to the old equity holder was not "on account of" his former equity interest, but only due to his cooperation during and after the reorganization process. In particular, the old equity holder had agreed to maintain the requisite voting power within the proposed reinstated credit agreement, transfer his valuable interests in solvent affiliates of the debtor, and compromise certain contract claims. *Id.* at 269. Since old equity holders are not universally precluded from gaining consideration, absent some evidence of a causal relationship, the *Charter* court would not find the new property interest to be "on account of" the equity holder's junior interest. *Id.* (citing *In re PWS Holding, Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)); *see also Lasalle*, 526 U.S. at 453 (noting that in some cases, old equity may be best equipped to pilot a reorganized company and "work out an equity-for-value reorganization").

The Lenders argue that the Committee Plan violates the absolute priority rule by providing Young with new equity in the Company even though general unsecured creditors were not paid in full and had voted to reject the Committee Plan. The Committee asserts that the Committee Plan expressly provides for cancellation of all old equity interests, and Young is not

receiving any interest "on account of" his preexisting equity interest but rather than "on account of" his work going forward and the necessity of his cooperation so as to comply with the Credit Agreement.

The Court finds that the Committee has failed to meet its burden of establishing that its Plan fulfills the absolute priority rule. In *Charter,* the court found that the $375 million paid to old equity, although substantial in absolute dollar amount, was outweighed by the estimated $3 billion in benefits and savings to the debtor through reinstatement of a credit agreement, future tax savings, and proceeds of a rights offering under the proposed plan of reorganization. *In re Charter*, 419 B.R. 221 at 241 (noting that the value to the estate and its creditors outweighed old equity's consideration by a "high multiple"). Here, the Committee argues that the 10% economic interest distributed to Young is "on account of" the value added to the Debtors by way of reinstating the Credit Agreement with a below-market interest rate. However, the Committee has failed to quantify the value of the reinstated Credit Agreement to the Debtors compared to the 10% economic interest distributed to Young under the Committee Plan. As with the unfair discrimination standard, the Court finds that the Committee has failed to meet its burden of proof on the issue, as there is insufficient evidence on the record to evaluate whether the direct and indirect benefits to the Debtors of reinstating the Credit Agreement are of a greater value than the 10% interest distributed to Young under the Committee Plan.[55]

**Confirmation of the Debtors Plan**

---

[55] In light of the Court's holding regarding the Committee Plan's feasibility, the Court does not reach the issue of whether it would be appropriate to afford the Committee an opportunity to supplement the record to satisfy its burden with respect to the cramdown requirements under section 1129(b).

The Committee objects to the Debtors Plan and argues that it is unconfirmable because (1) the terms, conditions, and covenants under the $10 million exit facility (the "Exit Facility")[56] for the Company under the Debtors Plan are not sufficiently disclosed and (2) if the Committee Plan is confirmable, the Lenders will have received, as a matter of law, more than they are entitled to under the Debtors Plan in violation of the cramdown requirements of the Bankruptcy Code.

In response to the Committee's objection regarding the Exit Facility, the Lenders filed secured letters of intent from two providers for $20 million of chapter 11 exit financing with term sheets attached to the Declaration of Wachovia Bank, N.A. (the "Wachovia Declaration") on January 12, 2010. The Court finds that the Wachovia Declaration is sufficient for the purpose of disclosing of terms, conditions, and covenants under proposed Exit Facility.

Regarding the Committee's objection that the Lenders are receiving more value than their claim under the Debtors Plan in violation of the Bankruptcy Code, the Court finds it is undisputed that Debtors' current TEV is less than the amount of the Lenders' claim and any evidence of purported future valuation of the Company in November 2012 is purely speculative. Thus, the Lenders will receive less value than what they are owed under the Debtors Plan and the Committee's objection is overruled.

The Court finds that, with the exception of section 1129(a)(8), the Debtors Plan satisfies all applicable requirements of the Bankruptcy Code pursuant to section 1129(a). Further, the Court finds that the Debtors Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes; therefore, the cramdown requirements under section

---

[56] Under Article VI.C of the Debtors Plan, "Exit Facility" means "a $10 million revolving credit facility for Reorganized Young, secured by all assets of Reorganized Mr. Young and its subsidiaries (as guarantors), entered into on the Effective Date."

1129(b) are satisfied.  In sum, the Debtors Plan satisfies all applicable criteria of section 1129

and is confirmable.

Accordingly, for the foregoing reasons, the Committee's motion to confirm the

Committee Plan is DENIED.  The Debtors' motion to confirm the Debtors Plan is GRANTED.[57]

The Debtors are directed to settle an order consistent with this Opinion and submit a proposed

order confirming the Debtors Plan.


April 19, 2010

**s/Arthur J. Gonzalez**
ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[57] At the Confirmation Hearing, the Debtors requested the Court to consider confirmation of the Debtors Plan only if
the Court finds the Committee Plan unconfirmable.